# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### Southern Division – Detroit

LC TRADEMARKS, INC., *et al.*,

        Plaintiffs,

v.

VICTORIOUS FOODS, LLC, *et al.*,

        Defendants.

Case No. 19-cv-13782

Hon. Paul D. Borman
Mag. Judge Anthony P. Patti

## APPENDIX OF UNPUBLISHED AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS OR STAY

# INDEX

**Case** **Tab**

*Boucher v. Michigan*,
No. 17-13233, 2018 WL 10425905 (E.D. Mich. Nov. 28, 2018) .................A

*Carter v. Univ. of Texas at Dallas*,
No. 19-12381, 2019 WL 6768748 (E.D. Mich. Oct. 9, 2019) ......................B

*Brown v. City of Allen Park*,
No. CV 17-12403, 2017 WL 6539044 (E.D. Mich. Dec. 21, 2017) .............C

*Chellman-Shelton v. Glenn*, 197 F. Appx 392 (6th Cir. 2006)................................D

*Crestmark Bank v. Electrolux Home Prod., Inc.*, No. 14-CV-11595,
2015 WL 13541146 (E.D. Mich. June 29, 2015) ..........................................E

*Healthcare Co. Ltd. v. Upward Mobility, Inc.*,
784 F. Appx 390 (6th Cir. 2019) ..................................................................F

*Hoffman v. Kik*,
No. 18-CV-11908, 2019 WL 4127158 (E.D. Mich. Aug. 9, 2019) ..............G

*Indigenous Am. People Inhabiting Cty. of Wayne, Michigan v.*
*Wayne Cty. Mun. Corp.*,
No. CV 19-12579, 2019 WL 7560052 (E.D. Mich. Dec. 16, 2019) .............H

*Live Cryo, LLC v. CryoUSA Imp. & Sales, LLC*,
No. 17-CV-11888, 2017 WL 4098853 (E.D. Mich. Sept. 15, 2017) .............I

*McCausland v. Charter Twp. of Canton*,
No. 18-12409, 2019 WL 4746763 (E.D. Mich. Sept. 30, 2019)....................J

*Smith v. Queener*, No. 17-5770, 2018 WL 3344176 (6th Cir. Jan. 4, 2018)...........K

*State Farm Mut. Auto. Ins. Co. v. Universal Health Grp., Inc.*,
No. 14-CV-10266, 2014 WL 5427170 (E.D. Mich. Oct. 24, 2014) .............L

*State Farm Mut. Ins. Co. v. Elite Health Centers, Inc.*,
No. 16-13040, 2017 WL 877396 (E.D. Mich. Mar. 6, 2017) ......................M

*Watkins v. Healy*,
No. 17-CV-13940, 2018 WL 1471479 (E.D. Mich. Mar. 26, 2018) ............N

# TAB A

2018 WL 10425905
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Ronald E. BOUCHER and Bradley Geller, Plaintiffs,
v.
State of MICHIGAN, William Schuette,
Stephen J. Markman, Nick Lyon, Shelly
Edgerton, Michigan Probate Courts, Public
Adminstrators, St. Clair County, Washtenaw
Counties, and All Counties, Defendants,
and
United States of America, Interested party.

Case Number 17-13233
|
Signed 11/28/2018

**Attorneys and Law Firms**

Bradley Geller, Ann Arbor, MI, pro se.

David Andrew Porter, Patrick Stephen Myers, Michigan Attorney General's Office, Lansing, MI, for Defendants Michigan, State of, Dana Nessel, Bridget M. McCormack, Robert Gordon, Orlean Hawks.

Todd J. Shoudy, Fletcher, Fealko, Port Huron, MI, for Defendants County of St. Clair, St. Clair County Public Guardian, St. Clair County Probate Court.

Stefani A. Carter, Ypsilanti, MI, for Defendant County of Washtenaw.

Lindsey A. Peck, Theresa M. Asoklis, Collins Einhorn Farrell PC, Southfield, MI, for Defendants Heidi C. Aull, Jennifer Carney, Thomas B. Fraser, George Heitmanis, Alan A. May, John B. Munger, Walter Sakowski, John Yun.

**<u>ORDER DISMISSING AS MOOT DEFENDANT'S
MOTION TO DISMISS AND VACATING
REPORT AND RECOMMENDATION</u>**

DAVID M. LAWSON, United States District Judge

**\*1** After the Court unsealed this *qui tam* case, defendant State of Michigan filed a motion to dismiss in lieu of an answer. On October 26, 2018, Magistrate Judge David R. Grand filed a report recommending that the State of Michigan's motion to dismiss the complaint be granted. However, the plaintiff filed an amended complaint, which was not docketed properly. The Court deemed the amended complaint filed as of September 28, 2018, rendering it timely filed as an amendment without leave of court. *See* ECF No. 19; Fed. R. Civ. P. 15(a)(1)(B). The amended complaint mooted Michigan's motion to dismiss.

The defendants have not responded to the amended complaint within the time required by Rule 12(a)(1)(A)(i). However, the parties have stipulated to enlarge the response time. *See* ECF No. 26.

Accordingly, it is **ORDERED** that defendant State of Michigan's motion to dismiss (ECF No 10) is **DISMISSED AS MOOT**.

It is further **ORDERED** that the report and recommendation issued on October 26, 2018 (ECF No. 18) is **VACATED**.

It is further **ORDERED** that the defendants who have been served with a summons and amended complaint must file an answer or otherwise respond **on or before January 19, 2019**.

It is further **ORDERED** that Magistrate Judge David R. Grand shall conduct further pretrial proceedings under the previous order of reference. *See* ECF No. 11.

**All Citations**

Slip Copy, 2018 WL 10425905

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works.   1

# TAB B

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.348 Filed 03/18/20 Page 6 of 90
Carter v. University of Texas at Dallas, Slip Copy (2019)
2019 WL 6768748

2019 WL 6768748
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Geaniece D. CARTER, Plaintiff,

v.

UNIVERSITY OF TEXAS AT
DALLAS, et al., Defendants.

No. 19-12381
|
Signed 10/09/2019

**Attorneys and Law Firms**

Geaniece D. Carter, Grosse Pointe Farms, MI, pro se.

Scot M. Graydon, Attorney General of Texas, Austin, TX, for Defendants.

**REPORT AND RECOMMENDATION**

R. STEVEN WHALEN, UNITED STATES MAGISTRATE JUDGE

**\*1** On August 12, 2019, Plaintiff Geaniece D. Carter filed a *pro se* civil complaint [ECF No. 1]. Defendants University of Texas at Dallas, George Fair, Carolyn Bray, and Barbara Ashmore filed a motion to dismiss on September 11, 2019 [ECF No. 9]. Because the Plaintiff's original complaint has been superseded by her timely filed amended complaint [ECF No. 13], I recommend that the Defendants' motion to dismiss [ECF No. 9] be DENIED AS MOOT. [1]

**I. DISCUSSION**

Fed.R.Civ.P. 15(a)(1)(B) provides that a party may amend a pleading to which a responsive pleading is required (such as a complaint) as a matter of right "21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." In this case, the Defendants filed a motion to dismiss under Fed.R.Civ.P. 12(b) (1), (2), and (6) on September 11, 2019 [ECF No. 9]. Plaintiff then filed an amended complaint on September 23, 2019 [ECF No. 13], within the 21 days set forth in Rule 15(a)(1)(B).

Plaintiff's amended complaint supersedes the original complaint on which the Defendants' motion to dismiss is based, and the original complaint has thus become a legal nullity. *See Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 306 (6th Cir. 2000) ("Plaintiff's first amended complaint, not his original complaint, was the legally operative complaint"); *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000) (when plaintiff files amended complaint, new complaint supersedes all previous complaints and controls case from that point forward). *See also B & H Medical, L.L.C. v. ABP Admin., Inc.*, 526 F.3d 257, 268 n. 8 (6th Cir. 2008) ("a prior 'complaint is a nullity, because an amended complaint supercedes all prior complaints' ") (quoting *Drake v. City of Detroit*, 2008 WL 482283 at \*2 (6th Cir. 2008).

Therefore, Defendants' motion to dismiss the original complaint [ECF No. 9] should be dismissed as moot. I note that Defendants have filed an amended motion to dismiss the amended complaint [ECF No. 17], which will be decided in due course. [2]

**II. CONCLUSION**

I recommend that Defendants' motion to dismiss [ECF No. 9] be DENIED AS MOOT.

Any objections to this Report and Recommendation must be filed within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

**\*2** Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

**All Citations**

Slip Copy, 2019 WL 6768748

## Footnotes

1    The case has been referred for all pretrial proceedings [ECF No. 8].
2    Plaintiff's response to the amended motion to dismiss is due on or before October 28, 2019.

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB C

Case 2:19-cv-13782-PDB-APP ECF No. 27-2 PageID.351 Filed 03/18/20 Page 9 of 90

Brown v. City of Allen Park, Not Reported in Fed. Supp. (2017)

2017 WL 6539044
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Tracie BROWN, Plaintiffs,
v.
CITY OF ALLEN PARK, A
municipal corporation, Defendants.

Case No. 17-12403
|
Signed 12/21/2017

**Attorneys and Law Firms**

Sarah Prescott, Salvatore Prescott, PLLC, Northville, MI, for
Plaintiffs.

Lauri B. Stewart, O'Connor, DeGrazia, Bloomfield Hills, MI,
for Defendants.

**ORDER DENYING DEFENDANT'S
MOTION FOR ABSTENTION [12]**

Nancy G. Edmunds, United States District Judge

**\*1** Police officer, Tracie Brown ("Plaintiff") filed this
Title VII Civil Rights action for sexual harassment, sex
discrimination and retaliation on July 25, 2017. The City of
Allen Park ("Defendant") moves to stay this action with a
Motion for Abstention in deference to a parallel action in state
court, pursuant to the *Colorado River* doctrine. (Dkt. 12, at 3.)
For the reasons that follow, based on the parties' briefs, and
the oral arguments which took place on December 6, 2017,
Defendant's motion is DENIED.

**I. Factual Background**
Having served the City of Allen Park's police department
for fifteen years, Plaintiff, in April of 2016, commenced
a lawsuit in the Wayne County Circuit Court against an
administrative sergeant in the Allen Park Police Department,
Daniele Cerroni. Case No. 2016-005240-CZ, Hon. John A.
Murphy. Plaintiff's suit alleges state law claims, of sex
harassment, and assault and battery, against Cerroni, related
to on-going unwanted sexualized attention and touching.
Plaintiff amended her state court complaint in January 2017,
to add their employer, Defendant, as a second defendant.

As with the original complaint, the amended complaint only
alleges state law claims.

In July 2017, Plaintiff filed in this Court, a new federal
claim against Defendant (and not Cerroni) based on the same
factual allegations. Specifically, Plaintiff alleges three counts
in violation of Title VII of the Civil Rights Act, 42 U.S.C.
§ 2000, *et seq.,* hostile environment sexual harassment,
retaliation, and sex discrimination. In response, Defendant,
asks this Court to stay these federal proceedings, pending
the outcome of the Plaintiff's state claims. Defendant argues
abstention is appropriate, since the two suits are based on the
same factual allegations and because the state causes of action
are similar to those asserted here under federal law.

**II. Legal Standard**
In *Colorado River*, the Supreme Court explained that a
district court may sometimes be justified in abstaining
from exercising jurisdiction in deference to a parallel
state-court proceeding. *Colorado River Water Conservation
District v. United States*, 424 U.S. 800 (1976). Federal
courts recognize several traditional bases for abstaining
from exercising their jurisdiction. *See e.g., Younger v.
Harris*, 401 U.S. 37 (1971)(holding abstention appropriate
where federal proceedings would restrain state criminal
proceedings); County of Allegheny v. Frank Mashuda Co.,
360 U.S. 185 (1959) and *Railroad Comm'n v. Pullman*,
312 U.S. 496 (1941)(holding abstention appropriate in cases
presenting federal constitutional issues which might be
mooted or narrowed by a definitive ruling on state law issues);
*Louisiana Power & Light Co. v. City of Thibodaux*, 360
U.S. 25 (1959)(holding abstention appropriate where difficult
questions of state law will be determinative of state policy
transcending the result in the case at bar); *Burford v. Sun
Oil Co.*, 319 U.S. 315 (1943)(holding abstention appropriate
where a federal review of the question in the case would be
disruptive to state efforts to establish a coherent policy with
respect to a matter of substantial public concern).

**\*2** Beyond these traditional bases for abstaining, *Colorado
River* established what has come to be called the *Colorado
River* doctrine, which recognizes there are exceptional
instances in which the traditional abstention categories are
inapplicable but which may nevertheless warrant a stay
or dismissal of a federal lawsuit pending the resolution
of concurrent state court proceedings. Application of the
*Colorado River* doctrine involves a two step process. First,
a determination of the threshold issue of whether the
state and federal cases are parallel. And second, careful

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.352 Filed 03/18/20 Page 10 of 90

Brown v. City of Allen Park, Not Reported in Fed. Supp. (2017)

consideration of the multiple *Colorado River* factors, to determine if abstention is appropriate. *Preferred Care of Delaware, Inc. v. VanArsdale*, 676 Fed.Appx. 388, 393 (6th Cir. 2017)(unpublished).

"Abdication of the obligation to decide cases can be justified under the doctrine only in exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Colorado River*, 424 U.S. at 813. "[T]he doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it." *Id.* at 813-14. "Generally, as between state and federal courts, the rule is that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.... This difference in general approach between state-federal concurrent jurisdiction and wholly federal concurrent jurisdiction stems from the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Id.* at 817 (internal quotation marks omitted).

### III. Analysis

A. Parallel Cases

To determine whether application of the *Colorado River* doctrine is appropriate, the Court must first address the threshold issue of whether the state and federal proceedings involve the same parallel matter. *See Moses H. Cone Memorial Hosp. V. Mercury Center*, 460 U.S. 1, 13-15 (1983). The appropriate consideration is whether the two cases are currently parallel, not whether one could be modified so as to make the cases identical. *Crawley v. Hamilton County Comm'rs*, 744 F.2d 28, 31 (6th Cir. 1984). "Exact parallelism" between the actions is not required; instead, the actions need only be "substantially similar." *Nakash v. Marciano*, 882 F.2d 1411, 1416 (9th Cir. 1989)

Here the state case and this matter are parallel. "[W]here (1) the parties are substantially similar and (2) [plaintiff's] claims against [defendants] are predicated on the same allegations as to the same material facts.... the actions must be considered "parallel" for the purposes of the *Colorado River* abstention doctrine." *Romine v. Compuserve Corp.*, 160 F.3d 337, 340 (6th Cir. 1998). Defendant is named in both the state and federal case. Likewise, Plaintiff, is the sole plaintiff in both matters. The party differences, that Plaintiff chose not to name

Cerroni as defendant in the federal case, is not decisive. "This court has never held that only a perfect, or even near-perfect, symmetry of parties and causes of action" are necessary to satisfy the "parallel" criteria. *Preferred Care*, 676 Fed.Appx. at 393.

The counts arise out of the same claims and alleged set of facts. Both concern whether Cerroni caused Plaintiff to experience a hostile work environment, and sexual harassment, and the adequacy of Defendant's response to those alleged incidents. Many of the witnesses and much of the discovery is expected to overlap. The parties have even stipulated they will rely on a single discovery process for both cases.

**\*3** Plaintiff argues the cases cannot be parallel where the remedies available in the two cases are different. The remedy available however does not inform parallelism. It is the similarity of the parties and the reliance on the same material facts, which determines parallelism. *Romine,* 160 F.3d at 340. Both of these factors support the determination the cases are parallel and thus satisfy the threshold issue under *Colorado River*.

B. The *Colorado River* Doctrine Factors

Defendant, as the moving party, has the burden of showing whether the sort of "exceptional circumstances" warranting abstention are present. This is done through the court's consideration of the *Colorado River* doctrine factors. The Sixth Circuit weighs eight factors when considering abstention: (1) whether either court has exercised jurisdiction over any *res* or property; (2) whether the federal forum is less convenient to the parties; (3) whether federal or state law provides the basis for decision of the case; (4) avoidance of piecemeal litigation; (5) the order in which jurisdiction was obtained; (6) the state court's ability to protect federal rights; (7) the relevant progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction. *Romaine*, 160 F.3d at 341. *See Moses H. Cone*, 460 U.S. at 1; *Heitmanis v. Austin*, 899 F.2d 521, 527 (6th Cir. 1990). When evaluating these factors, the abstention decision "does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone*, 460 U.S. at 16.

The parties do not dispute the first two *Colorado River* elements (jurisdiction over *res* or property and relative convenience).

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.353 Filed 03/18/20 Page 11 of 90

Brown v. City of Allen Park, Not Reported in Fed. Supp. (2017)

(1) Whether either court has exercised jurisdiction over any *res* or property

Neither the state nor federal court have exercised jurisdiction over any *res* or property related to this matter. "[D]oubts as to whether a particular factor exists in the abstention determination should be resolved against a stay, for only the clearest of justifications will warrant abstention." *Focus Radio, Inc. v. Summit Radio, Inc.*, 853 F.Supp. 252, 256 (E.D. Mich. 1994). Since this factor does not clearly favor abstention, the fact neither court has jurisdiction over any *res* or property weighs against abstention. *Romine*, 160 F.3d at 341 (noting that where no property is at issue, the first factor is inapposite and supports exercising jurisdiction).

(2) Whether the federal forum is less convenient to the parties

"[T]he second factor relates to geographical consideration, not to the relative jurisdictional scope of state versus federal courts." *PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 207 (6th Cir. 2001). All parties live and work in the Eastern District, making both forums equally convenient and also weighs against abstention.

(3) Whether federal or state law provides the basis for decision in the case

Federal law, and only federal laws govern, Plaintiff's Title VII claim. When the substantive law is federal, abstention is disfavored. The Supreme Court states "the presence of federal law issues must always be a major consideration weighing against surrender" of federal jurisdiction in deference to state proceedings. *Moses Cone*, 460 U.S. at 26. Here there are only federal law issues.

Defendant, citing *Romine*, asserts that because state and federal courts have concurrent jurisdiction of Title VII claims, this factor weighs in favor of abstention. (Dkt. 12, at 14.) However, Defendant overstates *Romine*, which never claims concurrent jurisdiction favors abstention at all, only that it minimized what otherwise "would be a strong argument against abstention." *Romine*, 160 F.3d at 342. The relative weight of the source-of-law factor may vary depending on the particular federal law implicated, however consistently, federal law issues weigh in favor of federal courts exercising jurisdiction. Federal law controls the claims brought in this action; therefore this factor weighs against abstention.

**\*4** (4) Avoidance of piecemeal litigation

"Piecemeal litigation occurs when different courts adjudicate the identical issues, thereby duplicating judicial effort and potentially rendering conflicting results." *Romine*, 160 F.3d at 341. The two actions in question have substantial overlap, however there are multiple argument against counting this factor toward abstention.

First, although the material facts in the two cases are the same, the legal issues are not. None of the claims asserted in the state actions is a federal claim, and none of the state common-law claims is asserted in the present action. For instance, to succeed on Count III for intentional infliction of emotional distress, Plaintiff will be required to show she suffered severe and serious emotion distress, and to succeed on Count IV of the state-law claim for battery, Plaintiff will be require to show a touching. Such showings are not needed in order to prevail on a Title VII claim for sexual harassment or retaliation. Title VII's prohibition against gender discrimination "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment," and Plaintiff may prevail on her Title VII claims even if she does not show Cerroni touched her or that she suffered severe and serious emotion distress. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

A second reason to avoid piecemeal litigation occurs when both courts must resolve the same legal issue which may lead to inconsistent outcomes and conflicting results. The "legitimacy of the court system in the eyes of the public and fairness to the individual litigants.... [is] endangered by duplicative suits." *Romaine*, 160 F.3d at 341(quoting *Lumen Constr., Inc. v. Brant Constr. Co.*, 780 F.2d 691, 694 (7th Cir. 1985)). Where, as here, different legal claims are implicated and thus examined in each case, such inconsistencies are not a concern.

Finally, the Supreme Court's goal in *Colorado River* and its progeny cannot be purely to maximize judicial efficiency by eliminating all piecemeal litigation. Traditionally, an action's pendency in state court is not a bar to proceedings concerning the same matter in federal court. The particular circumstances in *Colorado River* warranted extra consideration and concern of piecemeal litigation. There, the McCarran Amendment, the federal law at the heart of *Colorado River*, specifically addressed "the avoidance of piecemeal adjudication" of water rights in the southwest. *Colorado River*, 424 U.S. at 819. Congressional policy expressed a preference for

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.354 Filed 03/18/20 Page 12 of 90

Brown v. City of Allen Park, Not Reported in Fed. Supp. (2017)

unified state adjudication, which triggered the Supreme Court's added concern about piecemeal litigation, above what is otherwise common in our federal system. There is no similar Congressional policy expressing a preference for unified state adjudication in the civil rights context. Congress has not expressed a desire to avoid piecemeal litigation of Title VII claims. There is no compelling circumstance to warrant extraordinary concern about piecemeal litigation in this instance, and thus, this factor weighs against abstention.

**\*5** (5) Order in which jurisdiction was obtained

In *Moses H. Cone*, the Supreme Court determined the relevance of this factor is not to "be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." 460 U.S. at 21. Therefore although Plaintiff filed her state court claim before the federal court claim, the relative progress of the two cases is nearly the same. The state court has only just begun discovery, and since discovery will be shared, the progress there is also shared. There is no scheduling order in either of the cases. (Dkt. 17, at 10). Most importantly the state court has not disposed of any issue central to both the state and federal actions. The order in which the courts respectively gained jurisdiction does not strongly favor abstention, if at all.

(6) The state court's ability to protect federal rights

The state court can and regularly does protect federal rights of plaintiff's including under Title VII. "The fact that the state court will protect [the defendant's] rights under the [federal law].... does not provide the 'exceptional' circumstances necessary to justify" abstention. *PaineWebber*, 276 F.3d at 209. Nonetheless, this factor favors abstention, even if only slightly.

(7) The relative process of the state and federal proceedings

As noted previously, in the examination of factor five, the state court proceedings has not progressed significantly beyond the federal proceedings. Although in absolute terms the state court began before the federal case, there are no substantive differences favoring one over the other.

(8) The presence or absence of concurrent jurisdictions

Both courts can exercise jurisdiction over the claims presented in each of the cases. As they are currently divided, the state court claims are only in the state court and the federal court claims are only in federal court. In *PaineWebber*, 276 F.3d at 208, the Sixth Circuit noted that "the presence of concurrent jurisdiction only marginally, if at all, favors abstention."

Having examined the eight Colorado River factors, the majority weigh against abstention. The few that support abstention do not do so strongly. The present matter is routine, with no novel questions of law and this case does not present the sort of "exceptional circumstances" meriting a dismissal or stay pursuant to *Colorado River*. "[T]he doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it." *Colorado River*, 424 U.S. at 813-14.

Since the *Colorado River* doctrine factors do not council this court to abstain from its duty to adjudicate this controversy, and since precedent strongly supports the federal court retains jurisdiction, the Court finds no merit in Defendant's *Colorado River* abstention argument for a stay, pending the outcome of Plaintiff's state claims.

**IV. Conclusion**

For the reasons set forth above, the Court hereby DENIES Defendant's motion for abstention. (Dkt. 12.)
**\*6** SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6539044

---

**End of Document**　　　　　　　　　　　　　　　　© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB D

197 Fed.Appx. 392
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Gloria CHELLMAN–SHELTON and
Richard Shelton, Plaintiffs–Appellees,
v.
William GLENN, Crystal Glenn, Employees
of the Town of Smyrna in their professional
responsibility and individually, and Bob
Spivey, Mayor, Defendants–Appellants.

No. 05–5595.
|
July 28, 2006.

**Synopsis**
**Background:** Landowners brought state-court action against
neighbors, mayor, and township officials under § 1983 and
Tennessee Governmental Tort Liability Act, alleging that
they conspired to hinder prosecution of prior boundary
dispute action between landowners and neighbors. After
action was removed, the United States District Court for the
Middle District of Tennessee sua sponte dismissed action
on abstention grounds, and subsequently denied neighbors'
motions for relief from judgment. Neighbors appealed.

**Holding:** The Court of Appeals held that district court
had to exercise jurisdiction, given absence of parallel state
proceedings.

Reversed and remanded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**\*393** On Appeal from the United States District Court for
the Middle District of Tennessee.

BEFORE: SILER, MCKEAGUE, and GRIFFIN, Circuit
Judges.

**Opinion**

PER CURIAM.

**\*\*1** Plaintiffs-appellees Gloria Chellman–Shelton and
Richard Shelton ("the Sheltons") are the neighbors of
defendants-appellants William Glenn and Crystal Glenn
("the Glenns") in Smyrna, Tennessee. The two couples are
embroiled in a dispute over the boundaries of their respective
parcels. The Glenns sued the Sheltons in Tennessee state
court, which issued its final judgment in June 2003. So far as
the record reflects, neither side appealed the state trial court's
order.

In April 2004, the Sheltons sued the Glenns in Tennessee
state court, asserting claims under 42 U.S.C. § 1983 and the
Tennessee Governmental Tort Liability Act. The Sheltons
allege that the Glenns and various Smyrna township officials
conspired to hinder the prosecution of the prior boundary
dispute action. The Glenns removed this action to the United
States District Court, which *sua sponte* dismissed the action
under the abstention doctrine announced in *Colorado River
Water Conserv. Dist. v. United States,* 424 U.S. 800, 96 S.Ct.
1236, 47 L.Ed.2d 483 (1976). The Glenns filed two FED.
R. CIV. P. 60(b)(6) motions for relief from judgment, which
the district court denied. The Glenns appeal, contending that
*Colorado River* abstention was improper because no parallel
state court action existed when the district court entered its
order. The Sheltons have not filed a brief opposing the appeal.

For the reasons that follow, we reverse and remand.

I.

The district court had federal-question jurisdiction over the
Sheltons' § 1983 claims under 28 U.S.C. § 1331, and
supplemental jurisdiction over the state-law claims under 28
U.S.C. § 1367(a). We have appellate jurisdiction under 28
U.S.C. § 1291.

II.

We review abstention decisions de novo. *Superior Beverage
Co., Inc. v. Schieffelin & Co., Inc.,* 448 F.3d 910, 913 (6th

2006 Fed.App. 0529N

Cir.2006) (citations omitted); *Executive Arts Studio, Inc. v. City of Grand Rapids,* 391 F.3d 783, 791 (6th Cir.2004) (citation omitted).

"Abstention is 'an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.' " *Caudill v. Eubanks Farms, Inc.,* 301 F.3d 658, 660 (6th Cir.2002) (quoting **\*394** *Colorado River,* 424 U.S. at 813, 96 S.Ct. 1236). Abstention doctrines are "based on principles of federalism and comity." *Id.* (citation omitted).

The Supreme Court articulated the issue as follows:

> Ultimately, what is at stake is a federal court's decision, based on a careful consideration of the federal interests in retaining jurisdiction over the dispute and the competing concern for the independence of state action, that the State's interests are paramount and that a dispute would best be adjudicated in a state forum.

*Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 728, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (citations and internal quotation marks omitted). This equitable decision balances the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court, against the state's interests in maintaining uniformity in the treatment of an essentially local problem and retaining local control over difficult questions of state law bearing on policy problems of substantial public import. *Caudill,* 301 F.3d at 660 (citation omitted).

**\*\*2** "If there is any substantial doubt that the parallel litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties, it would be a serious abuse of discretion for the district court to stay or dismiss a case in deference to the parallel litigation." *TruServ Corp. v. Flegles, Inc.,* 419 F.3d 584, 592 (7th Cir.2005) (internal citation and quotation marks omitted); *accord Woodford v. Cmty. Action Agency of Greene Cty., Inc.,* 239 F.3d 517, 523 (2d Cir.2001).

"In *Colorado River,* the Supreme Court noted that, despite the 'virtually unflagging obligation of the federal courts to exercise the jurisdiction given them,' 424 U.S. at 817, 96 S.Ct. 1236 ..., considerations of judicial economy and federal-state comity may justify abstention in situations involving the *contemporaneous* exercise of jurisdiction of state and federal courts." *Romine v. Compuserve Corp.,* 160 F.3d 337, 339 (6th Cir.1998) (emphasis added). "[W]here ... there is no presently ongoing state proceeding parallel to the federal case, the exceptional circumstances necessary for *Colorado River* abstention do not exist." *Gottfried v. Med. Planning Servs., Inc.,* 142 F.3d 326, 329 (6th Cir.1998) (citation omitted). [1]

When the district court abstained, the related state court action between these parties had already concluded, so there was no pending state court proceeding to which the district court could defer. Consequently, the district court erred in abstaining under *Colorado River. Cf. Crawley v. Hamilton Cty. Comm'rs,* 744 F.2d 28, 31 (6th Cir.1984) (noting, in September 1984, "A necessary requirement for application of this *Colorado River* doctrine, however, is the presence of a *parallel* state proceeding. In our case, there is no such proceeding. In [state court] little, if any, action has been taken since December 23, 1980....."); *Warner v. Greenebaum, Doll & McDonald,* 104 Fed.Appx. 493, 496 (6th Cir.2004) (*Colorado River* abstention was inappropriate because state proceeding was not "parallel" to federal action; among **\*395** other factors, "to the extent that [plaintiffs] were involved in that case, their involvement may very well be over"). [2]

In short, "any doubt regarding the parallel nature of the [state court] suit should be resolved in favor of exercising jurisdiction ...," *TruServ Corp. v. Flegles, Inc.,* 419 F.3d at 592 (bracketed text in original) (citation omitted), and here there is no doubt that there was no pending parallel state court suit. The district court must exercise jurisdiction. *See Stewart v. W. Heritage Ins. Co.,* 438 F.3d 488, 491 n. 3 (5th Cir.2006) ("If the suits are not parallel, the federal court must exercise jurisdiction.") (citation omitted).

Reversed and remanded.

## All Citations

197 Fed.Appx. 392, 2006 WL 2168278, 2006 Fed.App. 0529N

Cheffman-Shelton v. Glenn, 197 Fed.Appx. 392 (2006)

2006 Fed.App. 0529N

# Footnotes

1    *Accord Village of Westfield, N.Y. v. Welch's,* 170 F.3d 116, 120 (2d Cir.1999) (*"Colorado River* applies
     where ... state and federal courts exercise concurrent jurisdiction *simultaneously."* ) (citation and internal
     quotation marks omitted) (emphasis added); *Sec. Farms v. Int'l Brhd. of Teamsters,* 124 F.3d 999, 1009 (9th
     Cir.1997) ("[I]nherent in the concept of abstention is the presence of a pend[ing] state action....").

2    *Cf. Elmendorf Grafica, Inc. v. D.S. America (East), Inc.,* 48 F.3d 46 (1st Cir.1995):

     In our view, the magistrate judge did not give appropriate attention to the fact that ... the Illinois action
     consisted of no more than a pending appeal from the order of the [state trial court] dismissing the action for
     lack of personal jurisdiction. This was not a case where the parallel state action was strongly underway,
     making it perhaps reasonable, depending on the facts, to await the outcome in the state case before
     proceeding in the federal court.

     Here, if the [state trial court]'s dismissal for lack of personal jurisdiction should be affirmed by the Illinois
     Appellate Court, there will be left in existence no state action whatever; while if the lower court's dismissal
     should be reversed on appeal, the parties will merely be back at the very beginning of the process of
     litigating the merits of their controversy [in state trial court].

     Under such circumstances, the federal diversity action ... was the more immediately available vehicle for
     litigating the dispute.

     The magistrate judge said that if the district court action were allowed to proceed, "the two parties would
     be litigating very similar issues in two separate forums." But this description suggests a parallelism that
     did not then exist, given that the Illinois case had been dismissed on jurisdictional grounds, leaving only
     an appeal from the dismissal.

     *Id.* at 51 (paragraph breaks added).

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB E

2015 WL 13541146
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

CRESTMARK BANK, Plaintiff,

v.

ELECTROLUX HOME
PRODUCTS, INC., Defendant.

Case No. 14-cv-11595
|
Signed 06/29/2015

**Attorneys and Law Firms**

Jonathan C. Myers, Jaffe, Raitt, Heuer & Weiss, P.C., Southfield, MI, for Plaintiff.

Gregory H. Wagoner, Toledo, OH, for Defendant.

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO STRIKE SUR-REPLY [27] AND DENYING DEFENDANT'S**

JUDITH E. LEVY, United States District Judge

**\*1** This is a contract dispute between a creditor (Crestmark) and a customer (Electrolux) of a company that supplied parts for home appliances. Before the Court are Electrolux's motion to strike Crestmark's sur-reply (Dkt. 27) and Electrolux's motion to stay this case in favor of an action in North Carolina state court (Dkt. 22). For the reasons set forth below, the Court will deny both motions.

**I. Background**

In 2008, Electrolux approved Tarheel Plastics, LLC ("Tarheel") as a supplier of plastic parts for the manufacture of Electrolux's home appliances. Tarheel is located in North Carolina. Electrolux provided Tarheel with certain tooling and molds to manufacture the parts. On December 28, 2011, Electrolux recorded its security interest in certain "Tools" possessed by Tarheel. (Dkt. 3-2 at 2.)

Electrolux also supplied Tarheel with resin, the raw material used to make the plastic parts. Electrolux and Tarheel agreed —although it is unclear whether this agreement was in writing —that Electrolux would periodically set off the resin costs

against what defendant owed on outstanding invoices from Tarheel. The setoffs did not always correspond to the cost of the resin actually used in the parts for which defendant owed payment.

Crestmark was Tarheel's primary lender. The loans were secured by a security interest in "[a]ll assets of the Debtor [*sc.* Tarheel] now owned or hereafter acquired and wherever located." (Dkt. 3-3 at 2.) Crestmark recorded its security interest on November 5, 2012.

Electrolux notified Crestmark, by letter dated March 1, 2013, of Electrolux's security interest in Tarheels' tooling. Soon after, by letter dated March 11, 2013, Electrolux released any security interest it held in Tarheel's accounts receivable or inventory. (Dkt. 1-3, Ex. B to Notice of Removal 15).

Tarheel ceased it operations in late summer or early fall of 2013. Electrolux sought immediate possession of the tooling, molds, and inventory held by Tarheel in North Carolina. Crestmark disputed Electrolux's right to take the tooling, molds, and inventory, until Electrolux had paid all of its outstanding invoices with Tarheel, amounting to approximately $1,109,000. Electrolux maintained it was entitled to set off remaining resin costs against the outstanding invoices.

To resolve their disputes, Crestmark, Electrolux, and Tarheel executed an Accommodation Agreement on October 4, 2013. (Dkt. 3-5.) As part of the Agreement, Crestmark relinquished any interest in the tooling Electrolux owned; in turn, Electrolux relinquished any interest in "any inventory or equipment other than" the tooling Electrolux owned. The Agreement further established that 1) Electrolux would immediately pay Crestmark $100,000, in exchange for the finished parts that had not yet been shipped to Electrolux; 2) Electrolux would wire to Crestmark $332,000 of the outstanding accounts receivable, to be held in escrow according to the terms of an Escrow Agreement; 3) upon payment of the $332,000, Electrolux would have the right to take immediate possession of its tooling; and 4) Electrolux could take possession of the resins and other raw materials it had supplied to Tarheel.

**\*2** Importantly, the Agreement also limits Electrolux to setting off only the costs of resin or other raw materials 1) supplied to Tarheel and 2) actually used in producing parts for Electrolux. Electrolux agreed to provide, within 5 days of the Agreement's execution, a reconciliation of the

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.361 Filed 03/18/20 Page 19 of 90

Crestmark Bank v. Electrolux Home Products, Inc., Not Reported in Fed. Supp. (2015)

2015 WL 13541146

outstanding invoices, including reasonable support for any setoffs claimed.

The Accommodation Agreement provides that it will be governed by Michigan law and that jurisdiction "will be proper in federal district court or in state court in Oakland County [Michigan]."

Also on October 4, 2013, Crestmark, Electrolux, and the escrow agent (the same law firm serving as Crestmark's counsel) executed the Escrow Agreement referred to in the Accommodation Agreement. (Dkt. 1-6, Ex. E to Notice of Removal 15.) The Escrow Agreement governs the holding and delivery of the $332,000 specified in the Accommodation Agreement. The Escrow Agreement contains mandatory choice-of-law and forum selection clauses, pursuant to which 1) Michigan law governs the Escrow Agreement, and 2) "any action, suit or proceeding arising out of [the] Escrow Agreement or the transactions between [the parties] contemplated by [the] Escrow Agreement" must be brought in the Eastern District of Michigan or in a state court in Oakland County, Michigan.

Electrolux paid the $100,000 to Crestmark and the $332,000 into escrow, as required by the Accommodation Agreement. According to Crestmark, Electrolux then repeatedly failed to provide the reconciliation required by the Accommodation Agreement. Instead, Crestmark alleges, Electrolux sought to set off the entire cost of resin and other raw materials, in violation of the Accommodation Agreement's express limitations on allowable setoffs.

The parties agree that, at some point, Electrolux took possession of the tooling and molds, and at least some of the resin.

On February 21, 2014, the escrow agent filed an interpleader action in Oakland County Circuit Court, Michigan, naming both parties here as defendants.

On February 28, 2014, Electrolux filed an action in North Carolina Superior Court in Mecklenburg County, naming Crestmark, the escrow agent, and Tarheel as defendants (the "North Carolina action"). (Dkt. 9-1 at 16-21.) In that action, Electrolux seeks, among other relief, declaration of its rights to the setoffs and the escrow funds, possession of the escrow funds, recovery of the $100,000 already paid to Crestmark, and damages for Tarheel's alleged breach of contract. Electrolux also alleges Crestmark engaged in unfair

business practices and tortiously interfered with Electrolux's business relationship with Tarheel by preventing return of the tooling and molds, thereby forcing Electrolux to enter the Accommodation and Escrow Agreements.

On March 18, 2014, Crestmark answered the interpleader complaint and filed a crossclaim against Electrolux, alleging Electrolux had breached the Accommodation Agreement by failing to provide the required reconciliation and by claiming setoffs prohibited by the Agreement. Crestmark claims a right to the escrow funds based on Electrolux's alleged breach.

On April 7, 2014, the state court granted the escrow agent's motion to deposit the escrow funds with the court and dismissed the agent from the interpleader action. On April 22, 2014, Electrolux removed the interpleader action to this Court, and moved to stay the action in favor of the North Carolina action, pursuant to *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). (Dkt. 3.) Alternatively, Electrolux sought to transfer this action to the United States District Court for the Western District of North Carolina. (Id.) Before that motion was decided, Crestmark removed the North Carolina action to the United States District Court for the Western District of North Carolina, thereby mooting Electrolux's motion with respect to the request for a stay under *Colorado River*. Electrolux's motion to transfer was denied on August 11, 2014. (Dkt. 14.)

**\*3** The North Carolina action was remanded to state court on December 16, 2014. (*See* Dkt. 22, Def.'s Br. 5.) Electrolux then filed this motion for a stay of this action under *Colorado River*. (Dkt. 22.)

## II. Motion to Strike Crestmark's Sur-Reply

As an initial matter, Electrolux moves to strike Crestmark's sur-reply filed in opposition to Electrolux's motion to stay. (Dkt. 27.) Electrolux cites two grounds in support: (1) Crestmark failed to seek leave before filing its sur-reply, and (2) Crestmark introduces no new arguments that might justify filing a sur-reply. (Id.)

The Eastern District's Local Rules require the filing of a response to a motion and permit the filing of a reply brief. E.D. Mich. L.R. 7.1. The Rules do not, however, provide for the filing of a sur-reply. *See id.* Crestmark's sur-reply repeats an argument from its response concerning the proper interpretation of one of the *Colorado River* factors discussed below. But Crestmark also addresses an exhibit Electrolux only submitted with its reply brief. Because the Court would

**Crestmark Bank v. Electrolux Home Products, Inc., Not Reported in Fed. Supp. (2015)**

2015 WL 13541146

have granted leave for Crestmark to file a sur-reply to address this new exhibit, Electrolux's motion to strike will be denied.

## III. Motion to Stay

In *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), the Supreme Court established that a federal court may abstain from exercising its jurisdiction when parallel proceedings are pending in a state court, in the interests of "judicial economy and federal-state comity." *Romine v. Compuserve Corp.*, 160 F.3d 337, 339 (6th Cir. 1998). However, "abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River*, 424 U.S. at 813. The analysis of whether abstention is appropriate follows two steps: first, a determination that the federal and state proceedings are, in fact, "parallel"; and second, whether the federal court's "virtually unflagging obligation" to exercise jurisdiction is outweighed by "the combination of factors counseling against that exercise." *Colorado River*, 424 U.S. at 817-18.

### A. Whether the North Carolina action and this action are parallel proceedings

"The threshold question in *Colorado River* abstention is whether there are parallel proceedings in state court." *Bates v. Van Buren Township*, 122 Fed.Appx. 803, 806 (6th Cir. 2004). The federal and state proceedings need not be identical, only "substantially similar." *Romine*, 160 F.3d at 339. For example, even where the state action is "more comprehensive" than the federal—that is, where the state action encompasses all issues in the federal case, but includes additional parties or issues— courts in this circuit have found the proceedings to be parallel. *Bates v. Van Buren Twp.*, 122 Fed.Appx. 803, 806-07 (6th Cir. 2004); *Romine*, 160 F.3d at 340-41.

The North Carolina action was filed by Electrolux against Crestmark, Tarheel, and Jaffe, the escrow agent. (Dkt. 22-2.) Electrolux brings claims for breach of contract and for declaratory relief against Tarheel; for declaratory relief, tortious interference, and unfair and deceptive trade practices against Crestmark; and for an order to Jaffe to disburse the escrow funds to Electrolux. (Id.) Together, these claims encompass the issues in this case, as well as other issues and parties (namely, Electrolux's claims against Tarheel) that are not before this Court. On its face, this satisfies the parallelism requirement of *Colorado River*.

**\*4** Crestmark argues, however, that the proceedings are not parallel, because the North Carolina court cannot resolve

all of the issues in this action. (Dkt. 24, Pl.'s Resp. 19-20.) Specifically, the North Carolina court has no jurisdiction over the interpleaded funds. (Id. at 20.) The cases cited by Crestmark in support appear to involve federal claims that were not raised in the corresponding state court action. That is not the case here. Even assuming the parallelism requirement is met here, however, Electrolux has failed to show this Court's "virtually unflagging obligation" to exercise jurisdiction is outweighed by "the combination of factors counseling against that exercise." *Colorado River*, 424 U.S. at 817-18.

### B. Whether this Court's obligation to exercise jurisdiction is outweighed by factors counseling against that exercise

The Supreme Court has identified a nonexhaustive list of eight factors to be considered in analyzing whether *Colorado River* abstention is appropriate. *Romine*, 160 F.3d at 340-41. The factors include:

(1) whether the state court has assumed jurisdiction over any res or property;

(2) whether the federal forum is less convenient to the parties;

(3) avoidance of piecemeal litigation; ...

(4) the order in which jurisdiction was obtained ...

(5) whether the source of governing law is state or federal,

(6) the adequacy of the state court action to protect the federal plaintiff's rights,

(7) the relative progress of the state and federal proceedings; and

(8) the presence or absence of concurrent jurisdiction.

*Romine*, 160 F.3d at 340-41. The court must engage in a "careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction. The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 16 (1983) (emphasis added). Because "[o]nly the clearest of justifications will warrant" abstention, *Colorado River*, 424 U.S. at 819, "doubts as to whether a particular factor exists in the abstention determination should be resolved against a stay." *Focus*

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.363 Filed 03/18/20 Page 21 of 90

Crestmark Bank v. Electrolux Home Products, Inc., Not Reported in Fed. Supp. (2015)

2015 WL 13541146

*Radio, Inc. v. Summit Radio, Inc.*, 853 F. Supp. 252, 256 (E.D. Mich. 1994).

### 1. Whether the state court has assumed jurisdiction over any res or property

Electrolux concedes that the North Carolina court has not assumed jurisdiction over any *res* or property. (Dkt. 22, Def.'s Br. 15.) Indeed, the North Carolina court could not assume jurisdiction over the disputed property central to this case —the escrow funds—because Oakland County, Michigan Circuit Court assumed jurisdiction over that property. This factor weighs against abstention. *Romine*, 160 F.3d at 341; *Williams v. Oak Park City Sch. Dist.*, No. 06-12512, 2007 WL 1063346, at *2 (E.D. Mich. Apr. 6, 2007).

### 2. Whether the federal forum is less convenient to the parties

Electrolux claims its witnesses, and those from Tarheel, are located in North Carolina and would be forced to travel to Michigan for trial in this case. Electrolux submitted a preliminary witness list as an exhibit to its original motion to stay, in which it listed five Electrolux witnesses and two Tarheel witnesses. (Dkt. 7-6.) Crestmark indicated at the June 17, 2014 hearing on Electrolux's first motion to stay that all of Crestmark's witnesses are located in Michigan and would be forced to travel to North Carolina if this action is stayed.

Electrolux argues that the bankruptcy court has only permitted Electrolux to pursue claims against Tarheel in North Carolina. (Dkt. 22, Def.'s Br. 16.) Crestmark counters that Electrolux has already obtained a default judgment against Tarheel in the North Carolina matter. Regardless, any inconvenience to Electrolux is counterbalanced by the fact that, if a stay were granted, separate proceedings in Michigan would be required to resolve the parties' claims to the escrow funds. The North Carolina court cannot determine the parties' rights to the escrow funds, and cannot order disbursement of those funds.

**\*5** Given that one party will inevitably suffer inconvenience, this factor is neutral and weighs against abstention. *See Focus Radio*, 853 F. Supp. 2d at 256.

### 3. Avoidance of piecemeal litigation

As an initial matter, Electrolux wrongly asserts that "avoidance of piecemeal litigation is the paramount factor considered by a court." (Dkt. 22 at 16; Dkt. 25 at 3.) This is a clear misreading of the opinion in *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 19. The Supreme Court explained that avoidance of piecemeal litigation was "the consideration that was paramount in *Colorado River* itself." *Id.* The Court did not hold this is the "paramount" consideration in every case; to the contrary, the Court expressly held that "[t]he weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." *Id.* at 16.

Next, the parties dispute the meaning of "piecemeal." Electrolux relies on language in *Romine*, 160 F.3d at 341, to argue that "piecemeal" means "duplicative." Crestmark cites several Eastern District cases in which "piecemeal" is distinguished from "duplicative."

The Supreme Court first addressed the concern with piecemeal litigation in *Colorado River*. The Court concluded that questions of water rights in a river system were best resolved in the unified, comprehensive proceedings provided for by Colorado, rather than one plaintiff at a time in federal court. *See Colorado River*, 424 U.S. at 819-20 (noting that the state had "established a single continuous proceeding for water rights adjudication" that "reaches all claims, perhaps month by month but inclusively in the totality").

Similarly, the Sixth Circuit has framed the concern over piecemeal litigation as one arising when multiple parties have similar claims, yet some of those claims would not be resolved in the federal proceedings. *See Crawley v. Hamilton Cnty. Comm'rs*, 744 F.2d 28, 31 (6th Cir. 1984); *accord Doe v. Ann Arbor Public Schs.*, No. 11-15657, 2012 WL 1110015, at *4-5 (E.D. Mich. Apr. 3, 2012); *CLT Logistics v. River West Brands*, 777 F. Supp. 2d 1052, 1061 (E.D. Mich. 2011) (describing piecemeal litigation scenario as one in which "the federal court would duplicate state-court efforts yet resolve only a piece of a larger dispute, whereas the state court would resolve the entire case"); *Williams*, 2007 WL 1063346, at *2.

*Romine* involved parallel securities class actions, brought by different named plaintiffs, in federal and state court. In finding the risk of piecemeal litigation was present, the Court stated that "piecemeal litigation occurs when different courts adjudicate the identical issues, thereby duplicating judicial

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.364 Filed 03/18/20 Page 22 of 90
Crestmark Bank v. Electrolux Home Products, Inc., Not Reported in Fed. Supp. (2015)
2015 WL 13541146

effort and rendering conflicting results." *Romine*, 160 F.3d at 341. This statement is consistent with the characterizations of piecemeal litigation in *Colorado River* and in *Crawley*: namely, that piecemeal litigation involves multiple parties with similar claims, where the federal proceedings will not resolve all of the claims, but the state court proceedings will.

This case does not involve multiple parties with similar claims, as in *Colorado River, Crawley,* or *Romine.* All of Crestmark's and Electrolux's claims against each other will be resolved in this proceeding. There is no risk of piecemeal litigation here; this factor weighs against abstention.

### 4. The order in which jurisdiction was obtained

**\*6** "[P]riority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 21. The Court has already determined that this action was filed first, and that the relevant date for making that determination is the date the interpleader action was filed, not the date of Crestmark's cross-claim. (Dkt. 14, Opinion and Order 16.) Electrolux's attempt to reargue this issue is not well-taken. (*See* Dkt. 22, Def.'s Br. 18.)

The record shows no progress in the state court following remand. Regardless, the proceedings here have progressed to within approximately 4 months of resolution. A scheduling order was entered on October 7, 2014. (Dkt. 21.) Discovery has closed, and the deadline for filing dispositive motions is imminent.[1] Trial is set for November 3, 2015. This factor, along with factor seven below, weighs strongly against abstention. *See CLT Logistics*, 777 F. Supp. 2d at 1062 (holding that, although state court action had been filed five months before federal court action, "[a]bsent a strong showing that the state court litigation is well in advance of this case, this factor slightly disfavors abstention").

### 5. Whether the source of governing law is state or federal

The presence of state-law issues may weigh in favor of abstention "in some rare circumstances." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 26. The state-law issues here concern the formation, interpretation, and breach of contracts —"routine" issues that are not "rare" and do not warrant abstention. *See Focus Radio*, 853 F. Supp. at 255. Moreover, interpretation of both the Accommodation Agreement and

the Escrow Agreement is expressly governed by Michigan law. This Court very likely has more experience applying Michigan law than the North Carolina court does.

Electrolux maintains that North Carolina law will control more of the disputes in this case, citing (1) ownership of the tooling and molds, (2) the business relationship between Electrolux and Tarheel, and (3) Electrolux's claim under North Carolina's Unfair and Deceptive Trade Practices Act. (Dkt. 22, Def.'s Br. 18.) Ownership of the tooling and molds does not appear to be in dispute in this case. The business relationship between Electrolux and Tarheel is, at present, tangential to this action. That relationship may become relevant only if Electrolux succeeds in its challenge to the validity of the Accommodation Agreement. The single remaining issue, Electrolux's claim under North Carolina's Unfair and Deceptive Trade Practices Act, is potentially governed by North Carolina law. In short, Michigan law controls more of the issues in this case.

This factor weighs against abstention.

### 6. The adequacy of the state court action to protect the federal plaintiff's rights

This factor is ordinarily concerned with the state court's adequacy to protect federal rights. *CLT Logistics*, 777 F. Supp. 2d at 1062. Federal rights are not at issue in this case, and there is no reason to believe that the North Carolina court will not adequately protect Crestmark's rights under state law. This factor weighs in favor of abstention.

### 7. The relative progress of the state and federal proceedings

As discussed under factor four above, the state proceedings do not appear to have progressed beyond the pleadings stage, while discovery has closed in this case and trial will occur in approximately four months. This factor weighs strongly against abstention.

### 8. The presence or absence of concurrent jurisdiction

**\*7** This Court and the North Carolina court have concurrent jurisdiction over the breach of contract claims. "The presence of concurrent jurisdiction only marginally, if at all, favors abstention." *PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 208

(6th Cir. 2001). However, as noted above, the North Carolina court does not have jurisdiction over the interpleaded funds. This factor is thus ambiguous at best, and weighs against abstention. *See Focus Radio*, 853 F. Supp. at 256.

### C. Balancing the factors

It bears repeating that the balance begins heavily weighted in favor of exercising jurisdiction. *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 16. The question then is whether the factors in favor of abstention can tip the scale in the other direction. Here, the question is not close. The only factor favoring abstention is the adequacy of the North Carolina court to protect Crestmark's rights. Abstention is not warranted here.

### IV. Conclusion

Accordingly, Electrolux's motion to strike Crestmark's sur-reply (Dkt. 27) is DENIED; and

Electrolux's motion to stay these proceedings in favor of the North Carolina action (Dkt. 22) is DENIED.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2015 WL 13541146

### Footnotes

1     The pendency of this motion should have presented no obstacle to discovery; as Electrolux notes in its brief, any discovery can be used equally in this action or in the North Carolina action. (*See* Dkt. 22, Def.'s Br. 20.)

**End of Document**                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB F

784 Fed.Appx. 390
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

HEALTHCARE COMPANY LTD. Plaintiff-Appellant,

v.

UPWARD MOBILITY, INC. dba
Bed Boss. Defendant-Appellee

No. 18-5781
|
FILED August 22, 2019

**Synopsis**
**Background:** Mattress dealer brought action against mattress
manufacturer alleging breach of contract. Manufacturer
moved to dismiss, or, in the alternative, for a stay. The
United States District Court for the Eastern District of
Tennessee, Susan K. Lee, United States Magistrate Judge,
granted manufacturer's motion for a stay, and dealer appealed.

**Holdings:** The Court of Appeals, Batchelder, Senior Circuit
Judge, held that:

appellate court had jurisdiction to consider court's abstention
decision as final;

proceedings were parallel under *Colorado River* abstention
doctrine analysis;

inclusion of additional parties in state proceeding did not
upset otherwise substantial symmetry between federal and
state actions; and

weight of *Colorado River* factors favored district court
abstention.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Stay.

**\*391** ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT OF
TENNESSEE

**Attorneys and Law Firms**

Anthony Philip Lomonaco, Counsel, Law Offices, Knoxville,
TN, for Plaintiff-Appellant

Nathaniel S. Goggans, Justitia Law Firm, Chattanooga, TN,
for Defendant-Appellee

BEFORE: BOGGS, BATCHELDER, and BUSH, Circuit
Judges.

**Opinion**

ALICE M. BATCHELDER, Circuit Judge.

Healthcare Co. Ltd. ("Healthcare Co.") appeals the district
court's decision in a breach of contract case to abstain under
the *Colorado River* [1] doctrine until the conclusion of related
state court proceedings. Healthcare Co. argues the federal
case is not parallel to the state case and that, even if the cases
are parallel, a balancing of the *Colorado River* factors weighs
against abstention. We disagree and affirm the district court.

**I.**

At some point prior to 2009, Ben Folkins and his wife,
Andrea, founded Upward Mobility, a mattress distributorship
in Chattanooga, Tennessee, that did business under the
name "The Bed Boss." Upward Mobility's mattresses were
manufactured by Healthcare Co., a Chinese company. While
producing mattresses for Upward Mobility, Healthcare Co.
simultaneously manufactured and marketed mattresses under
its own label, MLILY, in various countries. In 2011, Zhanggen
Ni, the President and Chief Executive Officer of Healthcare
Co., approached Ben Folkins to request his assistance in
marketing MLILY-branded bedding in the United States.
Folkins and Ni created a new partnership, China Beds Direct
(CBD), to be the exclusive distributor of MLILY products in
the United States to companies that owned or distributed to
fewer than twenty storefronts. Folkins owned 45% of CBD,
and Healthcare Group owned 55%. [2] Folkins was named
President and Chief Operating Officer of CBD, and Ni was
named its Vice-President and Chief Executive Officer.

Over the ensuing years, Folkins and Ni frequently disagreed and accused each other of violating the partnership's terms. On December 8, 2016, Folkins told Ni that he intended to withdraw as a member of CBD effective September 31, 2017. Pursuant to the CBD Operating Agreement, Folkins requested a $3,122,500 buyout, which Healthcare Co. refused, countering instead with a $1,080,000 buyout offer. Folkins refused the counteroffer, and the relationship between Folkins and Healthcare Co. continued to deteriorate.

At some point during 2016, while the dispute between them brewed, Folkins ordered six containers of mattresses from Healthcare Co. for Upward Mobility. The containers were shipped and delivered. Prior to payment's coming due on those six containers, Folkins ordered three more containers of mattresses. Healthcare Co. **\*392** shipped the containers, but before they were delivered to Upward Mobility, payment for the six containers came due and Folkins refused to pay. Healthcare Co. responded by diverting the three containers. Folkins struck back on March 17, 2017, by filing a complaint in the Chancery Court for Hamilton County, Tennessee, against Healthcare Co., Healthcare Group, and Ni. Folkins's complaint covered much more than the dispute about the nine containers of mattresses. The complaint covered all the disagreements between Folkins and his Chinese counterparts over CBD and contained nine counts: unjust enrichment, breach of fiduciary duties, intentional interference with business relationships, procurement of breach of contract, conversion, defamation, declaratory judgment, and two counts of breach of contract. The count of conversion related specifically to the dispute between Folkins and Healthcare Co. over the nine containers of mattresses.

Approximately six months after Folkins filed his state-court complaint, Healthcare Co. filed a federal claim for breach of contract regarding only the nine containers of mattresses. Healthcare Co. and Upward Mobility partially settled as to the first six containers, leaving only the dispute about the three remaining containers and miscellaneous costs related to the six containers. Healthcare Co. refuses to deliver the three containers because it claims Upward Mobility still owes unspecified "costs" for Upward Mobility's "breach of payment on the containers already delivered" as well as "storage and handling fee[s]" for the three containers "in excess of $79,067.35," exclusive of interest. Healthcare Co. claims that it "has financial concerns that if it delivers the three containers to the Defendant, who has breached payment on previous containers, it will be difficult to collect the debt owed to the Plaintiff." However, Healthcare Co. promises to

"deliver the three containers to Defendant" upon full payment for the three containers and all outstanding costs.

Upward Mobility moved to dismiss Healthcare Co.'s federal claim pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(1), and 12(b)(6), or, in the alternative, for a stay under the *Colorado River* abstention doctrine. The district court declined to decide the motion to dismiss but granted the stay. Healthcare Co. appeals only the stay. Upward Mobility argues that the state and federal proceedings are parallel proceedings and the enumerated *Colorado River* factors weigh in favor of the district court's declining to exercise jurisdiction until the completion of the state proceeding. We agree.

## II.

We must determine first whether we have jurisdiction to decide this appeal. Federal courts of appeals have jurisdiction over "final decisions of the district courts of the United States." 28 U.S.C. § 1291. Both parties assume that the district court's decision to abstain was a final decision, but we have found previously that not all abstention decisions are final, appealable orders. *See, e.g., Clark v. Adams,* 300 F. App'x 344, 351 (6th Cir. 2008) (holding that abstention under the *Younger* abstention doctrine was not a final, appealable order because the district court's decision to abstain did not put the plaintiffs "effectively out of court").

A district court's decision to abstain is a final decision if "there [will] be no further litigation in the federal forum" because "the state court's judgment on the issue [will] be res judicata." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 10, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Thus, in *Clark,* where we determined there were four issues for the district **\*393** court to decide after the state proceeding concluded, we held the district court's decision to abstain was not a final, appealable order because "there [were] clearly issues that remain to be decided by the federal court after resolution of the state court case." 300 F. App'x at 348, 351. Conversely, in *RSM Richter, Inc. v. Behr Am., Inc.*, we held that the district court's abstention decision was appealable because after the state court proceedings there would be nothing left for the district court to decide—abstaining was "the practical equivalent of an order dismissing the case." 729 F.3d 553, 557 (6th Cir. 2013) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 713, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996)).

The district court's order leaves open the possibility that some litigation could continue in federal court after the state proceeding has concluded. RE 62 at 512 ("Upon resolution of the State Court Case ... the parties shall jointly submit a report to the Court indicating the status of the State Court Case, and ... whether either party believes there are any remaining issues for this Court to address.") But the only issue in the federal case—breach of contract—is part-and-parcel of one of the claims before the state court—Upward Mobility's claim of conversion for the containers of mattresses. In Tennessee, "[t]he elements of a conversion claim include: (1) an appropriation of another's tangible property to one's use and benefit; (2) an intentional exercise of dominion over the chattel alleged to have been converted; and (3) defiance of the true owner's rights to the chattel." *White v. Empire Express, Inc.*, 395 S.W.3d 696, 720 (Tenn. Ct. App. 2012). In making determinations regarding elements (1) and (3), the state court will have to adjudicate the contract dispute. Because the state court's decision on the contract will be res judicata in the federal case, the district court's decision to abstain puts Healthcare Co. "effectively out of [federal] court," and therefore we have jurisdiction to consider its appeal. *Moses H. Cone*, 460 U.S. at 10, 103 S.Ct. 927.

### III.

The *Colorado River* abstention doctrine is premised on "considerations of judicial economy and federal-state comity." *Romine v. Compuserve Corp.*, 160 F.3d 337, 339 (6th Cir. 1998). The doctrine recognizes that although federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them, considerations of judicial economy and federal-state comity may justify abstention in situations involving the contemporaneous exercise of jurisdiction by state and federal courts." *Id.* (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). A *Colorado River* analysis has two steps. First, we must determine whether the state and federal proceedings are parallel. *Id.* If they are not parallel, the district court should not abstain. If they are parallel, we weigh the eight *Colorado River* factors to determine whether abstention is merited. *Id.* at 340–41.

We review de novo the district court's determination that the proceedings are parallel. *Heitmanis v. Austin*, 899 F.2d 521, 527 (6th Cir. 1990). Healthcare Co. argues that the district court erred in three ways: (1) the state court and federal court proceedings involve different legal theories for recovery; (2) the court should look only at claims that were made, not claims that might have been made; and (3) the parties in the two proceedings are not identical. We address these objections in turn.

*The state and federal proceedings involve different legal theories for recovery*. Healthcare Co. cites *Baskin v. Bath Twp.*   **\*394**  *Bd. of Zoning Appeals* for the proposition that when "two actions arise out of the same basic facts, but they each contest a different aspect of" the disputed issue and each party seeks "different relief," the actions are not parallel. 15 F.3d 569, 572 (6th Cir. 1994). Healthcare Co. argues that conversion and breach of contract are separate causes of action and cites several Tennessee court cases that have distinguished between contractual and tort liability. Thus, Healthcare Co. asserts that the district court erred in holding that a final decision on conversion in the state court would decide the breach of contract issue in the federal action.

Healthcare Co. is wrong. Parallelism does not require identical causes of action in the state and federal lawsuits. In *Romine*, for example, four class-action lawsuits were filed —two at the state level, and two at the federal level. 160 F.3d at 338–39. The two federal cases were filed in the same district court, and the court consolidated the federal cases and stayed them pending resolution of the state proceedings. *Id.* at 339. In affirming the district court, we acknowledged that the "state action [was] ... more comprehensive than the consolidated federal cases." *Id.* at 340. But we went on to state that "exact parallelism is not required; [i]t is enough if the two proceedings are substantially similar." *Id.* at 340 (quotation marks omitted). We concluded that where the federal claims were "predicated on the same allegations as to the same material facts ... the actions must be considered 'parallel' for the purposes of the *Colorado River* abstention doctrine." *Id.*

Applying this principle to *Baskin*, the case that Healthcare Co. relies on, it is easy to see why the result was different. Baskin applied for a zoning variance for five amateur-radio towers and antennae. 15 F.3d at 570. He received the variance but was then sued in state court by a group of local homeowners opposing the variance. *Id.* Baskin intervened in the state proceeding to defend the variance. *Id.* Simultaneously, he filed a federal lawsuit claiming that the Board of Zoning Appeals "failed to reasonably accommodate his use of his FCC amateur radio operator's license and violated his federal constitutional rights to equal protection and substantive due process." *Id.* In the state action, Baskin was *defending* the variance as not overly excessive; in the federal action, Baskin

was *attacking* the variance as too restrictive. The district court abstained, and Baskin appealed. We reversed, noting that although the two lawsuits arose "out of the same basic facts ... they each contest[ed] a different aspect of the variance granted by the Township zoning board and they [sought] different relief." *Id.* at 572.

The instant case is similar to *Romine*, not *Baskin*. The state lawsuit is broader, but just as in *Romine*, the proceedings are nevertheless "substantially similar." *Romine*, 160 F.3d at 340. As discussed in Part II *supra*, adjudication of Upward Mobility's conversion claim will require determination of issues dispositive of Healthcare Co.'s breach of contract claim. The proceedings in both courts are therefore "predicated on the same allegations as to the same material facts;" that the two parties pursue separate legal theories is of no consequence. *Id.*

*Only actual claims, not theoretical claims, count in a parallelism analysis.* Healthcare Co. again cites *Baskin*, this time for the proposition that, "in deciding whether a state action is parallel for abstention purposes, the district court must compare the issues in the federal action to the issues actually raised in the state court action, not those that might have been raised." 15 F.3d at 572. Healthcare Co. admits that it could have brought a counterclaim **\*395** for breach of contract in the state action but did not do so. Healthcare Co. appears to be arguing that the lawsuits would have been parallel if it had brought a breach of contract counterclaim in state court, but because it did not, the lawsuits are not parallel. Healthcare Co. is correct that *Baskin* says we may examine only claims that were made, not claims that might have been made. But as our prior analysis shows, here we do not need to examine claims that might have been made to determine that the two proceedings are substantially similar. This argument fails.

*The parties in the two proceedings are not identical.* Healthcare Co. does not cite any cases for its argument that if the parties in two actions are not identical, the actions are not parallel. And for good reason: we have never held that identity of parties is required for parallelism. In fact, we have held the opposite. *See, e.g., Preferred Care of Delaware, Inc. v. VanArsdale,* 676 F. App'x 388, 394 (6th Cir. 2017) ("Even if, as [Appellant] argues, the state suit includes parties ... beyond those in the federal suit, this court has nonetheless held that such [a] difference[ ] will not upset an otherwise substantial symmetry between a federal and state action."). Here, Healthcare Co. and Upward Mobility are each parties

in both the federal and state proceedings. That is enough for "substantial symmetry." *Id.* "If the rule were otherwise, the *Colorado River* doctrine could be entirely avoided by the simple expedient of naming additional parties." quoting *Romine*, 160 F.3d at 340 (quoting *Lumen Constr., Inc. v. Brant Constr. Co.*, 780 F.2d 691, 695 (7th Cir.1985)).

We hold that the state and federal proceedings are parallel.

## IV.

Because the proceedings are parallel, we proceed to step two of the analysis and consider the eight *Colorado River* factors:

> (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation ... (4) the order in which jurisdiction was obtained. ... (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction.

*Romine*, 160 F.3d at 340–41 (citations omitted). These factors do not constitute "a mechanical checklist." *Moses H. Cone,* 460 U.S. at 16, 103 S.Ct. 927. Rather, courts should "careful[ly] balanc[e] ... the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Id.*

The first, second, and seventh factors weigh against abstention. Regarding the first factor, neither court has assumed jurisdiction over any res or property; regarding the second factor, the state and federal courts are less than a mile apart. *See Bates v. Van Buren Twp.*, 122 F. App'x 803, 807 (6th Cir. 2004) (holding that when no res was involved and "there is no reason to think the federal forum is less convenient," the factors weigh against abstention). The seventh factor weighs against abstention but, as the district court noted, "only slightly" because "[b]oth cases appear to be

in their early stages." The edge goes to the federal proceeding because the parties have already settled as to six containers, for \$241,690.00. No settlement has occurred in the state proceeding. However, as neither case has yet proceeded to discovery, the district court was correct to find that both cases are in their early stages, and the weight against abstention is therefore very light.

**\*396** The remaining factors weigh in favor of abstention. Regarding the third factor, the state court will necessarily address whether there was a breach of contract in its determination of the conversion claim because adjudication of a conversion claim requires the court to identify to whom the property belongs. If both actions were permitted to go forward, two courts would be adjudicating the same legal issue—the classic piecemeal litigation situation. *See Cass River Farms, LLC v. Hausbeck Pickle Co.*, 2016 WL 5930493, at \*6 (E.D. Mich. Oct. 12, 2016) ("If the Court were to exercise jurisdiction, the contracts between the parties would be interpreted twice and potentially in contradictory ways. That result would not only waste of judicial resources, but it would also harm the legitimacy of the court system.") (quoting *Romine*, 160 F.3d at 341).

The fourth factor weighs in favor of abstention because the state suit was filed six months prior to the filing of the federal case**;** *Bates*, 122 F. App'x at 807. The fifth factor weighs in favor of abstention because Tennessee law would govern the breach of contract claim. *Id.* The sixth factor weighs in favor of abstention because, despite Healthcare Co.'s arguments to the contrary, there is no legitimate reason the state court is not adequate to adjudicate the dispute. Healthcare Co. argues that "the state court proceeding involves many issues and many parties that may confuse the jury if it goes to trial," but complex litigation does not render a state court

inadequate to hear a dispute. Finally, the eighth factor weighs in favor of abstention because there is no exclusive federal jurisdiction over the breach of contract at issue in the federal case. *VanArsdale*, 676 F. App'x at 397 ("[T]he presence of concurrent jurisdiction ... counsels in favor of abstention.").

In conclusion, three factors weigh against abstention, and five factors weigh in favor of abstention. The weight of the factors is in favor of abstention, and we therefore hold the district court did not err in deciding to abstain. In so holding, we recognize that abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Colorado River*, 424 U.S. at 813, 96 S.Ct. 1236. We nevertheless find abstention warranted because the driving principle of *Colorado River* abstention is "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Colorado River*, 424 U.S. at 817, 96 S.Ct. 1236 (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183, 72 S.Ct. 219, 96 L.Ed. 200 (1952)). Where, as here, the only issue in the federal litigation will be decided by a state proceeding that was filed first, is governed by state law, and is at least as far along as the federal proceeding, to hold otherwise would contravene the spirit of the *Colorado River* doctrine.

### V.

For the foregoing reasons, we **AFFIRM** the decision of the district court.

**All Citations**

784 Fed.Appx. 390

## Footnotes

1    The abstention doctrine derives from the Supreme Court's decision in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

2    Healthcare Group is a wholly-owned subsidiary of Healthcare Co. and is registered to do business in Tennessee.

---

**End of Document**                                             © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB G

2019 WL 4127158
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Robert HOFFMAN, Plaintiff,

v.

Teresa KIK, Defendant.

CIVIL ACTION NO. 18-cv-11908
|
Signed 08/09/2019

**Attorneys and Law Firms**

Robert Hoffman, Jackson, MI, pro se.

Joseph Yung-Kuang Ho, Elizabeth R. Husa Briggs, Michigan Department of Attorney General, Lansing, MI, for Defendant.

**REPORT AND RECOMMENDATION**

MONA K. MAJZOUB, UNITED STATES MAGISTRATE JUDGE

*1 Plaintiff Robert Hoffman, proceeding *pro se*, initiated this prisoner civil rights action pursuant to 42 U.S.C. § 1983 against Defendant Teresa Kik on June 6, 2018, alleging violations of his First and Fourteenth Amendment rights. (Docket no. 1.) This action is presently before the court on four motions: (1) Defendant's Motion to Dismiss (docket no. 10); (2) Plaintiff's Motion Seeking Leave to Amend His Complaint (docket no. 13); (3) Defendant's Motion to Dismiss Plaintiff's Amended Complaint (docket no. 17); and (4) Plaintiff's Motion Seeking Leave for a Second Amendment of Plaintiff's Complaint (docket nos. 20, 21). Plaintiff responded to Defendants' Motions to Dismiss (Docket nos. 16, 24). And Defendant filed an Objection to Plaintiff's Motion Seeking Leave for a Second Amendment, to which Plaintiff replied. (Docket nos. 23, 25). This action has been referred to the undersigned for all pretrial purposes. (Docket no. 15.) The undersigned has reviewed the pleadings, dispenses with oral argument on the Motions pursuant to Eastern District of Michigan Local Rule 7.1(f), and issues this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I. RECOMMENDATION**

For the reasons that follow, it is recommended that Defendant's Motion to Dismiss (docket no. 10) be **DENIED** as moot, Plaintiff's Motion Seeking Leave to Amend His Complaint (docket no. 13) be **GRANTED** as a matter of course, Defendant's Motion to Dismiss Plaintiff's Amended Complaint (docket no. 17) be **DENIED,** Plaintiff's Motion Seeking Leave for a Second Amendment of Plaintiff's Complaint (docket no. 20) be **GRANTED**, and Plaintiff's Second Amended Complaint be accepted as filed (docket no. 21).

**II. REPORT**

**A. Plaintiff's Complaint**

Plaintiff is currently incarcerated at the Parnall Correctional Facility in Jackson, Michigan; however, the events giving rise to the Complaint allegedly occurred between May and July 2017, while he was incarcerated at the G. Robert Cotton Correctional Facility also in Jackson, Michigan. (*See* docket no. 1 at 1-2.) Plaintiff alleges that he turned in ten prisoner-to-prisoner mail forms (CSJ-100s) on May 25, 2017. According to Plaintiff, Defendant called him in to her office on May 31, 2017, and asked him why he had turned in those forms. When Plaintiff told Defendant that they were witnesses in a civil lawsuit, Defendant replied that Plaintiff was engaged in a fishing expedition and indicated that she was going to deny them. Plaintiff told Defendant that she didn't have the authority to reject them because according to policy DOM 2017-4, she was required to turn them in to the Office of Legal Affairs. Defendant then allegedly asked Plaintiff if he knew the transfer policy, and when he said "no," she said, "You better get familiar with it you'll be transferring soon, prisoners who quote policy to me get squashed like the bugs they are."

On June 22, 2017, Plaintiff allegedly went to Defendant's office to have an affidavit notarized and to send out a subpoena using certified/return receipt mail and legal mail. Defendant allegedly told Plaintiff that he could not send a certified letter without a court order, and Plaintiff replied that MDOC mail policy said that he could send as much certified mail as he wanted. Plaintiff alleges that Defendant responded to him by stating, "I told you not to quote policy to me, you better pack your property, I'm riding you out." Defendant then signed the two legal mail forms as Plaintiff requested. According to Plaintiff, Defendant sent an email to the facility's transfer coordinator regarding Plaintiff eight minutes later.

**\*2** On July 9, 2017, a corrections officer told Plaintiff to pack his things because he was being transferred the next day. Plaintiff asked Defendant about the reason for his transfer, and Defendant allegedly answered, "That's what happens when you quote policy to me."

Plaintiff claims that Defendant violated his First and Fourteenth Amendment rights to be free from retaliation while he was engaged in the protected conduct of accessing the courts, *i.e.*, locating witness and sending out legal mail. He claims that as a result of Defendant's retaliatory actions, he lost his high-paying prison job, lost the help of his prisoner legal assistant, and was transferred away from his family in Jackson. As relief, Plaintiff seeks compensatory damages in excess of $75,000, punitive damages, exemplary damages, and presumed damages, among other things.

### B. Governing Law

#### 1. Motion to Amend Standard

Federal Rule of Civil Procedure 15(a) provides that a "party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). Otherwise, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Factors relevant to the determination of whether to permit an amendment include "the delay in filing, the lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 605 (6th Cir. 2001). The decision whether to grant a motion to amend is within the sound discretion of the court. *Id.* "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000) (citation omitted).

#### 2. Motion to Dismiss Standard

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint.

When deciding a motion under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). To survive a Rule 12(b)(6) motion, the complaint must contain direct or inferential allegations concerning all material elements of each claim and must allege sufficient facts to state a claim to relief that is plausible on its face. *Bishop v. Lucent Tech., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

#### 3. Qualified Immunity Standard

Under qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817–818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). That is, " '[t]he defense of qualified immunity protects officials from individual liability for monetary damages but not from declaratory or injunctive relief.' " *Top Flight Entertainment, Ltd. v. Schuette*, 729 F.3d 623, 635 n.2 (6th Cir. 2013) (quoting *Flagner v. Wilkinson*, 241 F.3d 475, 483 (6th Cir. 2001)).

**\*3** The Sixth Circuit has set forth a tri-part test to determine whether a defendant is entitled to qualified immunity: whether (1) "the facts viewed in the light most favorable to the plaintiff[ ] show that a constitutional violation has occurred;" (2) "the violation involved a clearly established constitutional right of which a reasonable person would have known;" and (3) "the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (citing *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)). The court may, however, take up these considerations in any order. *See Pearson v. Callahan*, 555 U.S. 223 (2009).

"A defendant who invokes the qualified immunity defense must present facts which, if true, would entitle him to immunity." *Noble v. Schmitt*, 87 F.3d 157, 161 (citing *Poe v. Haydon*, 853 F.2d 418, 425 (6th Cir. 1988), cert. denied, 488 U.S. 1007 (1989)). If the defendant does so, "the burden is on

the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *See id.*; *see also, Silberstein v. City of Dayton,* 440 F.3d 306, 311 (6th Cir. 2006) (citing *Barrett v. Steubenville City Schools,* 388 F.3d 967, 970 (6th Cir. 2004)). "The [plaintiff] will defeat a qualified immunity defense if he can produce sufficient evidence after discovery to prove the existence of genuine issues of material fact regarding the issue of immunity." *Noble,* 87 F.3d at 161 (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)).

### C. Analysis

#### 1. Defendant's First Motion to Dismiss and Plaintiff's First Motion to Amend

Defendant moved to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, on October 5, 2018. (Docket no. 10.) The crux of Defendant's Motion is that Plaintiff failed to allege sufficient facts to show that the transfer resulted in the foreseeable, negative consequences necessary to cause it to rise to the level of an adverse action and that she is otherwise entitled to qualified immunity. On October 18, 2018, Plaintiff filed a Motion Seeking Leave to Amend His Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B). (Docket no. 13.) In his Amended Complaint, Plaintiff attempts to cure the deficiency identified by Defendant in her Motion to Dismiss, by alleging that on May 31, 2017, after his conversation with Defendant was over, he went back to her office and begged her not to transfer him. He alleges that he explained to Defendant that his elderly mother lived in Jackson and was in poor health, and if he was transferred, he wouldn't get to see her at all. Plaintiff also alleges that he told Defendant that if he lost his job, he would not be able to afford to conduct depositions in an ongoing civil lawsuit regarding his left hand. Defendant allegedly responded, "[D]on't quote policy to me again[;] I don't like it." (*Id.* at 5.) Plaintiff also added an allegation that the transfer subjected him to harsher prison conditions. (*Id.* at 8.)

Plaintiff filed his Motion Seeking Leave to Amend His Complaint 13 days after Defendant filed her Motion to Dismiss, within the 21-day period set by Rule 15(a)(1)(B). As Defendant admits, Plaintiff's amendment is therefore available by right under the Rule. (*See* docket no. 17 at 7.) Accordingly, Plaintiff's Motion Seeking Leave to Amend His Complaint (docket no. 13) should be granted, and Defendant's Motion to Dismiss (docket no. 10) should be denied as moot.

#### 2. Defendant's Second Motion to Dismiss and Plaintiff's Second Motion to Amend

**\*4** Perhaps in anticipation of the recommendation above, Defendant filed a Motion to Dismiss Plaintiff's Amended Complaint. (Docket no. 17.) In this Motion, Defendant maintains that she is entitled to qualified immunity because (1) the conduct in which Plaintiff was engaged – quoting policy to Defendant and disregarding her instruction not to do so – does not constitute the protected conduct necessary to state a claim for retaliation under clearly established law; and (2) Plaintiff's transfer does not constitute an adverse action under clearly established law.

Plaintiff responded to Defendant's Motion to Dismiss his Amended Complaint by filing a Motion Seeking Leave for a Second Amendment of Plaintiff's Complaint.[1] (Docket nos. 20, 21.) Plaintiff seeks this leave to (1) clarify facts concerning his protected conduct and characterize it as an oral grievance; (2) clarify facts regarding how the loss of his prison job hindered his ability to access the courts; and (3) drop two of the alleged adverse consequences of his transfer – his loss of the legal assistance of another prisoner and harsher prison conditions. (*Id.* at 5.) Plaintiff asserts that leave to file a Second Amended Complaint should be granted because he was not dilatory in filing the instant Motion, he notified opposing counsel of his intent to file the Motion, and he is not acting in bad faith, just trying to more clearly define his claims in response to the deficiencies alleged by Defendant. (*Id.* at 7.) Defendant objects to Plaintiff's Motion for Seeking Leave for a Second Amendment of Plaintiff's Complaint on the basis that the amendment would be futile for the reasons explained in her second Motion to Dismiss. (Docket no. 23.) The undersigned will now proceed to evaluate Plaintiff's proposed Second Amended Complaint for futility.

Plaintiff claims that Defendant violated his First and Fourteenth Amendment rights to be free from retaliation. (Docket no. 21.) Prison officials may not retaliate against inmates who have engaged in constitutionally protected activities or conduct. *Thaddeus-X v. Blatter,* 175 F.3d 378, 394 (6th Cir. 1999). A retaliation claim has three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct;

and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Id.* (citations omitted).

### a. Protected Conduct

Plaintiff alleges that disputes arose between him and Defendant on May 31, 2017 and June 22, 2017, while he was engaged in the protected conduct of accessing the courts; specifically, while he was seeking approval of prisoner-to prisoner mail forms related to a civil lawsuit and attempting to have an affidavit notarized and send a subpoena via certified mail. When Defendant challenged Plaintiff's requests, Plaintiff attempted to and did successfully resolve the disputes by quoting the relevant MDOC policy to Defendant. However, Defendant allegedly did not like the fact that Plaintiff quoted policy to her, threatened to transfer Plaintiff if he didn't stop quoting policy, and eventually did initiate Plaintiff's transfer for continuing to quote policy. (Docket no. 21.)

Defendant argues that quoting policy does not constitute protected conduct for purposes of a retaliation claim. But for the first time in the proposed Second Amended Complaint, Plaintiff alleges that he quoted policy to Defendant in an effort to resolve his disputes through a verbal grievance. Defendant does not address this new allegation in her objection to Plaintiff's Second Amended Complaint.

**\*5** "An inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf." *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). This is true whether the grievance is written or oral. *Maben v. Thelen*, 887 F.3d 252, 265 (6th Cir. 2018), *reh'g denied* (Apr. 19, 2018). Where prison policy, like that of the MDOC, requires that prisoners raise their grievances orally with staff before filing a formal, written grievance, "[i]t would be an unfair and illogical result for prisons to ... be able to argue that a retaliation claim fails because the prisoner filed an oral, rather than written, complaint." *Id.* at 265-66. In other words, a prisoner "should not be punished for complying with prison policy, nor should prison officials be allowed to retaliate against [a prisoner] for making an oral grievance." *Id.* at 266.

Here, throughout the proposed Second Amended Complaint, Plaintiff maintains that he quoted MDOC policy to Defendant as part of a verbal grievance in order to resolve his and Defendant's disputes regarding his legal correspondence.

Accordingly, Plaintiff has sufficiently pleaded that he was engaged in protected conduct.

### b. Adverse Action

An action "capable of deterring a person of ordinary firmness from exercising the constitutional right in question" is an adverse action. *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (citation, internal quotation marks, and emphasis omitted). A plaintiff need not show "actual deterrence;" "[e]ven the threat of an adverse action can satisfy this element if the threat is capable of deterring a person of ordinary firmness from engaging in the protected conduct." *Id.* "[W]hile certain threats or deprivations are so *de minimis* that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Thaddeus-X*, 175 F.3d at 398. "Whether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a question of fact." *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002) (citations omitted). "[O]nly *de minimis* violations should be dismissed as a matter of law; in general, the adverseness question should survive the pleading stage." *Kennedy v. Bonevelle*, 413 F. App'x 836, 840 (6th Cir. 2011) (citing *Bell, supra*).

"Since prisoners are expected to endure more than the average citizen, and since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct." *Siggers-El v. Barlow*, 412 F.3d 693, 701-02 (6th Cir. 2005) (citing *Smith v. Yarrow,* 78 F. App'x 529, 543-44 (6th Cir. 2003) (collecting cases)). An exception lies where the transfer would result in "foreseeable, negative consequences" to the prisoner. *Hill*, 630 F.3d at 474-75 (citations omitted).

Plaintiff alleges in the Second Amended Complaint that when Defendant first threatened to transfer him on May 31, 2017, he begged her not to transfer him and explained to her that if he was transferred, he would not be able to see his elderly, ailing mother and he would lose his job, so he would be unable to pay for and conduct the deposition of a non-party medical witness in an ongoing civil rights lawsuit regarding his left hand. (Docket no. 21 at 3.) According to Plaintiff, that deposition was his only means of discovering information from that witness. (*Id.* at 5.) Plaintiff alleges that Defendant's

retaliatory transfer did indeed result in these "foreseeable, adverse consequences." (*Id.* at 6-7.) Specifically, Plaintiff alleges that he lost his high-paying job as a result of the transfer, which in turn hindered his ability to access the court because he could not pay for the deposition of the non-party medical witness. Plaintiff alleges that without the deposition, he was unable to sustain the subjective element of his non-frivolous Eighth Amendment claim and lost his case at the summary judgment stage. Plaintiff also alleges that he was moved away from his mother who is unable to travel long distances due to the effects of her Alzheimer's disease. (*Id.* at 7.)

 **\*6** There is conflicting Sixth Circuit case law regarding whether a transfer that makes it more difficult for a prisoner's family and friends to visit constitutes an adverse action. Two recent unpublished Sixth Circuit opinions suggest that it does not. In *Johnson v. Hoffner*, the Sixth Circuit held that transferring a prisoner to an "institution [that] was located farther away from those who visited him" did not rise to the level of an adverse action. No. 17-2102, 2018 WL 4488737, at \*3 (6th Cir. Apr. 20, 2018) (quoting *Friedman v. Corr. Corp. of Am.*, 11 F. App'x 467, 471 (6th Cir. 2001)). Similarly, in *Smith v. Weers*, the Sixth Circuit held that "a prison transfer does not constitute an adverse action simply because it makes it more difficult for friends and family to visit the prisoner." No. 17-1504, 2018 WL 2087122, at \*4 (6th Cir. Jan. 2, 2018). But the Sixth Circuit previously held in *Pasley v. Conerly* that threats to move a prisoner to a location where his family would not be able to visit him could constitute an adverse action and that the prisoner's allegations of such threats met the low requirements for surviving dismissal. 345 F. App'x 981, 985-86 (6th Cir. 2009). The Sixth Circuit later acknowledged and accepted the *Pasley* decision in *Hill v. Lappin*, *supra*, and characterized it as "holding that a threat to transfer the prisoner far away from the prisoner's family was an adverse action because it was foreseeable that his family would not be able to visit him." 630 F.3d at 475.

In light of this precedent, Plaintiff's claim of retaliatory transfer that resulted in the foreseeable consequence of being moved away from his mother might be sufficient to survive a motion to dismiss, but it cannot survive Defendant's Motion to Dismiss, as Defendant argues not only that Plaintiff's Complaint fails to state a claim upon which relief can be granted but also that she is entitled to qualified immunity. Specifically, she argues that the alleged retaliatory transfer did not violate a clearly established constitutional right of which a reasonable person would have known. "A right

is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred." *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009). Because the authoritative case law on this issue is not conclusive, Plaintiff cannot "show that he had a clearly established right not to be transferred to a prison farther away from family and friends who visited him, or that such a transfer would constitute 'adverse action' for purposes of a retaliation claim." *Kitchen v. Heyns*, No. 14-12883, 2018 WL 5094073, at \*4 (E.D. Mich. July 17, 2018), *report and recommendation adopted*, No. 14-12883, 2018 WL 4560915 (E.D. Mich. Sept. 24, 2018). Therefore, Defendant would be entitled to qualified immunity on this aspect of Plaintiff's retaliation claim, and Plaintiff's proposed Second Amended Complaint is futile in this regard.

The inquiry does not end here, however, as Plaintiff also alleges that he lost his high-paying job as a result of the transfer, which in turn hindered his ability to access the court because he could not pay for the deposition of a non-party witness in another civil rights action. A transfer that results in reasonably foreseeable consequences that inhibit a prisoner's ability to access the courts is an adverse action. *Siggers-El,* 412 F.3d at 701-02. The transfer in *Siggers-El* caused the prisoner to lose "his high paying job that he needed in order to pay his attorney" and "made it more difficult for his attorney to visit with or represent him because he was moved further away from her." *Id.* at 702. The court concluded that the retaliatory transfer constituted an adverse action because the consequences suffered by the prisoner were foreseeable and hindered his access to the courts.

Defendant argues that the consequences suffered by Plaintiff – the lack of funds to take a deposition – is not akin to a denial of access to the courts or the loss of an attorney. (Docket no. 17 at 20.) Defendant does not support this argument with any authority or analysis, and the undersigned declines to develop it on her behalf. Defendant also argues that Plaintiff's assertion that the deposition was his only method for obtaining information from the non-party witness "does not seem to account for the subpoena power authorized in Rule 45 of the Federal Rules of Civil Procedure." (Docket no. 23 at 3.) The point of this argument is unclear. To the extent that Defendant argues that Plaintiff could have sought documents from the non-party witness at a lesser cost, Plaintiff replies that he had already obtained all of his medical records. (Docket no. 25 at 3.) In any case, Rule 45 is the principal means for obtaining discovery,

including depositions, from a non-party witness, and Plaintiff is required to pay for the discovery costs and witness fees associated therewith, even though he is incarcerated and proceeding *in forma pauperis. See Kean v. Van Dyken*, No. 4:05-CV-64, 2006 WL 374502, at *3-4 (W.D. Mich. Feb. 16, 2006) (collecting cases).

**\*7** Here, accepting Plaintiff's allegations in the proposed Second Amended Complaint as true, Plaintiff forewarned Defendant that if she transferred him, he would lose his job and be unable to pay for the deposition of a non-party medical witness in an ongoing civil rights action. And like the prisoner-plaintiff in *Siggers-El*, Plaintiff was transferred and lost his high-paying job as a result, which in turn arguably hindered his access to the courts by rendering him unable to pay for and conduct the deposition of Dr. William Huettner in his then-pending non-frivolous civil rights case, *Hoffman v. Behler*, No. 17-316. Plaintiff alleges that the deposition was the only available method of obtaining the information he needed from Dr. Huettner, and without that information, he was unable to sustain the subjective element of his Eighth Amendment claim, which led to a grant of summary judgment in favor of the defendant(s). Plaintiff has sufficiently alleged that his transfer resulted in foreseeable consequences that inhibited his ability to access the courts, and under the clearly established law in *Siggers-El*, he has therefore sufficiently alleged that he suffered an adverse action.

### c. Motivating Factor

"This element addresses whether [a defendant's] subjective motivation for taking the adverse action was at least in part to retaliate against the prisoner for engaging in protected conduct." *Hill*, 630 F.3d at 475 (citation omitted). Evidence of retaliatory motive can include "the disparate treatment of similarly situated individuals or the temporal proximity between the prisoner's protected conduct and the official's adverse action." *Id.* at 475-76 (citation omitted). Here, Plaintiff alleges that Defendant verbally threatened to transfer him for quoting policy and then, "a mere eight minutes" after Plaintiff quoted policy to her on June 22, 2017, Defendant sent an email to the correctional facility's transfer coordinator regarding Plaintiff, which email is attached as an exhibit to the Proposed Second Amended Complaint. Defendant does not challenge Plaintiff's allegations concerning the motivation for her actions. The undersigned finds that the temporal proximity pleaded by Plaintiff demonstrates a causal connection between his protected conduct and Defendant's

allegedly adverse actions sufficient to survive a motion to dismiss.

Plaintiff's proposed Second Amended Complaint successfully pleads a claim of retaliatory transfer and is therefore not futile. Additionally, the other relevant factors weigh in favor of permitting the proposed amendment. For example, Plaintiff asserts that he received Defendants' second Motion to Dismiss on December 11, 2018, and he filed the instant Motion to Amend less than a week later. Plaintiff also asserts that he notified defense counsel of his intent to file this Motion. And through his two amendments, Plaintiff has seemingly been successful in curing the prior deficiencies in his complaints alleged by Defendant. Finally, Defendant does not argue that she would suffer any prejudice if the court were to allow the amendment, and the undersigned finds that any prejudice suffered by Defendant would be minimal. Accordingly, Plaintiff's Second Amended Complaint should be permitted and accepted as filed at docket no. 21.

### D. Conclusion

For the above-stated reasons, the court should **DENY** Defendant's Motion to Dismiss (docket no. 10) as moot, **GRANT** Plaintiff's Motion Seeking Leave to Amend His Complaint (docket no. 13) as a matter of course, **DENY** Defendant's Motion to Dismiss Plaintiff's Amended Complaint (docket no. 17), **GRANT** Plaintiff's Motion Seeking Leave for a Second Amendment of Plaintiff's Complaint (docket no. 20), and accept Plaintiff's Second Amended Complaint as filed (docket no. 21).

## III. NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Eastern District of Michigan Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *U.S. v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2),

a copy of any objections is to be served upon this Magistrate Judge.

 **\*8**  Any objections must be labeled as "Objection #1," "Objection #2," etc. Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than fourteen days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

**All Citations**

Slip Copy, 2019 WL 4127158

## Footnotes

1  Plaintiff has also filed a Response to Defendant's Motion to Dismiss his Amended Complaint, in which many of his arguments are based on the content of his Proposed Second Amended Complaint. (Docket no. 24.)

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB H

2019 WL 7560052
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

The INDIGENOUS AMERICAN
PEOPLE INHABITING the COUNTY OF
WAYNE, MICHIGAN, et al., Plaintiffs,
v.
WAYNE COUNTY MUNICIPAL
CORPORATION, et al., Defendants.

Civil Action No. 19-12579
|
Signed 12/16/2019

**Attorneys and Law Firms**

The Indigenous American People Inhabiting the County of Wayne, Michigan, Lathrup Village, MI, pro se.

Ronald L. March, Lathrup Village, MI, pro se.

Barbara March, pro se.

Malik Bey, pro se.

Kaamala El, pro se.

Betty Taylor, pro se.

Wallace Phelps, pro se.

Doris LaBordeaux, pro se.

Mary J. Peyton, pro se.

Ishmael Bey, pro se.

Alhakeem Elshabazz Ali, pro se.

Amis Rashid El, pro se.

Toylin Hawkins, pro se.

Clifford Stafford, pro se.

Trini Atun El Bey, pro se.

Blair Yvette Daniels, Cynthia M. Yun, Wayne County Corporation Counsel, Detroit, MI, for Defendants Wayne County Muncipal Corporation, Warren C. Evans, Raymond J. Wojtowicz, Eric R. Sabree, Wayne County Treasurer.

Blair Yvette Daniels, Cynthia M. Yun, Janet Anderson-Davis, Wayne County Corporation Counsel, Detroit, MI, for Defendants Cathy M. Garrett, Wayne County Clerk.

James D. Noseda, Detroit City Law Department, Detroit, MI, for Defendants City of Detroit Assessors Division, Mike Duggan.

**ORDER DENYING DEFENDANT
GARRETT'S MOTION TO STRIKE
AMENDED COMPLAINT (ECF NO. 25)**

**and**

**REPORT AND RECOMMENDATION TO
DENY AS MOOT WITHOUT PREJUDICE
DEFENDANT GARRETT'S MOTION TO
DISMISS (ECF NO. 19) AND CORRECTED
MOTION TO DISMISS (ECF NO. 20)**

DAVID R. GRAND, United States Magistrate Judge

**I. REPORT**

 **\*1** On September 3, 2019, Plaintiffs, "The Indigenous American People Inhabiting the County of Wayne, Michigan" ("IAP"), filed a "Petition" in this case, along with a motion for temporary restraining order ("TRO"), seeking to halt a real property auction scheduled for September 4, 2019. [1] (ECF Nos. 1, 2). In a recent ruling in this case, the Honorable Laurie J. Michelson concisely summarized IAP's allegations as follows:

> In its *pro se* complaint, IAP claims that the succession of the Wayne County Treasurer (from Raymond Wojtowicz to Richard Hathaway to Eric Sabree) was unlawful. IAP's complaint also suggests that some (or all) of the homes of its members were unlawfully deemed abandoned. As for its motion [for TRO], IAP describes how the Wayne County Treasurer is not lawfully in office, suggests that the Wayne County Treasurer (or related entity) committed mail fraud, claims that the "Land Mandate" ...

entitles its members to their properties, suggests that property-tax-assessment procedures were not followed, and suggests that proper procedures were not followed in deeming its members' properties abandoned. Many of these claims are difficult to follow and recite verbatim the text of case law, regulations, and statutes. As far as this Court can tell, members of IAP did not pay their taxes – or, at least, the Wayne County Treasurer determined that they had not – and so their homes were foreclosed upon and slated for the September 4 auction.

(ECF No. 13, PageID.168-69) (citations omitted).

On October 25, 2019, Defendant Cathy M. Garrett ("Garrett"), the Wayne County Clerk, filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). (ECF No. 19). On October 28, 2019, Garrett filed a Corrected Motion to Dismiss pursuant to the same Rules. (ECF No. 20).

On November 7, 2019, however, IAP filed an Amended Complaint as a matter of right. *See* Fed. R. Civ. P. 15(a)(1) (B) ("A party may amend its pleading once as a matter of course within ... 21 days after service of a motion under Rule 12(b), (e), or (f) ...."); *see also Broyles v. Correctional Med. Servs.*, No. 08-1638, 2009 WL 3154241, at *3 (E.D. Mich. Jan 23, 2009) (Rule 15(a) gives a plaintiff an "absolute right" to amend a complaint within 21 days of the filing of a responsive pleading).[2]

 **\*2** The law is clear that an amended complaint, when filed, supplants the original complaint and becomes the only live complaint in the case.[3] *See Parks v. Federal Express Corp.*, 1 F. App'x 273, 277 (6th Cir. 2001). *See also Long v. County of Saginaw*, No. 12-15586, 2014 WL 1845811, at *3 fn. 1 (E.D. Mich. May 8, 2014) (quoting 6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1476 (3d ed. 2010)) ("Because amended pleadings supersede original pleadings, 'the original pleading no longer performs any function in the case ...' "). Therefore, any motion directed at the original complaint is moot in the face of the filing of the amended complaint. *See KBT Group, LLC v. City of Eastpointe*, No. 18-10409, 2019 WL 1556194, at *3 (E.D. Mich. Apr. 10, 2019) (explaining that since an amended complaint supersedes the original complaint, a motion to dismiss the original complaint is moot). Thus, the Court should deny without prejudice Garrett's motion (and corrected motion) to dismiss.

## II. RECOMMENDATION

For the reasons set forth above, **IT IS RECOMMENDED** that Garrett's Motion to Dismiss (**ECF No. 19**) and Corrected Motion to Dismiss (**ECF No. 20**) be **DENIED AS MOOT WITHOUT PREJUDICE**.

### All Citations

Slip Copy, 2019 WL 7560052

---

## Footnotes

1    On September 4, 2019, this case was referred to the undersigned for all pretrial purposes pursuant to 28 U.S.C. § 636(b). (ECF No. 7).

2    On November 12, 2019, Garrett filed a Motion to Strike IAP's Amended Complaint, pointing out that both the Federal Rules of Civil Procedure and the Eastern District of Michigan's Local Rules require a party filing papers with the Court to provide his or her contact information, including name, address, e-mail address, and telephone number. (ECF No. 25, PageID.523 (citing Fed. R. Civ. P. 11(a) and E.D. Mich. LR 5.1(a)(E) (ii))). As Garrett correctly noted, the Amended Complaint filed by IAP listed fourteen new individual plaintiffs, but contact information for these individuals was not provided. IAP has since corrected this deficiency and provided contact information for each of the named plaintiffs. (ECF No. 40, PageID.1079-80). For this reason, **IT IS ORDERED** that Garrett's Motion to Strike (**ECF No. 25**) is **DENIED AS MOOT**.

2019 WL 7560052

3     Recognizing this principle, on November 26, 2019, Garrett filed a Second Motion to Dismiss that addresses IAP's amended complaint. (ECF No. 33).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB I

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.385 Filed 03/18/20 Page 43 of 90

Live Cryo, LLC v. CryoUSA Import and Sales, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4098853

2017 WL 4098853
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

LIVE CRYO, LLC, Plaintiff,
v.
CRYOUSA IMPORT AND
SALES, LLC et al., Defendants.

CASE NO. 17-CV-11888
|
Signed 09/15/2017

**Attorneys and Law Firms**

Gavin J. Fleming, Fleming Yatooma & Borowicz PLC,
Bloomfield Hills, MI, for Plaintiff.

Roger P. Meyers, Bush Seyferth & Paige, PLLC, Troy, MI,
for Defendants.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

GEORGE CARAM STEEH, UNITED STATES DISTRICT
JUDGE

 **\*1** This lawsuit arises out of the parties' agreement whereby
defendants provided cryotherapy chambers to plaintiff Live
Cryo, LLC. ("Live Cryo") for use at its Michigan locations.
Cryotherapy chambers, which use liquid nitrogen to maintain
a temperature of about 240 degrees below zero, are used
by clients for alleged health benefits. One of the defendants
herein, defendant CryoUSA Import and Sales LLC, filed a
related lawsuit in Texas state court three days before plaintiff
Live Cryo filed this federal lawsuit. As a result, defendants
argue that this court should abstain under the *Colorado
River* doctrine. Alternatively, defendants seek dismissal of all
claims under Federal Rule of Civil Procedure 12(b)(6) for
failure to state a claim. After defendants filed their motion
for abstention or dismissal, plaintiff filed a First Amended
Complaint without leave of court. As such, plaintiff alleges
defendants' motion is now moot.

In their reply brief, defendants assert that the time period
for filing an amended complaint without leave of court had

expired. Nevertheless, they agree to have the court consider
the First Amended Complaint in deciding their motion to
dismiss, and urge the court to consider their motion this
way rather than elevating form over substance and delaying
resolution of the issues pending here for a second round of
briefing. Because plaintiff had an adequate opportunity to
respond to defendants' arguments, and filed its First Amended
Complaint and Response brief in response to defendants'
motion to dismiss, the court finds it appropriate to adjudicate
the present dispute on the merits. For the reasons set forth
below, the court shall grant defendants' motion to dismiss for
failure to state a claim with respect to the tort and quasi-
contract claims, and shall deny the motion as to the breach of
contract and breach of warranty claims. Oral argument was
heard on August 29, 2017 and informs the court's decision
here.

### I. Background

Because the court is addressing a motion to dismiss, the
factual allegations set forth below are those set forth in
the First Amended Complaint. Plaintiff Live Cryo, LLC
is a Michigan corporation. Defendants CryoUSA Import
and Sales ("Cryo Import"), CryoUSA Franchising, LLC,
CryoUSA Holding, LLC, and CryoUSA Mobile, LLC are
Texas corporations. Defendants Eric Rauscher and Mark
Murdock are the owners of defendant corporations. Plaintiff
alleges that the parties entered into a franchise agreement.
Defendants, on the other hand, deny this and assert that the
two share a distribution agreement, as the parties' agreement
is entitled.

Whole body cryotherapy exposes the entire body to
temperatures as cold as 240 degrees below zero for about
three minutes. The alleged benefits of cryotherapy are more
restful sleep, improved mood, enhanced athletic performance,
increased energy, a stronger immune system, and faster
healing of injuries and muscle aches. Defendants market
themselves as experts in whole body cryotherapy businesses.
Plaintiff alleges that it entered into a franchise agreement with
the defendants following its attendance at a seminar meeting
in Texas in 2016. The agreement is memorialized in writing
in a document entitled, "Distribution Agreement," and which
was executed on July 15, 2016.

 **\*2** According to the First Amended Complaint, at the
business meeting, they received a fifty-three page booklet
which included a return on investment worksheet on one of

the pages. The investment worksheet projected that plaintiff could earn as much as $30,350 per month, assuming fifty clients per day at a cost of $45.00 per session. The workbook further represented that most locations average 10 clients a day within 90 days, that some locations reach the 25 per day mark fairly quickly, and that its Dallas location averages about 50 clients per day. Plaintiff does not allege that the statements regarding the Dallas location and others were fraudulent, only that they were designed to induce reliance on plaintiff's part.

Plaintiff claims that there was no factual basis for the prediction that it could replicate the Dallas location's success, or that it could service as many as 25 clients per day. Plaintiff also claims that representations about the effectiveness of the chambers were fraudulent, and that the chamber at its West Bloomfield location only operated properly for seven days since its January 16, 2017 opening. Plaintiff hired an HVAC technician to examine the chamber, and he concluded that it never reached below negative 166 degrees Fahrenheit on any of the five tests he performed.

The Distribution Agreement provides that plaintiff may exclusively distribute cryotherapy chambers in Michigan for a twenty-four month period that may be renewed upon the payment of $10,000. The Distribution Agreement further provides that plaintiff must purchase 15 chambers within the first six months to maintain its exclusive dealership status. The Agreement provides that defendants control marketing and training, and all of its chambers bear its name and mark. In order to purchase a chamber, plaintiff executes a Purchase Agreement. The cost of a chamber is $50,000.

Defendants train and certify five individuals on chamber operations as part of the purchase price, charge $250.00 for each subsequent person trained, and require that only trained and certified individuals operate the chambers in order for the limited warranty to remain in effect.

The Distribution Agreement contains a choice-of-law provision and forum selection clause:

> 10.3 <u>Venue/Governing Laws</u>. This Agreement is governed by the laws of the State of Texas. Any legal action concerning this Agreement shall be brought in the state and federal courts in Dallas, Texas.

(Doc. 4-1 at PgID 160). The Purchase Agreement also contains a choice-of-law provision and forum selection clause. Specifically, Paragraph 12.4 of the Purchase Agreement provides:

**12.4 Governing Law and Forum Selection**

> This Agreement shall be construed in accordance with the Law of Texas, without regard to its conflicts of laws provisions. The exclusive forum for any litigation arising from or relating to the Agreement and/or for resolving any related disputes shall be Dallas County, Texas state district court (the "Dallas Courts.") All parties irrevocably consent to the exclusive jurisdiction of the Dallas Courts for such purposes.

(Doc. 4-2 at PgID 172).

Plaintiff experienced numerous difficulties with the chambers. On April 26, 2017, plaintiff sent Rauscher and Murdock a letter, through counsel, alleging that defendants had engaged in fraud, were in violation of the Michigan Franchise Investment Law ("MFIL"), had breached the Purchase Agreement, and had breached the warranty. On May 2, 2017, Cryo Import brought suit against plaintiff in the state district court of Dallas County, Texas. Before receiving notice of that lawsuit, plaintiff filed this action in Wayne County Circuit Court on May 4, 2017, which defendants timely removed here.

In the Texas lawsuit, Cryo Import alleges breach of contract arising out of the parties' Distribution Agreement on the grounds that plaintiff did not live up to its end of the bargain to purchase a sufficient quota of cryotherapy machines, and breached the Purchase Agreements by failing to comply with its obligations to submit timely warranty claims and repairs. In their First Amended Complaint filed in federal court, plaintiff has pled eleven claims: (I) violation of the MFIL, Mich. Comp. Laws § 445.1501 *et seq.*, (II) violation of the MFIL, Mich. Comp. Laws § 445.1532, (III) fraud, (IV) silent fraud, (V) innocent misrepresentation, (VI) tortious interference with business relationship with Orchard Fitness, (VII) tortious interference with business relationships with its customers, (VIII) breach of warranty, (IX) breach of contract, (X) promissory estoppel, and (XI) unjust enrichment.

**II. Standard of Law**

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.387 Filed 03/18/20 Page 45 of 90

Live Cryo, LLC v. CryoUSA Import and Sales, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4098853

**\*3** Rule 12(b)(6) allows the Court to make an assessment as to whether the plaintiff has stated a claim upon which relief may be granted. Under the Supreme Court's articulation of the Rule 12(b)(6) standard in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-56 (2007), the court must construe the complaint in favor of the plaintiff, accept the allegations of the complaint as true, and determine whether plaintiff's factual allegations present plausible claims. " '[N]aked assertions' devoid of 'further factual enhancement' " are insufficient to " 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557, 570). To survive a Rule 12(b)(6) motion to dismiss, plaintiff's pleading for relief must provide " 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' " *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014) (quoting *Twombly*, 550 U.S. at 555). Even though the complaint need not contain "detailed" factual allegations, its " 'factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true.' " *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

## III. Analysis

### A. Choice of Law

Defendants argue that the Distribution Agreement's and Purchase Agreement's choice-of-law provisions calling for the application of Texas law, and forum selection clauses requiring litigation related to the Agreements to be filed in Texas, require dismissal of this action. Plaintiff has not responded to the argument that Texas law would govern their claims under the choice-of-law provision in the Agreements. An analysis of whether Texas or Michigan law controls is important to the court's determination of whether plaintiff's claims survive defendants' motion to dismiss.

Federal courts sitting in diversity apply the choice of law principles of the forum state. *See Wallace Hardware Co. v. Abrams*, 223 F.3d 383, 391 (6th Cir. 2000) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). Michigan's conflict of law rules follow the approach articulated in 1 Restatement (Second) of Conflict of Laws § 187, which provides that a contractual choice-of-law provision will govern unless the chosen state, here Texas, has no substantial relationship to the parties or the transaction, or Michigan has a materially greater interest and application of Texas law would

be "contrary to a fundamental policy" of Michigan. *Banek Inc. v. Yogurt Ventures USA, Inc.*, 6 F.3d 357, 361 (6th Cir. 1993).

Here, Texas has sufficient ties to the Distribution Agreement as plaintiff's corporate representatives traveled to Texas to obtain information about cryotherapy and to analyze the business opportunity there, and defendants are Texas corporations who are located in Texas. Also, there has been no showing that a dominating public interest of Michigan would be contravened by permitting the contractual dispute to be resolved under the law of Texas. Accordingly, the parties' choice-of-law clause in the Agreements may be enforced with respect to the parties' contractual dispute, and Texas law governs the contractual claims. The court notes that neither side has suggested breach of contract claims are analyzed differently under Texas or Michigan law.

**\*4** The question then becomes whether the choice-of-law provision in the parties' Agreements govern plaintiff's tort claims under MFIL, common law fraud, tortious interference with business relationships, promissory estoppel, and unjust enrichment. The choice-of-law provision in the Distribution Agreement provides: "This Agreement is governed by the laws of the State of Texas." The Purchase Agreement provides that "[t]he Agreement shall be construed in accordance with the Law of Texas." The Sixth Circuit has at least twice addressed similar issues in determining whether a choice-of-law provision is limited to contractual claims arising out of the agreement or whether it also applies to tort claims.

In *Moses v. Bus. Crd Express, Inc.*, 929 F.2d 1131, 1140 (6th Cir. 1991), the Sixth Circuit found that a choice-of-law provision applied to plaintiff's fraud and misrepresentation claims and was not limited to purely contractual claims. In that case, the choice-of-law provision in the parties' agreement stated, "This Franchise and License Agreement and the construction thereof shall be governed by the laws of the state of Michigan." *Id.* at 1139. In reaching its conclusion, the court distinguished the choice-of-law provision from one analyzed by the Fifth Circuit in *Caton v. Leach*, 896 F.2d 939 (5th Cir. 1990), which the Fifth Circuit construed narrowly, holding the provision only applied to contractual claims and did not apply to plaintiff's tort and *quantum meruit* claims where the clause provided that "**[t]his agreement** shall be construed under the laws of the State of California." *Caton*, 896 F.2d at 942 (emphasis added). The choice-of-law provision in *Caton* mirrors the clause at issue here. Thus, under the Sixth Circuit's holding in *Moses*, the choice-of-law

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**Live Cryo, LLC v. CryoUSA Import and Sales, LLC, Not Reported in Fed. Supp. (2017)**

2017 WL 4098853

provision requiring the application of Texas law is limited to contract claims and does not cover plaintiff's tort and quasi-contract claims.

The Sixth Circuit addressed a similar issue in *Banek, supra*, and held that a choice-of-law provision in a franchise agreement was sufficiently broad to cover plaintiff's claims for fraud and misrepresentation. 6 F.3d at 363. In that case, the choice-of-law clause provided, "[t]his Agreement was made and entered into in the State [of] Georgia and all rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the State of Georgia." *Id.* at 359. The court also found that the fraud and misrepresentation claims were directly related to the franchise agreement, and thus, applied the choice-of-law clause to cover those tort claims as well. The choice-of-law provision in *Banek* was much broader in scope than the clause at issue here.

Other district courts faced with a narrowly defined choice-of-law provision like that present here, have decided that the provision does not apply to tort claims. *See Touch-n-Buy, Ltd. P'ship v. Girocheck Fin., Inc.*, No. 15-10863, 2016 WL 2957930, at *2 (E.D. Mich. May 23, 2016) (agreement's choice-of-law clause limited to purely contractual claims as fraud claim involved representations made prior to entering into the contract and choice-of-law provision merely provides that Florida law "governs" the agreement); *AGA Gas, Inc. v. Wohlert Corp.*, No. 5:98-CV-155, 2000 WL 1478466, at *2 (W.D. Mich. July 21, 2000) (agreement's choice-of-law clause governed only contract claims, and the law of the forum applied to claims of fraud and misrepresentation). These cases, although not binding, are persuasive authority and support the conclusion here that the narrowly drafted choice-of-law provision does not apply to plaintiff's tort and quasi-contractual claims.

**\*5** Based on the above analysis, the court determines that the choice-of-law provisions in the Distribution Agreement and Purchase Agreements are limited to contractual claims and thus, Texas law governs the breach of contract and warranty claims. However, the law of the forum, namely Michigan law, governs plaintiff's tort and quasi-contract claims. Having determined that Michigan law applies to the majority of plaintiff's claims, the court turns now to the question of whether the forum selection clauses require dismissal of this action.

**B. Forum Selection Clause**

Defendants argue that the forum selection clause in the parties' Agreements require dismissal of this matter in total. Plaintiff responds that such clauses are void under the MFIL which provides that such clauses are negated when set forth in a franchise agreement. Specifically, MCL § 445.1527(f) provides that if contained in a document relating to a franchise, "[a] provision requiring that arbitration or litigation be conducted outside this state" is void and unenforceable. Defendants contend that MFIL does not apply because plaintiff is not a franchisee and Texas law controls. For the reasons set forth below, the forum selection clause is void and unenforceable as an issue of fact exists as to whether the parties share a franchisor/franchisee relationship and Michigan's prohibition of such clauses in franchise agreements controls.

**1. Franchisor/Franchisee Relationship**

Defendants seek dismissal of Counts I and II, which assert claims under the MFIL, arguing that plaintiff is not its franchisee, and that the parties share a distribution agreement, not a franchise agreement. Under MCL § 445.1502(3), a "franchise" is defined as "a contract or agreement, either express or implied, whether oral or written, between 2 or more persons to which all of the following apply:"

(a) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor;

(b) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate;

(c) The franchisee is required to pay, directly or indirectly, a franchise fee.

All three elements must be present in order for a relationship to be governed by the MFIL. *Bye v. Nationwide Mut. Ins. Co.*, 733 F. Supp. 2d 805, 827 (E.D. Mich. 2010).

According to the First Amended Complaint, all three factors are alleged as follows. First, Paragraph 3.1 of the Distribution Agreement gives defendants control over the marketing aspect of the business. Paragraph 3.1 provides:

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.389 Filed 03/18/20 Page 47 of 90

Live Cryo, LLC v. CryoUSA Import and Sales, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4098853

Marketing. Distributor shall be allowed to further the promotion, marketing, sale and other distribution of the Products in the Territory and to keep CryoUSA informed of marketing developments.

(Doc. 4-1 at PgID 154). Second, all products sold by plaintiff contains the CryoUSA name and logo and CryoUSA specifically provides plaintiff with a license to use marks, including "Cryosense" and "CryoUSA E Tablet." It appears that plaintiff satisfactorily alleged the first two elements. The court turns now to the third factor which presents the closest question.

As to the third factor, plaintiff alleges three methods of indirect payment of a franchise fee: (1) defendants charge a "mark up" on the purchases of their chambers, (2) defendants require that training fees of $250 be paid in order for any warranty to be honored, and (3) plaintiff must pay $10,000 to renew the Distribution Agreement. Defendants respond that plaintiff has failed to allege payment of a franchise fee within the strictures of *Iqbal* because (1) the chambers were sold at a bona fide wholesale price, (2) the training fee was part of the purchase fee of every chamber and additional training was optional and the amount of the fee was insufficient to amount to a hidden charge for the right to do business, and (3) the $10,000 renewal fee is not a hidden franchise fee because the only thing plaintiff loses upon non-renewal is the loss of exclusivity—the right to be the sole cryotherapy chamber distributor in the entire state of Michigan.

**\*6** The MFIL defines "franchise fee" as "a fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business under a franchise agreement, including but not limited to payments for goods and services." MCL. § 445.1503. Although a franchise fee may include payments for goods or services, MFIL specifically exempts "[t]he purchase or agreement to purchase goods, equipment, or fixtures directly or on consignment at a bona fide wholesale price." MCL § 445.1503(1)(a). Having set forth the statutory definition of franchise fee, the court considers now defendants' arguments that plaintiff has failed to adequately plead the existence of any such fee.

As to defendants' first argument, whether or not the chambers were sold at a bona fide wholesale price is an issue of fact that cannot be decided at the pleadings stage. However, the court tends to agree with defendants that the training fee is probably insufficient to amount to a franchise fee. *See Boeve v. Nationwide Mut. Ins. Co.*, No. 08-cv-12213, 2008 WL 3915011, at \*5 (E.D. Mich. Aug. 20, 2008) (costs incurred during training only amount to a franchise fee where the costs are substantial and unrecoverable.) It appears unlikely the $250 training fee at issue here would meet that standard. The court turns now to the question of whether the $10,000 renewal fee amounts to an indirect franchise fee.

Defendants claim the $10,000 fee cannot be considered because MFIL does not apply to "the renewal or extension of an existing franchise where there is no interruption in the operation of the franchised business by the franchise." MCL § 445.1503(3). The court is not convinced that Section 445.1503(3) informs this court's decision about whether plaintiff pays an indirect franchise fee. Section 445.1503(3) does not address franchise fees at all, but defines the terms "offer" and "offer to sell." Specifically, Section 445.1503(3) states:

> (3) "Offer" or "offer to sell" includes an attempt to offer to dispose of or solicitation of an offer to buy, a franchise or interest in a franchise for value. The terms defined in this act do not include the renewal or extension of an existing franchise where there is no interruption in the operation of the franchised business by the franchisee.

MCL § 445.1503(3). The Michigan Court of Appeals has explained that the above exclusion of renewal or extensions of a franchise agreement from the definitions of the terms "offer" and "offer to sell," indicates the Legislature's intent to restrict liability under MFIL to conduct at the time of a sale. *Franchise Mgmt. Unlimited, Inc. v. America's Favorite Chicken*, 221 Mich. App. 239, 251 (1997). A careful review of the First Amended Complaint indicates that plaintiff bases its MFIL claims on alleged misrepresentations at the time of the sale. Accordingly, at this pleadings stage, plaintiff has sufficiently pled that it paid an indirect franchise fee based on the alleged "mark up" of the cryotherapy chambers and the $10,000 renewal fee. Also, the First Amended Complaint

2017 WL 4098853

attaches a copy of CryoUSA's website page which advertises, "Own a Franchise." (Doc. 403 at PgID 181). In addition, one of the defendants is known as CryoUSA Franchising, LLC. Based on the allegations of the First Amended Complaint, a question of fact exists as to whether the parties bear the relationship of franchisor and franchisee.

### 2. Choice of Law

**\*7** Having found that a question of fact exists as to whether the parties entered into a franchise agreement, the court turns now to the question of whether the forum selection clauses in the parties' Agreements are void. Defendants argue the provision voiding such clauses does not apply because Texas law governs. For the reasons discussed previously, Texas law does not govern plaintiff's MFIL claim. In addition, under Section 187 of the Restatement (Second) of Conflict of Laws, Michigan has a substantially greater interest than Texas in protecting the rights of its franchisees and preventing them from being haled into an inconvenient forum far from the place when they operated their franchise. As the Sixth Circuit noted in *Banek,* the Michigan legislature prohibited such clauses in franchise agreements because, "the Michigan legislature understood the burdens of being forced to arbitrate a claim in a foreign forum are significant." 6 F.3d at 360. Accordingly, the court will not enforce the forum selection clause set forth in the parties' Agreements and will allow plaintiff's claims to proceed on the merits here.

### C. MFIL and Common Law Fraud Claims

Because the matter is properly before this court, the court now addresses defendants' argument that plaintiff's tort and quasi-contract claims should be dismissed for failure to state a claim. For the reasons set forth below, plaintiff has failed to plead fraud with requisite particularity and the statements alleged to be fraudulent are not actionable because they are merely forward looking projections of future conduct, and the parties' integration clause makes any reliance on any alleged misrepresentations made prior to the Agreements unreasonable.

Count I alleges violation of Section 5 of MFIL which prohibits fraudulent conduct "in connection with the filing, offer, sale, or purchase of any franchise." MCL § 445.1505 and Count II alleges derivative liability for a "person who directly controls a person liable under this act." MCL § 445.1532. Section 5 sounds in fraud:

### 445.1505. Filing, offer, sale, or purchase of franchise; prohibited conducts

Sec. 5. A person shall not, in connection with the filing, offer, sale, or purchase of any franchise, directly or indirectly:

(a) Employ any device, scheme, or artifice to defraud.

(b) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

(c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

MCL § 445.1505. The MFIL expressly states that "fraud" and "deceit" are not limited to common law fraud or deceit, thus, dictating that the court should construe the terms more broadly. MCL § 445.1503(2).

Even construing Section 5 of MFIL broadly, plaintiff's MFIL claims must meet the heightened pleading standard of Rule 9(b). *See Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.,* 683 F.3d 239, 247 (6th Cir. 2012). The analysis below applies to the MFIL claims as well as the common law claims for fraud, silent fraud, and innocent misrepresentation. The First Amended Complaint alleges that defendants misrepresented the quality of the cryotherapy chambers, which allegedly never reached a low enough temperature to be effective, and that through statements made in the workbook, at the seminar, and in negotiations leading up to the parties' agreement, defendants provided false earnings projections, return on investment numbers, and number of customers to be expected. Defendants claim the allegations are deficient because plaintiff engages in "group pleading" by treating all six defendants *en masse,* and that the statements could not be said to be fraudulent as they were merely forward looking statements or "puffery."

### 1. Group Pleading

In order to state a claim for fraud under Federal Rule of Civil Procedure 9(b), a plaintiff, at a minimum, must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *U.S. ex rel. Bledsoe v. Cmty. Health Sys.,*

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.391 Filed 03/18/20 Page 49 of 90

Live Cryo, LLC v. CryoUSA Import and Sales, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4098853

*Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993)). "Rule 9(b) is not to be read in isolation, but is to be interpreted in conjunction with Federal Rule of Civil Procedure 8." *Id.* at 503. Even construing the requirements of Rule 9(b) liberally in conjunction with Rule 8, plaintiff's fraud claims are woefully deficient here.

**\*8** Defendants argue that plaintiff has engaged in impermissible "group pleading" by alleging that all four corporate defendants, and the two individual defendants, are liable for fraud, without articulating with any particularity the identity of the speaker of the alleged fraudulent statements. Although the name of a specific employee need not always be alleged to meet the strictures of Rule 9(b), for example where only one corporation is a named defendant, *Bledsoe II*, 501 F.3d at 508, plaintiff has introduced no authority to suggest that fraud claims are sufficiently particular when directed generally at four corporations and two individuals in the same breath. Numerous courts have found allegations of fraud to be deficient when the speaker is not identified individually, but the claims are directed at the defendants *en masse. See Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 551 (6th Cir. 2012); *D.E. & J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 730 (E.D. Mich. 2003). Under these cases, plaintiff's fraud claims here are deficient as they fail to specify the defendants allegedly responsible for the allegedly fraudulent misrepresentations and which statements they made.

### 2. Future Promises

In addition, the fraud claims are deficient because they contain merely forward looking projections which are not actionable. Under the Michigan Supreme Court's seminal fraud case, the law is well settled that:

> An action for fraudulent misrepresentation must be predicted upon a statement relating to a past or an existing fact. Future promises are contractual and do not constitute fraud.

*Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336 (1976). In *Hi-Way Motor*, the court found that defendant's verbal promise that plaintiff would have an exclusive heavy-duty truck dealership for the Alpena area so long as the plaintiff did a reasonably good job, was not

actionable in fraud when defendant granted another party a dealership in the same area, because the statement was a future promise. *Id.* at 337-39. Similarly, in *Van Tassel v. McDonald Corp.*, 159 Mich. App. 745, 752-53 (1987), the court found representations that a Baskin-Robbins store would be a "gold mine," that plaintiff had a bright future, that she would soon be driving a big car and living in a big home, and that she could make more money owning her own business than at Chrysler, were merely expressions of opinion or puffing and were not actionable in fraud.

The Sixth Circuit addressed similar promises in *Busch v. Dyno Nobel, Inc.*, 40 Fed.Appx. 947, 964 (6th Cir. 2002) where it found that defendant's promise that it knew how to create a plant successfully, and its estimate of future costs did not amount to fraud because they were not known untruths at the time made, but amounted to promises of future capabilities, which are not actionable.

The same result should be reached here. Plaintiff alleges that it was induced to enter into a cryotherapy business based on estimates of its possible future earnings, but these estimates of future profits are merely erroneous conjectures as to future events which are not actionable. Although misrepresentations about the actual earnings of defendants' Dallas location might amount to actionable fraud, plaintiff does not allege that those figures were in any way false, but only that defendants' projections plaintiff could do as well as the Dallas location did not pan out.

Even taking into account that Section 5 of MFIL may be read more broadly than common law fraud claims, the Michigan Court of Appeals has held that opinions, sales puffery, and predictions of future events are not actionable under MFIL as well. *Shanafan, L.L.C. v. Vanrenterghem*, No. 294923, 2011 WL 1564613, at \*1 (Mich. Ct. App. Apr. 26, 2011). In that case, plaintiff relied on statements that food costs would be low and "there is a great potential to make six figures," which the court found were not false statements, and thus were not actionable under Section 5 of MFIL. *Id.* Plaintiff has not directed the court to any cases for the proposition that Section 5 of MFIL allows recovery for expressions of opinion about future earnings and sales puffery made to induce a franchisee to enter into a franchise agreement.

**\*9** Plaintiff claims that *Rutan v. Straehly*, 289 Mich. 341 (1939), *Crook v. Ford*, 249 Mich. 500 (1930), and *Hensley v. Colonial Dodge, Inc.*, 69 Mich. App. 597, 604 (1976) support its fraud claims, but those cases are inapposite. In *Rutan*, the

2017 WL 4098853

defendant promised to purchase certain notes in plaintiff's name, but never did so, and the notes were uncollectible. 289 Mich. at 346. The Michigan Supreme Court recognized that fraud claims could not generally be based on future promises, but found as exception existed because "defendant's promise was the device used to accomplish the fraud which consisted of obtaining his own notes from plaintiff and promising, but failing, to give her any obligation of value in return." *Id.* at 349. This case is unlike *Rutan* and its holding is inapplicable here.

Likewise, *Crook* fails to support plaintiff's fraud claims here. In *Crook*, defendants, experienced builders, represented that they could finish the second story of plaintiff's house and later represented that the house was complete, whereas it had no proper foundations, the wall cracked, the house was out of plumb and had to be jacked up, among other serious deficiencies. 249 Mich. at 501-03. The court recognized that breach of an agreement does not generally constitute fraud, but found that where the builders gave false opinions of matters of fact, namely that the foundation had been completed when it had not, and falsely promised to repair the foundation but did not, and where defendants had exclusive knowledge about the state of the foundation when the plaintiff entered the purchase agreement, an action for fraud could lie. *Id.* at 588. Unlike *Crook*, plaintiff here does not allege that defendants fraudulently misrepresented existing facts which could not be known to a buyer with significantly less bargaining power, but involve merely unknowable estimates of possible future earnings. Simply put, such statements do not amount to actionable fraud.

The court also finds plaintiff's reliance on *Hensley, supra,* for the proposition that statements of fact susceptible of knowledge are actionable is misplaced. First, plaintiff has not alleged that defendants misrepresented facts susceptible of knowledge, but merely seeks to recover for forward looking projections of possible returns on their investment in the cryotherapy chambers. Second, *Hensley* is inapposite on its face. In that case, the court found that a misrepresentation claim was viable where the plaintiff purchased a used car from a car lot with a prominent sign advertising, "USED CARS 1 YEAR WARRANTY" yet plaintiff signed a purchase agreement that contained fine print on the back stating that no warranties, express or implied, were made by the dealer. 69 Mich. App. at 600. Because no express warranty existed, plaintiff could not sue in contract, and his remedy lied in tort. By contrast, in this case, the Purchase Agreements contain an express warranty; thus, plaintiff may recover in contract.

Next, the court considers whether plaintiff's allegations that defendants had no intention of abiding by the warranty at the time made amounts to fraud. This is simply a breach of warranty claim, and does not give rise to a fraud claim. The economic loss doctrine bars a fraudulent misrepresentation claim where the alleged fraud is interwoven with the contract. *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 209 Mich. App. 365 (1995). In *Huron Tool*, the plaintiff alleged that defendant had misrepresented the abilities of its software program which did not operate as promised. *Id.* at 367-68. In that case, the court emphasized that in order for a fraud claim to fall outside the economic loss doctrine, the fraud had to be extraneous to the contract itself. *Id.* at 374. Here, plaintiff's claim that defendants did not abide by the warranty, is simply a claim that defendants intentionally breached the parties' contract and warranty. Plaintiff has failed to allege a viable fraud claim based on breach of warranty.

### 3. Reasonable Reliance

**\*10** Plaintiff's MFIL and common law fraud claims also must be dismissed as plaintiff cannot show reasonable reliance on any of the alleged misrepresentations because it agreed that there were no such promises in the written Distribution Agreement and Purchase Agreements. (Dist. Agmt. ¶¶ 10.1, 10.4; Purch. Agmt. ¶ 3.1). Reasonable or justifiable reliance is necessary for a MFIL claim. *Cook v. Little Caesar Enter., Inc.*, 210 F.3d 653, 659 (6th Cir. 2000). "Reliance upon oral representations or prior documents, even if false, is unreasonable if the party enters into a subsequent agreement." *Id.* at 658; *see Partner & Partner, Inc. v. ExxonMobil Oil Corp.*, 326 Fed.Appx. 892, 900 n. 4 (6th Cir. 2009) ("MFIL requires reasonable reliance, and that it is not reasonable to rely on oral promises that were not incorporated into the fully integrated written franchise agreement").

In sum, plaintiff has failed to plead fraud with sufficient particularity under Rule 9(b) because of impermissible group pleading, the claims are premised on non-actionable predictions of future earnings, the claims amount to breach of warranty claims under the economic loss doctrine, and plaintiff has failed to show reasonable reliance on any alleged misrepresentations. Accordingly, the MFIL claims pled in Count I and II, and the common law fraud claims pled in Counts III, IV, and V shall be dismissed.

### D. Tortious Interference with Contractual Relationships

*Live Cryo, LLC v. CryoUSA Import and Sales, LLC, Not Reported in Fed. Supp. (2017)*
2017 WL 4098853

Counts VI and VII allege tortious interference with contractual relationships. Plaintiff's claims for tortious interference with contractual relationships must also be dismissed under the economic loss doctrine as they seek recovery in tort for a warranty claim. *See Neibarger v. Universal Coops., Inc.*, 439 Mich. 512, 527-28 (1992) (tort claims are precluded where the alleged economic loss is "caused by a defective product purchased for commercial purposes."). Also, plaintiff expressly agreed that Cryo Import could not be liable for any "special," "incidental," "consequential," "lost profits," or "lost business" damages arising from any defect in a chamber. (Dist. Agmt. ¶ 2.7; Purch. Agmt. ¶ 10.5). Limitations of remedies are valid and enforceable. Uniform Comm. Code 2-719; *see also Kvaerner U.S. v. Hakim Plast. Co.*, 74 F. Supp. 2d 709, 722 (1999) (enforcing disclaimer of consequential damages). Accordingly, the court shall dismiss Counts VI and VII.

### E. Quasi-Contract Claims

Count X pleads promissory estoppel and Count XI pleads unjust enrichment. These claims are barred in light of the parties' express Distribution Agreement and Purchase Agreements which plaintiff has attached to its First Amended Complaint, has pled is valid and binding, and relies upon it in its breach of contract and breach of warranty claims. "Under Michigan law this court may not imply a contract where an express contract covers the same subject matter." *Aron Alan, LLC v. Tanfran, Inc.*, 240 Fed.Appx. 678, 684 (6th Cir. 2007) (citing *Belle Isle Grill Corp. v. Detroit*, 256 Mich. App. 463 (2003)).

### F. *Colorado River* Abstention

Having found that all of plaintiff's tort and quasi-tort claims should be dismissed for the various reasons discussed above, the court turns now to the question of *Colorado River* abstention warrants dismissal of plaintiff's claims of breach of warranty pled in Count VIII, and breach of contract pled in Count IX of the First Amended Complaint, and finds that it does not. A federal court has a "virtually unflagging obligation" to exercise the jurisdiction bestowed upon it. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817–18 (1976). This obligation should be avoided in only a few "extraordinary and narrow" circumstances. *Id.* Under the *Colorado River* doctrine, the federal court may decline to exercise jurisdiction where a parallel state matter is pending. *Id.*

**\*11** The threshold inquiry in deciding whether to abstain in deference to ongoing proceedings in state court is whether the actions are truly parallel. *Romine v. Compuserve Corp.*, 160 F.3d 337, 340 (6th Cir. 1998). To answer that question, the court must find that the two proceedings are "substantially similar." *Id.* The parties need not be identical as long as they are substantially similar and the two suits involve the same allegations as to the same material facts. *Id.* at 340. Although the cases need not be identical, the resolution of the state court action must provide complete relief for the federal action. *See Baskin v. Bath Twp. Bd. of Zoning Appeals*, 15 F.3d 569, 572 (6th Cir. 1994); *Heitmanis v. Austin*, 899 F.2d 521, 528 (6th Cir. 1990). "Broadly, the relevant inquiry is whether resolution on the state case will resolve the contested issues in the federal action." *Cass River Farms, LLC. v. Hausbeck Pickle Co.*, No. 16-cv-12269, 2016 WL 5930493, at \*2 (E.D. Mich. Oct. 12, 2016).

Once the court determines that the two actions are indeed parallel, the court considers the eight combined factors, the first five identified by the Court in *Colorado River,* and the last three added by the Court in *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 23-26 (1983). These include:

> (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; ... (4) the order in which jurisdiction was obtained[;] ... (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction.

*PaineWebber, Inc. v. Cohen,* 276 F.3d 197, 206–07 (6th Cir. 2001) (quoting *Romine,* 160 F.3d at 340–41). These factors, however, are not to be applied mechanically and no one factor is determinative. "Rather, they require 'a careful balancing of the important factors as they apply in a given case, with the balance heavily weighed in favor of the exercise of jurisdiction.

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.394 Filed 03/18/20 Page 52 of 90

Live Cryo, LLC v. CryoUSA Import and Sales, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4098853

As the federal lawsuit now stands, having been reduced to solely contractual claims, the two lawsuits are quite similar; however, the parties in the two lawsuits are different. Only defendant CryoUSA Import and Sales is a party in the Texas lawsuit while in the federal suit, plaintiff seeks relief not only against CryoUSA Import and Sales, but also has named five other defendants: CryoUSA Mobile, LLC, CryoUSA Holding, LLC, CryoUSA Franchising, LLC, Eric Rauscher, and Mark Murdock. Thus, even if plaintiff were to prevail in the Texas lawsuit, it would not receive complete relief sought here. Thus, the two cases are not parallel and the inquiry ends. However, even if the two cases were parallel, consideration of the eight factors above militates in favor of the court exercising jurisdiction.

The first factor is neutral as neither court has assumed jurisdiction over property. The second factor favors exercising jurisdiction over the case pending here as the contract called for performance in Michigan, the chambers were used in Michigan, tested and allegedly repaired in Michigan; thus, most of the witnesses are located here. Third, although it may be undesirable to have virtually the same litigation pending in two courts at once, plaintiff is entitled to bring his contractual claims here in light of the MFIL which protects franchisees by prohibiting the enforcement of forum selection clauses. Fourth, because the Texas lawsuit was filed a mere three days before the federal lawsuit, this factor does not weigh in favor of abstention and there has been no suggestion that there has been any progress in that matter which exceeds the progress of the federal suit.

 *12 As to the fifth and sixth factors, defendants argue choice-of-law provisions in the Distribution Agreement and Purchase Agreements call for application of Texas law, thus requiring abstention in favor of the Texas lawsuit. But as a federal court sitting in diversity, the court is perfectly able to apply Texas law. In any event, the court is not aware of any

difference between Texas and Michigan law regarding breach of contract.

This brings us to the last two factors for the court's consideration of whether it should abstain under the *Colorado River* doctrine. As to whether the state court action may protect the federal plaintiff's rights, the court notes that plaintiff seeks to proceed in its home state for transactions taking place in Michigan. Thus, this factor weighs against abstention. Finally, the court considers the presence or absence of concurrent jurisdiction. This factor is neutral as both Texas and this court have concurrent jurisdiction.

In sum, although the Texas lawsuit and this lawsuit are quite similar now that plaintiff's tort and quasi-contract claims have been dismissed, abstention is not warranted. The two lawsuits were commenced within three days of each other, thus interests of comity owe no deference to the Texas litigation, and Michigan has a strong interest in allowing the case to proceed here under its prohibition of forum selection clauses in franchise agreements. Under these circumstances, *Colorado River* abstention is not warranted and the court shall deny defendants' motion to dismiss on the basis of abstention.

## IV. Conclusion

For the reasons set forth above, defendants' motion to dismiss (Doc. 2) is GRANTED IN PART and Counts I through VII, and Counts X-XI are DISMISSED WITH PREJUDICE for failure to state a claim, and is DENIED IN PART as to Counts VIII and IX which remain viable and pending in this court.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4098853

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB J

2019 WL 4746763
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Daniel MCCAUSLAND, Robert McCausland,
IMAC Properties, LLC, Plaintiffs,
v.
CHARTER TOWNSHIP OF CANTON, Charles
Larocque, Philip Lajoy, Timothy Faas, Toebe
Construction, L.L.C., Thomas Yaak, Mark
Hook, and Jeffrey Goulet, Defendants.

Case No. 18-12409
|
Signed 09/30/2019

**Attorneys and Law Firms**

Kimberly J. Hamman, Law Offices of Kimberly J. Bowlin,
PLLC, Brighton, MI, for Plaintiffs.

Carol A. Rosati, Johnson, Rosati, Matthew J. Zalewski,
Rosati Schultz Joppich & Amtsbuechler, PC, Farmington
Hills, MI, Kristin B. Kolb, Charter Township of Canton,
Canton, MI, for Defendants Charter Township of Canton,
Charles LAROCQUE, Timothy Faas, Thomas Yaak, Mark
Hook, Jeffrey Goulet.

Kristin B. Kolb, Charter Township of Canton, Canton, MI, for
Defendant Philip LaJoy.

James Sukkar, Harvey Kruse, Troy, MI, for Defendant Toebe
Construction, L.L.C.

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS [ECF No. 15]**

DENISE PAGE HOOD, UNITED STATES DISTRICT
JUDGE

## I. INTRODUCTION

**\*1** On August 3, 2018, Plaintiffs filed a twelve-count
Complaint against Defendants. On September 12, 2018,
Plaintiffs filed a First Amended Complaint ("FAC"). On
November 11, 2018, Defendant Charter Township of Canton
(the "Township") and a number of its current and former

employees and officers[1] filed a Motion to Dismiss Pursuant
to Federal Rules of Civil Procedure 12(b)(1) and/or 12(b)(6)
("Motion to Dismiss"). Dkt. No. 15.[2] The Motion to Dismiss
has been fully briefed. For the reasons that follow, the Court
grants in part and denies in part the Motion to Dismiss.

## II. STATEMENT OF FACTS

Plaintiffs collectively own eighteen (18) separate parcels of
land located in the Township, and Plaintiffs have owned
property in the Township since the 1970s. In 1975, Plaintiffs
Daniel McCausland and Robert McCausland were approved
to operate an auto service business at 1981 N. Lotz Road
(the "Property"). At that time, the zoning ordinance classified
the Property as C-2, Community Commercial. In 1980, the
zoning ordinance was amended and the Property was zoned
C-3, which caused the auto service business to be classified
as a nonconforming use. Plaintiffs were permitted to continue
the auto service business as a legal nonconforming use.

In 1992, the Property and some surrounding parcels were re-
zoned to Mid-Rise Development ("MRD"), and the Township
granted Plaintiffs a Class B dealer's license the
Property in 1994. Several years later, the Township developed
a Comprehensive Plan that included the Lotz Road Corridor
Development Plan, as Lotz Road was a dirt road. At that
time, the Township also developed what came to be known as
the "Corporate Overlay District." The Property then became
subject to the Corporate Overlay District zoning ordinances,
in addition to the MRD zoning ordinances. The Township
requires a special use permit for any and every proposed use
of land within the Corporate Overlay District. Dkt. No. 4, ¶
21.

Since the mid-1990s, Plaintiffs have purchase smaller
surrounding parcels (comprising the total 18 contiguous
parcels) to meet the area requirements for any sort of proposed
development in an attempt to make their original few parcels
marketable in the only MRD in the Township with Corporate
Overlay District requirements, even though the parcels had
no water or sewer. Plaintiffs thought they had mitigated any
potential losses by assembling the required amount of land
area, and they believed the only piece missing was the water
and sewer aspect.

**\*2** In 2016, the Township began the Lotz Road paving
project, which was "[a] \$5-million project to transform a
pothole-riddled, dirt-and-gravel stretch of Lotz Road into a
three-lane, concrete road, between Ford and Cherry Hill."

2019 WL 4746763

The project entailed extending water mains, and Plaintiffs inquired about having the water mains extended to their main property on Lotz Road. Plaintiffs were told by Township Officials that they had to hire Toebe to do the work, as the project was closed and Toebe was the "preferred contractor." Plaintiffs hired Fairway Engineering to draw the proposed plans for the water main. The original plans by Fairway Engineering were completed in mid-June 2016, but the Township engineer had given Fairway Engineering erroneous information about the storm sewer pipe. The storm sewer pipe was 54" wide, not 24" wide, as the Township engineer stated. This difference required Plaintiffs to alter their plans and inhibited their ability to obtain all requisite approvals by the Township's deadline. Even after Plaintiffs timely submitted their drawings to the Township, the Township delayed approval of the drawings until after the deadline and the Lotz Road paving project was wrapping up. The Township kept $11,500.00 for "project supervision" for the utility extension, even after they quashed the project.

Earlier in 2016, the Township had requested an easement over the Property, a request that Plaintiffs denied. Plaintiffs contend that their denial of the easement request triggered retaliatory actions and exacerbated ill-will from the Township toward Plaintiffs that had been building due to Plaintiffs' history of vocalizing their concern regarding land use and zoning classifications. Plaintiff states that, as a result of the Township's failure to approve the drawings for the utility easement, Plaintiffs' land has been rendered valueless.

In January 2018, the Township filed a four-court complaint in Wayne County Circuit Court, alleging that Plaintiffs violated: (1) Article 6, Section 6.08 of the Zoning Ordinance (Nuisance Per Se for outdoor storage of vehicles); (2) Article 27, Section 27.08 of the Zoning Ordinance (Nuisance Per Se for failure to apply for site plan approval for numerous parcels); (3) M.C.L. § 125.3208 (Unlawful Expansion of a Legal Non-Conforming Use - Nuisance Per Se); and (4) Chapter 78, Article VII of the Township Code of Ordinances - Property Maintenance Code (for failure to maintain exterior property areas, storing or keeping inoperative or unlicensed vehicles, etc.). Plaintiffs state that surrounding properties have utilized outdoor storage (for example, Home Depot across the street blocks the fire lane with outdoor storage), yet those businesses have not been cited and dragged into the courts as Plaintiffs have. Plaintiffs claim that this shows they have been subjected to selective enforcement by the Township ordinance officer, Defendant Mark Hook, and been subject to the Township's overreaching use of the court system and police powers.

Plaintiffs First Amended Complaint sets forth twelve counts. The first five counts allege federal claims: (a) violation of the Fourteen Amendment Due Process Clause (Count I); (b) the Township's Zoning Ordinance is unconstitutional (Count II); (c) violations of the Fifth Amendment Takings Clause (Count III); (d) violations of the (Fourteenth Amendment) Equal Protection Clause (Count IV); and (e) a conspiracy in violation of 42 U.S.C. § 1986 (Count V). Plaintiffs also have asserted several state law claims (Counts VI - X), and "Injunction" claim (Count XI), and a claim for "Costs of Litigation" pursuant to 42 U.S.C. § 1988.

## III. LEGAL STANDARDS

### A. Rule 12(b)(1)

Fed.R.Civ.P. 12(b)(1) provides for the dismissal of an action for lack of subject matter jurisdiction. A Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack). *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true for purposes of Rule 12(b)(1) analysis. *Id.*

A factual attack challenges the factual existence of subject matter jurisdiction. In the case of a factual attack, a court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case. *Id.* Plaintiff bears the burden of establishing that subject matter jurisdiction exists. *DLX, Inc. v. Commonwealth of Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).

**\*3** *Cartwright v. Garner*, 751 F.3d 752, 759-60 (6th Cir. 2014).

Defendants assert that their motion constitutes a factual attack. Dkt. No. 15, PgID 128. As Defendants state, Plaintiff's allegations need not be presumed true, and "the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Ritchie*, 15 F.3d at 598. The Court "has wide discretion" to consider affidavits and documents "to arrive at the factual predicate that subject-matter jurisdiction does or does not exist." *Gentek Bldg.*

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.398 Filed 03/18/20 Page 56 of 90
McCausland v. Charter Township of Canton, Slip Copy (2019)
2019 WL 4746763

*Products, Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007).

**B. Rule 12(b)(6)**
A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the plaintiff's complaint. Accepting all factual allegations as true, the court will review the complaint in the light most favorable to the plaintiff. *Eidson v. Tennessee Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). As a general rule, to survive a motion to dismiss, the complaint must state sufficient "facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint must demonstrate more than a sheer possibility that the defendant's conduct was unlawful. *Id.* at 556. Claims comprised of "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**IV. ANALYSIS**
Article III of the U.S. Constitution limits federal courts to exercising jurisdiction over actual cases and controversies. *Arnett v. Myers*, 281 F.3d 552, 562 (6th Cir. 2002). "If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed." *Id.* Defendants argue that Plaintiffs' federal claims are not ripe, in particular the Fifth Amendment Takings Clause claim in Count III, a claim that Defendants assert is the basis for all of Plaintiffs' federal claims.

**A. Count III - Federal Takings Clause Claim**
Defendants argue that Plaintiffs' federal taking claim is not ripe because it does not satisfy the criteria set forth in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985). In *Williamson*, the Court held that a plaintiff alleging a federal takings claim must establish ripeness by demonstrating:

(1) that "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue; and

(2) that if the state had a "reasonable, certain and adequate provision for obtaining [just] compensation ... at the time

of the taking," just compensation was sought by – and denied to – the applicant through that procedure.

*Arnett*, 281 F.3d at 562 (quoting *Williamson*, 473 U.S. at 186, 194). Unless both of those criteria are satisfied, the takings action cannot be considered complete and ripe for review. *Arnett*, 381 F.3d at 562. "A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes," and cannot determine whether compensation is just "until it knows what, if any, compensation" the government intends to provide. *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348-350 (1986).

**\*4** Defendants first assert there has not been any adverse final decision on any Township zoning ordinance request by Plaintiffs. Defendants state that every zoning application to the Township by Plaintiffs has been resolved in a manner favorable to Plaintiffs. And, it is undisputed that there is no pending zoning request made by Plaintiffs upon which the Township must act. Defendants therefore argue that, as the Complaint does not reflect that Plaintiffs have received from the Township a "final, definitive position regarding how it will apply the regulations at issue to the particular land in question" that is adverse to Plaintiffs, Plaintiffs cannot have a ripe takings (or other federal) claim. *MacDonald*, 477 U.S. at 351 (citing *Williamson*, 473 US at 191).

Defendants also argue that Plaintiffs have failed to allege the second element of *Williamson* that requires that Plaintiffs pursue their takings claim in state court before asserting it in federal court. Defendants claim that Michigan law parallels *Williamson* in requiring that a final decision implicating a taking must be obtained from a governmental entity, and the state's just compensation procedures must first be utilized to seek just compensation, before a federal taking claim may be pursued. *Electro-Tech, Inc. v. H.F Campbell Co.*, 433 Mich. 57, 62 (1989). Defendants contend, and it is uncontested by Plaintiffs, that the First Amended Complaint does not contain any allegations that Plaintiffs availed themselves of pursuing any action in state court before filing this case.

Plaintiffs do not address or refute Defendants' *Williamson* arguments, essentially conceding that, if *Williamson* analysis is appropriate, Defendants are entitled to dismissal of Plaintiff's Fifth Amendment Takings Clause claim (Count III).[3] Plaintiffs argue instead that a "takings claim that challenges the constitutionality of an ordinance is ripe when the ordinance, as enacted, deprives an owner of viable

economic use of his or her property." Dkt. No. 17, PgID 280 (citing *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 297 (1981) (claim is ripe if the regulation on its face if it "deprived [Plaintiffs] of economically viable use of their property")). With respect to Plaintiffs' taking claim in Count III, however, the Court concludes that Plaintiffs' federal taking claim is an as-applied challenge, not a facial challenge. All of Plaintiffs' takings claim allegations, specifically related to Defendants denying Plaintiffs the economic viability of the Property, appear to stem from Defendants' conduct pursuant to the zoning ordinances, not the mere enactment or existence of those ordinances. *See* Dkt. No. 4, ¶¶ 40, 42, 84, 89 (the paragraphs in which the terms economic viability or use, or some variation – is used). Defendants' Motion to Dismiss is granted as to Count III.

**B. Counts I, II, IV and V**

Defendant next argues that, if an as-applied regulatory takings claim is joined with due process and equal protection claims related to the alleged regulatory taking, those claims must also satisfy *Williamson*, including the requirement of a final decision. *Community Treatment Centers, Inc. v. City of Westland*, 970 F.Supp. 1197, 1210-1211 (E.D. Mich. 1997) (citing *Seguin v. City of Sterling Heights*, 968 F2d 584, 588 (6th Cir. 1992)). Defendants contend that, since Count I, II, IV, V, and XII (discussed below) are all ancillary to Plaintiffs' takings claim, they are not ripe and should be dismissed for lack of subject matter jurisdiction.

Defendants argue that: (a) Count I alleges multiple constitutional claims under the Fourteenth Amendment Due Process Clause that, at its core, appear to derive from Plaintiffs' federal takings claim (citing Dkt. No. 4, ¶¶ 54, 55, 63); (b) Count II appears to assert a substantive due process claim regarding the Township's allegedly unconstitutional zoning ordinance that is derivative of Plaintiffs' federal takings claim (citing Dkt. No. 4, ¶¶ 73, 76); (c) Count IV reflects a continued pattern of Plaintiffs' takings allegations in claiming that Defendants violated the Equal Protection Clause (citing Dkt. No. 4, ¶ 89); and (d) Count V, a violation of 42 U.S.C. § 1986, only vaguely and very briefly alleges a conspiracy with reference to the prior counts, which (as set forth above) Defendants contend are based on Plaintiffs' takings claim (citing Dkt. No. 4, ¶ 95). Defendants conclude this argument by suggesting that Paragraph 43 of the First Amendment Complaint ties all five of those federal claims together under the takings clause. That paragraph alleges:

> *5 43. The actions of Defendants, which continue to this day, violated and continue to violate Plaintiffs' rights to procedural due process, substantive due process and equal protection under the laws, constitute an unlawful prior restraint of speech and unlawful retaliation for Plaintiffs' exercise of their First Amendment unlawfully harassing and coercive, and constitute an unconstitutional and unlawful taking of Plaintiffs' property.

Dkt. No. 4, ¶43.

Plaintiffs recognize that Defendants attempt to invalidate Plaintiffs' other federal claims as unripe by lumping all of the counts together as takings claims. Plaintiffs counter that, even if the takings claim is unripe, Plaintiffs' other claims are ripe because they are challenging an unlawful zoning ordinance and that alone makes substantive and procedural due process claims – as well as an equal protection claim – ripe. *Jacobs & Sons v. Saginaw Cnty Dep't of Pub. Health*, 284 F.Supp.2d 711, 717-18 (E.D. Mich. 2003) (a claim is ripe if it challenges the existence or enactment of an ordinance). Plaintiffs contend that, because they are making a facial challenge to the regulations promulgated by the Township, their claims are ripe even in the absence of enforcement by the Township, as claims that a regulation is unconstitutional on its face is ripe when the regulation is enacted. Citing *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 736 (1997); *Hodel*, 452 U.S. at 297 (claim is ripe if the regulation on its face if it "deprived [Plaintiffs] of economically viable use of their property").

Plaintiffs state that their First Amended Complaint alleges that the Township's requirement that Plaintiff obtain a special use permit for any proposed use in an MRD or Corporate Overlay District (the approval of which is entirely within the Township's discretion) does not clearly advise a resident what is or is not permitted. Citing Dkt. No. 4, ¶¶ 20, 21, 44, 69. Plaintiffs allege that they are the only property owners in the Township in a MRD zone, Dkt. No. 4, ¶ 20 – and are subject to the Corporate Overlay District that cannot be rezoned. Plaintiffs have alleged that Defendants have used

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.400 Filed 03/18/20 Page 58 of 90
McCausland v. Charter Township of Canton, Slip Copy (2019)
2019 WL 4746763

the ordinances to retaliate against them for years of disputes regarding Plaintiffs' parcels.

### 1. Count I (Procedural Due Process)

Plaintiffs assert that their procedural due process claim is ripe because the Township failed to provide them with notice of its proposed action and an opportunity to be heard before depriving Plaintiffs of their property. *Paterek v. Village of Armada*, 801 F.3d 630, 649 (6th Cir. 2015). *See also Nasierowski Bros. Inv. Co. v. Sterling Heights*, 949 F.2d 890, 894 (6th Cir. 1991) ("A procedural due process claim is instantly recognizable in federal court without requiring a final decision on a proposed development from the responsible municipal agency"). A claimed injury that is based on a municipality's process does not require that the municipality make a final determination or that the plaintiff exhaust its remedies. *Id.*

Plaintiffs contend that they have alleged facts regarding the Township's process, including that numerous Defendants "intentionally provided false information to Plaintiffs' engineers, and subsequently delayed internal approvals ..." and "The policies and actions of Defendants were based on considerations other than those proper to the good-faith administration of justice ..." Dkt. No. 4, ¶¶ 56, 60. Defendants counter that *Nasierowski*, where the issue was that the City Council improperly rezoned property in an executive session without a hearing, is inapplicable in this case because the plaintiff in *Nasierowski* "did not allege an unconstitutional 'taking' of his property," as Defendants insist is the issue here. *Id.* at 893.

### 2. Count II (Substantive Due Process)

**\*6** In their response brief, Plaintiffs argue that Township Ordinance 19.03(B) requires site approval for all uses in an MRD district. *See* Dkt. No. 4, ¶ 21 (In the Complaint, ¶ 21 does not specify Township Ordinance 19.03(B), nor is that ordinance number mentioned anywhere in the First Amended Complaint). Plaintiffs argue that giving local officials that degree of improper – or unbridled – discretion is unconstitutional and injunctive relief is appropriate when there are vague and indefinite guidelines. Citing *15192 Thirteen Mile Rd., Inc. v. Warren*, 626 F.Supp. 803, 821 (E.D. Mich. 1985). Defendants suggest that Count II is a takings claim, but Plaintiffs assert that it is based on the breadth of

authority granted to Township officials. Citing Dkt. No. 4, ¶ 21. For this reason, Plaintiffs argue that Township Ordinance 19.03(B) is unconstitutional on its face.

Defendants argue that Plaintiffs' substantive due process claim must be dismissed because Plaintiffs have alleged that it is an "as-applied" claim subject to *Williamson County's* ripeness rule. (Citing Dkt. No. 4, ¶ 73 ("Neither the MRD, nor the Corporate Overlay Districts are constitutional as applied to Plaintiffs' Properties"); ¶ 75 ("Neither the MRD [and] the Corporate Overlay District as applied to Plaintiffs' Properties are arbitrary and unreasonable ...")). Defendants state that the one paragraph that could be interpreted as asserting a facial challenge is conclusory and lacking in underlying factual allegations. (Citing Dkt. No. 4, ¶ 74 ("The Corporate Overlay District is unconstitutionally void [for] vagueness")).

Defendants contend that, even if Plaintiffs have sufficiently alleged a facial challenge, it is still not ripe because Plaintiffs never applied to rezone their property or obtain any special land use application that has ben denied. Citing *Hendee v. Putnam Twp.*, 486 Mich. 556, 573-74 (2010) ("in the absence of an express prohibition of a lawful land use within the ordinance itself, the issue of the ordinance's exclusionary effect, or the absence of it, will not be ripe for consideration by the courts until the township has been afforded the opportunity to make that determination."). Defendants further contend that Plaintiffs fail to state a substantive due process claim because Plaintiffs have not alleged that they have commenced any construction of utilities on their undeveloped parcels, something that is required to vest a protected property right. *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992); *Schubiner v. West Bloomfield Twp*, 133 Mich.App.490, 500 (1984).

### 3. Count IV (Equal Protection Claim)

Plaintiffs rely on *Neuenfeldt v. Williams Twp.*, 356 F.Supp.2d 770, 775 (E.D. Mich. 2005), to argue that a viable equal protection claim exists when there is evidence of ill-will by a municipality against a plaintiff, even if the plaintiff has not pursued any remedies in state court. In *Neuenfeldt*, the court noted that no taking had been alleged (and, in fact, the plaintiff had stated adequate facts to establish that his claims did not arise under the Fifth Amendment's Taking Claus) and held the plaintiff could proceed on his claim of "unequal treatment and arbitrary application of the ... ordinance." *Id.* at 776.

Plaintiffs state that Defendants violated Plaintiffs' equal protection rights when Defendants denied Plaintiffs the ability to connect to the Township's water and sewer systems (as others did), not permitting Plaintiffs to use their property for outdoor storage (and fining Plaintiffs) while allowing other neighboring businesses to store items outside. Dkt. No. 4, ¶¶ 30, 35-39, 89-91. Plaintiffs also note that Township officials (Defendants) have treated them with ill-will, including making disparaging comments and arbitrary treatment. Dkt. No. 4, ¶¶ 31, 33, 40, 49-50.

### 4. Count V (Conspiracy)

**\*7** Defendants believe Count V must be dismissed for two reasons. First, because all of the underlying claims upon which it was based should be dismissed as unripe. Second, Defendants contend that Plaintiffs fail to state a claim of conspiracy. 42 U.S.C. § 1986 is intended to "punish those who aid and abet violations of [§]1985," which means there can be no violation of 42 U.S.C. § 1986 without a violation of 42 U.S.C. § 1985. *Browder v. Tipton*, 630 F.3d 1149, 1155 (6th Cir. 1980). "The Supreme Court requires that a § 1985 claim contain allegations of 'class-based, invidiously discriminatory animus.' " *Webb v. United States*, 789 F.3d 647, 672 (2015) (quoting *Griffin v. Breckenridge*, 403 US 88, 102 (1971)). As Plaintiffs do not allege that they are members of a protected class, instead (according to Defendants) claiming only that they have been subjected to "animus and ill-will," Defendants contend that the Court should dismiss Count V for failure to state a claim under 42 U.S.C. § 1985 or § 1986.

### 5. Conclusion

The Court finds that Defendants' interpretation of Plaintiffs' allegations *vis a vis* Counts I, II, IV, and V of the First Amended Complaint is too limited. As noted above, Plaintiffs have alleged that Defendants have deprived Plaintiffs of a viable economic use of the Property, allegations that have been found sufficient to support an equal protection claim. *See Neuenfeldt, supra.* Plaintiffs have alleged that the Corporate Overlay District is unconstitutionally vague and alleged that Township Ordinance 19.03(B) is unconstitutionally vague on its face, as it gives the Township unbridled discretion. For these reasons, the Court denies Defendants' motion as it relates to the conspiracy claim in Count V – and their

arguments related to the ripeness and plausability of Counts I, II, and IV. *See Jacobs, supra.*

### C. Counts XI (Injunction) and XII (Costs of Litigation)

Plaintiff's request for injunctive relief in Count XI (Injunction) must be dismissed because injunctive relief is a remedy and not an independent cause of action. *Terlecki v. Stewart*, 278 Mich.App. 644, 663 (2008) ("It is well settled that an injunction is an equitable remedy, not an independent cause of action."). "It is not the remedy that supports the cause of action, but rather the cause of action that supports a remedy." *Henry v. Dow Chem. Co.*, 473 Mich. 63, 96–97 (2005). As Count XI (Injunction) does not constitute an independent cause of action, it is dismissed.

Defendants correctly argue that Count XII (Costs of Litigation) is not a cause of action but, instead, relief to which Plaintiffs may be entitled if they are successful on their claims in this Court. As "Costs of Litigation" does not constitute an independent cause of action, Count XII is dismissed. *See, e.g., North Carolina Dept. of Transp. v. Crest Street Community Council, Inc.*, 479 U.S. 6, 12-16 (1986).

Although Counts XI and XII are dismissed as causes of action, in their claims for relief, Plaintiffs have requested the issuance of an injunction and/or an award of costs of litigation and may still pursue injunctive relief and their costs of litigation.

### D. Abstention

In the event Plaintiffs' federal claims are not dismissed as unripe (or for failure to state a claim), Defendants suggest that the Court should abstain from exercising subject matter jurisdiction pursuant to *Younger v. Harris*, 401 U.S. 37 (1971) and/or *Colorado River Water Conservation District v. U.S.*, 424 U.S. 800 (1976). It is undisputed that there is a pending state court action being litigated in Wayne County Circuit Court. In that case, the Township has asserted four claims against the named Plaintiffs in this case: (1) violation of Article 6, Section 6.08 of the Zoning Ordinance (Nuisance Per Se for outdoor storage of vehicles); (2) Violation of Article 27, Section 27.08 of the Zoning Ordinance (Nuisance Per Se for failure to apply for site plan approval for numerous parcels); (3) violation of M.C.L. § 125.3208 (Unlawful Expansion of a Legal Non-Conforming Use - Nuisance Per Se); and (4) Violation of Chapter 78, Article VII of the Township Code of Ordinances - Property Maintenance Code

(for failure to maintain exterior property areas, storing or keeping inoperative or unlicensed vehicles, etc.).

**\*8** "*Younger* abstention applies when the state proceeding (1) is currently pending; (2) involves an important state interest; and (3) affords the plaintiff an adequate opportunity to raise constitutional claims." *Carroll v. City of Mt. Clemens*, 139 F.3d 1072, 1074 (6th Cir. 1998). Defendants argue that cases involving enforcement of municipal land use policy and zoning ordinances are recognized as especially appropriate for abstention, as a municipality has "a substantial interest in enforcing its zoning laws without federal interference in the state's administrative processes." *Executive Arts Studio, Inc. v. City of Grand Rapids*, 391 F.3d 783, 791 (6th Cir. 2004). Defendants believe that, because the instant case involves enforcement of a zoning ordinance and implicates both: (1) the active state court nuisance proceeding, and (2) state just compensation procedures (not yet utilized by Plaintiffs), abstention is warranted.

Plaintiffs contend that *Younger* abstention is not appropriate in this case, where they have alleged constitutional violations that arise out of different factual circumstances than are being litigated in Wayne County Circuit Court, such that any decision here will not conflict with the state court's findings. Citing *Dubuc v. Green Oak Twp.*, 810 F.Supp. 867, 870 (E.D. Mich. 1992). Plaintiffs argue that the state court litigation centers on whether Plaintiffs have violated local ordinances, whereas Plaintiffs' claims are focused on whether the MRD and Corporate Overlay District classifications are constitutional. Plaintiffs also state that they have alleged several causes of action that will not be addressed in the state court litigation; specifically, Counts I (Due Process Violations), IV (Equal Protection Violations), IX (Defamation), and X (Tortious Interference with Business Relations).

Plaintiffs contend that *Colorado River* abstention is not warranted in this case because their claims are not parallel to the claims made by the Township in the state court litigation. *Inrecon, LLC v. Highlands Ins. Co.*, 284 F.Supp.2d 773, 778 (E.D. Mich. 2003) ("The appropriate consideration is whether the two cases are currently parallel, not whether one could be modified so as to make the cases identical" and a case is not parallel when the claims allege entirely different causes of action). Plaintiffs contend that the constitutional rights claims in this case are distinct from the ordinance enforcement claims in the state court litigation. Defendants contend the cases are parallel. Defendants state that the parties are identical (other

than the additional individual Defendants name in this case – except that Toebe Construction, Inc. is a different, unrelated party) and "a comparison of the statement of facts [in the two cases] reveals that they draw upon the same facts."

The Court finds that Plaintiffs' position is supported. Although many of the same facts are discussed in both complaints, the claims brought by the Township are for non-compliance with Township ordinances. The Court notes that most, if not all, of the ordinances the Township seeks to enforce in the Wayne County Circuit Court litigation are not at issue in this case.

**\*9** Plaintiffs state that the eight factors to be addressed weigh against abstention under the *Colorado River* doctrine. The factors are:

> (1) whether federal or state law provides the basis for decision of the case; (2) whether the federal forum is less convenient to the parties; (3) whether there would be piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether the governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction.

*Dunn v. Daniel S. Gross & Assocs., PLC*, 2018 WL 583077, at \*3 (E.D. Mich. 2018) (citing *Colorado River*, 424 U.S. at 818-19; *Romine v. Compuserve Corp.*, 160 F.3d 337, 340 (6th Cir. 1998)).

Contrary to Defendants' suggestion that the operative law in this case is state law, the Court finds that Plaintiffs' allegations in Counts I-V are based on federal law and require interpretation of rights under the U.S. Constitution. It is equally convenient for Defendants to litigate in federal court as in state court as both courts are within blocks of each other in Detroit. The Court finds that it is not clear that proceeding with this action would result in piecemeal litigation, as there are no claims that could result in inconsistent rulings (other than perhaps the mandamus claim in Count VIII). It is true

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.403 Filed 03/18/20 Page 61 of 90
McCausland v. Charter Township of Canton, Slip Copy (2019)
2019 WL 4746763

that the state court action was filed first and discovery has commenced in that action but not in this one. Plaintiffs could raise some of their federal constitutional claims as defenses in the state court action, but they also are appropriately filed here.

The Court denies Defendants' proposal that the Court invoke the *Younger* or *Colorado River* doctrines to abstain from exercising jurisdiction over Plaintiffs' cause of action. As the *Colorado River* court stated, the general rule is that "the pendency of an action in state court is no bar to proceedings concerning the same matter in the federal court having jurisdiction." *Colorado River*, 424 U.S. at 817 (quoting *McClelland v. Carland*, 217 U.S. 268, 282 (1910)). The Court concludes that this federal court is the most appropriate forum to determine the federal constitutional law issues – whether the Township ordinances are valid under the U.S. Constitution. The Court also finds that its rulings will not affect the state court's ability to determine whether Plaintiffs violated the terms of the Township ordinances, even if the Court invalidates the Township ordinances such that they cannot be enforced against Plaintiffs.

**E. Supplemental Jurisdiction over State Law Claims**

Defendants argue that, absent a viable federal claim, supplemental jurisdiction over Plaintiffs' state law claims (Counts VI-XI) should be declined. Other than Count XI (Injunction), which should be dismissed as discussed above, Defendants do not offer any other basis for dismissal of Plaintiffs' state law claims (even the state law takings claim in Count VI). As the Court has concluded that several of Plaintiffs' federal claims should remain, the Court retains supplemental jurisdiction over Plaintiffs' state law claims in Counts VI-X.

**V. CONCLUSION**

**\*10** For the reasons stated above,

IT IS ORDERED that Defendant's Motion to Dismiss [Dkt. No. 15] is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that Counts III (Federal Takings Claim), Count XI (Injunction), and Count XII (Costs of Litigation) are DISMISSED.

IT IS FURTHER ORDERED that the Court RETAINS JURISDICTION over Counts I, II, and IV-X.

IT IS ORDERED.

**All Citations**

Slip Copy, 2019 WL 4746763

**Footnotes**

1    The individual Defendants include: Charles Larocque, Staff Engineer for the Township; Jeff Goulet, Township Planner; Thomas Yaak, former Supervisor of (and policy and decision-making official for) the Township; Mark Hook, ordinance officer for the Township; and Tim Faas, Municipal Services Director for the Township.
2    Toebe Construction, Inc. ("Toebe"), an entity with no association to the Township other than as a contractor, also has been named as a Defendant. Toebe has been served with the First Amended Complaint and filed an Answer, but Toebe is not a party to the Motion to Dismiss.
3    Defendants never directly challenge Plaintiffs' state law takings claim in Count VII.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB K

Smith v. Queener, Not Reported in Fed. Rptr. (2018)

2018 WL 3344176

2018 WL 3344176
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Constance R. SMITH, Plaintiff-Appellant,

v.

Henry QUEENER, Defendant-Appellee.

No. 17-5770
|
Filed January 4, 2018

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

**Attorneys and Law Firms**

Constance R. Smith, Nashville, TN, pro se.

Lauren Paxton Roberts, Ashley N. Goins, Stites & Harbison, Nashville, TN, Defendant-Appellee.

Before: SILER, GRIFFIN, and STRANCH, Circuit Judges.

ORDER

**\*1** Constance R. Smith, a pro se United States citizen living in Bermuda, appeals a district court order dismissing without prejudice her civil case against attorney Henry Queener. This case has been referred to a panel of the court that, upon examination, unanimously agrees that oral argument is not needed. *See* Fed. R. App. P. 34(a).

In 2014, Smith, while represented by Queener, filed a personal injury lawsuit against Martha Smith, which the district court dismissed pursuant to a settlement agreement arrived at through mediation. *Smith v. Smith*, No. 3:14-cv-1455 (M.D. Tenn. June 29, 2015).

In December 2016, Smith filed a complaint against Queener and alleged that Queener had committed negligence and legal malpractice by using a "purchased" medical report rather than her personal medical records during mediation. Smith alleged in the complaint that she was a resident of Tennessee living abroad in Bermuda and asked the district court to "[s]et aside the ruling" and to give her "full compensation."

Queener moved to dismiss the case for a lack of subject-matter jurisdiction and for failure to state a claim,

arguing that: (1) Smith did not establish federal question jurisdiction; (2) Smith's allegation that she was a resident of Tennessee and her failure to allege more than $75,000 in controversy independently defeated diversity jurisdiction; (3) the applicable statute of limitations barred Smith's claim; and (4) Smith failed to allege facts sufficient to state a claim of legal negligence. *See* Fed. R. Civ. P. 12(b)(1), (6).

Smith responded and argued that: (1) diversity of citizenship existed because she was a resident of Bermuda; (2) there were $575,000 in damages; and (3) she discovered the injury in August 2016. She also attempted to establish federal question jurisdiction by citing 42 U.S.C. § 1981 and alleging that Queener: (1) violated her Fifth Amendment right to due process; (2) violated her Seventh Amendment right to a jury trial; and (3) rendered ineffective assistance of counsel. Smith then filed an amendment to her response in which she, among other things, asserted that she was a resident of Bermuda and a citizen of Alabama.

The magistrate judge recommended dismissing Smith's case without prejudice for lack of subject-matter jurisdiction because the complaint did not contain a "short and plain statement of the grounds for the court's jurisdiction" or any other basis for federal jurisdiction. Fed. R. Civ. P. 8(a)(1). The magistrate judge further determined that, even if she were to construe Smith's subsequent filings as motions to amend her complaint, Smith failed to establish subject-matter jurisdiction because, as a Bermuda resident, Smith was "stateless" for the purposes of diversity jurisdiction, her pleadings failed to establish residency in Alabama, and she failed to state a claim under 42 U.S.C. § 1983.

Smith objected and argued in relevant part that she was not "stateless" for purposes of diversity jurisdiction. She also asserted that Queener was acting under color of state law because he abused his authority as her attorney and conspired with opposing counsel and the mediator and she expanded upon her previous allegations of racial discrimination.

**\*2** The district court overruled Smith's objections, adopted the recommendation of the magistrate judge, and dismissed the case without prejudice for lack of subject-matter jurisdiction. The district court held that Smith's complaint failed to state a federal claim because a private attorney in a civil case is not acting under color of state law. It further held that, as a United States citizen residing in Bermuda, Smith could not establish diversity jurisdiction.

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.406 Filed 03/18/20 Page 64 of 90

Smith v. Queener, Not Reported in Fed. Rptr. (2018)

2018 WL 3344176

Smith now argues in relevant part that the district court had diversity jurisdiction over her case and, in any case, federal question jurisdiction exists because Queener violated her Seventh Amendment right to a trial by jury. Smith also argues for alienage jurisdiction on the basis that she holds dual citizenship.

"We review *de novo* the decision to dismiss for lack of subject-matter jurisdiction." *202 N. Monroe, LLC v. Sower*, 850 F.3d 265, 269 (6th Cir. 2017); Fed. R. Civ. P. 12(b)(1). Smith was required to include "a short and plain statement of the grounds for the court's jurisdiction" in her complaint. Fed. R. Civ. P. 8(a)(1). Her complaint does not include any such statement or any other basis upon which the district court could find that subject-matter jurisdiction exists. It does not state a claim arising under the Constitution, laws, or treaties of the United States; nor does it establish diversity of citizenship. *See* 28 U.S.C. §§ 1331, 1332. And Smith's subsequent allegations, to the extent that they are properly before us, *see* 28 U.S.C. § 1653, fail to establish that the district court had subject-matter jurisdiction.

Smith first claims that the district court had diversity jurisdiction. Smith has variously argued that diversity jurisdiction exists because she owns a home in Alabama and plans to move there, she is a resident of Bermuda, or she holds dual citizenship as a citizen of the United States and a naturalized citizen of the British Overseas Territories.

The district court properly held that, as a United States citizen residing in Bermuda, Smith could not establish diversity jurisdiction. For diversity jurisdiction to apply under 28 U.S.C. § 1332(a)(3), the suit must be between citizens of different states, and the amount in controversy must exceed $75,000. "In order to be a citizen of a State within the meaning of the diversity statute, a natural person must both be a citizen of the United States *and* be domiciled within the State." *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828

(1989). "[D]omicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989). Smith's current domicile is Bermuda and allegations of future plans or economic ties to Alabama do not change her current location. Because Smith "has no domicile in any [s]tate," she "is therefore 'stateless' for purposes of § 1332(a)(3)," and not diverse with the residents of any state. *Newman-Green*, 490 U.S. at 828.

Nor may Smith rely upon 28 U.S.C. § 1332(a)(2), which provides for alienage jurisdiction in civil actions between "citizens of a State and citizens or subjects of a [foreign] state." Smith argues that alienage jurisdiction exists because she is a citizen of both the United States and the British Overseas Territories. But we have indicated that "dual citizenship does not create alienage jurisdiction." *Von Dunser v. Aronoff*, 915 F.2d 1071, 1075 (6th Cir. 1990).

**\*3** Finally, the district court properly held that Smith failed to establish federal question jurisdiction against Queener because, as a non-state actor, Queener is not subject to suit under § 1983. "[A] lawyer representing a client is not, by virtue of being an officer of the court, a state actor 'under color of state law' within the meaning of § 1983." *Polk County v. Dodson*, 454 U.S. 312, 318 (1981); *see Otworth v. Vanderploeg*, 61 F. App'x 163, 165-66 (6th Cir. 2003) (noting that "private attorneys representing private citizens ... [are] not acting under color of state law"). Smith made no allegations in her complaint that Queener was a state actor, and Smith's recent allegations that Queener conspired with a mediator fail to establish that Queener was a state actor.

Accordingly, we **AFFIRM** the judgment of the district court.

**All Citations**

Not Reported in Fed. Rptr., 2018 WL 3344176

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB L

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.408 Filed 03/18/20 Page 66 of 90
State Farm Mut. Auto. Ins. Co. v. Universal Health Group, Inc., Not Reported in...
2014 WL 5427170

2014 WL 5427170
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, Plaintiff,
v.
UNIVERSAL HEALTH GROUP, INC., a/k/a
Michigan Spine and Rehab; UGH Management,
LLC; Professional Health Systems, LLC, a/
k/a Professional Medical Billing, LLC; Scott
P. Zack, D.C.; David M. Katz, D.C.; Loren C.
Chudler, D.O.; Joseph F. DeSanto; Horizon
Imaging, LLC; Clear Imaging, LLC; Jeff
S. Pierce, D.O.; Thomas D. Caruso, D.O.;
and Katherine H. Karo, D.O., Defendants.

No. 14–cv–10266.
|
Signed Oct. 24, 2014.

**Attorneys and Law Firms**

Jared T. Heck, Ross O. Silverman, Eric T. Gortner, Katten
Muchin Rosenman LLP, Chicago, IL, Thomas W. Cranmer,
Miller Canfield Paddock and Stone PLC, Troy, MI, for
Plaintiff.

Ben M. Gonek, Law Offices of Ben M. Gonek, PLLC, Detroit,
MI, for Defendant.

*OPINION AND ORDER DENYING DEFENDANTS'
MOTIONS TO DISMISS [45, 46, 49, 53] AND
GRANTING PLAINTIFF'S MOTION TO STRIKE
NOTICE OF JOINDER/CONCURRENCE [57]*

JUDITH E. LEVY, District Judge.

**\*1** This is a RICO case. Pending are defendants Scott
P. Zack, D.C. and David M. Katz, D.C.'s motion to
dismiss (Dkt.45), Loren Chudler, D.O.'s motion to dismiss
(Dkt.46), Universal Health Group, Inc. ("Universal") UHG
Management, LLC ("UHG"), and Professional Health
Systems' ("PHS") motion to dismiss (Dkt.49), Joseph F.
DeSanto's motion to dismiss (Dkt.53), and plaintiff State
Farm Mutual Automobile Insurance Company's ("State

Farm") motion to strike the concurrence and joinder of
defendants Jeff S. Pierce, D.O. and Thomas D. Caruso, D.O.
in Zack, Katz, and Chudler's motions to dismiss. (Dkt.57.)[1]

**I. Background**

Plaintiff alleges that defendants are part of a racketeering
enterprise that has the alleged purpose of fraudulently
generating bills for unneeded medical services for individuals
who are in automobile accidents and have Personal Injury
Protection ("PIP") benefits under plaintiff's auto insurance
policies. These bills are then submitted to plaintiff for
payment.

The enterprise, in brief, allegedly consists of a group of
doctors and their respective medical businesses, each of
which work in concert to maximize billing for allegedly
unnecessary treatment, largely focused on neck and spine
injuries. Plaintiff alleges that the enterprise has been in
existence in one shape or form since 2007. Plaintiff's
complaint alleges that Zack was the owner of UHG, the entity
that initially controlled Universal, and that Zack and Katz
are officers and operators of PHS, the eventual successor-in-
interest to UHG. Zack, Katz, and DeSanto are each alleged
to be the owners and/or directors of the dayto-day operations
of Universal.

Plaintiff accuses defendants Zack and Katz, each
chiropractors, of falsely diagnosing patients with injuries
through Universal. Zack and Katz then refer patients to
Chudler, the Medical Director of Universal, who is accused
of conducting sham examinations that consistently support
the initial diagnosis and require prescriptions for extensive
and unnecessary physical therapy. Zack and Katz, along
with DeSanto, are also alleged to control Horizon Imaging,
LLC ("Horizon") and Clear Imaging, LLC ("Clear"), which
perform medically unnecessary magnetic resonance imaging
("MRI") tests. Pierce, Caruso, and Katherine Karo, D.O.,
as a part of this enterprise, are accused of performing
unnecessary electrodiagnostic ("EDX") tests, which further
increased the stream of billable procedures submitted to
plaintiff. Collectively, Plaintiff refers to these doctors and
companies as Universal. The Court will refer to them as "the
Universal Group."

Plaintiff's complaint is supported by several lists of what it
claims are hundreds of fraudulent evaluations, assessments,
treatments, and tests that the Universal Group conducted that
led to bills being submitted to Plaintiff for payment. The

2014 WL 5427170

complaint is also supported by affidavits from two doctors, Aria Sabit and Bharat Tolla, who performed some work for the Universal Group. [2]

 **\*2** Plaintiff requests a declaratory judgment stating that the corporate members of the Universal Group (Universal, Horizon, and Clear) are not entitled to reimbursement for any unpaid charges. Plaintiff also brings causes of action for common law fraud, unjust enrichment, and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d).

## II. Standard

When deciding a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.,* 684 F.3d 605, 608 (6th Cir.2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action[.]" *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

## III. Analysis

Defendants, in their four motions to dismiss, raise a bevy of reasons the Court should dismiss plaintiff's claims against each of them. Because of the manner in which the motions are argued—the defendants share in and build on each other's arguments, raising new facets of the same argument in subsequently filed motions—the Court will treat the motions to dismiss as a single extended motion to dismiss, addressing the various arguments under the counts to which each argument applies.

## A. Plaintiff's Fraud Claim

Fed.R.Civ.P. 9(b) requires that "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Under this heightened pleading standard, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were

fraudulent." *Indiana State Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc.,* 583 F.3d 935, 943–44 (6th Cir.2009) (quotation marks and citation omitted). A party must also identify the "alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of [the other party]; and the injury resulting from the fraud." *Coffey v. Foamex L.P.,* 2 F.3d 157, 161–62 (6th Cir.1993).

Plaintiff alleges that all of the defendants conducted mail fraud in violation of 18 U.S.C. § 1341. Defendants argue that plaintiff has failed to state how any of them committed fraud with the requisite particularity required of such a claim. Ultimately, this boils down to a claim that plaintiff engaged in impermissible "group pleading," and failed to specify which of the defendants engaged in fraudulent activity, and what fraudulent activity the defendants were to have engaged in.

 **\*3** Plaintiffs are not permitted, when asserting a fraud claim, to generally assert all claims against all defendants. *Hoover v. Langston Equip. Assocs., Inc.,* 958 F.2d 742, 745 (6th Cir.1992). "Group pleading run[s] afoul of *Central Bank [v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) ], [and] also fails to meet ... Fed.R.Civ.P. 9(b)'s specificity requirements." *D.E. & J Ltd. Partnership v. Conaway,* 284 F.Supp.2d 719, 730 (E.D.Mich.2003).

As another court in this district recently held, when faced with a motion to dismiss for failure to plead fraud with particularity, "a court must factor in the policy of simplicity in pleading which the drafters of the Federal Rules codified in Rule 8." *Llewellyn–Jones v. Metro Property Group, LLC,* 2014 WL 2214209, at (E.D.Mich. May 27, 2014) (citing *Whalen v. Stryker Corp.,* 783 F.Supp.2d 977, 982 (E.D.Ky.2011) (further citations omitted). "The threshold test is whether the complaint places the defendant on sufficient notice of the misrepresentation allowing the defendants to answer, addressing in an informed way plaintiff[']s claim of fraud." *Coffey v. Foamex L.P.,* 2 F.3d 157, 162 (6th Cir.1993).

Plaintiff has provided a nearly ninety-page description of how the defendants' alleged mail fraud worked, coupled with charts demonstrating the types of claims submitted as a part of this purportedly fraudulent enterprise. Each defendant has received sufficient notice of the misrepresentations it is alleged to have made. A party that causes a fraudulent bill to be submitted to an insurer may be as liable for fraud as the person whose name was on the fraudulent submission.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 2

*Allstate Ins. Co. v. Etienne,* 2010 WL 4338333, at *10 (E.D.N.Y. Oct.26, 2010); *see also Fremont Reorganizing Corp. v. Duke,* 811 F.Supp.2d 1323, 1337 (E.D.Mich.2011) ("A person commits mail fraud if he devises a scheme to defraud, executes the scheme using the mail or causing it to be used, and acts with the intent to defraud.") (citing 18 U.S.C. § 1341).

As it did in *State Farm Mut. Auto. Ins. Co. v. Physiomatrix, Inc. .,* 2013 WL 509284, at *5 (E.D.Mich. Jan.12, 2013), plaintiff has provided a listing of several hundred claims which each defendant is alleged to have contributed to or orchestrated: Zack and Katz make fraudulent initial diagnoses through Universal, which was initially operated and directed through UHG and then PHS; Chudler conducts fraudulent examinations which lead to the prescription of unnecessary treatments; Pierce and Caruso fraudulently conduct unnecessary EDX tests while Zack and Katz, through Horizon and Clear, fraudulently conduct MRIs. DeSanto, as a non-doctor, works with Zack and Katz through Universal to design and direct the entire system. Each of these actions ultimately contributes to the fraudulent submission to plaintiff, in which each member has contributed in whole or in part to one of the hundreds of false representations specifically referenced in the complaint.

**\*4** Accordingly, plaintiff has adequately pled that all defendants either executed or caused the execution of the mail fraud scheme at issue here.

### B. Plaintiff's RICO Claims

Defendants argue that plaintiff has failed to adequately plead RICO claims against them. Plaintiff contends that defendants violated 18 U.S.C. §§ 1962(c) and (d).

The statute states:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

Liability under § 1962(c) is determined by whether the plaintiff can establish "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985).

Defendants challenge multiple aspects of plaintiff's RICO claim. The Court will address each challenge in turn.

### 1. Challenges to the Scope of the Enterprise

Plaintiff argues that the entire Universal Group constitutes an association-in-fact enterprise as defined by the Supreme Court in *Boyle v. United States.* "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle,* 556 U.S. 938, 946, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009).

Defendants' first objection to plaintiff's definition of their alleged enterprise is that it consists of a simple conspiracy, rather than a RICO enterprise. An association-in-fact enterprise "requires[s] a certain amount of organizational structure which eliminates simple conspiracies from the Act's reach." *VanDenBroeck v. CommonPoint Mortg. Co.,* 210 F.3d 696, 699 (6th Cir.2000), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008). However, a plaintiff need only show "a continuing unit that functions with a common purpose." *Boyle,* 556 U.S. at 948. Other than simply stating that plaintiff alleges a conspiracy rather than an enterprise, defendants offer no colorable argument that plaintiff has failed to do so.

Plaintiff "delineates the specific roles and relationships of the defendants," alleges an ongoing enterprise since at least 2007, and alleges that it functioned for the common purpose of submitting fraudulent bills for reimbursement. *Ouwinga v. Benistar 418 Plan Servs., Inc.,* 694 F.3d 783, 794–95 (6th Cir.2012). Accordingly, plaintiff has successfully pled an association-in-fact enterprise.

Next, defendants Universal, UHG, and PHS argue that plaintiff has failed to establish their role in the racketeering enterprise. These defendants seek a near-atomic level of particularity that neither the Federal Rules nor the RICO statute require. Plaintiff has sufficiently argued that these defendants were a part of the enterprise by stating that UHG and then PHS were the corporate vehicles that ultimately controlled and directed Universal, and that Universal

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.411 Filed 03/18/20 Page 69 of 90
State Farm Mut. Auto. Ins. Co. v. Universal Health Group, Inc., Not Reported in...
2014 WL 5427170

generated and directed, at the very least, the initial diagnoses leading to the allegedly unnecessary tests and procedures.

**\*5** Finally, defendants argue that Horizon and Clear were founded in 2009, and thus cannot be a part of an enterprise alleged to have begun in 2007. There is no requirement under RICO that an enterprise remain static from the moment of its inception; members may come and go, and those who joined even years after the enterprise began are just as liable for their unlawful acts under RICO as founding members. *See, e.g., Boyle,* 556 U.S. at 951 (upholding RICO liability for an enterprise member who joined three years after the enterprise began).

Accordingly, plaintiff has pled the existence of an association-in-fact enterprise consisting of all the members of the Universal Group.

### 2. Conducting the Affairs of the Enterprise

Defendants argue that plaintiff failed to allege that all defendants conducted the affairs of the enterprise, as required to state a RICO claim. *See* 18 U.S.C. § 1962(c) (parties may not "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ."). "In order to participate, directly or indirectly, in the conduct of such enterprise's affairs, one must have some part in directing those affairs." *Reeves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). "This requirement confirms that the enterprise element demands evidence of a certain quantum of business-like organization—*i.e.,* a system of processes, dealings, or other affairs that can be 'directed.' " *Boyle,* 556 U.S. at 954.

Defendants' argument is essentially that the pleading is inadequate because plaintiff must draft its complaint at some level of factual detail greater than what is contained in the complaint, and that plaintiff did not use the specific phrase "conducting the affairs of the enterprise" at all times when discussing how each plaintiff conducted or participated in the conduct of the enterprise.

After a careful reading of the complaint, the Court finds that plaintiff alleged the course of conduct each defendant engaged in with regard to the enterprise, and it has therefore sufficiently pled that each defendant had some part in directing the affairs of the enterprise.

### 3. The "Relationship Plus Continuity" Test

A party asserting a civil RICO claim must allege predicate acts in the preceding ten-year period that "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). In other words, the party must show a "relationship plus continuity." *Brown v. Cassens Transp. Co.,* 546 F.3d 347, 355 (6th Cir.2008). "Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J.,* 492 U.S. at 240.

Defendant argues that plaintiff's allegations amount only to a "single, fraudulent scheme to accomplish a single objective," which the Sixth Circuit has held "does not possess the requisite RICO continuity." *Percival v. Girard,* 692 F.Supp.2d 712, 722 (6th Cir.2010) (citing *Moon v. Harrison Piping Supply,* 465 F.3d 719, 726 (6th Cir.2006)) (further citations omitted).

**\*6** However, *Percival* and *Moon,* which each found single schemes that failed to meet continuity requirements, are very different from this case. In *Percival,* the defendants were alleged to have prevented a single person from exercising his rights under a single settlement agreement. *Percival,* 692 F.Supp.2d at 723. In *Moon,* the defendants were alleged to have conspired to cut a single person off from his unemployment benefits. *Moon,* 465 F.3d at 725. Neither case mirrors this case, in which plaintiff alleges that defendants conspired over the course of several years to submit fraudulent bills for hundreds, if not thousands, of patients.

Defendants seek to have the Court read the words "scheme" and "objective" at a level of abstraction that is inconsistent with RICO case law. Essentially, defendants would define an enterprise that has the purpose of repeatedly engaging in criminal conduct over a period of several years as a single "scheme" having only a single "objective" if the enterprise sought to repeatedly gain similar benefits from repeated instances of organized criminal conduct, no matter how many discrete instances it engaged in or discrete benefits it received. That is a flawed reading of *Percival* and *Moon,* which each concerned a single, discrete scheme with a single goal that was not repeated and bore no threat of repetition once the goal was accomplished.

Plaintiff has sufficiently pled either a closed-ended pattern consisting of the discrete period of allegedly fraudulent submissions defendants made to plaintiff from 2007 on,

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.412 Filed 03/18/20 Page 70 of 90
State Farm Mut. Auto. Ins. Co. v. Universal Health Group, Inc., Not Reported in...
2014 WL 5427170

or an open-ended pattern consisting of that same conduct, coupled with the threat of its indefinite continuance as long as defendants treat patients that plaintiff insures. Accordingly, plaintiff has satisfied the "relationship plus continuity" test.

### 4. Time–Barred Claims
Defendants argue that plaintiff's RICO claims are partially timebared.

Michigan's Insurance Code requires that an insurer pay PIP benefits such as those at issue here within 30 days if an insurer receives "reasonable proof of the fact and of the amount of loss sustained." M.C.L. § 500.3142. RICO claims must be brought within four years of the discovery of the injury giving rise to the RICO claim. *Agency Holding Corp. v. Mally–Duff & Assocs., Inc.,* 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987); *Rotella v. Wood,* 528 U.S. 548, 555–57 (2000). "The limitations period for RICO claims accrues when a plaintiff knew or should have known of an injury." *Taylor Group v. ANR Storage Co.,* 24 Fed. Appx. 319, 325 (6th Cir.2001).

Defendants argue that plaintiff either knew or should have known of each fraudulent submission paid within thirty days. Because plaintiff paid those claims based on the "reasonable proof" defendants provided, defendants argue plaintiff is barred from bringing a RICO claim for any claim paid more than four years before the date this complaint was filed on January 21, 2014. Because plaintiff now uses the patterns of treatment in defendants' submissions as far back as 2007 as a basis for its fraud allegations, defendants contend plaintiff should have noticed those patterns at the time of submission rather than years later.

**\*7** Defendants further argue that, because plaintiff has filed other RICO suits against other defendants prior to filing this case, plaintiff should have been on notice concerning the alleged fraud here earlier.

It is premature at this stage of the litigation to dismiss a claim on statute of limitations grounds where plaintiff has plausibly pled that its claim arose within the statute of limitations. Plaintiff contends it learned of the fraud only shortly before it filed suit, based on depositions and evidence in other cases. Defendants' countervailing assertion is not evidence that plaintiff knew of the fraud, but instead an argument that plaintiff should have known—an argument that cannot be proved at this stage in the litigation.

Defendants' argument under the Michigan Insurance Code is unsupported by legal authority. Defendants do not allege that State Farm failed to request or review reasonable proof of each claim. Instead, they argue that any submission of proof constitutes sufficient notice of fraud, *even where the proof is itself fraudulent.* The Court can find no legal authority to support the argument that fraud itself should be considered *de facto* notice of fraud.

Finally, defendants' argument that the existence of alleged fraud of entirely different and unrelated parties, which may or may not bear resemblance to the fraud allegedly committed here, is irrelevant. Again, the Court can find no legal authority for the contention that the general discovery of fraud on the part of one party puts a plaintiff on notice as to fraud on the part of all other parties.

### 5. Reverse Preemption Under the McCarren–Ferguson Act
Defendants argue that the McCarren–Ferguson Act, 15 U.S.C. § 1011, *et seq.,* "reverse-preempts" plaintiff's RICO claims. The Act provides that "[t]he business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." 15 U.S.C. § 1012(a). It also provides that "[n]o act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance." *Id.* "The McCarran–Ferguson Act thus precludes application of a federal statute in face of state law 'enacted ... for the purpose of regulating the business of insurance,' if the federal measure does not 'specifically relat[e] to the business of insurance,' and would 'invalidate, impair, or supersede' the State's law." *Humana, Inc. v. Forsyth,* 525 U.S. 299, 307, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999) (alteration in original) (quoting 15 U.S.C. § 1012(b)).

Defendants contend that plaintiff's RICO claims are reverse-preempted because (1) RICO does not specifically relate to the business of insurance; (2) Michigan's Insurance Code was enacted specifically to regulate the business of insurance; and (3) application of RICO would impair, invalidate, or supersede Michigan's no-fault laws.

**\*8** The Court need not address the first two parts of the argument, as the application of RICO would not impair, invalidate or supersede Michigan's Insurance Code. Another court in this district, facing the identical argument, determined that the Insurance Code "provides for criminal prosecution

2014 WL 5427170

and remedies for insurance fraud ." *Physiomatrix,* 2013 WL 509284, at *3 (citing M.C.L. § 500.4511). As the Insurance Code provides for civil liability for fraud, the application of RICO is consistent with the Insurance Code. *Id.* (citing *Humana,* 525 U.S. at 311–12 (holding that the application of RICO was consistent with Nevada's insurance laws providing "both statutory and common-law remedies to check insurance fraud.").

6. Recovery for "Personal Injuries" Under *Jackson v. Sedgwick*

Defendants argue that the Sixth Circuit's decision in *Jackson v. Sedgwic Claims Mgmt. Inc.* bars recovery under RICO in this case. In *Jackson,* the Sixth Circuit held that plaintiffs seeking recovery for workers' compensation benefits were seeking recovery for personal injuries, rather than injuries to their business or property as required to state a claim under RICO, 18 U.S.C. § 1964(c). *Jackson,* 731 F.3d 556, 566 (6th Cir.2013).

Defendants here argue that plaintiff's RICO claim is derivative of personal injuries, and is therefore barred by *Jackson. Jackson* does not bar a corporation that sells insurance covering personal injury claims from bringing a RICO suit, because the injuries alleged in relation to an enterprise seeking fraudulent reimbursements for services performed are to the business or property of the corporation. *See State Farm Mut. Auto. Ins. Co. v. Physiomatrix, Inc.,* 2014 WL 555199, at *2 (E.D.Mich. Feb.12, 2014); *Allstate Ins. Co. v. Med. Evaluations, P.C.,* 2014 WL 2559230, at *1–2 (E.D.Mich. June 6, 2014).

Defendants' argument, if successful, would also have the effect of barring virtually all RICO claims by any company with business involving health insurance claims. If any claim merely *derivative* of a personal injury barred RICO liability, then not only would insurance companies be barred from seeking RICO recovery, but doctors, hospitals, and any number of nonprofits directly injured in their business dealings involving personal injuries would as well. This is not how the Court interprets the holding in *Jackson.*

7. Agreement to the Objective of a Violation of RICO

Defendants argue that plaintiff has failed to prove the agreement between the parties necessary to show that they conspired to violate RICO as required by 18 U.S.C. § 1962(d). Defendants cite a Seventh Circuit case, *Goren v. New Vision Int'l, Inc.,* in support of this contention. Plaintiff, defendants argue, failed to allege "(1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Goren,* 156 F.3d 721, 732 (7th Cir.1998).

**\*9** "Unlike the general conspiracy statute, § 1962(d) requires no 'overt act or specific act' in carrying it forward." *U.S. v. Corrado,* 227 F.3d 542, 553–54 (6th Cir.2000) (quoting *Salinas v. United States,* 522 U.S. 52, 63, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997)). "Supporters are as guilty as ... perpetrators ... so long as they share a common purpose, conspirators are liable for the acts of their co-conspirators." *Salinas,* 522 U.S. at 64. "A RICO conspirator may be convicted so long as he agrees with such other person or persons that they or one or more of them will engage in conduct that constitutes such crime." *Corrado,* 227 F.3d at 554 (quoting *Salinas,* 522 U.S. at 65) (internal quotation marks and further citations omitted).

Plaintiff has adequately pled both the existence of an agreement between all members of the Universal Group to defraud it and the necessary predicate acts. Further, defendants seek to revitalize their argument that later-arriving members of a conspiracy cannot be members of the conspiracy. The Court rejects this argument, as set forth above.

C. Application of Abstention Doctrines

Defendants argue that the Court should abstain from hearing this case under three doctrines of abstention: *Colorado River, Burford,* and *Wilton.* The Court will address each in turn.

1. *Colorado River* Abstention

Under the doctrine of abstention established in *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), a district court may abstain from hearing cases "in situations involving the contemporaneous exercise of jurisdiction by state and federal courts." *Romine v. Compuserve Corp.,* 160 F.3d 337, 339 (6th Cir.1998) (citing *Colorado River,* 424 U.S. at 817).

In order for *Colorado River* abstention to apply, the Court must determine (1) if the state and federal cases are parallel, and (2) whether wise judicial administration justifies

2014 WL 5427170

abstaining from hearing the federal case. *Colorado River,* 424 U.S. at 817.

To the extent defendants have made an effort to show the existence of parallel state court proceedings, they have only shown the existence of suits between former Universal Group patients, suing as individual plaintiffs, and State Farm for unpaid PIP benefits. The argument, as the Court understands it, is that because State Farm has asserted that the claims are fraudulent as an affirmative defense in the state court litigation, those state court cases are parallel to this federal case.

That is simply not so. First, the state court cases share only one party with this case: State Farm. The plaintiff in this case brings a series of claims against these defendants that will not and cannot be adjudicated in single-plaintiff state court litigation. Defendants do not argue that the adjudication of any case in state court will resolve whether they engaged in a conspiracy to defraud plaintiff.

Second, this case concerns either paid claims, and therefore not at issue in state court cases concerning unpaid claims, or unpaid claims, which plaintiff has stipulated will not be a part of this case if they are at issue in a state court case. Defendants' argument for *Colorado River* abstention fails to show there is any action in state court that is parallel to this case.

**\*10** Because there is no parallel state court case, the Court need not engage in the remainder of the *Colorado River* analysis.

### 2. *Burford* Abstention

Defendants also argue that the Court should abstain from hearing this case pursuant to the abstention doctrine outlined in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Under *Burford,*

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends

the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989).

As a threshold matter, defendants fail to identify any ongoing proceedings or orders of *state administrative agencies* with which this case would interfere.

Defendants argue that because Michigan's no-fault insurance system is unique to Michigan, determination of any no-fault case should be left to state courts. The primary evidence relied on for the "substantial public import" prong of *Burford* abstention is the large number of state-court cases involving litigation of no-fault insurance claims.

Every owner or registrant of a motor vehicle in the state of Michigan is required to carry no-fault insurance on the vehicle in question. M.C.L. § 500.3101. Litigation will inevitably ensue on a variety of fronts as a result of automobile accidents. That there are a number of lawsuits in Michigan state courts under no-fault laws does not mean that any claim related to no-fault insurance is a matter of "substantial public import." It means that Michigan residents bring Michigan state law claims in Michigan courts. Moreover, this is not a no-fault case.

Abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Answers in Genesis of Ky., Inc. v. Creation Ministries Int'l., Ltd.,* 556 F.3d 459, 467 (6th Cir.2009) (quoting *Colorado River,* 424 U.S. at 813). The fact that a law is "unique," alone, is insufficient to trigger the Court's discretion to abstain. Accordingly, defendants fail to convince the Court to abstain from hearing claims related to Michigan's no-fault insurance.

### 3. *Wilton* "Abstention"

Defendants also argue that the Court should abstain from hearing this case pursuant to the doctrine outlined in *Wilton v.*

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.415 Filed 03/18/20 Page 73 of 90
State Farm Mut. Auto. Ins. Co. v. Universal Health Group, Inc., Not Reported in...
2014 WL 5427170

*Seven Falls Co.,* 515 U.S. 277, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). In short, a Court may dismiss or stay an action in which solely declaratory relief is sought. *Id.* at 288, 290. The Supreme Court did not determine in *Wilton* whether that discretion extends to cases in which issues of federal law were raised, or where there were no parallel state court proceedings. *Id.* at 290.

**\*11** The Court will not abstain here, particularly where the declaratory judgment action is inextricably dependent on and connect to the underlying substantive counts. As a matter of *Wilton'*s applicability to complaints containing both a declaratory judgment action and other federal actions, such as this one, the Court does not believe it is a wise use of its discretion to decline to entertain a declaratory judgment action tied to a viable federal cause of action.

Accordingly, the Court will not abstain from hearing any of plaintiff's claims.

### D. Collateral Estoppel

Defendants argue that plaintiff is collaterally estopped from litigating issues in this case previously litigated in other cases. *See Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Defendants, however, identify no prior cases and no prior issues to serve as the basis for the exercise of collateral estoppel.

### E. Voluntary Waiver

Defendants argue that plaintiff has voluntarily waived the right to contest the propriety of claims previously paid. Because Michigan's Insurance Code requires the submission of "reasonable proof" to the insurer before benefits may be paid, M.C.L. § 500.3142(2), defendants argue that the payment of any benefits constitutes a waiver as to all claims arising from the payment, even if the payment was fraudulently gained.

Defendants cite no authority for the proposition that a reimbursement under Michigan's no-fault insurance system constitutes a waiver of claims related to the payment.

Michigan law codifies a number of fraudulent insurance acts as felonies punishable by up to ten years in prison. M.C.L. §§ 500.4503, 500.4511. There is no reasonable interpretation of Michigan law that punishes, for instance, the submission of "false information concerning any fact or thing material to [an insurance] claim," M.C.L. § 500.4503(c), but only if the

claim is unpaid. In effect, defendants' interpretation of the law would only punish those who were incompetent fraudsters, letting their more intelligent or devious colleagues off the hook.

The Court will not dismiss this case on the basis of voluntary waiver.

### F. Unjust Enrichment

Defendants argue that plaintiff's unjust enrichment claim is barred because the express contracts between plaintiff and the insureds govern these claims. "[U]nless it is undisputed that there is an express contract between the same parties covering the same subject matter, State Farm is entitled to plead unjust enrichment as an alternative claim of relief." *Physiomatrix,* 2013 WL 509284, at *5. As plaintiff disputes the existence of an express contract between it and defendants, the claim will be permitted to go forward.

### G. The "Challenge" to Universal's Nonprofit Status

Defendant Universal argues that plaintiff is claiming Universal is unlawfully incorporated as a nonprofit entity, and seeks to have all portions of the complaint relating to that claim stricken.

Plaintiff argues that, although Universal is incorporated as a nonprofit, its real purpose is to engage in fraud with the rest of the Universal Group. Plaintiff does not dispute that Universal is properly incorporated as a non-profit, and does not seek to have its corporate status revoked or altered. Instead, plaintiff argues that the non-profit status is a ruse used to hide Universal's true nature as a key player in an enterprise that has defrauded plaintiff out of millions of dollars for the monetary benefit of its owners and operators.

**\*12** Universal relies on *Miller v. Allstate Ins. Co.,* 481 Mich. 601, 751 N.W.2d 463 (2008), in support of the proposition that plaintiff may not argue that Universal's non-profit status is a sham. In that case, an insurer attempted to directly challenge the corporate status of a health care provider the insurer believed was not legally allowed to provide health care services. *Id.* at 606, 751 N.W.2d 463. The question there, however, was "whether a corporation has been properly incorporated under the relevant law," not whether a purported non-profit was operating in accordance with its corporate status, and whether that alleged failure was a part of a conspiracy to commit fraud. *Id.* at 615, 751 N.W.2d 463.

State Farm Mut. Auto. Ins. Co. v. Universal Health Group, Inc., Not Reported in...
2014 WL 5427170

Here, plaintiff does not dispute that Universal was properly incorporated, and does not seek to revoke Universal's corporate charter. Instead, plaintiff argues that Universal is behaving contrary to its corporate status as a non-profit, and that this behavior makes it a part of an enterprise designed to defraud plaintiff. *Miller* does not bar such a claim. Accordingly, the Court will not strike references to Universal's alleged fraud or non-compliance with respect to its non-profit status.

H. Plaintiff's Motion to Strike Pierce and Caruso's Joinder
Plaintiff moves to strike defendants Pierce and Caruso's concurrence and joinder (Dkt.52) in the motions to dismiss filed by defendants Katz, Zack, and Chudler.

Pierce and Caruso filed answers to the complaint on March 28, 2014. (Dkt.29, 31.) The only other defendant to file an answer was Karo, on the same day. (Dkt.30.) All other defendants filed motions to dismiss, or concurrences and joinders in the motions to dismiss of other defendants.

Fed.R.Civ.P. 12(b) states that a motion to dismiss under subsection (6) "must be made before pleading if a responsive pleading is allowed." Pierce and Caruso's concurrence and joinder is therefore untimely under Rule 12(b)(6).

Pierce and Caruso argue that their concurrence and joinder should instead be treated as a motion for judgment on the pleadings. A party may file a motion under Fed.R.Civ.P. 12(c) for judgment on the pleadings "[a] fter the pleadings are closed."

The pleadings in this matter are not closed, as all but three defendants have filed the instant motions to dismiss and various concurrences and joinders. *See, e.g., Dunn–Mason v. JP Morgan Chase Bank Nat. Ass'n,* 11–CV–13419, 2013 WL 4084676, at *4 (E.D.Mich. Aug.13, 2013). Further, Pierce and Caruso's concurrence and joinder, if permitted, would convert the two motions to dismiss here into motions for judgment on the pleadings, even though the parties that filed the motions to dismiss have not answered. Rule 12(c) does not permit one defendant to change the procedural posture of another defendant's motion.

Accordingly, the Court will grant the motion to strike Pierce and Caruso's concurrence and joinder.

IV. Conclusion
For the reasons stated above, it is hereby ordered that:

**\*13** Defendants' motions to dismiss (Dkt.45, 46, 49, 53) are DENIED; and

Plaintiff's motion to strike the concurrence and joinder of defendants Pierce and Caruso (Dkt.57) is GRANTED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5427170

---

**Footnotes**

1    In addition, Horizon Imaging, LLC and Clear Imaging, LLC joined in Zack and Katz's motion to dismiss. (Dkt.47.) The disposition of Zack and Katz's motion will also address these parties' joinder.
2    Zack and Katz attack the credibility of Dr. Sabit, citing among other things, investigations into whether Dr. Sabit engaged in fraud. (Dkt.76.) When deciding a motion to dismiss, "[i]t is not the function of the court to weigh evidence or evaluate the credibility of witnesses." *Miller v. Currie,* 50 F.3d 373, 377 (6th Cir.1995). Instead, the Court tests only the sufficiency of the factual matter pleaded, and accepts that pleaded factual matter as true. *Currier v. First Resolution Inv. Corp.,* 762 F.3d 529, 533 (6th Cir.2014).

---

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB M

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.418 Filed 03/18/20 Page 76 of 90

State Farm Mutual Ins. Co. v. Elite Health Centers, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 877396

2017 WL 877396
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

STATE FARM MUTUAL INS. CO., Plaintiff,

v.

ELITE HEALTH CENTERS, INC., et al., Defendants.

Case No. 16-13040
|
Signed 03/06/2017

**Attorneys and Law Firms**

Kathy P. Josephson, Matthew R. Ryan, Ross O. Silverman, Katten Muchin Rosenman LLP, Chicago, IL, Michael Rosensaft, Katten Muchin Rosenman LLP, New York, NY, Thomas W. Cranmer, Miller Canfield Paddock and Stone PLC, Troy, MI, for Plaintiff.

Emily R. Warren, Peter W. Joelson, Joelson Rosenberg, PLC, Farmington Hills, MI, Gary R. Blumberg, Dearborn, MI, Ziyad I. Hermiz, Butzel Long, Matthew J. Thomas, Paul J. Manion, Rutledge, Manion, Ben M. Gonek, Law Offices of Ben M. Gonek, PLLC, Detroit, MI, for Defendants.

**OPINION AND ORDER DENYING
DEFENDANTS' MOTION TO DISMISS**

Sean F. Cox, United States District Judge

***1** Plaintiff State Farm Mutual Automobile Insurance Company ("State Farm") brings this action against 18 defendants. Specifically, State Farm claims that Defendants have submitted fraudulent claims to the insurer under Michigan's No-Fault Automobile Act. State Farm's complaint alleges several claims of common law fraud, civil conspiracy and unjust enrichment, and a count for declaratory judgment.

Currently before the Court is Defendants Elite Health Centers, Inc., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., Midwest Medical Associates, Inc., Pure Rehabilitation, Inc., Derek L. Bittner D.C., Mark A. Radom, Derek Lawrence Bittner, D.C., Ryan Matthew Lukowski, D.C., Michael P. Draplin, D.C., Mark J. Juska, M.D., and Superior Diagnostic, Inc.'s Motion to Dismiss. Defendants Dearborn Center

for Physical Therapy, LLC, Michigan Center for Physical Therapy, Inc., Jayson Rosett, Noah H. Upfall and Michael J. Paley, M.D. have filed concurrences to the Motion to Dismiss. Defendant Chintan Desai, M.D. has not concurred in the motion and has instead filed a separate motion to dismiss, which the Court will address at a later date in a separate Opinion & Order.

Defendants' advance the following arguments in their motion: (1) the complaint fails to plead any facts to support individual liability; (2) State Farm lacks standing to allege claims arising from the incorporation of the entity defendants as non-profit corporations; (3) the fraud claims fail because they do not meet the heightened pleading requirements of Rule 9(b); (4) the civil conspiracy claims fail because the complaint fails to plead an underlying tort and because the complaint fails to plead conspiracy with requisite specificity; (5) the unjust enrichment claims fail because the complaint fails to identify which Defendants received which benefits and because an express contract exists covering the subject matter at issue; and (6) the Court should abstain from exercising jurisdiction over the declaratory judgment action.

Defendants' motion has been fully briefed. The Court finds that oral argument would not significantly aid in the decisional process and therefore orders that the instant motion will be decided upon the briefs. *See* E.D. Mich. LR 7.1(f). For the reasons that follow, the Court shall **DENY** Defendants' motion.

**BACKGROUND**

**A. Factual Background**

Plaintiff State Farm is a corporation that engages in the business of insurance in Michigan. State Farm brings this action against 18 defendants, all of which are alleged to have played a role in a scheme to defraud the insurer: (1) Elite Health Centers, Inc.; (2) Elite Chiropractic, P.C.; (3) Elite Rehabilitation, Inc.; (4) Midwest Medical Associates, Inc.; (5) Pure Rehabilitation, Inc.; (6) Derek L. Bittner D.C., P.C.; (7) Mark A. Radom; (8) Derek Lawrence Bittner D.C.; (9) Ryan Matthew Lukowski D.C.; (10) Michael P. Draplin D.C.; (11) Noel H. Upfall D.O.; (12) Mark J. Juska; (13) Superior Diagnostic, Inc.; (14) Chintan Desai, M.D.; (15) Michael J. Paley; (16) Dearborn Center for Physical Therapy, LLC; (17) Michigan Center for Physical Therapy, Inc.; and (18) Jason Rosett.

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.419 Filed 03/18/20 Page 77 of 90

State Farm Mutual Ins. Co. v. Elite Health Centers, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 877396

### 1. The Defendants

**\*2** At the center of the alleged scheme are Defendants Derek Lawrence Bittner, D.C., a chiropractor, and Mark A. Radom, a layperson.

State Farm alleges that Bittner and Radom created, own and control several entities that: (1) submit bills and supporting documentation to State Farm Mutual for chiropractic, physical therapy and medical services purportedly rendered to patients that were not actually performed or were not medically necessary; (2) that prescribe and refer patients to two locations owned by Defendant Jayson Rosett for physical therapy services that are either not performed or not medically necessary; and (3) that refer State Farm Mutual insureds to receive medically unnecessary MRIs from Horizon Imaging, LLC and from Defendant Superior Diagnostics, Inc. (Compl. at ¶ 1).

### a. The Elite Entities

Defendant Derek L. Bittner D.C., P.C. ("Bittner P.C.") is a Michigan professional corporation, formed in 2000. (Compl. at ¶ 203). Bittner is the resident agent and president. (*Id.*). Defendant Elite Chiropractic P.C. ("Elite Chiro") is a Michigan professional corporation formed in 2011. Derek Bittner is the resident agent and sole officer.

Bittner P.C. and Elite Chiro submitted bills to State Farm Mutual for chiropractic services purportedly rendered at four locations: Sterling Heights, Detroit, Westland, and Riverview. (Compl. at ¶ 205).

Defendant Elite Rehabilitation, Inc. ("Elite Rehab") is a Michigan domestic non-profit formed by Bittner in 2011. (Compl. at ¶ 206). Defendant Pure Rehabilitation, Inc., ("Pure Rehab") is a Michigan domestic non-profit corporation formed in March 2014 to replace Elite Rehab. (Compl. at ¶ 207).

Defendant Elite Health Centers, Inc., ("Elite Health") is a Michigan domestic non-profit formed in 2011 by Bittner. (Compl. at ¶ 208). From 2013 through June 2014, Elite Health submitted documentation for: (1) physical therapy under the assumed names Rehabilitation of Sterling Heights and Rehabilitation of Detroit; (2) for medical exams under the name Pain Specialists of Michigan; for surgery consultations under the name Prime Neurosurgery Group; and

(3) for neurological consultations under the name Pioneer Neurology Group. Defendant Midwest Medical Associates, Inc. ("Midwest Medical") is a Michigan domestic non-profit corporation formed in March 2014 to replace Elite Health.

### b. Defendant Chiropractors

Defendant Ryan Matthew Lukowski, D.C. ("Lukowski") is a licensed chiropractor. (Compl. at ¶ 211). From Approximately 2012 through approximately February 2013, Lukowski worked for the Elite Entities full-time at the Detroit location and once a week at the Sterling Heights location.

Defendant Michael Patrick Draplin, D.C., ("Draplin") is a licensed chiropractor. (Compl. at ¶ 212). Draplin worked for the Elite Entities at the Detroit location, where he became the primary Elite chiropractor after Lukowski left.

During this time, Lukowski and Draplin are alleged to have falsely purported to provide legitimate chiropractic evaluations and treatment for a significant number of patients who treated at Elite pursuant to the Predetermined Protocol, referred patients to Elite doctors for medical exams pursuant to which medically unnecessary physical therapy could be prescribed and ordered medically unnecessary MRIs.

### c. The Elite Doctors

**\*3** Defendant Noah Upfall, D.O. ("Upfall") is a licensed doctor of osteopathy. (Compl. at ¶ 213). Upfall worked for Elite Health and its successor, Midwest Medical, from 2011 through February 2014.

Defendant Mark J. Juska, M.D. ("Juska") is a licensed medical doctor. (Compl. at ¶ 214). Juska worked at Elite Health and its successor, Midwest Medical, from late 2013 through early 2015. Juska testified that: he was an employee of Michigan Sports and Spine Center, P.C. ("Michigan Sports"); his boss was Jeff S. Pierce, D.O., who is the president of Michigan Sports; Pierce arranged for him to work at Elite Health; there was a relationship or agreement between Elite Health and Michigan Sports; and that he was paid by Michigan sports, not Elite Health.

Upfall and Juska are alleged to have falsely purported to examine, diagnose and prescribe medically unnecessary physical therapy for patients who treated at the Elite Entities

State Farm Mutual Ins. Co. v. Elite Health Centers, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 877396

and made referrals to other Elite doctors and ordered medically unnecessary MRIs.

### d. MRI Defendants

Defendant Superior Diagnostic, Inc. ("Superior") is a Michigan non-profit corporation formed in 2014. (Compl. at ¶ 215). Superior is owned by Bittner and Radom, either directly or indirectly through Midwest Medical, which in turn is owned by Bittner and Radom.

Bittner and Radom are alleged to have directed chiropractors, doctors and staff at the Elite Entities to steer patients to Superior for medically unnecessary MRIs to serve Radom's and Bittner's financial interests.

Defendant Chintan Desai, M.D. ("Desai") is a licensed doctor and works as an independent contractor with a teleradiology company where he remotely reviews MRIs for Horizon, a mobile MRI truck located in a parking lot (which Radom allegedly has a financial interest). (Compl. ¶¶ 22, 216).

Defendant Michael J. Paley, M.D. ("Paley") is a licensed doctor and remotely reviews MRIs from Horizon and Superior. (Compl. at ¶ 217).

Desai and Paley have allegedly provided fraudulent MRI reports for patients who treated at Elite, which report abnormalities that do not exist and which over-read and exaggerate abnormalities that may exist.

### e. The Rosett Defendants

At all times relevant to this action, Defendant Jayson Rosett ("Rosett") owned Defendant Dearborn Center for Physical Therapy, LLC ("Dearborn Center") and Defendant Michigan Center for Physical Therapy, Inc. ("Michigan Center") (collectively, "the Rosett PT Entities). (Compl. at ¶ 219).

Rosett is alleged to have directed the activities of those who were employed by and associated with the Rosett PT Entities. From 2011 to present, the Rosett PT Entities allegedly submitted medical records and supporting documents, which are fraudulent in that they represented that physical therapy services were actually rendered and were medically necessary when, in fact, they were not.

### 2. Factual Allegations Regarding Fraudulent Scheme

State Farm's 116-page complaint details Defendants' alleged schemed to defraud the insurer. Below is a broad overview of the alleged facts.

Defendants' scheme is alleged to have began in or about 2011 and has continued uninterrupted since. State Farm alleges that Defendants Bittner and Radom are at the center of the scheme. To facilitate this scheme and to circumvent Michigan laws–which limit the circumstances under which a chiropractor and a layperson may own and control entities providing professional services–Bittner and Radom are alleged to have fraudulently incorporated several of the Defendant entities as non-profit corporations and have allegedly attempted to conceal their respective interests and roles in these entities. (Compl. at ¶ 2).

 **\*4** State Farm further alleges that each of the individual physicians and chiropractors who are named as defendants in this case are essential to the scheme because they falsely purported to examine, diagnose and either order or provide medically necessary services tailored to the unique needs of each patient. (Compl. at ¶ 3). The individual defendants are alleged to have examined and diagnosed patients based upon a "predetermined protocol" of chiropractic, physical therapy, medical and MRI services that are either not performed or are not medically necessary.

State Farm alleges that the bills and related documentation submitted by Defendants were fraudulent because they falsely represented that: (1) patients were legitimately examined; (2) patients were legitimately diagnosed with sprains and strains of the cervical, thoracic, and/or lumbar regions of the spine; (3) each patient's injury was a result of an auto accident; and (4) patients were prescribed and received services that were medically necessary when in fact the services were provided pursuant to a fraudulent "predetermined protocol." (Compl. at ¶ 4).

Pursuant to the "predetermined protocol," Defendants allegedly: (1) failed to perform legitimate chiropractic examinations to determine the true nature of patients' injuries; (2) reported nearly identical chiropractic examination findings for patients; (3) implemented the same chiropractic treatment plans regardless of the unique needs of each patient; (4) referred patients for unnecessary MRIs to Horizon, in which Radom has a financial interest and Superior, in which both Radom and Bittner have financial interests; (5) referred patients to doctors, including Upfall and Juska, who purported

2017 WL 877396

to examine patients at Elite Health/Midwest Medical, but who did not perform legitimate medical examinations and who prescribed medically unnecessary services at Elite Rehab/ Pure Rehab or at the Rosett PT Entities; (6) provided medically unnecessary physical therapy concurrently with chiropractic services; (7) purported to treat patients until patients stopped treatment on their own or until State Farm communicated that it would no longer pay for further treatment; and (8) submitted fraudulent bills and supporting documentation in order to obtain no-fault benefits.

State Farm further alleges that the "predetermined protocol" has resulted in: (1) patients not being legitimately examined, diagnosed and treated for conditions they may have had; (2) patients being subjected to treatment for conditions they may not have had; and (3) the use of fraudulent bills and related documents to inflate the value of uninsured motorist claims against State Farm and bodily injury claims against at-fault drivers.

As a result of Defendants' material representations, State Farm alleges that it did not discover, and should not have reasonably discovered, that its damages were attributable to fraud until recently.

## B. Procedural Background

State Farm initiated this action on August 22, 2016. (Doc. # 1, Compl.). State Farm's complaint asserts the following claims:

Count I Common Law Fraud, against Bittner, Radom, Lukowski, Draplin, Juska, Upfall, Superior, Desai, Paley, Elite Chiro, Bittner P.C., Midwest Medical, Elite Health, Pure Rehab and Elite Rehab;

Count II Civil Conspiracy, against Bittner, Radom, Lukowski, Draplin, Upfall, Juska, Superior, Desai, Paley, Elite Chiro, Bittner P.C., Midwest Medical, Elite Health, Pure Rehab and Elite Rehab;

Count III Unjust Enrichment, against Bittner, Radom, Lukowski, Draplin, Upfall, Juska, Superior, Desai, Paley, Elite Chiro, Bittner P.C., Midwest Medical, Elite Health, Pure Rehab and Elite Rehab;

**\*5** Count IV Common Law Fraud, against Bittner, Radom, Draplin, Upfall, Juska, Superior, Desai, Paley, Rosett, Elite Chiro, Bittner P.C., Midwest Medical, Elite Health and Rosett PT Entities;

Count V Civil Conspiracy, against Bittner, Radom, Draplin, Upfall, Juska, Superior, Desai, Paley, Rosett, Elite Chiro, Bittner P.C., Midwest Medical, Elite Health and Rosett PT Entities;

Count VI Unjust Enrichment, against Bittner, Radom, Draplin, Upfall, Juska, Superior, Desai, Paley, Rosett, Elite Chiro, Bittner P.C., Midwest Medical, Elite Health and Rosett PT Entities;

Count VII Common Law Fraud, against Bittner, Radom and Superior;

Count VIII Civil Conspiracy, against Bittner, Radom and Superior;

Count IX Unjust Enrichment, against Bittner, Radom and Superior; and

Count X Declaratory Judgment, against Elite Entities, Rosett PT Entities and Superior

(Compl. at ¶¶ 222-271). State Farm seeks monetary and declaratory relief.

On October 24, 2016, Defendants Bittner, Bittner P.C., Draplin, Elite Chiro, Elite Health, Elite Rehab, Juska, Lukowski, Midwest Medical, Pure Rehab, Radom and Superior filed the instant Motion to Dismiss. (Doc. # 21, Def.s' Br.). Defendants Dearborn Center for Physical Therapy LLC, Michigan Center for Physical Therapy, Inc., Jayson Rosett, Michael J. Paley and Noel H. Upfall have concurred in the filing of the motion. (Doc. # 26, 27, 42). Defendant Desai has not concurred in the motion and has instead filed a separate motion to dismiss. (Doc. # 58).

In their motion to dismiss, Defendants make the following arguments: (1) the complaint fails to plead any facts to support individual liability; (2) State Farm Mutual lacks standing to allege claims arising from the incorporation of the entity defendants as non-profit corporations; (3) the fraud claims fail because they do not meet the heightened pleading requirements of Rule 9(b); (4) the civil conspiracy claims fail because the complaint fails to plead an underlying tort and because the complaint fails to plead the conspiracy with requisite specificity; (5) the unjust enrichment claims fail because the complaint fails to identify which Defendants received which benefits and because an express contract exists covering the subject matter at issue; and (6) the

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.422 Filed 03/18/20 Page 80 of 90

State Farm Mutual Ins. Co. v. Elite Health Centers, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 877396

Court should abstain from exercising jurisdiction over the declaratory judgment action.

## STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirectV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). Dismissal is appropriate if the plaintiff failed to offer sufficient factual allegations that make the asserted claim plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In practice, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory. *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996).

 *6 "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997).

The Sixth Circuit has instructed that at this "early stage," courts should "take into account economic or logistical circumstances that prevent [Plaintiffs] from obtaining evidence supporting [their] claim[s] and adjust the plausibility threshold appropriately to account for these difficulties." *El-Hallani v. Huntington Nat'l Bank*, 623 Fed.Appx. 730, 735 (6th Cir. 2015).

## ANALYSIS

### A. Challenges Against Personal Liability
Initially, Defendants argue that State Farm's "conclusory allegations are insufficient to pierce the corporate veil and hold individual officers, members, or employees of the Defendant entities personally liable" for the acts alleged in the complaint. (Def.'s Br. at 11). This argument is unavailing.

As State Farm correctly points out, " '[i]t is beyond question that a corporate employee or official is personally liable for all tortious ... acts in which he participates, regardless of whether he was acting on his own behalf or on behalf of the corporation.' " (Pl.'s Resp. at 14, n. 6) (quoting *Attorney Gen. v. Ankerson*, 148 Fed.Appx. 260, 263 (6th Cir. 2005)).

### B. Challenges As To Standing
Defendants also argue that State Farm lacks standing to allege claims arising from the incorporation of the entity defendants as non-profit corporations. (Def.'s Br. at 16). Specifically, Defendants argue that the "Michigan Non-Profit Act does not provide for a private cause of action under these circumstances." (*Id.* at 17). Defendants' argument misses the mark.

Despite Defendants' arguments to the contrary, there is no standing issue here. State Farm does not bring a claim under the Michigan Non-Profit Act. Nor does State Farm dispute that the defendant entities were properly incorporated as non-profits. Instead, State Farm alleges that, while the defendant entities are incorporated as non-profits, their real purpose is to enable Defendants Bittner and Radom to engage in fraud. Specifically, State Farm alleges that the non-profit entities named as defendants in this case behave contrary to their non-profit corporate status, and that this behavior makes these entities essential players in the scheme to defraud State Farm out of money for the benefit of their owners.

### C. Challenges to Fraud Claim
State Farm alleges common law fraud claims against Defendants in Counts I, IV, and VIII of its complaint. In their motion, Defendants advance the following arguments against Plaintiff's fraud claims: (1) the complaint does not meet the heightened pleading requirements of Rule 9(b) and the allegations against the individual defendants are conclusory and amount to group pleading; (2) the complaint fails to identify "which 'services' were fraudulent" or "where" and "when" the fraudulent statements were made; and (4) the complaint does not allege that Defendant Radom made any fraudulent statements. Each of these arguments is without merit for the reasons below.

Federal Rule of Civil Procedure 9(b) imposes a particularity requirement on fraud claims. For State Farm to meet the requirement, its complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made,

2017 WL 877396

and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (internal quotations and citations omitted). To this end, State Farm must, "at a minimum, ... allege the time, place and contents of the misrepresentation upon which they relied." *Id.*

**\*7** "When read against the backdrop of Rule 8, it is clear that the purpose of Rule 9 is not to reintroduce formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct." *Llewellyn Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 780-81 (E.D. Mich. 2014) (quotations and citations omitted). Accordingly, "[t]he threshold test is whether the complaint places the defendant on sufficient notice of the misrepresentation allowing the defendants to answer, addressing in an informed way plaintiff[']s claim of fraud." *Id.*

Here, State Farm has provided a 116-page description of how the Defendants' alleged scheme to defraud the insurer worked. Among the exhibits attached to the complaint are charts detailing the fraudulent services purportedly rendered to each patient, the dates of service and the amounts billed. (*See* Ex. 1, 3-5, 15, 17, 19-23 to Compl.).

A review of the allegations and exhibits makes it clear that Defendants have received sufficient notice of the fraudulent misrepresentations they are alleged to have made: (1) Bittner and Radom fraudulently created non-profit corporations and hired the individual defendants in order to carry out and profit from the predetermined protocol of treatment; (2) Bittner, Lukowski and Draplin falsely purported to provide legitimate chiropractic evaluations and treatment for a significant number of patients who treated at the Elite Entities and unnecessarily referred patients to Elite Health/Midwest Medical for medical exams; (3) Upfall and Juska falsely purported to examine, diagnose and prescribe unnecessary physical therapy for patients who treated at the Elite Entities, made unnecessary referrals to other Elite doctors and to the Rosett PT Entities, and ordered unnecessary MRIs through Superior or Horizon; (4) Rosett directed the activities of the Rosett PT Entities, which submitted fraudulent medical records and supporting documentation; and (5) Paley and Desai provided fraudulent MRI reports for patients who treated at the Elite Entities.

Numerous courts have similarly concluded that such documentation and explanation of the fraudulent scheme satisfies Rule 9(b). *See e.g. State Farm Mut. Auto Ins. Co. v.*

*Universal Health Grp., Inc.*, 2014 WL 5427170, at \*4 (E.D. Mich. Oct. 24, 2014);*State Farm Mut. Auto Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F. Supp. 3d 772 (E.D. Mich. 2015); *State Farm Mut. Auto Ins. Co. v. Physiomatrix, Inc.*, 2014 WL 555199 (E.D. Mich. Feb. 12, 2014). As such, State Farm's complaint provides a level of detail that is sufficient at the pleading stage to satisfy the particularity requirement of Rule 9(b). [1]

### D. Challenges to Civil Conspiracy Claim

State Farm asserts civil conspiracy claims against Defendants in Counts II, IV and VIII. Defendants argue that State Farm's civil conspiracy claims fail because: (1) the complaint fails to allege an underlying tort; and (2) the complaint fails to allege a conspiracy. [2] Defendants' arguments are without merit.

**\*8** "A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a purpose not lawful by criminal or unlawful means." *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 194 Mich. App. 300, 358 (1992). A claim for civil conspiracy requires proof of an agreement to achieve the objective of the conspiracy. *Fremont Reorganizing Corp. v. Duke*, 811 F. Supp. 2d 1323, 1341 (E.D. Mich. 2011). A plaintiff asserting civil conspiracy must also demonstrate some underlying tortious conduct because civil conspiracy is not an independently actionable tort. *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 257 Mich. App. 365, 383 (2003). "Civil conspiracy claims must be pled with some specificity: vague and conclusory allegations that are unsupported by material facts" are insufficient to state a claim. *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6 th Cir. 1987).

Because State Farm has sufficiently alleged fraud as the underlying tort for its conspiracy claim, the Court need only address whether the conspiracy claim has been alleged with requisite specificity. Here, State Farm alleges that each defendant has acted in concert and knowingly and intentionally agreed and conspired to accomplish, through a common plan and design, an unlawful and common purpose, *i.e.*, to defraud the insurer through the submission of thousands of fraudulent bills and supporting documentation.

At this juncture, the Court finds that the claim that Defendants knowingly conspired to defraud State Farm is supported by allegations tending to show an agreement between Defendants. State Farm's 116-page complaint explains in

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.424 Filed 03/18/20 Page 82 of 90
State Farm Mutual Ins. Co. v. Elite Health Centers, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 877396

detail each defendant's role in the overall conspiracy. In so doing, the complaint identifies the "predetermined protocol" that governed Defendants' actions (*i.e.*, Defendants acted in furtherance of the conspiracy pursuant to a common plan) and it identifies the actual fraudulent bills submitted or caused to be submitted by Defendants.

### E. Challenges to Unjust Enrichment Claim

State Farm alleges unjust enrichment claims against Defendants in Counts III, VI and IX. Defendants argue that State Farm's unjust enrichment claims fail because: (1) the complaint fails to allege which benefits the individual defendants received as the result of fraud or conspiracy; and (2) because express contracts covering the same subject matter exist. (Def.s' Br. at 24). Defendants' arguments are without merit.

In order to sustain an unjust enrichment claim, a plaintiff must establish: "(1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 195 (2006).

Defendants' first argument–that State Farm fails to allege which benefits the individual defendants received–is not persuasive in light of the allegations set forth in the complaint. The complaint alleges that State Farm conferred a benefit upon the individual defendants by paying their claims. The complaint further alleges that it would be inequitable to allow the individual defendants to retain the benefit of payments made for services that were not rendered or were not medically necessary. In so alleging, the complaint identifies which fraudulent services were billed, the dates of the services and the amounts billed. These allegations permit the Court to infer that the individual defendants benefitted at the expense of State Farm.

Defendants' second argument–that the unjust enrichment claims fail because express contracts exist between State Farm and its insureds–is not persuasive and has been consistently rejected by other courts within this District. "[U]nless it is undisputed that there is an express contract between the same parties covering the same subject matter, State Farm is entitled to plead unjust enrichment as an alternative claim of relief." *State Farm Mut. Auto Ins. Co. v. Physiomatrix, Inc.*, 2013 WL 509284, at *5 (E.D. Mich. Jan. 12, 2013). Here, State Farm disputes the existence of

an express contract between it and Defendants. As such, the Court shall permit the unjust enrichment claims to go forward.

### F. Abstention Arguments

**\*9** Defendants' final arguments pertain to abstention. Specifically, Defendants argue that the Court should abstain from ruling on State Farm's claim for declaratory relief pursuant to: (1) the *Burford* abstention doctrine; (2) the *Colorado River* abstention doctrine; (3) the *Wilton* abstention doctrine; and (4) the *Scottsdale* factors. Defendants' arguments are without merit because each of these doctrines are inapplicable.

#### 1. *Burford* Doctrine

First, Defendants assert that the Court should abstain from hearing this action under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). "*Burford* abstention is used to avoid conflict with a state's administration of its own affairs." *Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711, 716 (6th Cir. 2002). Under this doctrine:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989).

Defendants argue that "Michigan's No-Fault Act is a particularly unique state-law regime which is unquestionably 'of substantial public import.'" (Def.s' Br. at 26). Defendants further argue that the exercise of jurisdiction would impede

State Farm Mutual Ins. Co. v. Elite Health Centers, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 877396

Michigan's ability "to control policy" regarding "no-fault insurance." (*Id.*). Defendants arguments are conclusory and unsupported by any relevant authority.

Initially, it is worth noting that Defendants have not identified a single ongoing proceeding or order of state administrative agencies with which this case would interfere. Moreover, despite Defendants' arguments to the contrary, "federal courts regularly decide issues concerning Michigan's no-fault scheme without raising the conflict issues *Burford* abstention is intended to address." *State Farm Mut. Auto. Ins. Co. v. Warren Chiropractic & Rehab Clinic P.C.*, 2015 WL 4724829, at *17 (E.D. Mich. Aug. 10, 2015); *see also Universal Health*, 2014 WL 5427170, at *10 (refusing to abstain on the basis that Michigan's no-fault insurance system is "unique").

As such, Defendants have failed to persuade the Court that abstention is warranted.

### 2. *Colorado River* Doctrine

Defendants next argue that the Court should abstain from presiding over this action pursuant to *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). The *Colorado River* doctrine permits a federal court to abstain from exercising jurisdiction over a matter "in deference to a parallel state-court proceeding if abstention will best promote the values of efficient dispute resolution and judicial economy." *Gentry v. Wayne Cnty.*, 2010 WL 4822749, at *2 (E.D. Mich. Nov. 22, 2010).

Abstention under the *Colorado River* doctrine is appropriate if two requirements are met. First, the Court must find that the concurrent state and federal actions are parallel. *Romine v. Compuserve Corp.*, 160 F.3d 337, 339-40 (6th Cir. 1998). Second, the Court must determine whether abstention is appropriate by considering a number of factors. *Id.* at 340-41. Because Defendants are contesting jurisdiction, it is their burden to prove that abstention is warranted. *See Answers in Genesis of Ky.*, 556 F.3d 459, 467 (6th Cir. 2009).

**\*10** Here, Defendants have not satisfied the doctrine's first requirement because they fail to specifically identify a single parallel case. In an attempt to satisfy the doctrine's threshold inquiry, Defendants argue that "there are ongoing and active cases in Michigan courts between State Farm and various Defendants, and/or State Farm insureds." (Def.s' Br. at 28). Defendants generally conclude that "[t]his suit and the concurrent state suits are (or will be) parallel proceedings"

because "the state court cases will likely involve the same parties (either Defendants directly or through individual insureds) and the same issues." (*Id.*).

==Defendants' generalized and conclusory assertions are insufficient to establish that these purported state court suits are parallel. Importantly, suits are only parallel "if substantially the same parties litigate substantially the same issues," and "involve the same plaintiff against the same defendant."== *Total Renal Care, Inc. v. Childers Oil Co.*, 743 F. Supp. 2d 609, 613-14 (E.D. Ky. 2010). Here, Defendants have not sufficiently identified any state action, let alone a parallel one. *See Warren Chiropractic & Rehab Clinic*, 2015 WL 4724829, at *15 (refusing to abstain on the basis that there were similar ongoing cases in state court and concluding that "Defendants' generic reference to "scores" of other cases, without citation or explanation, is not enough to show that these purported matters are parallel for purposes of the *Colorado River* doctrine"). Because Defendants have not identified a parallel state court case, the Court need not engage in the remainder of the *Colorado River* analysis. *See Universal Health*, 2014 WL 5427170, at *10.

### 3. *Wilton* Abstention

Defendants also argue that the Court should abstain from hearing this action pursuant to the doctrine outlined in *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995). Pursuant to that doctrine, a Court may dismiss or stay an action in which solely declaratory relief is sought. *Id.* at 288-90. Defendants' arguments in support of abstention are without merit. To put it simply, *Wilton* abstention is not appropriate where, as here, an action seeks monetary damages (through common law fraud, unjust enrichment and civil conspiracy claims) in addition to declaratory relief. *See State Farm Mut. Ins. Co. v. Pointe Physical Therapy, LLC*, 68 F. Supp. 3d 744, 758 (E.D. Mich. 2014).

### 4. *Scottsdale* Factors

Defendants' final argument is that abstention is appropriate pursuant to the five factors outlined in *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008). In *Scottsdale*, the Sixth Circuit outlined a number of factors to assist district courts in determining whether to exercise jurisdiction under the Declaratory Judgment Act: (1) whether the declaratory action will settle the controversy; (2) whether the declaratory action will serve a useful purpose by clarifying the legal relations at issue; (3) whether the declaratory action is merely intended to advance "procedural fencing" or "a race for res

Case 2:19-cv-13782-PDB-APP ECF No. 27-2, PageID.426 Filed 03/18/20 Page 84 of 90

State Farm Mutual Ins. Co. v. Elite Health Centers, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 877396

judicata;" (4) whether the declaratory action will increase friction between state and federal courts and improperly encroach upon state jurisdiction; and (5) whether there exists a more effective alternative remedy. *Scottsdale*, 513 F.3d at 554.

Critical to the Court's determination here is the notion that "[d]eclining to exercise jurisdiction may be an abuse of discretion–even if all the factors set forth in *Scottsdale* weigh in favor of doing so–if 'a plaintiff seeks relief in addition to a declaratory judgment, such as damages or injunctive relief, both of which a court must address.' " *Warren Chiropractic & Rehab Clinic*, 2015 WL 4724829, at * 21 (quoting *Adrian Energy Assocs. v. Mich. Pub. Serv. Comm'n*, 481 F.3d 414, 422 (6th Cir. 2007)). "This is because, in such a case, the entire benefit derived from exercising discretion not to grant declaratory relief is frustrated, and a stay or dismissal would not save any judicial resources." *Id.* (internal quotation marks and citations omitted).

**\*11** Here, Defendants unpersuasively argue that each of the five *Scottsdale* factors support abstention. The main problem with this argument is that it overlooks the fact that State Farm seeks monetary relief in addition to declaratory relief. Moreover, State Farm's success on its claim for monetary relief depends on the same allegations and proofs as its success on its claim for declaratory relief. As such, the Court shall reject Defendants' argument to abstain from exercising jurisdiction on this basis.

### CONCLUSION & ORDER

For the foregoing reasons, the Court shall **DENY** Defendants' Motion to Dismiss (Doc. # 21).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 877396

## Footnotes

1    Defendants also mention State Farm's failure to offer evidence to support the allegations contained within its complaint. Defendants miss the mark. At this stage in the proceedings, State Farm is not required to produce evidence. Instead, the Court is required to accept all factual allegations in the complaint as true.
Defendants also imply that State Farm's fraud claim fails because State Farm's reliance on the alleged misrepresentations was not reasonable. This argument is without merit. State Farm has alleged that it justifiably relied on Defendants' misrepresentations. (Compl. at ¶¶ 194-97). At this juncture, the Court must accept this allegation as true.

2    To the extent that Defendants rely on the intracorporate-conspiracy doctrine for the proposition that corporations generally cannot conspire with their board of directors, officers or employees, this argument is not developed and the doctrine is not applicable here. First, this doctrine does not apply "where the directors have an independent personal stake in a particular action ..." *Blair v. Checker Cab Co.*, 219 Mich. App. 667, 674 (1996); *Bear Hollow, LLC v. Moberk, LLC*, 2006 WL 1642126, at *13 (W.D.N.C. June 5, 2006) ("where the plaintiff alleges that the corporate employees were controlled by personal motives or where their actions exceeded the bounds of their authority, the intracorporate conspiracy doctrine is inapplicable"). Here, State Farm persuasively points out that the individual defendants had a personal stake in the alleged conspiracy, which can be demonstrated by the allegations of self-referrals. Moreover, the doctrine is not applicable where, as here, the defendants are not all agents of the same corporation. *Bear Hollow*, 2006 WL 1642126, at *13 ("Since Defendants and Cler are not all agents of the same corporation, the intracorporate conspiracy doctrine is an inapplicable defense").

# TAB N

2018 WL 1471479
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Ledura WATKINS, Plaintiff,
v.
Robert H. HEALY, et al., Defendants.

Case No. 17-cv-13940
|
Signed 03/26/2018

**Attorneys and Law Firms**

Wolfgang Mueller, Mueller Law Firm, Farmington Hills, MI, for Plaintiff.

Davidde A. Stella, Wayne County Corporation Counsel, Jacob M. Satin, Jerry L. Ashford, City of Detroit Law Department, Detroit, MI, for Defendants.

**ORDER DENYING DEFENDANT ROBERT H. HEALY'S MOTION TO ABSTAIN (ECF #8)**

MATTHEW F. LEITMAN, UNITED STATES DISTRICT JUDGE

**\*1** In 1976, Plaintiff Ledura Watkins was convicted of murder and sentenced to life in prison. In this action, Watkins asserts that Defendants Robert H. Healy, Neil Schwartz, [1] and Ronald Badaczewski violated his constitutional rights when they suppressed favorable evidence, fabricated evidence, maliciously prosecuted him, and conspired against him during the murder investigation and trial. (*See* Compl., ECF #1.) Watkins also maintains that Defendant the City of Detroit is liable for Defendants Schwartz and Badaczewski's constitutional violations because the City had a custom or policy authorizing their actions and/or because it failed to adequately train Defendants Schwartz and Badaczewski. (*See id.*) Defendant Healy has moved the Court to abstain from hearing and to stay this action pending the resolution of a state court action in which Watkins seeks compensation under a Michigan statute for wrongful imprisonment. (*See* Mot. to Abstain, ECF #8.) The other Defendants have concurred in the relief sought in Healy's motion. (*See* ECF #10.) For the reasons stated below, the Court **DENIES** the motion and will not abstain or stay this action. [2]

**I**

**A** [3]

On September 6, 1975, a Detroit school teacher named Yvette Ingram was found shot to death in her home. (*See* Compl. at ¶ 12, ECF #1 at Pg. ID 4.) Healy, then an Assistant Prosecuting Attorney employed by the Wayne County Prosecutor's Office, and Schwartz, then a Sergeant employed by the Detroit Police Department (the "DPD"), investigated the murder of Ingram. (*See id.* at ¶¶ 5, 7, 18, Pg. ID 3, 4, 6.) Following the investigation, police arrested Watkins, and the Wayne County Prosecutor charged Watkins with murdering Ingram. (*See id.* at ¶¶ 43-44, 51, Pg. ID 11-13.)

Watkins was tried in Michigan's Recorder's Court. (*See id.* at ¶¶ 51, 81, Pg. ID 12-13, 19.) At trial, the prosecution relied on two primary pieces of evidence: (1) testimony by an acquaintance of Watkins that he saw Watkins shoot Ingram and (2) expert testimony from Badaczewski, then an evidence technician with the DPD, that a hair found on Ingram matched Watkins' hair. (*See id.* at ¶¶ 65-70, 77, Pg. ID 15-17.)

On March 16, 1976, a jury convicted Watkins of first degree murder. (*See id.* at ¶ 81, Pg. ID 19.) On April 15, 1976, the state trial court sentenced Watkins to a term of life imprisonment without the possibility of parole. (*See id.*)

**B**

In 2017, Watkins filed a motion for relief from judgment in state court. (*See* ECF #8-7.) In that motion, Watkins argued that the state court should vacate his conviction because, among other reasons, (1) the witness who testified that he saw Watkins shoot Ingram recanted that testimony and (2) Badaczewski's testimony was unreliable, flawed, and failed to comport with the Federal Bureau of Investigation's revised standards for hair comparisons. (*See id.*) The Wayne County Prosecutor's Office agreed that Watkins' motion for relief from judgment should be granted. The prosecutor stipulated that Badaczewski's hair analysis was unreliable and that a retrial would probably result in Watkins' release. (*See* ECF #8-8.) On June 15, 2017, the state court entered a stipulated

2018 WL 1471479

order granting Watkins' motion for relief from judgment and dismissing the case without prejudice. (*See id.*)


**C**

**\*2** On July 25, 2017, Watkins filed a lawsuit against the State of Michigan in the Michigan Court of Claims under Michigan's Wrongful Imprisonment Compensation Act (the "WICA"), Mich. Comp. Laws § 691.1751 *et seq.* (the "Court of Claims Action"). (*See* Ct. of Claims Compl., ECF #8-9.) The Michigan Legislature enacted the WICA to compensate formerly convicted persons who could show that new evidence established their innocence. *See* Mich. Comp. Laws § 691.1755(1) (requiring that a plaintiff prove as one element of a WICA claim that "[n]ew evidence demonstrates that the plaintiff did not perpetrate the crime and was not an accomplice or accessory to the acts that were the basis of the conviction...."). The WICA sets compensation for a successful plaintiff at $50,000 for each year imprisoned. *See id.* The Michigan Court of Claims has exclusive jurisdiction over claims under the WICA. *See* Mich. Comp. Laws § 691.1753.

Watkins alleges in the Court of Claims Action that new evidence, including the eye-witness's recantation of his testimony and the unreliability of Badaczewski's analysis and testimony, establishes his innocence. Thus, Watkins contends, he is entitled to compensation under the WICA. (*See* Ct. of Claims Compl., ECF #8-9.)

Discovery has begun in the Court of Claims Action. Among other things, Watkins has taken the depositions of Healy and Badaczewski in that case.


**D**

On December 6, 2017, Watkins filed this action against Healy, Schwartz, Badaczewski, and the City of Detroit. (*See* Compl., ECF #1.) In Count I of the Complaint, Watkins asserts the following constitutional violations under 42 U.S.C. § 1983 against the Defendants:

> 1. Healy, Schwartz, and Badaczewski (the "Individual Defendants") fabricated evidence against him. (*See id.* at ¶ 113, Pg. ID 29-32.)

> 2. Schwartz and Badaczewski failed to disclose exculpatory evidence in violation of their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). (*See id.*)

> 3. Schwartz maliciously prosecuted Watkins. (*See id.*)

> 4. Healy and Schwartz conspired to fabricate evidence. (*See id.*)

> 5. The City of Detroit had a custom or policy that authorized, condoned, tolerated, and approved illegal and unconstitutional actions by the DPD officers and staff. (*See id.*)

> 6. The City of Detroit failed to provide adequate training to its police officers. (*See id.*)

Watkins also asserts common law malicious prosecution claims against Schwartz and Healy in Counts II and III, respectively, and an intentional infliction of emotional distress claim against all of the Defendants in Count IV. (*See id.* at Pg. ID 34-38.)

On February 20, 2018, Healy filed a motion in which he asked this Court to abstain and stay this action pending resolution of the Court of Claims Action pursuant to *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), and its progeny. (*See* Mot. to Abstain, ECF #8.) The other Defendants thereafter filed statements concurring in the Motion to Abstain. (*See* ECF #10.)


**II**

**A**

Federal courts have a "virtually unflagging obligation" to hear and adjudicate claims falling within their original jurisdiction. *Colorado River Water Conservation Dist.*, 424 U.S. 800 at 817. However, the Supreme Court in *Colorado River* recognized a limited exception to this obligation: in certain "exceptional" circumstances, a federal court may abstain to a parallel state court proceeding. *Id.*

Whether it is proper to abstain under *Colorado River* is a two-step inquiry. First, a court must determine if the federal and state proceedings are "parallel." *Romine v. Compuserve Corp.*, 160 F.3d 337, 339 (6th Cir. 1998). Second, if the proceedings are parallel, a court must consider and apply

2018 WL 1471479

eight factors to determine if abstention is appropriate: (1) whether the state court has assumed jurisdiction over any *res* or property; (2) whether the federal forum is less convenient to the parties; (3) the avoidance of piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction. *See id.* at 340-41. "These factors, however, do not comprise a mechanical checklist. Rather, they require a careful balancing of the important factors as they apply in a given case depending on the particular facts at hand." *Id.* at 341 (internal quotations omitted).

 **\*3** "When a district court decides to dismiss or stay under *Colorado River*, it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 28 (1983). Finally, the Supreme Court has "emphasize[d] that our task in cases such as this not to find some substantial reason for the exercise of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist exceptional circumstances, the clearest of justifications, that can suffice under *Colorado River* to justify the *surrender* of that jurisdiction." *Id.* at 25-26 (emphasis original).

### B

The Court declines to abstain under *Colorado River* because this action is not parallel to the Court of Claims Action. To be considered parallel, the federal and state proceedings must be "substantially similar." *Romine*, 160 F.3d at 340. Actions are substantially similar "where (1) the parties are substantially similar and (2) [the plaintiff's] claims against the [defendants] are predicated on the same allegations as to the same material facts." *Id.* Neither of these circumstances exist here.

First, the Defendants in this action are not substantially similar to the defendant in the Court of Claims Action. The State of Michigan is the sole defendant in the Court of Claims Action; it is not a defendant in this action. The Defendants here are (1) three individuals who were not employed by the State of Michigan and (2) the City of Detroit, a municipal entity that is distinct from the State of Michigan. Given the difference in defendants, the parties in the Court of Claims Action and this action are not substantially similar. *See Crawley v. Hamilton Cty. Comm'rs*, 744 F.2d 28, 31 (6th Cir. 1984) (concluding that officials of Hamilton County, Ohio named as defendants in a federal action were not substantially similar to officials of the City of Cincinnati, Ohio who were named as defendants in a state action).

Second, the claims in this action and the Court of Claims Action are not predicated on the same allegations as to the same material facts. Indeed, the facts that are "material" to both actions differ sharply. "A fact is material" if, among other things, "proof of that fact would have effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties...." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citations and internal quotations omitted). The elements of the WICA claim in the Court of Claims Action and the elements of the claims in this action vary widely, and thus many of the material facts are different in each action.

Watkins' WICA claim requires him to prove "by clear and convincing evidence" that: (1) he was "convicted of 1 or more crimes ... and sentenced to imprisonment"; (2) his "judgment of conviction was reversed or vacated and either the charges were dismissed or [he] was determined on retrial not to be guilty"; and (3) "[n]ew evidence demonstrates that [he] did not perpetrate the crime...." Mich. Comp. Laws § 691.1755(1). The first two elements do not appear to be meaningfully in dispute in the Court of Claims Action. Therefore, the key material factual issue in that action is whether Watkins murdered Ingram.

The disputed material facts at issue here are both different and broader because the elements of Watkins' claims here are different and broader. For example, several of Watkins' claims in this Court have as an element that the Individual Defendants acted with a culpable state of mind. *See e.g., Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017) (noting that "[t]he basis of a fabrication-of-evidence claim under § 1983 is an allegation that a defendant knowingly fabricated evidence against him ...") (internal quotations omitted); *Newman v. Twp. of Hamburg*, 773 F.3d 769, 773 (6th Cir. 2014) (noting that under Michigan law, a malicious prosecution claim requires that plaintiff "show malice") (internal quotations omitted). Likewise, some of Watkins' claims here involve causation questions that do not bear on Watkins' innocence. *See, e.g., Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010)

Case 2:19-cv-13782-PDB-APP  ECF No. 27-2, PageID.431  Filed 03/18/20  Page 89 of 90

Watkins v. Healy, Not Reported in Fed. Supp. (2018)
2018 WL 1471479

(holding that a constitutional malicious prosecution claim requires a showing that the defendant "made, influenced, or participated in the decision to prosecute"); *Dalley v. Dykema Gossett*, 287 Mich. App. 296, 321, 788 N.W.2d 679, 694 (2010) (noting that an intentional infliction of emotional distress claim requires that defendant's conduct caused severe emotional distress). Additionally, Watkins' conspiracy claim necessarily depends on whether there was an agreement to injure him by unlawful action. *See Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) ("A civil conspiracy under § 1983 is an agreement between two or more persons to injure another by unlawful action." (internal quotations omitted)). Thus, many of the key factual questions here relate to the Individual Defendants' states of mind, whether the Individual Defendants' actions caused Watkins' prosecution or injury, and whether an agreement existed—factual questions that are not presented in the Court of Claims Action.

**\*4** Moreover, Watkins' claim against the City of Detroit turns, in part, upon his allegation that the City had a particular custom or practice, *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), and that issue, too, is absent from the Court of Claims Action. Accordingly, this action will present important factual issues concerning the City of Detroit's practices that are absent from the Court of Claims Action.

Finally, when determining whether two actions are parallel, courts also consider the similarity of the theories of recovery in each proceeding. *See, e.g., Baskin v. Bath Twp. Bd. of Zoning Appeals*, 15 F.3d 569, 572 (6th Cir. 1994) (highlighting the "very different theories advanced" by the parties in the state and federal actions to determine that the proceedings were not parallel); *Gentry v. Wayne Cty.*, No. 10-CV-11714, 2010 WL 4822749, at \*2 (E.D. Mich. Nov. 22, 2010) ("[W]hen the state and federal cases present different theories of recovery, courts do not generally characterize the proceedings as 'parallel.' "). As described above, the theories of recovery in this action and the Court of Claims Action differ markedly. These differences underscore that the actions are not parallel.

### C

Even if the Court had concluded that the proceedings were parallel, the Court would still decline to abstain because the balance of the relevant factors weigh against abstention. The Court considers each factor in turn.

(1) *whether the state court has assumed jurisdiction over any res or property*: This factor weighs against abstention. There does not appear to be *res* or property at issue in the Court of Claims Action.

(2) *whether the federal forum is less convenient to the parties*: This factor weighs against abstention. Defendants do not argue that this forum is less convenient. (*See* Mot. to Abstain, ECF #8 at Pg. ID 75.)

(3) *the avoidance of piecemeal litigation*: This factor weighs against abstention. "Piecemeal litigation occurs when different courts adjudicate the identical issue, thereby duplicating judicial effort and potentially rendering conflicting results." *Romine*, 160 F.3d at 341. As described above, the issues presented in this action and the Court of Claims Action are far from identical. Moreover, the claims in the two actions will be decided under differing burdens of proof—preponderance of the evidence here and clear and convincing evidence in the Court of Claims Action. These different burdens highlight that the fact finders in the two actions will not be deciding the same questions.

(4) *the order in which jurisdiction was obtained*: This factor weighs in favor of abstention. The Court of Claims Action was filed about five months before this action.

(5) *whether the source governing law is state or federal*: This factor weighs against abstention. In this action, Watkins asserts federal constitutional claims under 42 U.S.C. § 1983 (in addition to his state law claims). The presence of those federal claims weighs against abstention in this case.

(6) *the adequacy of the state court action to protect federal plaintiff's rights*: This factor counsels heavily against abstention. The Michigan Court of Claims cannot hear the bulk of the federal claims asserted by Watkins in this action. As relevant here, that court has jurisdiction over "any claim ... against the state or any of its departments or officers." Mich. Comp. Laws § 600.6419. As the Defendants concede, the City of Detroit, a municipality, does not fall within that grant of jurisdiction. (*See* Mot. to Abstain, ECF #8 at Pg. ID 76.) Schwartz and Badaczewski, as Detroit Police Officers, likewise do not fall within the scope of that jurisdiction.[4] Thus, the Court of Claims cannot hear Watkins' federal claims against most (if not all[5]) of the Defendants and, accordingly, cannot adequately protect Watkins' federal rights. Finally, the amount of relief available to Watkins is limited under the

Case 2:19-cv-13782-PDB-APP  ECF No. 27-2, PageID.432  Filed 03/18/20  Page 90 of 90
Watkins v. Healy, Not Reported in Fed. Supp. (2018)
2018 WL 1471479

WICA in the Court of Claims Action, and he faces no similar limit on his recovery for any violation of federal law he may establish here.

**\*5** (7) *the relative progress of the state and federal proceedings*: This factor weighs slightly in favor of abstention. Unlike in this action, discovery has commenced in the Court of Claims Action.

(8) *the presence or absence of concurrent jurisdiction*: This factor weighs against abstention. As noted above, the Michigan Court of Claims could not hear most (if not all) of Watkins' claims in this case.

The balance of these factors counsels against abstention in this case. Six of the eight factors weigh against abstention. And the two factors that favor abstention—the fourth and seventh—do so only slightly. The factors that weigh against abstention, in contrast, tip heavily in that direction. For these reasons, the Court would not abstain even if the two actions were parallel.

## III

For the reasons explained above, the Court **DENIES** Defendant Healy's motion to abstain (ECF #8).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1471479

## Footnotes

1    Schwartz is now deceased. Watkins has therefore formally brought his claims related to Schwartz' conduct during the murder investigation and trial against "John Ferguson, Esq., Personal Representative of the Estate of Neil Schwartz, deceased."
2    The Court has determined that it may properly resolve Healy's motion without a hearing. *See* E.D. Mich. L.R. 7.1(f).
3    The facts in Section I(A) are taken from Watkins' Complaint in this action.
4    Even if Schwartz and Badaczewski were employed as law enforcement officers by the State of Michigan, the Court of Claims would still lack jurisdiction over Watkins' claims against them. *See Burnett v. Moore*, 314 N.W.2d 458, 460 (Mich. Ct. App. 1981) (holding that state police trooper was not a state officer for purposes of Court of Claims jurisdiction).
5    In addition, it seems unlikely that the Court of Claims could hear Watkins' federal claims against Healy, an assistant prosecuting attorney, because he does not appear to be a State "officer." *See Burnett, supra.*

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.