# EXHIBIT A
# Federal Complaint
# And
# First Amended Federal Complaint

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

| | | |
|---|---|---|
| LC Trademarks, Inc., et al. | ) | |
| | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action No.  19-13782 |
| | ) | |
| v. | ) | |
| | ) | |
| Bitwealth Holdings, LLC, et al. | ) | Hon.  Paul D. Borman |
| | ) | |
| | ) | |
| *Defendant,* | ) | |

## SUMMONS IN A CIVIL ACTION

To:    Afifi Koury

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> Larry J. Saylor
> Miller, Canfield,
> 150 W. Jefferson Avenue
> Suite 2500
> Detroit, MI 48226-4415

If you fail to respond, judgment by default may be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*DAVID J. WEAVER, CLERK OF COURT*

By:  s/D.Peruski

*Signature of Clerk or Deputy Clerk*

Date of Issuance:  December 26, 2019



AO 440 (Rev. 06/12) Summons in a Civil Action

## Summons and Complaint Return of Service

Case No. 19-13782
Hon. Paul D. Borman

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*   Afifi Koury
was received by me on *(date)*                                        .

☐ I personally served the summons on the individual at *(place)*
                                                    on *(date)*                    ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*
                              , a person of suitable age and discretion who resides there,
on *(date)*                    , and mailed a copy to the individual's last known address, or

☐ I served the summons on *(name of individual)*                                        , who is
designated by law to accept service of process on behalf of *(name of organization)*
                                        on *(date)*                    ; or

☐ I returned the summons unexecuted because                                        ; or

☐ Other *(specify)*:


My fees are $              for travel and $              for services, for a total of $              .

I declare under penalty of perjury that this information is true.

Date:

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### Southern Division – Detroit

LC TRADEMARKS, INC.,
 a Michigan corporation, and
BLUE LINE FOODSERVICE
  DISTRIBUTION, INC.,
 a Michigan corporation,
   Plaintiffs,

   v.

BITWEALTH HOLDINGS, LLC,
 a Nevada limited liability company,
MATTHEW GOETTSCHE,
 a Colorado citizen,
GAVIN DICKSON,
 a Utah citizen,
GEORGE OMAR KOURY,
 a Nevada citizen,
GEORGE OMAR KOURY,
 Trustee of the VM3G Family Trust,
GINA RENEE KOURY,
 a Nevada citizen,
GINA RENEE KOURY,
 Trustee of the VM3G Family Trust,
AFIFI KOURY,
 a Nevada citizen,
THOMAS B. ROSHEK, III,
 a Texas citizen,
DANIELLE GOETTSCHE,
 a Colorado citizen, and
TARA MICHELLE DUVAL,
 a Texas citizen,

   Defendants.

Case No. 19-cv-13782

## COMPLAINT

Plaintiffs LC Trademarks, Inc. ("LCT") and Blue Line Foodservice Distribution, Inc. ("Blue Line") (collectively, "Plaintiffs") bring this action seeking damages for breaches of personal guarantees given by Defendants in connection with an International Multiple Unit Franchise Agreement ("IMUFA") permitting the development of LITTLE CAESARS franchises in New South Wales, Australia. Under the written IMUFA, non-party Evo Pizza Pty Ltd ("Evo Pizza"), an Australian proprietary limited company owned by Defendants, agreed to develop and operate the restaurants through the end of specified terms and to pay royalties to LCT in accordance with the IMUFA and Restaurant Addenda specific to each restaurant. Evo Pizza also agreed to purchase from Blue Line certain equipment and supplies used in its restaurants and to pay Blue Line for those purchases.

Evo Pizza developed fourteen LITTLE CAESARS restaurants under the IMUFA before it entered voluntary administration pursuant to the Australian Corporations Act of 2001 on October 23, 2019. Evo Pizza failed to perform its obligations under the IMUFA when it failed to make payments to LCT for royalties and to Blue Line for deliveries, equipment, and supplies. Each of the Defendants jointly and severally guaranteed in writing the performance of Evo Pizza's obligations under the IMUFA. Accordingly, Plaintiffs now seek damages

2

and other relief to which they are entitled under the express terms of the personal guarantees given by Defendants.

## THE PARTIES

1.     Plaintiff LC Trademarks, Inc. ("LCT") is a Michigan corporation with its principal place of business in Detroit, Michigan. LCT is a wholly owned subsidiary and an affiliate of non-party Little Caesar Enterprises, Inc. ("LCE"). LCE is the owner of the LITTLE CAESARS trademarks, service marks, trade names, and related marks. Plaintiff LCT is the exclusive licensee of LCE of such trademarks, service marks, trade names and related marks for purposes of the development of LITTLE CAESARS franchises in Australia.

2.     Plaintiff Blue Line Foodservice Distribution, Inc. is a Michigan corporation with its principal place of business in Detroit, Michigan. Blue Line is a wholly owned subsidiary and an affiliate of non-party LCE and is a supplier of products, ingredients, equipment, supplies, and materials used and sold by franchised LITTLE CAESARS restaurants.

3.     Defendant BitWealth Holdings, LLC is a Nevada limited liability company. The members of BitWealth Holdings are Matthew Goettsche, a Colorado citizen, and Gavin Dickson, a Utah citizen. Pursuant to the Deed of Guarantee, Indemnification, and Acknowledgement attached to the IMUFA (the "Guarantee"), BitWealth Holdings guaranteed the obligations of Evo Pizza related

to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

4.      Defendant Matthew Goettsche is a natural person and a Colorado citizen. Pursuant to the Guarantee, he guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

5.      Defendant Gavin Dickson is a natural person and a Utah citizen. Pursuant to the Guarantee, he guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

6.      Defendant George Omar Koury is a natural person and a Nevada citizen. Pursuant to the Guarantee, he guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

7.      Defendant Gina Renee Koury is a natural person and a Nevada citizen. Pursuant to the Guarantee, she guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

8.      George Omar Koury and Gina Renee Koury are also defendants in their capacity as Trustees of the VM3G Family Trust. Pursuant to the Guarantee,

4

the VM3G Family Trust guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

9.     Defendant Afifi Koury is a natural person and a Nevada citizen. Pursuant to the Guarantee, she guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

10.     Defendant Thomas B. Roshek, III is a natural person and a Texas citizen. Pursuant to the Guarantee, he guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

11.     Defendant Danielle Goettsche is a natural person and a Colorado citizen. Pursuant to the Guarantee, she guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

12.     Defendant Tara Michelle Duval is a natural person and a Texas citizen. Pursuant to the Guarantee, she guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

## JURISDICTION AND VENUE

13.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The parties are completely diverse in citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. The underlying facts substantiating the Court's jurisdiction are set out in greater detail below.

14.   This Court has *in personam* jurisdiction over Defendants because they conducted business in this district and they have consented to the personal jurisdiction of this Court in the Guarantee that each has executed.

15.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district. Defendants have also consented to venue in this Court in the Guarantee that each has executed.

## BACKGROUND FACTS

### The IMUFA and Restaurant Addenda

16.   LCT authorizes franchisees in Australia to use the LITTLE CAESAR trade names, trademarks, and service marks (the "LITTLE CAESARS Marks") and to operate under the LITTLE CAESARS System, which involves the production, merchandising, and sale of pizza and related products utilizing special equipment,

equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, and information.

17.   Evo Pizza entered into the IMUFA with LCT on August 13, 2018. The IMUFA provided Evo Pizza with the right and obligation to establish and operate restaurants in the Australian state of New South Wales. (IMUFA § 1.1 (grant of rights); Attachment B (defining development territory and development schedule)). For each new restaurant developed by Evo Pizza, it entered into a restaurant addendum with LCT stating the location of the new restaurant and agreeing to operate the new restaurant in accordance with the terms and conditions of the IMUFA. (*Id.* § 1.1.2 (providing for restaurant addenda)).

18.   Having entered into fourteen restaurant addenda under the IMUFA, Evo Pizza was licensed to use the LITTLE CAESARS Marks and System at each restaurant described in an addendum. Each license had a term of ten years from the date the restaurant opened for business. (*Id.* § 2.2.2).

| Franchise Number | Address | Opening Date | Term Expiration |
|---|---|---|---|
| 4136-0001 | 3 Graham Avenue Casula, NSW 2170 | 10/2/2014[1] | 10/1/2024 |
| 4136-0002 | Shop 9, 4-6 Wandella Road Miranda, NSW 2228 | 12/27/2016 | 12/26/2026 |
| 4136-0003 | 111 George Street | 9/19/2016 | 9/18/2026 |

[1] Because the IMUFA replaced a prior agreement entered into in February 2014, some of the restaurant addenda predate the IMUFA. These existing restaurants were brought under the terms of the IMUFA by the signing of a new addendum for each. (IMUFA § 1.2).

| | Parramatta, NSW 2228 | | |
|---|---|---|---|
| 4136-0004 | 137 Marion Street Leichhardt, NSW 2040 | 1/23/2017 | 1/22/2027 |
| 4136-0005 | Shop 10, 2 Birmingham Road South Penrith, NSW 2750 | 11/13/2017 | 11/12/2027 |
| 4136-0006 | 2/35 William Street Bathurst, NSW 2795 | 12/17/2018 | 12/16/2028 |
| 4136-0007 | 20 Sale Street Orange, NSW 2800 | 7/30/2018 | 7/29/2028 |
| 4136-0008 | Shop 3A, Bradbury Shopping Villa Bradbury, NSW 2560 | 1/29/2018 | 1/28/2028 |
| 4136-0010 | 1/2 Blamey Street Revesby, NSW 2212 | 6/25/2018 | 6/24/2028 |
| 4136-0011 | Shop 4, 274-290 Victoria Street Darlinhurst, NSW 2010 | 1/21/2019 | 1/20/2029 |
| 4136-0012 | 684 Hunter Street Newcastle, NSW 2302 | 7/16/2018 | 7/15/2028 |
| 4136-0016 | 1/2-10 Gallipoli Street St. Marys, NSW 2760 | 11/19/2018 | 11/18/2028 |
| 4136-0017 | 2/230 Elizabeth Street Surry Hills, NSW 2010 | 12/3/2018 | 12/2/2028 |
| 4136-0018 | FS1 46 Wilsons Road Mount Hutton, NSW 2290 | 2/18/2019 | 2/17/2029 |

19.     The IMUFA required Evo Pizza to pay a Royalty Fee of 4% of Gross Sales for each restaurant through December 2022, after which time the Royalty Fee was to increase to 5% of Gross Sales. (IMUFA § 4.3).

20.     The IMUFA defined "Gross Sales" as follows:

4.7     Gross Sales. As used in this Agreement, "**Gross Sales**" means all revenue from the sale of all services and products and all other income and consideration of every kind and nature related to the Restaurants (including, without limitation, proceeds from any business interruption insurance policies, delivery and/or catering fees), whether for cash, credit, or other value, and regardless of collection in the case of credit. . . .

8

21.   Evo Pizza agreed to submit each week a report of Gross Sales realized by each restaurant during the prior week. (*Id.* § 10.2).

22.   Evo Pizza agreed that any late payment would be subject to LCT's then-current late fee, in addition to interest at a rate of the lower of six percent over the one-year Libor Rate as published in the Wall Street Journal or the maximum rate permitted by law. (*Id.* § 4.10).

23.   The IMUFA also required Evo Pizza to purchase equipment and supplies for its restaurants from suppliers designated by LCT. (*Id.* §§ 5.11; 5.12). LCT designated Blue Line as its supplier for certain equipment and supplies to be used in Evo Pizza's restaurants.

24.   Evo Pizza agreed that it would be in default of the IMUFA if it failed to submit required financial reports to LCT, failed to make required payments to LCT or LCT's affiliates, or knowingly submitted false financial reports to LCT. (*Id.* §§ 15.2.10; 15.2.18).

25.   Evo Pizza also agreed that it would be in default of the IMUFA if it were to become bankrupt or insolvent, or became unlikely to be able to pay its debts as they became due. (*Id.* §§ 15.1.1.2; 15.2.8).

26.   Likewise, Evo Pizza agreed that it would be in default of the IMUFA if it were to cease to operate or abandon its restaurants. (*Id.* § 15.2.17).

9

27.    Finally, the IMUFA required Evo Pizza to reimburse LCT for costs and expenses it incurred as a result of Evo Pizza's breaches of the IMUFA:

> [I]n connection with any failure by Franchisee to comply with this Agreement, regardless of whether there is any legal proceeding to enforce the terms of this Agreement, Franchisee shall reimburse LCT, upon demand, for the actual (or reasonably approximate) costs and expenses incurred by LCT, as applicable, as a result of such failure and for its enforcement of the terms of this Agreement, including, without limitation, accountants', attorneys', attorneys' assistants and expert witness fees, cost of investigation and proof of facts, court costs, other litigation expenses and travel expenses however excluding costs incurred by LCT in relation to settling a dispute under this Agreement.

(*Id.* § 18.4).

### Evo Pizza's Breaches of the IMUFA

28.    Beginning in June 2019, Evo Pizza ceased making payments to LCT and Blue Line.

29.    At present, the outstanding amount owed by Evo Pizza to LCT for royalty payments required by Section 4.3 of the IMUFA is $100,971.62.[2] A small portion of this—$1,643.06—is attributable to a shortfall in Evo Pizza's royalty payments from earlier in 2019. The remaining amount is allocable to Evo Pizza's restaurants as follows:

| Franchise Number | Address | Royalties Owed |
|---|---|---|
| 4136-0001 | 3 Graham Avenue | $12,889.09 |

---

[2] Unless otherwise noted, all amounts in this Complaint are stated in United States Dollars. The IMUFA requires that all payments made under its terms be made in United States Dollars. (IMUFA § 4.9).

| | Casula, NSW 2170 | |
|---|---|---|
| 4136-0002 | Shop 9, 4-6 Wandella Road<br>Miranda, NSW 2228 | $8,068.59 |
| 4136-0003 | 111 George Street<br>Parramatta, NSW 2228 | $7,186.88 |
| 4136-0004 | 137 Marion Street<br>Leichhardt, NSW 2040 | $4,833.61 |
| 4136-0005 | Shop 10, 2 Birmingham Road<br>South Penrith, NSW 2750 | $9,444.57 |
| 4136-0006 | 2/35 William Street<br>Bathurst, NSW 2795 | $2,560.66 |
| 4136-0007 | 20 Sale Street<br>Orange, NSW 2800 | $3,214.34 |
| 4136-0008 | Shop 3A, Bradbury Shopping Villa<br>Bradbury, NSW 2560 | $12,805.88 |
| 4136-0010 | 1/2 Blamey Street<br>Revesby, NSW 2212 | $4,260.12 |
| 4136-0011 | Shop 4, 274-290 Victoria Street<br>Darlinhurst, NSW 2010 | $3,324.45 |
| 4136-0012 | 684 Hunter Street<br>Newcastle, NSW 2302 | $4,490.05 |
| 4136-0016 | 1/2-10 Gallipoli Street<br>St. Marys, NSW 2760 | $4,935.44 |
| 4136-0017 | 2/230 Elizabeth Street<br>Surry Hills, NSW 2010 | $10,946.63 |
| 4136-0018 | FS1 46 Wilsons Road<br>Mount Hutton, NSW 2290 | $10,368.25 |
| Subtotal | | $99,328.56 |
| **Including prior shortfall of $1,643.06** | | **$100,971.62** |

30.    From at least May 17, 2019, and continuing through October 4, 2019, Blue Line delivered equipment, supplies, and food products including, but not limited to, pizza dough mix, cheese, and sauce to the restaurants operated by Evo Pizza. However, Evo Pizza repeatedly failed to pay invoices associated with those shipments, despite having a contractual obligation to do so. At present, the

outstanding amount owed by Evo Pizza to Blue Line for the purchase and delivery of equipment and supplies required by Sections 5.11 and 5.12 of the IMUFA is **$659,531.96**. This amount includes, in addition to $653,007.88 in past due amounts, $6,524.08 due on a December 10, 2019 invoice.

31.   In October 2019, LCT audited Evo Pizza's sales records for each of its restaurants for the fiscal year ending June 30, 2019. The results of that audit showed that Evo Pizza had underreported its sales for that period in large part by failing to report the full amount paid by customers using delivery services such as Uber Eats or Deliveroo. Instead, Evo Pizza would discount the sales at the point of sale by approximately 38%, resulting in total underreporting of AUS$600,000 for the audited fiscal year.

| Total underreported | AUS$600,000 |
|---|---|
| Royalties owed at 4% | AUS$24,000 |
| Currency conversion | USD$16,478.97 |

32.   The audit also found that Evo Pizza failed to report opening day sales for its restaurants that opened during that fiscal year. Each store opened on a Monday, which was the last day of the reporting week, and Evo Pizza failed to report any sales for opening day for each of the following restaurants:

| Franchise Number | Address | Opening Date | Underreported Sales |
|---|---|---|---|
| 4136-0006 | 2/35 William Street Bathurst, NSW 2795 | 12/17/2018 | AUS$5,043 |
| 4136-0007 | 20 Sale Street Orange, NSW 2800 | 7/30/2018 | AUS$8,195 |

| 4136-0011 | Shop 4, 274-290 Victoria Street<br>Darlinhurst, NSW 2010 | 1/21/2019 | AUS$1,495 |
|---|---|---|---|
| 4136-0012 | 684 Hunter Street<br>Newcastle, NSW 2302 | 7/16/2018 | AUS$6,105 |
| 4136-0016 | 1/2-10 Gallipoli Street<br>St. Marys, NSW 2760 | 11/19/2018 | AUS$2,972 |
| 4136-0017 | 2/230 Elizabeth Street<br>Surry Hills, NSW 2010 | 12/3/2018 | AUS$1,818 |
| 4136-0018 | FS1 46 Wilsons Road<br>Mount Hutton, NSW 2290 | 2/18/2019 | AUS$8,280 |
| Total | | | AUS$33,908 |
| Royalties owed at 4% | | | AUS$1,356.32 |
| Currency conversion | | | USD$933.76 |

33.     In total, at present, Evo Pizza owes **$118,384.35** to LCT for unpaid royalties and **$659,531.96** to Blue Line for deliveries of supplies.

34.     Evo Pizza appointed administrators and entered into voluntary administration under Australian law on October 23, 2019. As a result of this proceeding, LCT incurred AUS$36,200.23 (US**$24,978.03**) in attorneys' fees for its counsel in Australia and **$2,175.30** in attorneys' fees for its counsel in the United States. These fees will increase as Evo Pizza's administration proceedings continue.

35.     Under the terms of the IMUFA, Evo Pizza had the right and the obligation to operate each licensed restaurant for a period of ten years from the opening of each restaurant. (IMUFA §§ 1.1.2 (obligation to operate restaurant), 2.2.2 (ten-year term). However, Evo Pizza has breached this obligation and has permanently closed and abandoned each of the restaurants. This has caused, and

will continue to cause, a loss of profits for LCT in the form of lost royalties that would reasonably be expected from continued operations. Based upon the period when all fourteen restaurants were operating, LCT received an average of AUS$29,284 in combined monthly royalties. Projecting this amount four years into the future, LCT would have expected to have received at least US$969,848.82 in royalties from Evo Pizza. This calculation understates the amount that actually will be lost by LCT due to the premature closure and abandonment, because the licenses for some of the restaurants extended into 2029, and none of the licenses would have expired by their terms in four years or fewer.

| Average monthly royalties | AUS$29,284 |
| Multiplied by 48 months | AUS$1,405,632 |
| Currency conversion | US$969,848.82 |

### The Guarantees

36.    Evo Pizza's obligations under the IMUFA, as set out above, are enforceable against Defendants. Each Defendant executed a personal guarantee for the IMUFA (the "Guarantee"). A true copy of the Guarantee as executed by each Defendant is attached hereto as Exhibit A.

37.    In the Guarantee, Defendants agreed to

jointly and severally, hereby unconditionally guarantee that all of Franchisee's obligations to LCT and its affiliates, including under the [IMUFA] and obligations to LCT's affiliate Blue Line Foodservice Distribution Inc., will be punctually paid and performed.

(Guarantee at 58).

14

38. Defendants also agreed that LCT would have no obligation to proceed against the Franchisees prior to enforcing their obligations as guarantors. (*Id.*)

39. Defendants also specifically agreed to indemnify LCT for legal costs it might incur as a result of Evo Pizza's failure to perform its obligations under the IMUFA:

> The undersigned hereby agree to defend, indemnify and hold LCT harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorneys' fees, reasonable costs of investigation, court costs, and arbitration fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement . . . .

(*Id.*)

40. Finally, Defendants agreed that the Guarantee would be interpreted under Michigan law, excluding any applicable choice of law rules, and that they would submit to the personal jurisdiction of the federal court sitting in Detroit, Michigan. (*Id.* at 58–59).

41. On December 23, 2019, Plaintiffs issued demands for payment to Defendants on the basis of moneys owed by Evo Pizza and Defendants' personal guarantees of those debts. These demands included amounts owed for royalty fees and deliveries of equipment and supplies for the periods in which Evo Pizza's restaurants had been operating, attorneys' fees and costs incurred by LCT as a result of Evo Pizza's bankruptcy, and future royalties lost as a result of the closure

of Evo Pizza's restaurants. Plaintiffs demanded that Defendants pay all outstanding amounts owed immediately.

42.   To date, Defendants have failed to pay any of the foregoing amounts.

## COUNT I
### Breach of Contract

43.   The allegations of Paragraphs 1 through 42 are hereby incorporated by reference.

44.   In the Guarantee, Defendants agreed unconditionally to jointly and severally guarantee that all of Evo Pizza's obligations to LCT and its affiliates under the IMUFA would be punctually paid.

45.   In the course of its operations and administration, Evo Pizza accumulated $145,537.68 in debts to LCT.

46.   In the course of its operations, Evo Pizza accumulated $659,531.96 in debts to Blue Line.

47.   Evo Pizza agreed that, should it fail to make a required payment, it would owe additional late fees, plus interest at the lower of six percent over the one-year Libor Rate as published in the Wall Street Journal or the maximum rate permitted by law.

48.   In the IMUFA and Restaurant Addenda, Evo Pizza also agreed to operate each of the LITTLE CAESARS restaurants it opened for a period of ten years.

49.    Evo Pizza closed and abandoned its restaurants in late 2019, in material breach of its contractual obligations under the IMUFA and Restaurant Addenda.

50.    As a direct result of Evo Pizza's closure and abandonment of its restaurants, LCT additionally has been deprived of future royalty payments it was owed, in the amount of at least $969,848.92.

51.    Through the Guarantee, Plaintiffs are entitled to collect all of these amounts from Defendants personally.

52.    Defendants have failed to pay any of the amounts Plaintiffs have demanded.

53.    Defendants' refusals constitute material breaches of the contractual provisions of the Guarantee cited herein.

54.    As a direct and proximate result of Defendants' refusal, Plaintiffs have been deprived of moneys they are owed.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A.    Enter judgment in favor of LCT and against each of the Defendants, jointly and severally, for monetary damages in the amount of $145,537.68, or such higher amount as may be proven by the evidence, plus prejudgment interest pursuant to the IMUFA and Guarantee;

B.     Enter judgment in favor of LCT and against each of the Defendants, jointly and severally, for monetary damages for lost future royalty payments in the amount of $969,848.82, or such higher amount as may be proven by the evidence, plus prejudgment interest pursuant to the IMUFA and Guarantee;

C.     Enter judgment in favor of Blue Line and against each of the Defendants, jointly and severally, for monetary damages in the amount of $659,531.96, or such higher amount as may be proven by the evidence, plus prejudgment interest pursuant to the IMUFA and Guarantee;

D.     Award Plaintiffs their costs and attorneys' fees incurred in connection with this action, pursuant to the IMUFA and Guarantee; and

E.     Award Plaintiffs such other relief in their favor as this Court may deem just and proper.

/s/ Larry J. Saylor
Larry J. Saylor (P28165)
Kimberly A. Berger (P56165)
MILLER, CANFIELD, PADDOCK
     & STONE P.L.C.
150 West Jefferson Avenue, Suite 2500
Detroit, Michigan 48226
Telephone:  (313) 496-7986
Facsimile:  (313) 496-8454
Saylor@millercanfield.com
Berger@millercanfield.com

Robert L. Zisk (admitted in E.D. Mich.)
Michael L. Sturm (admitted in E.D. Mich.)
GRAY, PLANT, MOOTY, MOOTY
     & BENNETT, P.A.

The Watergate
600 New Hampshire Avenue, N.W. – Suite 700
Washington, D.C. 20037
Telephone:   (202) 295-2200
Facsimile:    (202) 295-2250
robert.zisk@gpmlaw.com
michael.sturm@gpmlaw.com

Dated: December 26, 2019      *Attorneys for Plaintiffs*

## INDEX OF EXHIBIT

EXHIBIT A      International Multiple Unit Franchise Agreement
Attachment D – Deed of Guarantee, Indemnification,
And Acknowledgment

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### Southern Division – Detroit

LC TRADEMARKS, INC.,
    a Michigan corporation, and
BLUE LINE FOODSERVICE
    DISTRIBUTION, INC.,
    a Michigan corporation,
        Plaintiffs,
     v.
VICTORIOUS FOODS, LLC,
    a Nevada limited liability company,
BITWEALTH HOLDINGS, LLC,
    a Nevada limited liability company,
MATTHEW GOETTSCHE,
    a Colorado citizen,
GAVIN DICKSON,
    a Utah citizen,
ERNEST KOURY,
    a Texas citizen,
GEORGE OMAR KOURY,
    a Nevada citizen,
GEORGE OMAR KOURY,
    Trustee of the VM3G Family Trust,
GINA RENEE KOURY,
    a Nevada citizen,
GINA RENEE KOURY,
    Trustee of the VM3G Family Trust,
AFIFI KOURY,
    a Nevada citizen,
THOMAS B. ROSHEK, III,
    a Texas citizen,
DANIELLE GOETTSCHE,
    a Colorado citizen,
SANDRA KOURY,
    A Texas citizen, and
TARA MICHELLE DUVAL,
    a Texas citizen,
        Defendants.

Case No. 19-cv-13782

Hon. Paul D. Borman
Mag. Judge Anthony P. Patti

# FIRST AMENDED COMPLAINT

Pursuant to FED. R. CIV. P. 15(a)(1)(B), Plaintiffs LC Trademarks, Inc. ("LCT") and Blue Line Foodservice Distribution, Inc. ("Blue Line") (collectively, "Plaintiffs") hereby file this First Amended Complaint. Plaintiffs amend their Complaint to allow the claims against all guarantors, including those who at the time of the prior filing were not known to be diverse, to be adjudicated together.

Plaintiffs bring this action seeking damages for breaches of personal guarantees given by Defendants in connection with an International Multiple Unit Franchise Agreement ("IMUFA") permitting the development of LITTLE CAESARS franchises in New South Wales, Australia. Under the written IMUFA, non-party Evo Pizza Pty Ltd ("Evo Pizza"), an Australian proprietary limited company owned by Defendants, agreed to develop and operate the restaurants through the end of specified terms and to pay royalties to LCT in accordance with the IMUFA and Restaurant Addenda specific to each restaurant. Evo Pizza also agreed to purchase from Blue Line certain equipment and supplies used in its restaurants and to pay Blue Line for those purchases.

Evo Pizza developed fourteen LITTLE CAESARS restaurants under the IMUFA before it entered voluntary administration pursuant to the Australian Corporations Act of 2001 on October 23, 2019. Evo Pizza failed to perform its obligations under the IMUFA when it failed to make payments to LCT for

royalties and to Blue Line for deliveries, equipment, and supplies. Each of the Defendants jointly and severally guaranteed in writing the performance of Evo Pizza's obligations under the IMUFA. Accordingly, Plaintiffs now seek damages and other relief to which they are entitled under the express terms of the personal guarantees given by Defendants.

## THE PARTIES

1. Plaintiff LC Trademarks, Inc. is a Michigan corporation with its principal place of business in Detroit, Michigan. LCT is a wholly owned subsidiary and an affiliate of non-party Little Caesar Enterprises, Inc. ("LCE"). LCE is the owner of the LITTLE CAESARS trademarks, service marks, trade names, and related marks. Plaintiff LCT is the exclusive licensee of LCE of such trademarks, service marks, trade names and related marks for purposes of the development of LITTLE CAESARS franchises in Australia.

2. Plaintiff Blue Line Foodservice Distribution, Inc. is a Michigan corporation with its principal place of business in Detroit, Michigan. Blue Line is a wholly owned subsidiary and an affiliate of non-party LCE and is a supplier of products, ingredients, equipment, supplies, and materials used and sold by franchised LITTLE CAESARS restaurants.

3. Defendant Victorious Foods, LLC is a Nevada limited liability company. The members of Victorious Foods are Ernest Koury, a Texas citizen;

3

Afifi Koury, a Nevada citizen; Thomas B. Roshek, III, a Texas citizen; the VM3G Family Trust, whose trustees are George Omar Koury and Gina Renee Koury, each a Nevada citizen; and BitWealth Holdings, LLC, a Nevada limited liability company whose members are Matthew Goettsche, a Colorado citizen, and Gavin Dickson, a Utah citizen. Pursuant to the Deed of Guarantee, Indemnification, and Acknowledgement attached to the IMUFA (the "Guarantee"), Victorious Foods guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

4.      Defendant BitWealth Holdings, LLC is a Nevada limited liability company. The members of BitWealth Holdings are Matthew Goettsche, a Colorado citizen, and Gavin Dickson, a Utah citizen. Pursuant to the Guarantee, BitWealth Holdings guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

5.      Defendant Matthew Goettsche is a natural person and a Colorado citizen. Pursuant to the Guarantee, he guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

6.      Defendant Gavin Dickson is a natural person and a Utah citizen. Pursuant to the Guarantee, he guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the

IMUFA.

7.     Defendant Ernest Koury is a natural person and, upon information and belief, a Texas citizen. Mr. Koury's counsel has represented that he is a citizen of Texas or California; either is diverse from Plaintiffs. Pursuant to the Guarantee, he guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

8.     Defendant George Omar Koury is a natural person and a Nevada citizen. Pursuant to the Guarantee, he guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

9.     Defendant Gina Renee Koury is a natural person and a Nevada citizen. Pursuant to the Guarantee, she guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

10.     George Omar Koury and Gina Renee Koury are also defendants in their capacity as Trustees of the VM3G Family Trust. Pursuant to the Guarantee, the VM3G Family Trust guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

11.     Defendant Afifi Koury is a natural person and a Nevada citizen. Pursuant to the Guarantee, she guaranteed the obligations of Evo Pizza related to

the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

12.     Defendant Thomas B. Roshek, III is a natural person and a Texas citizen. Pursuant to the Guarantee, he guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

13.     Defendant Danielle Goettsche is a natural person and a Colorado citizen. Pursuant to the Guarantee, she guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

14.     Defendant Sandra Koury is a natural person and, upon information and belief, a Texas citizen. Mrs. Koury's counsel has represented that she is a citizen of Texas or California; either is diverse from Plaintiffs. Pursuant to the Guarantee, she guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

15.     Defendant Tara Michelle Duval is a natural person and a Texas citizen. Pursuant to the Guarantee, she guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The parties are completely diverse in citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. The underlying facts substantiating the Court's jurisdiction are set out in greater detail below.

17.     This Court has *in personam* jurisdiction over Defendants because they conducted business in this district and they have consented to the personal jurisdiction of this Court in the Guarantee that each has executed.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district. Defendants have also consented to venue in this Court in the Guarantee that each has executed.

## BACKGROUND FACTS

### The IMUFA and Restaurant Addenda

19.     LCT authorizes franchisees in Australia to use the LITTLE CAESAR trade names, trademarks, and service marks (the "LITTLE CAESARS Marks") and to operate under the LITTLE CAESARS System, which involves the production, merchandising, and sale of pizza and related products utilizing special equipment,

equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, and information.

20.    Evo Pizza entered into the IMUFA with LCT on August 13, 2018. The IMUFA provided Evo Pizza with the right and obligation to establish and operate restaurants in the Australian state of New South Wales. (IMUFA § 1.1 (grant of rights); Attachment B (defining development territory and development schedule)). For each new restaurant developed by Evo Pizza, it entered into a restaurant addendum with LCT stating the location of the new restaurant and agreeing to operate the new restaurant in accordance with the terms and conditions of the IMUFA. (*Id.* § 1.1.2 (providing for restaurant addenda)).

21.    Having entered into fourteen restaurant addenda under the IMUFA, Evo Pizza was licensed to use the LITTLE CAESARS Marks and System at each restaurant described in an addendum. Each license had a term of ten years from the date the restaurant opened for business. (*Id.* § 2.2.2).

| Franchise Number | Address | Opening Date | Term Expiration |
|---|---|---|---|
| 4136-0001 | 3 Graham Avenue Casula, NSW 2170 | 10/2/2014[1] | 10/1/2024 |
| 4136-0002 | Shop 9, 4-6 Wandella Road Miranda, NSW 2228 | 12/27/2016 | 12/26/2026 |
| 4136-0003 | 111 George Street | 9/19/2016 | 9/18/2026 |

---

[1] Because the IMUFA replaced a prior agreement entered into in February 2014, some of the restaurant addenda predate the IMUFA. These existing restaurants were brought under the terms of the IMUFA by the signing of a new addendum for each. (IMUFA § 1.2).

| | Parramatta, NSW 2228 | | |
|---|---|---|---|
| 4136-0004 | 137 Marion Street Leichhardt, NSW 2040 | 1/23/2017 | 1/22/2027 |
| 4136-0005 | Shop 10, 2 Birmingham Road South Penrith, NSW 2750 | 11/13/2017 | 11/12/2027 |
| 4136-0006 | 2/35 William Street Bathurst, NSW 2795 | 12/17/2018 | 12/16/2028 |
| 4136-0007 | 20 Sale Street Orange, NSW 2800 | 7/30/2018 | 7/29/2028 |
| 4136-0008 | Shop 3A, Bradbury Shopping Villa Bradbury, NSW 2560 | 1/29/2018 | 1/28/2028 |
| 4136-0010 | 1/2 Blamey Street Revesby, NSW 2212 | 6/25/2018 | 6/24/2028 |
| 4136-0011 | Shop 4, 274-290 Victoria Street Darlinhurst, NSW 2010 | 1/21/2019 | 1/20/2029 |
| 4136-0012 | 684 Hunter Street Newcastle, NSW 2302 | 7/16/2018 | 7/15/2028 |
| 4136-0016 | 1/2-10 Gallipoli Street St. Marys, NSW 2760 | 11/19/2018 | 11/18/2028 |
| 4136-0017 | 2/230 Elizabeth Street Surry Hills, NSW 2010 | 12/3/2018 | 12/2/2028 |
| 4136-0018 | FS1 46 Wilsons Road Mount Hutton, NSW 2290 | 2/18/2019 | 2/17/2029 |

22.     The IMUFA required Evo Pizza to pay a Royalty Fee of 4% of Gross Sales for each restaurant through December 2022, after which time the Royalty Fee was to increase to 5% of Gross Sales. (IMUFA § 4.3).

23.     The IMUFA defined "Gross Sales" as follows:

4.7     Gross Sales. As used in this Agreement, "**Gross Sales**" means all revenue from the sale of all services and products and all other income and consideration of every kind and nature related to the Restaurants (including, without limitation, proceeds from any business interruption insurance policies, delivery and/or catering fees), whether for cash, credit, or other value, and regardless of collection in the case of credit. . . .

24.     Evo Pizza agreed to submit each week a report of Gross Sales realized by each restaurant during the prior week. (*Id.* § 10.2).

25.     Evo Pizza agreed that any late payment would be subject to LCT's then-current late fee, in addition to interest at a rate of the lower of six percent over the one-year Libor Rate as published in the Wall Street Journal or the maximum rate permitted by law. (*Id.* § 4.10).

26.     The IMUFA also required Evo Pizza to purchase equipment and supplies for its restaurants from suppliers designated by LCT. (*Id.* §§ 5.11; 5.12). LCT designated Blue Line as its supplier for certain equipment and supplies to be used in Evo Pizza's restaurants.

27.     Evo Pizza agreed that it would be in default of the IMUFA if it failed to submit required financial reports to LCT, failed to make required payments to LCT or LCT's affiliates, or knowingly submitted false financial reports to LCT. (*Id.* §§ 15.2.10; 15.2.18).

28.     Evo Pizza also agreed that it would be in default of the IMUFA if it were to become bankrupt or insolvent, or became unlikely to be able to pay its debts as they became due. (*Id.* §§ 15.1.1.2; 15.2.8).

29.     Likewise, Evo Pizza agreed that it would be in default of the IMUFA if it were to cease to operate or abandon its restaurants. (*Id.* § 15.2.17).

30.     Finally, the IMUFA required Evo Pizza to reimburse LCT for costs

and expenses it incurred as a result of Evo Pizza's breaches of the IMUFA:

> [I]n connection with any failure by Franchisee to comply with this
> Agreement, regardless of whether there is any legal proceeding to enforce
> the terms of this Agreement, Franchisee shall reimburse LCT, upon demand,
> for the actual (or reasonably approximate) costs and expenses incurred by
> LCT, as applicable, as a result of such failure and for its enforcement of the
> terms of this Agreement, including, without limitation, accountants',
> attorneys', attorneys' assistants and expert witness fees, cost of investigation
> and proof of facts, court costs, other litigation expenses and travel expenses
> however excluding costs incurred by LCT in relation to settling a dispute
> under this Agreement.

(*Id.* § 18.4).

## Evo Pizza's Breaches of the IMUFA

31.     Beginning in June 2019, Evo Pizza ceased making payments to LCT

and Blue Line.

32.     At present, the outstanding amount owed by Evo Pizza to LCT for

royalty payments required by Section 4.3 of the IMUFA is $100,971.62.[2] A small

portion of this—$1,643.06—is attributable to a shortfall in Evo Pizza's royalty

payments from earlier in 2019. The remaining amount is allocable to Evo Pizza's

restaurants as follows:

| Franchise Number | Address | Royalties Owed |
|---|---|---|
| 4136-0001 | 3 Graham Avenue | $12,889.09 |

---

[2] Unless otherwise noted, all amounts in this Complaint are stated in United States
Dollars. The IMUFA requires that all payments made under its terms be made in
United States Dollars. (IMUFA § 4.9).

11

| | Casula, NSW 2170 | |
|---|---|---|
| 4136-0002 | Shop 9, 4-6 Wandella Road Miranda, NSW 2228 | $8,068.59 |
| 4136-0003 | 111 George Street Parramatta, NSW 2228 | $7,186.88 |
| 4136-0004 | 137 Marion Street Leichhardt, NSW 2040 | $4,833.61 |
| 4136-0005 | Shop 10, 2 Birmingham Road South Penrith, NSW 2750 | $9,444.57 |
| 4136-0006 | 2/35 William Street Bathurst, NSW 2795 | $2,560.66 |
| 4136-0007 | 20 Sale Street Orange, NSW 2800 | $3,214.34 |
| 4136-0008 | Shop 3A, Bradbury Shopping Villa Bradbury, NSW 2560 | $12,805.88 |
| 4136-0010 | 1/2 Blamey Street Revesby, NSW 2212 | $4,260.12 |
| 4136-0011 | Shop 4, 274-290 Victoria Street Darlinhurst, NSW 2010 | $3,324.45 |
| 4136-0012 | 684 Hunter Street Newcastle, NSW 2302 | $4,490.05 |
| 4136-0016 | 1/2-10 Gallipoli Street St. Marys, NSW 2760 | $4,935.44 |
| 4136-0017 | 2/230 Elizabeth Street Surry Hills, NSW 2010 | $10,946.63 |
| 4136-0018 | FS1 46 Wilsons Road Mount Hutton, NSW 2290 | $10,368.25 |
| Subtotal | | $99,328.56 |
| **Including prior shortfall of $1,643.06** | | **$100,971.62** |

33. From at least May 17, 2019, and continuing through October 4, 2019, Blue Line delivered equipment, supplies, and food products including, but not limited to, pizza dough mix, cheese, and sauce to the restaurants operated by Evo Pizza. However, Evo Pizza repeatedly failed to pay invoices associated with those shipments, despite having a contractual obligation to do so. At present, the

outstanding amount owed by Evo Pizza to Blue Line for the purchase and delivery of equipment and supplies required by Sections 5.11 and 5.12 of the IMUFA is **$659,531.96**. This amount includes, in addition to $653,007.88 in past due amounts, $6,524.08 due on a December 10, 2019 invoice.

34.     In October 2019, LCT audited Evo Pizza's sales records for each of its restaurants for the fiscal year ending June 30, 2019. The results of that audit showed that Evo Pizza had underreported its sales for that period in large part by failing to report the full amount paid by customers using delivery services such as Uber Eats or Deliveroo. Instead, Evo Pizza would discount the sales at the point of sale by approximately 38%, resulting in total underreporting of AUS$600,000 for the audited fiscal year.

| Total underreported | AUS$600,000 |
| Royalties owed at 4% | AUS$24,000 |
| Currency conversion | USD**$16,478.97** |

35.     The audit also found that Evo Pizza failed to report opening day sales for its restaurants that opened during that fiscal year. Each store opened on a Monday, which was the last day of the reporting week, and Evo Pizza failed to report any sales for opening day for each of the following restaurants:

| Franchise Number | Address | Opening Date | Underreported Sales |
| --- | --- | --- | --- |
| 4136-0006 | 2/35 William Street Bathurst, NSW 2795 | 12/17/2018 | AUS$5,043 |
| 4136-0007 | 20 Sale Street Orange, NSW 2800 | 7/30/2018 | AUS$8,195 |

13

| 4136-0011 | Shop 4, 274-290 Victoria Street<br>Darlinhurst, NSW 2010 | 1/21/2019 | AUS$1,495 |
|---|---|---|---|
| 4136-0012 | 684 Hunter Street<br>Newcastle, NSW 2302 | 7/16/2018 | AUS$6,105 |
| 4136-0016 | 1/2-10 Gallipoli Street<br>St. Marys, NSW 2760 | 11/19/2018 | AUS$2,972 |
| 4136-0017 | 2/230 Elizabeth Street<br>Surry Hills, NSW 2010 | 12/3/2018 | AUS$1,818 |
| 4136-0018 | FS1 46 Wilsons Road<br>Mount Hutton, NSW 2290 | 2/18/2019 | AUS$8,280 |
| Total | | | AUS$33,908 |
| Royalties owed at 4% | | | AUS$1,356.32 |
| Currency conversion | | | USD**$933.76** |

36.  In total, at present, Evo Pizza owes **$118,384.35** to LCT for unpaid royalties and **$659,531.96** to Blue Line for deliveries of supplies.

37.  Evo Pizza appointed administrators and entered into voluntary administration under Australian law on October 23, 2019. As a result of this proceeding, LCT incurred AUS$36,200.23 (US**$24,978.03**) in attorneys' fees for its counsel in Australia and **$2,175.30** in attorneys' fees for its counsel in the United States. These fees will increase as Evo Pizza's administration proceedings continue.

38.  Under the terms of the IMUFA, Evo Pizza had the right and the obligation to operate each licensed restaurant for a period of ten years from the opening of each restaurant. (IMUFA §§ 1.1.2 (obligation to operate restaurant), 2.2.2 (ten-year term). However, Evo Pizza has breached this obligation and has permanently closed and abandoned each of the restaurants. This has caused, and

will continue to cause, a loss of profits for LCT in the form of lost royalties that would reasonably be expected from continued operations. Based upon the period when all fourteen restaurants were operating, LCT received an average of AUS$29,284 in combined monthly royalties. Projecting this amount four years into the future, LCT would have expected to have received at least US$969,848.82 in royalties from Evo Pizza. This calculation understates the amount that actually will be lost by LCT due to the premature closure and abandonment, because the licenses for some of the restaurants extended into 2029, and none of the licenses would have expired by their terms in four years or fewer.

| Average monthly royalties | AUS$29,284 |
| Multiplied by 48 months | AUS$1,405,632 |
| Currency conversion | US**$969,848.82** |

### The Guarantees

39.   Evo Pizza's obligations under the IMUFA, as set out above, are enforceable against Defendants. Each Defendant executed a personal guarantee for the IMUFA (the "Guarantee"). A true copy of the Guarantee as executed by each Defendant is attached hereto as Exhibit A.

40.   In the Guarantee, Defendants agreed to

jointly and severally, hereby unconditionally guarantee that all of Franchisee's obligations to LCT and its affiliates, including under the [IMUFA] and obligations to LCT's affiliate Blue Line Foodservice Distribution Inc., will be punctually paid and performed.

(Guarantee at 58).

41.     Defendants also agreed that LCT would have no obligation to proceed against the Franchisees prior to enforcing their obligations as guarantors. (*Id.*)

42.     Defendants also specifically agreed to indemnify LCT for legal costs it might incur as a result of Evo Pizza's failure to perform its obligations under the IMUFA:

> The undersigned hereby agree to defend, indemnify and hold LCT harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorneys' fees, reasonable costs of investigation, court costs, and arbitration fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement . . . .

(*Id.*)

43.     Finally, Defendants agreed that the Guarantee would be interpreted under Michigan law, excluding any applicable choice of law rules, and that they would submit to the personal jurisdiction of the federal court sitting in Detroit, Michigan. (*Id.* at 58–59).

44.     On December 23, 2019, Plaintiffs issued demands for payment to Defendants on the basis of moneys owed by Evo Pizza and Defendants' personal guarantees of those debts. These demands included amounts owed for royalty fees and deliveries of equipment and supplies for the periods in which Evo Pizza's restaurants had been operating, attorneys' fees and costs incurred by LCT as a result of Evo Pizza's bankruptcy, and future royalties lost as a result of the closure

of Evo Pizza's restaurants. Plaintiffs demanded that Defendants pay all outstanding amounts owed immediately.

45.     To date, Defendants have failed to pay any of the foregoing amounts.

## COUNT I
## Breach of Contract

46.     The allegations of Paragraphs 1 through 45 are hereby incorporated by reference.

47.     In the Guarantee, Defendants agreed unconditionally to jointly and severally guarantee that all of Evo Pizza's obligations to LCT and its affiliates under the IMUFA would be punctually paid.

48.     In the course of its operations and administration, Evo Pizza accumulated $145,537.68 in debts to LCT.

49.     In the course of its operations, Evo Pizza accumulated $659,531.96 in debts to Blue Line.

50.     Evo Pizza agreed that, should it fail to make a required payment, it would owe additional late fees, plus interest at the lower of six percent over the one-year Libor Rate as published in the Wall Street Journal or the maximum rate permitted by law.

51.     In the IMUFA and Restaurant Addenda, Evo Pizza also agreed to operate each of the LITTLE CAESARS restaurants it opened for a period of ten years.

17

52.     Evo Pizza closed and abandoned its restaurants in late 2019, in material breach of its contractual obligations under the IMUFA and Restaurant Addenda.

53.     As a direct result of Evo Pizza's closure and abandonment of its restaurants, LCT additionally has been deprived of future royalty payments it was owed, in the amount of at least $969,848.92.

54.     Through the Guarantee, Plaintiffs are entitled to collect all of these amounts from Defendants personally.

55.     Defendants have failed to pay any of the amounts Plaintiffs have demanded.

56.     Defendants' refusals constitute material breaches of the contractual provisions of the Guarantee cited herein.

57.     As a direct and proximate result of Defendants' refusal, Plaintiffs have been deprived of moneys they are owed.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

A.     Enter judgment in favor of LCT and against each of the Defendants, jointly and severally, for monetary damages in the amount of $145,537.68, or such higher amount as may be proven by the evidence, plus prejudgment interest pursuant to the IMUFA and Guarantee;

B.      Enter judgment in favor of LCT and against each of the Defendants, jointly and severally, for monetary damages for lost future royalty payments in the amount of $969,848.82, or such higher amount as may be proven by the evidence, plus prejudgment interest pursuant to the IMUFA and Guarantee;

C.      Enter judgment in favor of Blue Line and against each of the Defendants, jointly and severally, for monetary damages in the amount of $659,531.96, or such higher amount as may be proven by the evidence, plus prejudgment interest pursuant to the IMUFA and Guarantee;

D.      Award Plaintiffs their costs and attorneys' fees incurred in connection with this action, pursuant to the IMUFA and Guarantee; and

E.      Award Plaintiffs such other relief in their favor as this Court may deem just and proper.

Respectfully submitted,

/s/ Robert L. Zisk
Robert L. Zisk (admitted in E.D. Mich.)
Michael L. Sturm (admitted in E.D. Mich.)
LATHOP GPM LLP
The Watergate
600 New Hampshire Avenue, N.W. – Suite 700
Washington, D.C. 20037
Telephone:  (202) 295-2200
Facsimile:   (202) 295-2250
robert.zisk@lathropgpm.com
michael.sturm@lathropgpm.com

Larry J. Saylor (P28165)
Kimberly A. Berger (P56165)

MILLER, CANFIELD, PADDOCK
   & STONE P.L.C.
150 West Jefferson Avenue, Suite 2500
Detroit, Michigan 48226
Telephone:  (313) 496-7986
Facsimile:   (313) 496-8454
Saylor@millercanfield.com
Berger@millercanfield.com

Dated: March 18, 2020     *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 18, 2020, I caused the foregoing to be electronically filed with the Clerk of Court using the ECF system, which will send notification of such filing to the following:

Jay Y. Mandel, Esq.
Jay Y. Mandel, PLLC
535 Griswold Street, Suite 1000
Detroit, MI 48226
jmandel@jymlaw.com

*Attorney for Defendants Bitwealth Holdings, LLC; Matthew Goettsche; and Danielle Goettsche*

John A. MacKenzie, Esq.
Maddin Hauser Roth & Heller, PC
28400 Northwestern Highway, 2nd Floor
Southfield, MI 48034
jmackenzie@maddinhauser.com

*Attorney for Defendants George Omar Koury; George Omar Koury Trustee of the VM3G Family Trust; Gina Renee Koury; Gina Renee Koury Trustee of the VM3G Family Trust; Afifi Koury; Thomas B. Roshek, III; Tara Michelle Duval*

I hereby also certify that, on March 18, 2020, I caused the foregoing to be emailed and sent via first class U.S. mail to the following:

Scott Gordon, Esq.
Gordon Business Law
222 S. Main, Suite 500
Salt Lake City, UT 84101
ScottGordonLaw@gmail.com

*Attorney for Gavin Dickson*

/s/ Robert L. Zisk

# EXHIBIT A

# INTERNATIONAL MULTIPLE UNIT FRANCHISE AGREEMENT ATTACHMENT D

# DEED OF GUARANTEE, INDEMNIFICATION, AND ACKNOWLEDGMENT

## ATTACHMENT D

### Deed of Guarantee, Indemnification, and Acknowledgment ("Guarantee")

As an inducement to LC Trademarks, Inc. ("**LCT**"), to execute the International Multiple Unit Franchise Agreement between LCT and Evo Pizza Pty Limited ("**Franchisee**"), dated __August 13, 2018__ (the "**Agreement**"), the undersigned, jointly and severally, hereby unconditionally guarantee that all of Franchisee's obligations to LCT and its affiliates, including under the Agreement and obligations to LCT's affiliate Blue Line Foodservice Distribution Inc., will be punctually paid and performed (the "**Obligations**").

Upon demand by LCT, the undersigned will immediately make each payment required of Franchisee under the Obligations. The undersigned hereby waive any right to require LCT to: (a) proceed against Franchisee for any payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee; or (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee. Without affecting the obligations of the undersigned under this Guarantee, LCT may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee. The undersigned waive notice of amendment of the Agreement and notice of demand for payment by Franchisee, and agree to be bound by any and all such amendments and changes to the Agreement.

The undersigned hereby agree to defend, indemnify and hold LCT harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorneys' fees, reasonable costs of investigation, court costs, and arbitration fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement, any amendment thereto, any other agreement executed by Franchisee referred to therein, or any other Obligations.

The undersigned hereby acknowledge and agree to be individually bound by all of the covenants and terms contained in the Agreement, including, without limitation, those contained in Sections 6, 9, 13, 14, 16, and 23 of the Agreement; however, nothing in this Guarantee shall afford the undersigned the right to exercise any of Franchisee's rights under the Agreement. The undersigned specifically acknowledge and agree that they shall be individually bound by such covenants and terms that apply to "Franchisee" in such sections of the Agreement as if the undersigned were named personally in such provisions. In addition to the foregoing, with regard to the Confidential Information defined in Section 9.1, if any of the undersigned is a corporate entity, such entity specifically acknowledges and agrees that it shall not disclose any Confidential Information to its shareholders, either individually or collectively, and either directly or indirectly, including, but not limited to, by disclosing such Confidential Information in its annual report to shareholders.

This Guarantee shall terminate upon the termination or expiration of the Agreement, except that all obligations and liabilities of the undersigned which arose from events which occurred on or before the effective date of such termination shall remain in full force and effect until satisfied or discharged by the undersigned, and all covenants which by their terms continue in force after the expiration or termination of the Agreement shall remain in force according to their terms. Upon the death of an individual guarantor, the estate of such guarantor shall be bound by this Guarantee, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

Unless specifically stated otherwise, the terms used in this Guarantee shall have the same meaning as in the Agreement, and shall be interpreted and construed in accordance with Section 23 of the Agreement. However, in recognition that most of the undersigned are domiciled in and executing this Guarantee in the United States of America, if LCT elects to commence any action, litigation or proceeding of any kind whatsoever against the undersigned in any way arising from or relating to this Guarantee and

all contemplated transactions, the undersigned agrees to submit to the federal courts sitting in Detroit, Michigan or, if such court does not have subject matter jurisdiction, the courts of the State of Michigan sitting in Wayne County, and the courts competent to determine appeals from those courts, and in such instances, this Guarantee shall be interpreted and construed under the laws of the State of Michigan, U.S.A. (excluding any applicable choice of law rules, which shall not be applied).

**The undersigned represent and warrant that they have full power and** authority to execute, deliver and perform this Guarantee, and that neither the execution, delivery nor performance of this Guarantee will violate any law or regulation, or any order or decree of any court or governmental authority, or will conflict with, or result in the breach of, or constitute a default under, any agreement or other instrument to which they are a party or by which the undersigned may be bound, or will result in the creation or imposition of any lien, claim or encumbrance upon any property of the undersigned.

IN WITNESS WHEREOF, the undersigned have signed this Guarantee as a deed as of the date of the Agreement.

**GUARANTORS:**

Signed, sealed and delivered by **Ernest Koury**, Individually

Signed: _____

Printed Name: ERNEST KOURY

Address: 4C Wolseley Grove, Zetland, NSW 2017

Witness: _____

Witness Address: 40 WOLSELEY GROVE
ZETLAND 2017

Signed, sealed and delivered by **Sandra Koury**, Individually

Signed: _____

Printed Name: Sandra Koury

Address: 4C Wolseley Grove, Zetland, NSW 2017

Witness: _____

Witness Address: 4A WOLSEBEY GROVE
ZETLAND 2017

Signed, sealed and delivered by **G. Omar Koury**, Individually

Signed: _____

Printed Name: _____

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness: _____

Witness Address: _____

Signed, sealed and delivered by **Gina Koury**, Individually

Signed: _____

Printed Name: _____

: 11 Paradise Valley Ct., Henderson, NV 89052

Witness: _____

Witness Address: _____

*[Additional Signature Pages Follow]*

all contemplated transactions, the undersigned agrees to submit to the federal courts sitting in Detroit, Michigan or, if such court does not have subject matter jurisdiction, the courts of the State of Michigan sitting in Wayne County, and the courts competent to determine appeals from those courts, and in such instances, this Guarantee shall be interpreted and construed under the laws of the State of Michigan, U.S.A. (excluding any applicable choice of law rules, which shall not be applied).

**The undersigned represent and warrant that they have full power and** authority to execute, deliver and perform this Guarantee, and that neither the execution, delivery nor performance of this Guarantee will violate any law or regulation, or any order or decree of any court or governmental authority, or will conflict with, or result in the breach of, or constitute a default under, any agreement or other instrument to which they are a party or by which the undersigned may be bound, or will result in the creation or imposition of any lien, claim or encumbrance upon any property of the undersigned.

IN WITNESS WHEREOF, the undersigned have signed this Guarantee as a deed as of the date of the Agreement.

**GUARANTORS:**

Signed, sealed and delivered by **Ernest Koury**, Individually

Signed: _____

Printed Name: _____

Address: 4C Wolseley Grove, Zetland, NSW 2017

Witness:_____

Witness Address:_____

Signed, sealed and delivered by **Sandra Koury**, Individually

Signed: _____

Printed Name: _____

Address: 4C Wolseley Grove, Zetland, NSW 2017

Witness:_____

Witness Address:_____

Signed, sealed and delivered by **G. Omar Koury**, Individually

Signed: _____

Printed Name: _GEORGE OMAR KOURY_

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness: _Jessica Jhong_

Witness Address: _9691 Picton Ct. Las Vegas NV 89148_

Signed, sealed and delivered by **Gina Koury**, Individually

Signed: _Gina Renee Koury_

Printed Name: _GINA RENEE KOURY_

: 11 Paradise Valley Ct., Henderson, NV 89052

Witness: _Katty J. S_

Witness Address: _2144 Fort Halifax St Henderson NV 89052_

*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Afifi Koury**, Individually

Signed: _Afifi . Koury_

Printed Name: _AFIFI KOURY_

Address: 348 Roland Falls Ln., Las Vegas, NV 89183

Witness: _Affi my_

Witness Address: _737 EVEREST PEAK AVE, HENDERSON NV 89012_


Signed, sealed and delivered by **Dr. Thomas B. Roshek III**, Individually

Signed: _____

Printed Name: _____

Address: 7011 Spanky Branch Ct., Dallas, TX 75248

Witness: _____

Witness Address: _____

Signed, sealed and delivered by **Dr. Tara Michelle Du Val**, Individually

Signed: _____

Printed Name: _____

Address: 7011 Spanky Branch Ct., Dallas, TX 75248

Witness: _____

Witness Address: _____


Signed, sealed and delivered by **Matthew Goettsche**, Individually

Signed: _____

Printed Name: _____

Address: 80 Rivera Court, Erie, Colorado 80516

Witness: _____

Witness Address: _____

Signed, sealed and delivered by **Danielle Goettsche**, Individually

Signed: _____

Printed Name: _____

Address: 80 Rivera Court, Erie, Colorado 80516

Witness: _____

Witness Address: _____


*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Afifi Koury**, Individually

Signed: _____

Printed Name: _____

Address: 348 Roland Falls Ln., Las Vegas, NV 89183

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **Dr. Thomas B. Roshek III**, Individually

Signed: _____

Printed Name: _____

Address: 7011 Spanky Branch Ct., Dallas, TX 75248

Witness:_____

Witness Address: _____


Signed, sealed and delivered by **Dr. Tara Michelle Du Val**, Individually

Signed: _____

Printed Name: _____

Address: 7011 Spanky Branch Ct., Dallas, TX 75248

Witness:_____

Witness Address: _____


Signed, sealed and delivered by **Matthew Goettsche**, Individually

Signed: _____

Printed Name: _____

Address: 80 Rivera Court, Erie, Colorado 80516

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **Danielle Goettsche**, Individually

Signed: _____

Printed Name: _____

Address: 80 Rivera Court, Erie, Colorado 80516

Witness:_____

Witness Address:_____


*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Afifi Koury**, Individually

Signed: _____

Printed Name: _____

Address: 348 Roland Falls Ln., Las Vegas, NV 89183

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **Dr. Thomas B. Roshek III**, Individually

Signed: _____

Printed Name: _____

Address: 7011 Spanky Branch Ct., Dallas, TX 75248

Witness:_____

Witness Address:_____

Signed, sealed and delivered by **Dr. Tara Michelle Du Val**, Individually

Signed: _____

Printed Name: _____

Address: 7011 Spanky Branch Ct., Dallas, TX 75248

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **Matthew Goettsche**, Individually

Signed: _____

Printed Name: Matthew Goettsche

Address: 80 Rivera Court, Erie, Colorado 80516

Witness: Allison Kloek

Witness Address: _____
2735 W 27th Ave
Denver, CO 80211

Signed, sealed and delivered by **Danielle Goettsche**, Individually

Signed: Danielle Goettsche

Printed Name: Danielle Goettsche

Address: 80 Rivera Court, Erie, Colorado 80516

Witness: Allison Kloek

Witness Address: 2735 W 27th Ave, Denver, CO 8021.

*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Gavin Dickson**, Individually

Signed: _____

Printed Name: Gavin Dickson

Address: 4604 Summerview Road, Bountiful, UT 84010

Witness: _____

Witness Address: 8483 Robidoux Road
SANDY, UT 84093

| | |
|---|---|
| Signed, sealed and delivered by **VM3G Family Trust** | Signed, sealed and delivered by **VM3G Family Trust** |
| _____ | _____ |
| By: Omar Koury | By: Gina Koury |
| Its: Trustee | Its: Trustee |
| Address: 11 Paradise Valley Ct., Henderson, NV 89052 | 11 Paradise Valley Ct., Henderson, NV 89052 |
| Witness:_____ | Witness:_____ |
| Witness Address:_____ | Witness Address:_____ |
| Signed, sealed and delivered by **Victorious Foods, LLC** | Signed, sealed and delivered by **Victorious Foods, LLC** |
| _____ | _____ |
| By: Omar Koury | By: Ernest Koury |
| Its: Manager | Its: Manager |
| Address: 11 Paradise Valley Ct., Henderson, NV 89052 | 11 Paradise Valley Ct., Henderson, NV 89052 |
| Witness:_____ | Witness:_____ |
| Witness Address:_____ | Witness Address:_____ |

*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Gavin Dickson**, Individually

Signed: _____

Printed Name: _____

Address: 4604 Summerview Road, Bountiful, UT 84010

Witness:_____

Witness Address:_____

Signed, sealed and delivered by **VM3G Family Trust**

_____

By: Omar Koury

Its: Trustee

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address: 9691 Pictou Ct, Las Vegas, NV 89148

Signed, sealed and delivered by **VM3G Family Trust**

_____

By: Gina Koury

Its: Trustee

11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address: 2144 Fort Archibald St Henderson, NV 89052

Signed, sealed and delivered by **Victorious Foods, LLC**

_____

By: Omar Koury

Its: Manager

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness_____

Witness Address: 9691 Pictou Ct, Las Vegas, NV 89148

Signed, sealed and delivered by **Victorious Foods, LLC**

_____

By: Ernest Koury

Its: Manager

11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address:_____

*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Gavin Dickson**, Individually

Signed: _____

Printed Name: _____

Address: 4604 Summerview Road, Bountiful, UT 84010

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **VM3G Family Trust**

_____

By: Omar Koury

Its: Trustee

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **VM3G Family Trust**

_____

By: Gina Koury

Its: Trustee

11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **Victorious Foods, LLC**

_____

By: Omar Koury

Its: Manager

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **Victorious Foods, LLC**

_____

By: Ernest Koury

Its: Manager

11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address: _4/3 HOLSLEY GROVE ZETLAND) 2017_


*[Additional Signature Pages Follow]*

LC Trademarks, Inc.
International Multiple Unit Franchise Agreement – _13 August_ 2018
Doc ID 577428443/v1

61

Signed, sealed and delivered by **BitWealth Holdings LLC**

By: Matt Goettsche

Its: Managing Member

Address: 321 Greenleaf Glen St., Henderson, NV
89014; 360 W. Broadway, Ste. 100, Salt Lake
City, UT 84101

Witness: Allison Kloek

Witness Address: 2735 W. 27th Ave, Denver, CO 80211

Signed, sealed and delivered by **BitWealth Holdings LLC**

By: ~~Matt Goettsche~~ GAVIN DICKSON

Its: ~~Managing Member~~ Co - PRESIDENT

Address: 321 Greenleaf Glen St., Henderson, NV 89014; 360 W. Broadway, Ste. 100, Salt Lake City, UT 84101

Witness: _____

Witness Address: 8483 ROBIDOUX ROAD
SANDY, UT 84093

# EXHIBIT B

# STATE COMPLAINT

**STATE OF MICHIGAN**
**CIRCUIT COURT FOR THE THIRD JUDICIAL CIRCUIT**

LC TRADEMARKS, INC., a Michigan
Corporation, and BLUE LINE FOODSERVICE
DISTRIBUTION, INC., a Michigan
Corporation,

                    Plaintiffs,                          Case No. _____-CB

        v.

VICTORIOUS FOODS, LLC,
a Nevada Limited Liability Company,
ERNEST KOURY, an individual, and
SANDRA KOURY, an individual,

                    Defendants.

This case meets the statutory requirements to be assigned to the Business Court.

A civil action between other parties arising out of some of the transactions or occurrences alleged in this Complaint has been previously filed in the United States District Court for the Eastern District of Michigan, where it was given case number 2:19-cv-13782-PDB-APP and was assigned to Judge Borman. That action remains pending.

## COMPLAINT

Plaintiffs LC Trademarks, Inc. ("LCT") and Blue Line Foodservice Distribution, Inc.

("Blue Line") (collectively, "Plaintiffs") bring this action seeking damages for breaches of

personal guarantees given by Defendants in connection with an International Multiple Unit

Franchise Agreement ("IMUFA," copies of which are in the possession of Defendants)

permitting the development of LITTLE CAESARS franchises in New South Wales, Australia.

Under the written IMUFA, non-party Evo Pizza Pty Ltd ("Evo Pizza"), an Australian proprietary

limited company owned by Defendants, agreed to develop and operate the restaurants through

the end of specified terms and to pay royalties to LCT in accordance with the IMUFA and

restaurant addenda specific to each restaurant. Evo Pizza also agreed to purchase from Blue Line certain equipment and supplies used in its restaurants and to pay Blue Line for those purchases.

Evo Pizza developed fourteen LITTLE CAESARS restaurants under the IMUFA before it entered voluntary administration pursuant to the Australian Corporations Act of 2001 on October 23, 2019. Evo Pizza failed to perform its obligations under the IMUFA when it failed to make payments to LCT for royalties and to Blue Line for deliveries, equipment, and supplies. Each of the Defendants jointly and severally guaranteed in writing the performance of Evo Pizza's obligations under the IMUFA. Accordingly, Plaintiffs now seek damages and other relief to which they are entitled under the express terms of the personal guarantees given by Defendants.

## THE PARTIES

1.     Plaintiff LC Trademarks, Inc. ("LCT") is a Michigan corporation with its principal place of business in Detroit, Michigan. LCT is a wholly owned subsidiary and an affiliate of non-party Little Caesar Enterprises, Inc. ("LCE"). LCE is the owner of the LITTLE CAESARS trademark, service mark, trade name, and related marks and Plaintiff LCT is the exclusive licensee of LCE of such trademarks, service marks, trade names and related marks for purposes of the development of LITTLE CAESARS franchises in Australia.

2.     Plaintiff Blue Line Foodservice Distribution, Inc. is a Michigan corporation with its principal place of business in Detroit, Michigan. Blue Line is a wholly owned subsidiary and an affiliate of non-party LCE and is a supplier of products, ingredients, equipment, supplies, and materials used and sold by franchised LITTLE CAESARS restaurants.

3. Defendant Victorious Foods, LLC is a Nevada limited liability company headquartered at 11 Paradise Valley Ct., Henderson, NV 89052. Pursuant to the Deed of

Guarantee, Indemnification, and Acknowledgement attached to the IMUFA (the "Guarantee"), Victorious Foods guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA.

4. Defendant Ernest Koury is a natural person and, upon information and belief, a United States citizen domiciled abroad at 4C Wolseley Grove, Zetland, NSW 2017, Australia. Pursuant to the Guarantee, he guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA. Ernest Koury is also a member of Victorious Foods.

5. Defendant Sandra Koury is a natural person and, upon information and belief, a United States citizen domiciled abroad at 4C Wolseley Grove, Zetland, NSW 2017, Australia. Pursuant to the Guarantee, she guaranteed the obligations of Evo Pizza related to the fourteen LITTLE CAESARS restaurants owned and operated under the IMUFA. Sandra Koury is also a member of Victorious Foods.

## JURISDICTION AND VENUE

6. This Court has jurisdiction pursuant to MCL 600.605. Exclusive jurisdiction is not given in the Constitution or by statute to any other court, nor are the circuit courts denied jurisdiction by the Constitution or statutes of Michigan. The underlying facts substantiating the Court's jurisdiction are set out in greater detail below.

7. This Court has *in personam* jurisdiction over Defendants pursuant to MCL 600.705 and 600.725 because Defendants transacted business within the state and entered into a contract requiring payment within the state. This Court also has *in personam* jurisdiction over Defendants because they have consented to the personal jurisdiction of this Court in the Guarantee that each has executed.

3

8.     Venue is proper in this circuit pursuant to MCL 600.1621(b), because Plaintiffs have their principal places of business in this circuit. Defendants also consented to venue in this Court in the Guarantee that each Defendant has executed.

## BACKGROUND FACTS

### The IMUFA and Restaurant Addenda

9.     LCT authorizes franchisees in Australia to use the LITTLE CAESAR trade names, trademarks, and service marks (the "LITTLE CAESARS Marks") and to operate under the LITTLE CAESARS System, which involves the production, merchandising, and sale of pizza and related products utilizing special equipment, equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, and information.

10.     Evo Pizza entered into the IMUFA with LCT on August 13, 2018. The IMUFA provided Evo Pizza with the right and obligation to establish and operate restaurants in the Australian state of New South Wales. (IMUFA § 1.1 (grant of rights); Attachment B (defining development territory and development schedule)). For each new restaurant developed by Evo Pizza, it entered into a restaurant addendum with LCT stating the location of the new restaurant and agreeing to operate the new restaurant in accordance with the terms and conditions of the IMUFA. (*Id.* § 1.1.2 (providing for restaurant addenda)).

11.     Having entered into fourteen restaurant addenda under the IMUFA, Evo Pizza was licensed to use the LITTLE CAESARS Marks and System at each restaurant described in an addendum. Each license had a term of ten years from the date the restaurant opened for business. (*Id.* § 2.2.2).

| Franchise Number | Address | Opening Date | Term Expiration |
|---|---|---|---|

4

| 4136-0001 | 3 Graham Avenue<br>Casula, NSW 2170 | 10/2/2014[1] | 10/1/2024 |
|---|---|---|---|
| 4136-0002 | Shop 9, 4-6 Wandella Road<br>Miranda, NSW 2228 | 12/27/2016 | 12/26/2026 |
| 4136-0003 | 111 George Street<br>Parramatta, NSW 2228 | 9/19/2016 | 9/18/2026 |
| 4136-0004 | 137 Marion Street<br>Leichhardt, NSW 2040 | 1/23/2017 | 1/22/2027 |
| 4136-0005 | Shop 10, 2 Birmingham Road<br>South Penrith, NSW 2750 | 11/13/2017 | 11/12/2027 |
| 4136-0006 | 2/35 William Street<br>Bathurst, NSW 2795 | 12/17/2018 | 12/16/2028 |
| 4136-0007 | 20 Sale Street<br>Orange, NSW 2800 | 7/30/2018 | 7/29/2028 |
| 4136-0008 | Shop 3A, Bradbury Shopping Villa<br>Bradbury, NSW 2560 | 1/29/2018 | 1/28/2028 |
| 4136-0010 | 1/2 Blamey Street<br>Revesby, NSW 2212 | 6/25/2018 | 6/24/2028 |
| 4136-0011 | Shop 4, 274-290 Victoria Street<br>Darlinhurst, NSW 2010 | 1/21/2019 | 1/20/2029 |
| 4136-0012 | 684 Hunter Street<br>Newcastle, NSW 2302 | 7/16/2018 | 7/15/2028 |
| 4136-0016 | 1/2-10 Gallipoli Street<br>St. Marys, NSW 2760 | 11/19/2018 | 11/18/2028 |
| 4136-0017 | 2/230 Elizabeth Street<br>Surry Hills, NSW 2010 | 12/3/2018 | 12/2/2028 |
| 4136-0018 | FS1 46 Wilsons Road<br>Mount Hutton, NSW 2290 | 2/18/2019 | 2/17/2029 |

12.     The IMUFA required Evo Pizza to pay a Royalty Fee of 4% of Gross Sales for each restaurant through December 2022, after which time the Royalty Fee was to increase to 5% of Gross Sales. (IMUFA § 4.3).

13.     The IMUFA defined "Gross Sales" as follows:

4.7     Gross Sales. As used in this Agreement, **"Gross Sales"** means all revenue from the sale of all services and products and all other income and consideration of every kind and nature related to the Restaurants (including, without limitation, proceeds from any business interruption insurance policies, delivery and/or catering fees), whether for cash, credit, or other value, and regardless of collection in the case of credit. . . .

---

[1] Because the IMUFA replaced a prior agreement entered into in February 2014, some of the restaurant addenda predate the IMUFA. These existing restaurants were brought under the terms of the IMUFA by the signing of a new addendum for each. (IMUFA § 1.2).

5

14.     Evo Pizza agreed to submit each week a report of Gross Sales realized by each restaurant during the prior week. (*Id.* § 10.2).

15.     Evo Pizza agreed that any late payment would be subject to LCT's then-current late fee, in addition to interest at a rate of the lower of six percent over the one-year Libor Rate as published in the Wall Street Journal or the maximum rate permitted by law. (*Id.* § 4.10).

16.     The IMUFA also required Evo Pizza to purchase equipment and supplies for its restaurants from suppliers designated by LCT. (*Id.* §§ 5.11; 5.12). LCT designated Blue Line as its supplier for certain equipment and supplies to be used in Evo Pizza's restaurants.

17.     Evo Pizza agreed that it would be in default of the IMUFA if it failed to submit required financial reports to LCT, failed to make required payments to LCT or LCT's affiliates, or knowingly submitted false financial reports to LCT. (*Id.* §§ 15.2.10; 15.2.18).

18.     Evo Pizza also agreed that it would be in default of the IMUFA if it were to become bankrupt or insolvent, or became unlikely to be able to pay its debts as they became due. (*Id.* §§ 15.1.1.2; 15.2.8).

19.     Likewise, Evo Pizza agreed that it would be in default of the IMUFA if it were to cease to operate or abandon its restaurants. (*Id.* § 15.2.17).

20.     Finally, the IMUFA required Evo Pizza to reimburse LCT for costs and expenses it incurred as a result of Evo Pizza's breaches of the IMUFA:

> [I]n connection with any failure by Franchisee to comply with this Agreement, regardless of whether there is any legal proceeding to enforce the terms of this Agreement, Franchisee shall reimburse LCT, upon demand, for the actual (or reasonably approximate) costs and expenses incurred by LCT, as applicable, as a result of such failure and for its enforcement of the terms of this Agreement, including, without limitation, accountants', attorneys', attorneys' assistants and expert witness fees, cost of investigation and proof of facts, court costs, other litigation expenses and travel expenses however excluding costs incurred by LCT in relation to settling a dispute under this Agreement.

6

(*Id.* § 18.4).

### Evo Pizza's Breaches of the IMUFA

21.     Beginning in June 2019, Evo Pizza ceased making payments to LCT and Blue Line.

22.     At present, the outstanding amount owed by Evo Pizza to LCT for royalty payments required by Section 4.3 of the IMUFA is $100,971.62.[2] A small portion of this—$1,643.06—is attributable to a shortfall in Evo Pizza's royalty payments from earlier in 2019. The remaining amount is allocable to Evo Pizza's restaurants as follows:

| Franchise Number | Address | Royalties Owed |
|---|---|---|
| 4136-0001 | 3 Graham Avenue Casula, NSW 2170 | $12,889.09 |
| 4136-0002 | Shop 9, 4-6 Wandella Road Miranda, NSW 2228 | $8,068.59 |
| 4136-0003 | 111 George Street Parramatta, NSW 2228 | $7,186.88 |
| 4136-0004 | 137 Marion Street Leichhardt, NSW 2040 | $4,833.61 |
| 4136-0005 | Shop 10, 2 Birmingham Road South Penrith, NSW 2750 | $9,444.57 |
| 4136-0006 | 2/35 William Street Bathurst, NSW 2795 | $2,560.66 |
| 4136-0007 | 20 Sale Street Orange, NSW 2800 | $3,214.34 |
| 4136-0008 | Shop 3A, Bradbury Shopping Villa Bradbury, NSW 2560 | $12,805.88 |
| 4136-0010 | 1/2 Blamey Street Revesby, NSW 2212 | $4,260.12 |
| 4136-0011 | Shop 4, 274-290 Victoria Street Darlinhurst, NSW 2010 | $3,324.45 |
| 4136-0012 | 684 Hunter Street Newcastle, NSW 2302 | $4,490.05 |
| 4136-0016 | 1/2-10 Gallipoli Street St. Marys, NSW 2760 | $4,935.44 |

---

[2] Unless otherwise noted, all amounts in this Complaint are stated in United States Dollars. The IMUFA requires that all payments made under its terms be made in United States Dollars. (IMUFA § 4.9).

| 4136-0017 | 2/230 Elizabeth Street<br>Surry Hills, NSW 2010 | $10,946.63 |
|---|---|---|
| 4136-0018 | FS1 46 Wilsons Road<br>Mount Hutton, NSW 2290 | $10,368.25 |
| Subtotal | · | $99,328.56 |
| **Including prior shortfall of $1,643.06** | | **$100,971.62** |

23.     From at least May 17, 2019, and continuing through October 4, 2019, Blue Line delivered equipment, supplies, and food products including, but not limited to, pizza dough mix, cheese, and sauce to the restaurants operated by Evo Pizza. However, Evo Pizza repeatedly failed to pay invoices associated with those shipments, despite having a contractual obligation to do so. At present, the outstanding amount owed by Evo Pizza to Blue Line for the purchase and delivery of equipment and supplies required by Sections 5.11 and 5.12 of the IMUFA is **$659,531.96**. This amount includes, in addition to $653,007.88 in past due amounts, $6,524.08 due on a December 10, 2019 invoice.

24.     In October 2019, LCT audited Evo Pizza's sales records for each of its restaurants for the fiscal year ending June 30, 2019. The results of that audit showed that Evo Pizza had underreported its sales for that period in large part by failing to report the full amount paid by customers using delivery services such as Uber Eats or Deliveroo. Instead, Evo Pizza would discount the sales at the point of sale by approximately 38%, resulting in total underreporting of AUS$600,000 for the audited fiscal year.

| Total underreported | AUS$600,000 |
|---|---|
| Royalties owed at 4% | AUS$24,000 |
| Currency conversion | USD$16,478.97 |

25.     The audit also found that Evo Pizza failed to report opening day sales for its restaurants that opened during that fiscal year. Each store opened on a Monday, which was the last day of the reporting week, and Evo Pizza failed to report any sales for opening day for each of the following restaurants:

8

| Franchise Number | Address | Opening Date | Underreported Sales |
|---|---|---|---|
| 4136-0006 | 2/35 William Street<br>Bathurst, NSW 2795 | 12/17/2018 | AUS$5,043 |
| 4136-0007 | 20 Sale Street<br>Orange, NSW 2800 | 7/30/2018 | AUS$8,195 |
| 4136-0011 | Shop 4, 274-290 Victoria Street<br>Darlinhurst, NSW 2010 | 1/21/2019 | AUS$1,495 |
| 4136-0012 | 684 Hunter Street<br>Newcastle, NSW 2302 | 7/16/2018 | AUS$6,105 |
| 4136-0016 | 1/2-10 Gallipoli Street<br>St. Marys, NSW 2760 | 11/19/2018 | AUS$2,972 |
| 4136-0017 | 2/230 Elizabeth Street<br>Surry Hills, NSW 2010 | 12/3/2018 | AUS$1,818 |
| 4136-0018 | FS1 46 Wilsons Road<br>Mount Hutton, NSW 2290 | 2/18/2019 | AUS$8,280 |
| Total | | | AUS$33,908 |
| Royalties owed at 4% | | | AUS$1,356.32 |
| Currency conversion | | | USD$933.76 |

26.     In total, at present, Evo Pizza owes **$118,384.35** to LCT for unpaid royalties and **$659,531.96** to Blue Line for deliveries of supplies.

27.     Evo Pizza appointed administrators and entered into voluntary administration under Australian law on October 23, 2019. As a result of this proceeding, LCT incurred AUS$36,200.23 (US**$24,978.03**) in attorneys' fees for its counsel in Australia and **$2,175.30** in attorneys' fees for its counsel in the United States. These fees will increase as Evo Pizza's administration proceedings continue.

28.     Under the terms of the IMUFA, Evo Pizza had the right and the obligation to operate each licensed restaurant for a period of ten years from the opening of each restaurant. (IMUFA §§ 1.1.2 (obligation to operate restaurant), 2.2.2 (ten-year term). However, Evo Pizza has breached this obligation and has permanently closed and abandoned each of the restaurants. This has caused, and will continue to cause, a loss of profits for LCT in the form of lost royalties that would reasonably be expected from continued operations. Based upon the period when all

9

fourteen restaurants were operating, LCT received an average of AUS$29,284 in combined monthly royalties. Projecting this amount four years into the future, LCT would have expected to have received at least US$969,848.82 in royalties from Evo Pizza. This calculation understates the amount that actually will be lost by LCT due to the premature closure and abandonment, because the licenses for some of the restaurants extended into 2029, and none of the licenses would have expired by their terms in four years or fewer.

| Average monthly royalties | AUS$29,284 |
| Multiplied by 48 months | AUS$1,405,632 |
| Currency conversion | US$969,848.82 |

### The Guarantees

29.    Evo Pizza's obligations under the IMUFA, as set out above, are enforceable against Defendants. Each Defendant executed a personal guarantee for the IMUFA (the "Guarantee"). A true copy of the Guarantee as executed by each Defendant is attached hereto as Exhibit A.

30.    In the Guarantee, Defendants agreed to

jointly and severally, hereby unconditionally guarantee that all of Franchisee's obligations to LCT and its affiliates, including under the [IMUFA] and obligations to LCT's affiliate Blue Line Foodservice Distribution Inc., will be punctually paid and performed.

(Guarantee at 58).

31.    Defendants also agreed that LCT would have no obligation to proceed against the Franchisees prior to enforcing their obligations as guarantors. (*Id.*)

32.    Defendants also specifically agreed to indemnify LCT for legal costs it might incur as a result of Evo Pizza's failure to perform its obligations under the IMUFA:

The undersigned hereby agree to defend, indemnify and hold LCT harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorneys' fees, reasonable costs of investigation, court costs, and arbitration

10

fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement . . . .

(*Id.*)

33.     Finally, Defendants agreed that the Guarantee would be interpreted under Michigan law, excluding any applicable choice of law rules, and that they would submit to the personal jurisdiction of Michigan state courts sitting in Wayne County. (*Id.* at 58–59).

34.     On December 23, 2019, Plaintiffs issued demands for payment to Defendants on the basis of moneys owed by Evo Pizza and Defendants' personal guarantees of those debts. These demands included amounts owed for royalty fees and deliveries of equipment and supplies for the periods in which Evo Pizza's restaurants had been operating, attorneys' fees and costs incurred by LCT as a result of Evo Pizza's bankruptcy, and future royalties lost as a result of the closure of Evo Pizza's restaurants. Plaintiffs demanded that Defendants pay all outstanding amounts owed immediately.

35.     To date, Defendants have failed to pay any of the foregoing amounts.

## COUNT I
### Breach of Contract

36.     The allegations of Paragraphs 1 through 35 are hereby incorporated by reference.

37.     In the Guarantee, Defendants agreed unconditionally to jointly and severally guarantee that all of Evo Pizza's obligations to LCT and its affiliates under the IMUFA would be punctually paid.

38.     In the course of its operations and administration, Evo Pizza accumulated $145,537.68 in debts to LCT.

39.     In the course of its operations, Evo Pizza accumulated $659,531.96 in debts to Blue Line.

11

40.     Evo Pizza agreed that, should it fail to make a required payment, it would owe additional late fees, plus interest at the lower of six percent over the one-year Libor Rate as published in the Wall Street Journal or the maximum rate permitted by law.

41.     In the IMUFA and restaurant addenda, Evo Pizza also agreed to operate each of the LITTLE CAESARS restaurants it opened for a period of ten years.

42.     Evo Pizza closed and abandoned its restaurants in late 2019, in material breach of its contractual obligations under the IMUFA and restaurant addenda.

43.     As a direct result of Evo Pizza's closure and abandonment of its restaurants, LCT additionally has been deprived of future royalty payments it was owed, in the amount of at least $969,848.92.

44.     Through the Guarantee, Plaintiffs are entitled to collect all of these amounts from Defendants personally.

45.     Defendants have failed to pay any of the amounts Plaintiffs have demanded.

46.     Defendants' refusals constitute material breaches of the contractual provisions of the Guarantee cited herein.

47.     As a direct and proximate result of Defendants' refusal, Plaintiffs have been deprived of moneys they are owed.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

A.     Enter judgment in favor of LCT and against each of the Defendants, jointly and severally, for monetary damages in the amount of $145,537.68, or such higher amount as may be proven by the evidence, plus prejudgment interest pursuant to the IMUFA and Guarantee;

B.     Enter judgment in favor of LCT and against each of the Defendants, jointly and

severally, for monetary damages for lost future royalty payments in the amount of $969,848.82, or such higher amount as may be proven by the evidence, plus prejudgment interest pursuant to the IMUFA and Guarantee;

      C.    Enter judgment in favor of Blue Line and against each of the Defendants, jointly and severally, for monetary damages in the amount of $659,531.96, or such higher amount as may be proven by the evidence, plus prejudgment interest pursuant to the IMUFA and Guarantee;

      D.    Award Plaintiffs their costs and attorneys' fees incurred in connection with this action, pursuant to the IMUFA and Guarantee; and

      E.    Award Plaintiffs such other relief in their favor as this Court may deem just and proper.

<div style="margin-left:40%">

/s/ Larry J. Saylor
Larry J. Saylor (P28165)
Kimberly A. Berger (P56165)
MILLER, CANFIELD, PADDOCK
   & STONE P.L.C.
150 West Jefferson Avenue, Suite 2500
Detroit, Michigan 48226
Telephone:    (313) 496-7986
Facsimile:    (313) 496-8454
Saylor@millercanfield.com
Berger@millercanfield.com

</div>

Dated: December 26, 2019        *Attorneys for Plaintiffs*

35011193.1\088888-00162

# **EXHIBIT C**

# **IMUFA**

**LC TRADEMARKS, INC.**

**INTERNATIONAL MULTIPLE UNIT FRANCHISE AGREEMENT**

| | |
|---|---|
| Territory: | The State of New South Wales In the Commonwealth of Australia |
| Franchisee: | Evo Pizza Pty Limited |
| Effective Date: | August 13, 2018 |

**LC Trademarks, Inc.**
**International Multiple Unit Franchise Agreement**

**Table of Contents**

1.  GRANT OF RIGHTS ................................................................................................. 3
2.  TERM .......................................................................................................................... 6
3.  LCT'S DUTIES ........................................................................................................... 7
4.  PAYMENTS BY FRANCHISEE ................................................................................. 8
5.  FRANCHISEE'S DUTIES ......................................................................................... 11
6.  PROPRIETARY MARKS ........................................................................................... 21
7.  OPERATING RIGHTS AND OBLIGATIONS ............................................................ 24
8.  OPERATING MANUAL ............................................................................................. 25
9.  CONFIDENTIAL INFORMATION .............................................................................. 27
10. ACCOUNTING AND RECORDS .............................................................................. 28
11. INSURANCE ............................................................................................................. 29
12. ADVERTISING AND TECHNOLOGY ...................................................................... 30
13. TRANSFER OF INTEREST ...................................................................................... 35
14. COVENANTS ............................................................................................................ 39
15. DEFAULT AND TERMINATION ............................................................................... 42
16. OBLIGATIONS UPON TERMINATION OR EXPIRATION ....................................... 45
17. TAXES, PERMITS, AND INDEBTEDNESS ............................................................. 47
18. INDEPENDENT CONTRACTOR AND INDEMNIFICATION .................................... 47
19. APPROVALS AND WAIVERS .................................................................................. 48
20. NOTICES .................................................................................................................. 49
21. SEVERABILITY AND CONSTRUCTION ................................................................. 49
22. ENTIRE AGREEMENT AND AMENDMENTS .......................................................... 50
23. APPLICABLE LAW ................................................................................................... 51
24. GOVERNMENTAL APPROVALS ............................................................................. 52
25. POWER OF ATTORNEY .......................................................................................... 53
26. NO COMMERCIAL AGENCY, REPRESENTATION, OR DISTRIBUTION RELATIONSHIP ............ 53

Attachment A – Restaurant Addendum
Attachment B – Territory and Development Schedule
Attachment C – Statement of Ownership
Attachment D – Guarantee, Indemnification, and Acknowledgment
Attachment E – Proprietary Marks in the Territory
Attachment F – Confidentiality and Non-Competition Agreement
Attachment G – Index to Defined Terms
Attachment H – List of Existing Restaurants
Attachment I – List of Guarantors
Attachment J – Form of Termination and Release
Attachment K – Existing Restaurants Addenda

LC TRADEMARKS, INC.

INTERNATIONAL MULTIPLE UNIT FRANCHISE AGREEMENT

THIS INTERNATIONAL MULTIPLE UNIT FRANCHISE AGREEMENT (the "**Agreement**") is made this 13th day of August, 2018 (the "**Effective Date**") by and between:

- **LC TRADEMARKS, INC.**, a corporation organized under the laws of the State of Michigan, U.S.A., with its principal place of business at 2211 Woodward Avenue, Detroit, Michigan 48201, U.S.A. ("**LCT**"); and

- **EVO PIZZA PTY LIMITED**, an Australian Proprietary Company organized under the laws of the Commonwealth of Australia, with its principal place of business at 76 Watkins Road, Baulkham Hills, New South Wales 2153 Australia ("**Franchisee**").

RECITALS:

WHEREAS, LCT's affiliate entity, Little Caesar Enterprises, Inc. ("**LCE**") has developed and owns a distinctive format and system relating to the establishment and operation of Little Caesar's restaurants that feature, among other things, a variety of pizza, pasta, and other items prepared in accordance with LCE's proprietary formula, recipes and accompaniments (the "**System**");

WHEREAS, LCT has appointed LCE as agent therefor, whereby LCE shall have the right to perform any and all obligations and enforce any and all terms and conditions set forth in this Agreement;

WHEREAS, the System may be revised from time to time by LCE;

WHEREAS, the System is identified in the Territory by means of those certain trademarks and such other trademarks, trade names, trade dress, logos, emblems, domain name, and indicia of origin as may hereafter be designated by LCE in writing for use in connection with the System (the "**Proprietary Marks**");

WHEREAS, the distinguishing characteristics of the System include, without limitation, distinctive food products prepared and produced using special spices, sauces, pizza dough and other ingredients, as well as special recipes and other trade secrets, including certain proprietary food products ("**Proprietary Food Products**"), and other, non-proprietary, food products offered for sale at Little Caesar's restaurants (together, "**Food Products**"), as well as distinctive exterior and interior building design, decor, color scheme, and furnishings; uniform standards, specifications, and procedures for operations; quality and uniformity of products and services offered; procedures for management and cost control; training and assistance; and advertising and promotional programs; all of which may be changed, improved, and further developed by LCE from time to time;

WHEREAS, on or about February 1, 2014, LCT entered into a Multiple Unit Franchise Agreement (as amended, the "**Prior Agreement**") with Franchisee, under which LCT granted Franchisee certain rights to develop Little Caesars® restaurants within certain defined geographic areas in the Commonwealth of Australia as defined in Attachment B to this Agreement (the "**Territory**");

WHEREAS, Franchisee and LCT each desires to replace the Prior Agreement and enter into this Agreement for the purpose of, among other things, modifying the Development Rights and recording the ownership structure of Franchisee as of the Effective Date;

WHEREAS, on the Effective Date, the Prior Agreement was terminated pursuant to a Termination and Release in the form attached to this Agreement as Attachment J;

WHEREAS, prior to the Effective Date, Franchisee owned and operated eight (8) Little Caesars® restaurants set forth in Attachment H (the "**Existing Restaurants**") pursuant to the terms and conditions of the Prior Agreement, and on and after the Effective Date, Franchisee will operate the Existing Restaurants pursuant to this Agreement;

WHEREAS, Franchisee desires to continue to develop additional Little Caesars® restaurants (the "**New Restaurants**" and together with the Existing Restaurants, the "**Restaurants**") in accordance with the Development Schedule and in accordance with the terms and conditions set forth herein; and

WHEREAS, concurrently with the execution of this Agreement, Franchisee's direct and indirect shareholders set forth in Attachment I (collectively "**Guarantors**") will execute a Guarantee, Indemnification and Acknowledgment in the form of Attachment D to this Agreement and Franchisee and the previous guarantors are executing a General Release in the form of Attachment J to this Agreement.

NOW, THEREFORE, in consideration of the mutual undertakings and commitments set forth herein, the parties hereby agree as follows:

1.     **GRANT OF RIGHTS**

1.1     _Grant of Rights_.  On the basis of Franchisee's representations and warranties contained in this Agreement, LCT hereby grants to Franchisee the right, and Franchisee hereby accepts and undertakes the obligation, under the terms and conditions of this Agreement, each of the following:

1.1.1     The right and obligation to establish the New Restaurants pursuant to the terms of this Agreement, and subject to the national laws of the Territory regarding the conduct of business and the ownership/leasing of commercial property (with respect to the establishment of Restaurants in the Territory, Franchisee agrees to comply, on its own and without the appointment of a local representative or agent, with the commercial laws and other laws pertaining to the conduct of business applicable in the jurisdiction where the Restaurants are located (the "**Development Rights**"));

1.1.2     The right and obligation to operate the Restaurants described in Section 1.1.1 pursuant to the terms of this Agreement and the terms of an Addendum for each Restaurant in the form that is attached to this Agreement as Attachment A ("**Restaurant Addendum**"), and subject to the national laws of the Territory regarding the conduct of business and the ownership/leasing of commercial property (the "**Operating Rights**"); and

1.1.3     The right and obligation to use the Proprietary Marks and the System solely in connection with the exercise of the Development Rights and Operating Rights, all as specified in this Agreement.

1.2     _Existing Restaurants_.  Attached to this Agreement as Attachment H is a complete list of the Existing Restaurants operated by Franchisee as of the date of this Agreement. Franchisee and the Guarantors represent and warrant that Attachment H is true and accurate as of the Effective Date. Concurrently with the execution of this Agreement, Franchisee and LCT are executing a Restaurant Addendum in the form that is attached to this Agreement as Attachment K for each of the Existing Restaurants. This Agreement and the applicable Restaurant Addendum shall supersede the Prior Agreement and each restaurant addenda for each respective Existing Restaurant.

1.2.1     _Remodel to Comply With Current Standards_.  Franchisee agrees to remodel, renovate and re-furbish the following Existing Restaurants to comply with its current standard (known as of the Effective Date as "**i7**") in accordance with the following schedule:

| Remodel Complete on or Before: | Existing Restaurant | Location |
|---|---|---|
| Not Applicable | | |

1.3     Approved Location.  Each Restaurant shall only be located at a specified location within the Territory previously approved in writing by LCT in its reasonable discretion (the "**Approved Location**").  The Restaurants shall be established in accordance with the Development Schedule, and Franchisee's Development Rights shall expire at the time specified in Section 2 below.  Franchisee shall obtain and retain occupational rights to the Approved Location.  Franchisee further confirms that in the case of leased/licensed premises, appropriate provisions will be incorporated in the lease/license agreement to ensure uninterrupted occupational rights with respect to each Approved Location and transferability of the benefit of each such lease/license to LCT or its designee.

1.4     Relocation.  Franchisee shall not relocate any Restaurant without the prior written approval of LCT, which approval may be subject to, among other requirements, refurbishing the Restaurant as set forth in Section 5.9 and Section 5.9A of this Agreement and execution of a Restaurant Addendum prior to the date of opening of the relocated Restaurant.  In order to be considered for a relocation under the terms of this Agreement, the new location must be within a one and one-half kilometer (1.5 km) radius of the original location and must re-open within six (6) months of the original location's closure.  Franchisee shall pay LCT a relocation fee of Two Thousand Five Hundred U.S. Dollars (US$2,500.00) at the time Franchisee submits its relocation request package to LCT.  The relocation fee is refundable only if LCT does not approve Franchisee's relocation request.  Any approvals furnished by LCT pursuant to this Section 1.4 shall not be deemed to be a guarantee or assurance by LCT that the Restaurant shall be profitable or successful at the new location.

1.5     Certain Limitations on LCT.  Provided that Franchisee is in compliance with its obligations under this Agreement, LCT agrees not to establish and/or operate, or license anyone other than Franchisee to establish and/or operate, Little Caesar's restaurants within the Territory until the expiration of the Development Schedule.

1.6     Exceptions to Limitations on LCT.  Notwithstanding anything to the contrary contained in Section 1.5, LCT retains all other rights, and may, among other things, on any terms and conditions LCT deems advisable, and without granting Franchisee any rights therein:

1.6.1     establish, and license others to establish, Little Caesar's restaurants at any location outside the Territory notwithstanding their proximity to the Territory or any Approved Location or their actual or threatened impact on sales at the Restaurants;

1.6.2     establish, acquire or operate, or license others to establish and operate, other restaurants or concepts under other systems or marks other than the Proprietary Marks, which restaurants or concepts may offer or sell products or services that are the same as, or similar to, or different from, the products and services offered from the Restaurants, and which restaurants or concepts may be located within or outside the Territory, notwithstanding such restaurants' or concepts' proximity to any Approved Location or their threatened or actual impact on sales at the Restaurants;

1.6.3     sell and distribute, directly or indirectly, or license others to sell and distribute, directly or indirectly, any products (including the Food Products), services or merchandise, from any location or to any purchaser (including, but not limited to, sales made at retail locations, supermarkets, mail order, or on the Internet), so long as such sales are not conducted from a Restaurant physically located inside the Territory; and

1.6.4     sell and distribute, directly or indirectly, or license others to sell and distribute, directly or indirectly, any products (including the Food Products), services or merchandise, from any (a) business premises, where the primary business conducted at such business premises is other than the retail sale of food or food products which are ready for consumption, including without limitation, sports stadiums, shopping malls, convenience stores, travel stations, petrol stations, amusement parks, fairs, schools, factories, hospitals, penal institutions, airports, government facilities, hotels and other similar businesses; and (b) business premises where LCT's right to establish or license others to establish Little

Caesar's restaurants at such business premises is governed by an agreement between LCT and a third party whose terms supersede this Section (collectively, "**Special Limited Access Facilities**").

1.7 <u>Restaurant Radius Restriction</u>. After the Development Rights have expired or been terminated, LCT shall be free to operate and license others to operate at any location within the Territory except within a circle that has as its center the front door of the Restaurant and a radius of one kilometer (1.0 km) ("**Restaurant Radius Restriction**"); provided, that: (a) the Restaurant Radius Restriction shall be subject to the exclusions specified in Section 1.6 above; and (b) the Restaurant Radius Restriction shall not apply if Franchisee has not been in substantial compliance with its obligations under this Agreement during its term.

1.8 <u>Development Schedule</u>.

1.8.1 Franchisee shall develop the Restaurants in accordance with the "**Development Schedule**," which is specified in Attachment B to this Agreement.

1.8.2 If Franchisee fails to fulfill its obligations under the Development Schedule, LCT shall have the right to terminate any or all of Franchisee's Development Rights under Section 1.1.1 above. LCT may exercise its rights under this Section 1.8.2 only by giving written notice of the default to Franchisee at least thirty (30) days in advance of such termination, which termination shall take place automatically unless, within said thirty (30)-day period, Franchisee has cured such default.

1.9 <u>Trade Secrets</u>. Franchisee acknowledges that the know-how and confidential business methods disclosed to Franchisee by LCT pursuant to this Agreement (including, without limitation, standards, specifications, and procedures of operations; procedures for management and cost control; and advertising and promotional programs) are all trade secrets owned by LCT.

1.10 <u>Retail Sales Only</u>. Franchisee shall only be permitted to offer and sell from Approved Locations to retail customers for consumption on the Restaurants' premises or for personal, carry-out, or delivery consumption from the Restaurants. LCT may approve sales from other locations on a case-by-case basis.

1.11 <u>No Subfranchising Rights</u>. Franchisee shall not have any right, under this Agreement, to sublicense the use of the Proprietary Marks or the System, or to subfranchise any of the rights hereunder, to any other party.

1.12 <u>Termination of Prior Agreement</u>. As of the Effective Date, the parties hereto do hereby terminate any and all prior agreements and/or understandings governing the subject matter of this Agreement, including without limitation the Prior Agreement, except for any obligations that arose or claims that occurred prior to the Effective Date or that by their terms survive such termination, including, without limitation, Franchisee's indemnification obligations.

1.13 <u>The Exercise of LCT's Business Judgment</u>. Except as otherwise specifically provided in this Agreement, LCT has the right from time to time to develop, operate, and change the System in any manner not specifically prohibited by this Agreement. Whenever LCT has reserved in this Agreement a right to take or to withhold an action, or to grant or decline to grant Franchisee the right to take or omit an action, LCT may, except as otherwise specifically provided in this Agreement, make its decision or exercise its rights based on information readily available to it and its judgment of what is in the best interests of LCT and its affiliates, the Little Caesar's restaurant network generally, or the System at the time its decision is made, without regard to whether LCT could have made other reasonable or even arguably preferable alternative decisions or whether its decision promotes LCT's (or its affiliates') financial or other interest.

1.14 <u>UCT Qualification</u>. In this Agreement, "**UCT Qualification**" means a qualification on a contractual right or discretion to vary or impose an obligation under this Agreement, including the ability to

vary a document referenced in this Agreement, that it must be read subject to and will only be exercised where any one or more of the following circumstances apply:

1.14.1  a majority of the franchisees who are affected by the variation or obligation agree to the variation or obligation; or

1.14.2  the variation or obligation is reasonably necessary to protect LCT's legitimate interests; or

1.14.3  the variation or obligation is reasonably necessary to protect or enhance the Proprietary Marks or other intellectual property used in connection with the System or adapt the business model to meet changes in consumer behaviour, competitor behaviour, supplier behaviour or the behaviour of other parties with whom LCT or the Franchisee deal; or

1.14.4  the variation, imposition of obligation or exercise of discretion is reasonably necessary to achieve the purpose of this Agreement, which is to grant to the Franchisee the right to establish and operate the Restaurants using the Proprietary Marks and System, specify the terms and conditions that must be complied with by the Franchisee in the establishment and operation of the Restaurants including the Franchisee's payment obligations and use of the Proprietary Marks and System and further commercialize the Proprietary Marks and other intellectual property used in connection with the System to enhance the business interests and goodwill of LCT and to benefit other franchisees in the franchised network.

## 2.    TERM

2.1     The term of this Agreement shall begin on the Effective Date and (unless earlier terminated as provided in this Agreement) shall terminate upon the expiration or termination of Franchisee's right to operate the last Restaurant that has been established pursuant to a Restaurant Addendum under this Agreement; except as otherwise specified in Section 2.2 below.

2.2     Without limiting the provisions of Section 2.1 above, and unless the following rights are terminated earlier as provided in this Agreement:

2.2.1    the Development Rights shall expire on earlier of: (a) the last date specified in the Development Schedule; or (b) the opening of the last Restaurant required in the Development Schedule.  After that date, the limitations imposed on LCT under Section 1.5 shall no longer apply and Franchisee may not establish any additional Restaurants.  Notwithstanding the foregoing, and provided Franchisee is in good standing (as set forth in Section 7.2.3 below), LCT may permit Franchisee to establish additional Restaurants on a non-exclusive basis following the expiration of the Development Rights on a case-by-case basis in its sole discretion.

2.2.2    the Operating Rights with respect to each Restaurant expires ten (10) years from the date such Restaurant opened for business (but may be renewed under the provisions described in Section 7.2 below).

2.3     Franchisee may terminate this Agreement within seven (7) days after the earlier of: (a) entering into this Agreement; or (b) making any non-refundable payment (whether of money or of other valuable consideration) under this Agreement.  If Franchisee terminates this Agreement within the timeframe contemplated in this Section 2.3, LCT must, within fourteen (14) days, return all payments (whether of money or of other valuable consideration) made by Franchisee to LCE under this Agreement less the sum of Fifty Thousand U.S. Dollars (US$50,000.00), which the parties agree represents the reasonable expenses incurred by LCE prior to such termination.

3.     <u>LCT'S DUTIES</u>

3.1     <u>Training Programs</u>.  LCT shall provide Franchisee with the training programs described in Section 5.5 of this Agreement.

3.2     <u>Prototype Plans</u>.  LCT shall make available, as may be modified from time to time and at no charge to Franchisee, prototype architectural plans and specifications in a standard electronic format that is commercially available in the U.S. (together with specifications for the related exterior and interior designs, layout, fixtures, furnishings, equipment, and signs) used in the construction of Restaurants in the United States (collectively, the "**Prototype Plans**").  All rights with respect to the Prototype Plans shall at all times belong to LCT.  Franchisee shall adapt, at its own expense, the Prototype Plans to suit the needs of (and laws applicable to) the location of each Restaurant with LCT's prior written approval and in accordance with Section 5.2 below; provided, however, that if an Approved Location will not accommodate any adaptation of the Prototype Plans, LCT will not unreasonably withhold its approval of special plans and specifications, prepared at Franchisee's expense, created for such Approved Location to the extent such plans and specifications conform to LCT's general design and operational criteria.

3.3     <u>Supervision and Assistance</u>.  LCT will provide Franchisee with such pre-opening and opening supervision and assistance (by on-site visits, telephone, e-mail, and as otherwise deemed appropriate by LCT) for the Restaurants as LCT may determine is necessary.

3.4     <u>Advertising Review</u>.  LCT shall have the right, pursuant to Section 12 below, to review and approve or disapprove all advertising and promotional materials which Franchisee proposes to use.

3.5     <u>Site Selection Criteria</u>.  LCT shall provide Franchisee with its confidential specifications and criteria for selecting sites for the operation of Restaurants in the United States within ten (10) days of Franchisee's request for such materials.  All rights with respect to such confidential specifications and criteria for selecting sites shall at all times belong to LCT.  No information communicated to Franchisee regarding LCT's standard site selection criteria for Restaurants nor publicly available data for the site constitutes a warranty or representation of any kind, expressed or implied, as to the suitability of the proposed site for a Restaurant or for any other purpose.  Franchisee's decision to develop and operate a Restaurant at the proposed site is based solely on its own independent investigation of the suitability of the proposed site.

3.5.1     In connection with any proposed site for the operation of a Restaurant, Franchisee acknowledges and agrees that:

3.5.1.1 Whether Franchisee chooses to proceed with a particular site depends on its own confidence in the site after conducting its due diligence, carefully investigating all of the concerns (in addition to any raised by LCT), and investigating whether proper signage can be used at the site.  If Franchisee decides to proceed with a proposed site, it will still have to determine whether it can obtain a lease on favorable terms.

3.5.1.2 There is no way to know whether a particular site is likely to be successful or not, or whether Franchisee has considered every important factor.  Factors no party can predict may also play a role (for example, a construction project that impedes the flow of traffic).

3.5.1.3 If Franchisee decides to go ahead with a proposed site, Franchisee should know that LCT's "go ahead" or even "approval" does not mean that LCT has reached any conclusion as to whether or not Franchisee will be successful at such site.  The review LCT conducts is for its own benefit to determine whether a site meets certain internal characteristics.

3.6     <u>Manual</u>.  During the term of this Agreement, LCT shall lend Franchisee one (1) copy of LCT's confidential operations manual in the English language and prepared for use in the U.S. (together with, subject to the UCT Qualification, any revisions thereto or replacements thereof, the "**Manual**"), to be

adapted for use in the Territory as set forth in Section 8 below.  In the event any copy of the Manual is lost, destroyed or otherwise misplaced, Franchisee shall immediately request a replacement copy from LCT.

3.7     Pre-Opening Inspection.  LCT may, at its sole discretion, inspect and approve each Restaurant for opening prior to the opening of such Restaurant.  LCT may request, and Franchisee must provide, photograph and/or video documentation (including, but not limited to, video that LCT can view on a secure Website (as defined in Section 12.10.8) or an alternative secure internet connection reasonably acceptable to LCT) necessary for inspection of such Restaurant.  If LCT disapproves the proposed Restaurant for opening, Franchisee shall not commence operation until LCT's concerns have been addressed to LCT's satisfaction and it has approved the opening in writing.

3.8     Periodic Inspections.  LCT may conduct, as it deems advisable, periodic inspections of the Restaurants, and may provide evaluations of the products sold and services rendered by the Restaurants.  Upon request by Franchisee, LCT will provide Franchisee with copies of any such inspection or evaluation reports.

3.9     Consulting Assistance.  LCT shall provide periodic and continuing advisory assistance to Franchisee as to the operation and promotion of the Restaurants, as LCT determines is reasonable.  This assistance shall be provided by LCT in or from the U.S. and/or a location outside of the U.S. as determined by LCT in its sole discretion and shall be provided in the English language and/or the language of the Territory as determined by LCT in its sole discretion.

3.10    Marketing Material.  LCT may make available to Franchisee for purchase such promotional and marketing material (in the English language and developed for the United States market) as LCT deems appropriate for use (or for adaptation by Franchisee to be used) in the Territory by Franchisee.  This material may be made available in a standard electronic format that is commercially available in the U.S. (for example, using Microsoft® Word® software).

3.11    Approved Suppliers.  LCT shall, in its reasonable discretion, identify and authorize approved suppliers of menu items and products to be sold or offered for sale at the Restaurants.  LCT may consult with Franchisee during the process of sourcing and approving food and product suppliers, but in no event shall such consultation be deemed as a grant of any approval rights to Franchisee.  Franchisee may make a proposal to LCT for the use of certain local suppliers and/or manufacturers in accordance with the provisions of Sections 5.11 and 5.12 of this Agreement.

3.12    Delegation of LCT's Duties.  Franchisee acknowledges and agrees that any affiliate, designee, employee, regional/branch offices, contractor or agent of LCT may perform any duty or obligation imposed on LCT by this Agreement, as LCT may designate; provided, however, that LCT shall remain fully responsible to Franchisee for all of its obligations hereunder.

4.      **PAYMENTS BY FRANCHISEE**

4.1     Store Franchise Fees
.   Franchisee shall pay LCT in lump sum an initial store franchise fee (the "**Store Franchise Fee**") in the amount of Fifteen Thousand U.S. Dollars (US$15,000.00) for each Restaurant proposed to be opened in excess of the number of Restaurants designated in the Development Schedule.  Franchisee shall pay the Store Franchise Fee to LCT at the time of its submission to LCT of a Site Approval Package (as defined in Section 5.2.1.1 below) for the proposed Restaurant.  The Store Franchise Fee shall be fully earned when received by LCT and shall be non-refundable in consideration of administrative and other expenses incurred by LCT and for the development opportunities lost or deferred as a result of the rights granted to Franchisee herein.

4.2     Development Rights Fee.  Franchisee has paid LCT a development rights fee in the amount of Two Hundred and Forty Thousand U.S. Dollars (US$240,000.00) (the "**Development Rights**

Fee") for the Development Rights granted in this Agreement.  The Development Rights Fee is in consideration of the Development Rights granted hereunder and for the development opportunities lost or deferred by LCT as a result of granting such rights, as well as for all costs and expenses incurred by LCT in connection with this transaction.  Accordingly, the Development Rights Fee shall be absolutely non-refundable, and is deemed to have been fully earned by LCT on the date hereof, whether or not any Restaurants are ever opened by Franchisee.

        4.3     Royalty Fee.  During the term of this Agreement, Franchisee shall pay to LCT a continuing royalty fee for each Restaurant in accordance with the following schedule:

| For Gross Sales Received by Franchisee | Royalty Fee |
|---|---|
| From Effective Date through December, 2022 | 4% of Gross Sales |
| From January 2023 until ten years from Effective Date | 5% of Gross Sales |

Notwithstanding the foregoing, if Franchisee fails to comply with the Development Schedule, upon receipt of written notice from LCT, Franchisee shall pay to LCT a continuing royalty fee in an amount equal to five percent (5%) of Gross Sales for all Restaurants through December 31, 2020 and LCT's then-current royalty fee thereafter, which will be determined by LCT acting reasonably.  LCT shall notify Franchisee in writing prior to December 31, 2020 as to LCT's then-current royalty fee that is due from Franchisee after such date.  All royalty fees described in this Section 4.3 are subject to the Annual Minimum set forth in Section 4.6 below.  Upon expiration of the operating term for each Restaurant (ten (10) years from opening for each Restaurant), the royalty fee for the Restaurant will be the then-current royalty fee percentage stated in LCT's then-current form of International Multiple Unit Franchise Agreement (or successor agreement) which will be determined by LCT acting reasonably, unless otherwise mutually agreed.

        4.4     Ad Funds. LCT shall have the right, but not the obligation, to initiate a global advertising fund ("GAF"), regional advertising fund ("RAF") and/or a national advertising fund ("NAF"), as specified in Section 12 below.  If LCT notifies Franchisee of LCT's intent to start such a GAF, RAF and/or NAF, Franchisee agrees that it shall contribute an amount designated by LCT in accordance with the UCT Qualification and Section 12 below.

        4.5     When Fees Are Due.  All royalty and ad fund fees shall be due and payable to LCT by electronic funds transfer (as described in Section 4.9 below) no later than fourteen (14) days after each Accounting Period (as defined below) based on the Gross Sales (as defined in Section 4.7 below) of each Restaurant during the Accounting Period, and shall be accompanied by any reports or statements for such Accounting Period required under Section 10 hereof.  The Store Franchise Fee for each Restaurant shall be due not later than the date of submission of a Site Approval Package for such Restaurant.  As used herein, the term "Accounting Period" means the accounting period that LCT reasonably designates in writing, which may be a weekly or bi-weekly (i.e., two (2)-week) structure, a thirteen (13)-period-per-year structure, a monthly structure, or otherwise.  Where LCT changes the Accounting Period, LCT will provide reasonable notice of the change, which for the avoidance of doubt, is not required to exceed 60 days' notice.

        4.6     Annual Per Restaurant Minimum Royalties.  With respect to each of the Restaurants, the minimum annual royalty payment, each year, for each such Restaurant, shall be Five Thousand U.S. Dollars (US$5,000.00) (the "Annual Minimum").  In addition:

        4.6.1     For any Restaurant that is open for less than a full year, the Annual Minimum shall be prorated on a *per diem* basis to reflect the number of days that the Restaurant was open during said year.

4.6.2    Within ninety (90) days after the end of each year:  (a) the parties shall review the amount of royalties actually paid for each Restaurant to determine whether additional payments are needed to meet the Annual Minimum requirement; (b) Franchisee shall submit a report to LCT, in such form as LCT may reasonably specify, as to the amount of royalties actually paid during the previous year for each Restaurant; and (c) Franchisee shall promptly submit to LCT payment of the additional amount, if any, that is needed in order to bring the amount of royalties paid for each Restaurant for that year up to the level of the Annual Minimum applicable to said Restaurant.

4.7    <u>Gross Sales</u>.  As used in this Agreement, "**Gross Sales**" means all revenue from the sale of all services and products and all other income and consideration of every kind and nature related to the Restaurants (including, without limitation, proceeds from any business interruption insurance policies, delivery and/or catering fees), whether for cash, credit, or other value, and regardless of collection in the case of credit.  Gross Sales shall not, however, include any value-added taxes, sales taxes, or other taxes collected from customers by Franchisee and transmitted by Franchisee to the appropriate taxing authorities, nor shall Gross Sales include the sale by Franchisee of the furniture, fixtures, and equipment used at the Restaurant(s).

4.8    <u>Taxes</u>.  Franchisee shall deduct and pay to the appropriate authorities, on LCT's behalf, any taxes that LCT may owe under the laws of the Territory and that Franchisee is obligated to withhold.  Within thirty (30) days after each Accounting Period (or such other schedule that LCT designates in writing, but in no case less than once per calendar year), Franchisee shall provide LCT with the original copy of the official receipt(s) or other evidence issued by (or under the authorization of) the taxing authorities relating to payment of such taxes sufficient (in LCT's determination) for LCT to claim foreign tax credits under U.S. or other applicable law. (Franchisee further agrees that it shall fully cooperate with LCT in filing such documents and in providing such information as is appropriate to obtain any reduction in or exemption from withholding taxes available under any tax treaty between the U.S.A. and the Territory.  Franchisee further agrees that it will provide LCT with such complete and accurate information, and documents, that LCT may reasonably request in that regard.)  If Franchisee fails to pay such taxes, it shall indemnify LCT for the full amount of such taxes, including any penalties, interest, expenses or losses occasioned by Franchisee's failure to withhold and pay any taxes imposed on amounts payable by Franchisee under this Agreement.  All other taxes imposed on payments by Franchisee to LCT, including, but not limited to, value-added taxes, consumption taxes, and sales taxes, which may be imposed now or in the future under the laws of the Territory or any taxing authority therein, shall be Franchisee's sole responsibility, and Franchisee shall remit such taxes to the appropriate authorities.  Such other taxes shall not be deducted from, or otherwise reduce or affect, Franchisee's payments to LCT as required under this Agreement.

4.9    <u>Payments in U.S. Dollars</u>.  All payments to be made by Franchisee to LCT under this Agreement shall be made in the United States in U.S. Dollars (or as LCT may otherwise designate in writing).  The conversion rate for computation of any conversion from local currency to U.S. Dollars for the purpose of calculating any payments required under this Agreement shall be the rate for the purchase of U.S. Dollars applicable as of the last day of the Accounting Period for which such payment is due, as quoted by a major international bank or commercially-recognized index reasonably designated by LCT from time to time, either directly or indirectly through a third-party services provider.  Payments shall be made by electronic funds transfer in U.S. Dollars to such bank account in the United States (or another reasonable location) as LCT may designate in writing, or by such other means as LCT may from time to time direct, and Franchisee shall execute all necessary authorization and other documents required to make such payments (including any electronic funds transfer authorization).  All costs of transmission of funds shall be borne by Franchisee, and all costs associated with receipt of funds shall be borne by LCT.

4.10    <u>Overdue Payments; Late Fees</u>.  Any payment or report not actually received by LCT on or before the date specified in this Agreement shall be deemed overdue.  In addition to the overdue amount, Franchisee shall pay to LCT LCT's then-current late fee for each overdue payment.  Further, Franchisee must pay interest on the overdue amount from and including the due date for payment up to and including the date of actual payment at the rate per year of six percent (6%) over the 1 year "Libor

Rate" as published in the Wall Street Journal or the maximum rate permitted by law, whichever is less. If Franchisee's weekly Gross Sales report required by Section 10.2 below is not received when due, (i) all payments owed by Franchisee for such time period shall be deemed overdue until such reports are received by LCT, regardless of whether payment was actually made, and Franchisee shall be responsible for the applicable interest described in this Section; and (iii) LCT will have the right to estimate Gross Sales and to either invoice Franchisee or draft from Franchisee's bank account the estimated amount due for royalties and any other charges and fees required to be paid under this Agreement. Upon receipt of the delinquent Gross Sales report, LCT will reconcile any difference between the estimated amount and the actual royalties and other charges and fees due for the period. In addition, if Franchisee's financial statements are not received when due, Franchisee shall pay LCT a late fee of Five Hundred U.S. Dollars (US$500.00) or its then-current late fee for each day the financial statement is overdue. If Franchisee's tax returns, or other reports required by Section 10 below are not received when due, Franchisee shall pay LCT a late fee of Fifty U.S. Dollars (US$50.00) or its then-current late fee for each thirty (30) day (or portion thereof) the tax return or other report is overdue. LCT's entitlement to late fees and interest under this Section shall be in addition to any other remedies LCT may have under this Agreement

4.11    Governmental Restrictions on Remittance of Funds. If at any time legal restrictions shall be imposed upon the purchase of U.S. Dollars or the transfer to or credit of a non-resident corporation with payments in U.S. Dollars, Franchisee shall notify LCT immediately. Franchisee shall use its best efforts to obtain any consents or authorizations which may be necessary in order to permit timely payments in U.S. Dollars of all amounts payable hereunder. While such restrictions are in effect, LCT may require Franchisee to deposit all amounts due but unpaid as a result of such a restriction in any type of account, in any bank or institution in the Territory designated by LCT and in any currency designated by LCT that is available to Franchisee. LCT shall be entitled to all interest earned on such deposits. In the event such restrictions are in place for one hundred eighty (180) days or longer, the parties agree that LCT may terminate this Agreement (provided LCT complies with clause 28 of the Code).

4.12    Funds Earned and Not Refundable; No Set-Off. Franchisee's obligations for the full and timely payment of the fees described in this Agreement are absolute and unconditional. Franchisee must not delay or withhold the payment of all or part of those fees based on the alleged non-performance by LCT or for any other reason or put the fees in escrow or setoff against any claims Franchisee may allege against LCT. LCT may apply any payments received from Franchisee for royalty, ad fund fees, purchases from LCT, interest, late charges or any other obligation of Franchisee to LCT to the obligation and in the manner chosen by LCT, regardless of any other designation by Franchisee. All fees, contributions and other amounts required to be paid under this Agreement shall be deemed fully-earned by LCT upon receipt and non-refundable to the extent permitted by law.

5.    **FRANCHISEE'S DUTIES**

5.1    High Operating Standards and Good Business Practices. Franchisee understands and acknowledges that every detail of the Restaurants is important to Franchisee, LCT, and other franchisees of the System, and Franchisee agrees to conduct its business in order to develop and maintain high operating standards, to increase the demand for the services and products sold by all franchisees, and to protect LCT's reputation and goodwill. In all dealings with LCT, as well as Franchisee's customers, suppliers, lessors and the public, Franchisee must adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. Franchisee agrees to adhere to LCT's mandatory policies and standards with respect to dealing with customers. Franchisee shall refrain from any business or advertising practice which may be injurious to LCT's business, to the business of other Little Caesar's restaurants or to the goodwill associated with the Proprietary Marks.

5.2    Pre-Construction Requirements. Before commencing any construction of each Restaurant, Franchisee, at its sole expense, shall comply with all of the following requirements to the complete satisfaction of LCT:

5.2.1    Franchisee shall establish and operate each Restaurant at an Approved Location.  Approved Locations shall be determined in the following manner:

5.2.1.1  For each proposed site for a Restaurant, Franchisee must submit to LCT, in the form specified by LCT, a completed site approval package containing photographs and/or video documentation (including, but not limited to, video that LCT can view on a secure Website) together with such other information or materials as LCT may reasonably require (the "**Site Approval Package**"). LCT will review the Site Approval Package and provide its approval or disapproval, in writing.  LCT retains the right, but not the obligation, to have its representative visit and personally inspect the proposed site of a Restaurant.

5.2.1.2  The parties hereto acknowledge LCT's review shall be conducted for its own benefit only, and Franchisee acknowledges that LCT's review and approval of a proposed site shall not constitute LCT's recommendation, endorsement, or guarantee of the suitability of that location or the terms of the lease (or purchase agreement) for the site.  Accordingly, Franchisee agrees that it shall take all steps necessary to determine for itself whether that location and the terms of any lease or purchase agreement for the site are acceptable to Franchisee.  Franchisee accepts complete responsibility for (and shall hold LCT harmless from and against any claims relating to) Franchisee's selection of locations and agrees that LCT's approval does not reflect LCT's endorsement, nor any representation, that the site will be successful.

5.2.1.3  Within thirty (30) days after written site approval by LCT, Franchisee shall execute a lease, after obtaining LCT's approval therefor, or a binding agreement to purchase the site, subject to the various national laws of the Territory regarding the ownership/leasing of commercial property, and subject to Franchisee's ability to comply, on its own with the commercial property laws of the jurisdiction where each Restaurant is located.  Franchisee shall also obtain any necessary zoning variances, and building or use permits.  Upon approval by LCT, and Franchisee's execution of a lease (or the consummation of an agreement to purchase the site), the approved site shall automatically be deemed an "Approved Location" for the establishment and operation of a Restaurant.

5.2.2    Franchisee shall use a qualified, licensed architect or engineer to whom LCT does not have a reasonable objection to prepare, for LCT's approval, preliminary plans and specifications for site improvement and construction of such Restaurant at the Approved Location, based upon the Prototype Plans furnished by LCT in accordance with Section 3.2 above.

5.2.3    Franchisee shall be responsible for obtaining all zoning classifications and clearances which may be required by applicable laws, ordinances, or regulations of the Territory which may be necessary or advisable owing to any restrictive covenants relating to each Approved Location. After having obtained such approvals and clearances, Franchisee shall submit to LCT, for LCT's approval, final plans for construction based upon the preliminary plans and specifications.   Once approved by LCT, such final plans shall not thereafter be changed or modified without the prior written consent of LCT.

5.2.4    For each Restaurant, Franchisee shall obtain all permits and certifications required for the lawful construction and operation at the Approved Location, and shall certify in writing to LCT that all such permits and certifications have been obtained.  Upon LCT's written request, Franchisee shall also provide LCT with copies of all construction permits, sanitary licenses, operation permits, and fire department permits obtained by Franchisee as a condition of Franchisee's lawful construction and operation of the Restaurant.

5.2.5    Franchisee shall employ a qualified licensed general contractor to whom LCT does not have a reasonable objection to construct each Restaurant and to complete all improvements thereto.  Franchisee shall obtain and maintain in force during the entire period of construction the insurance required under Section 11 of this Agreement.

5.3     Pre-Opening Requirements.    Franchisee shall construct, furnish, and open each Restaurant according to the requirements contained herein.  Prior to opening each Restaurant for business, Franchisee shall comply with all pre-opening requirements set forth in this Agreement, the applicable Manual, and/or elsewhere in writing by LCT.  LCT may request, and Franchisee must provide, photograph and/or video documentation (including, but not limited to, video that LCT can view on a secure Website) necessary for LCT's inspection of such Restaurant.

5.4     Opening of Restaurants.  In connection with the opening of each Restaurant:

5.4.1    Franchisee shall conduct grand opening promotional and advertising activities as described in Section 12.1 below.

5.4.2    Franchisee shall provide at least fourteen (14) days prior written notice to LCT of the date on which Franchisee proposes to first open each Restaurant for business.  Franchisee shall not commence operation of any Restaurant until: (a) receiving LCT's prior written approval therefore; (b) executing and delivering to LCT the Restaurant Addendum at the time required under Section 7.1 below (Attachment A); and (c) paying LCT all fees required under Section 4 above.

5.5     Training.  At least one (1) qualified employee of Franchisee ("**Master Trainer**") who is reasonably acceptable to LCT shall enroll in, attend, and successfully complete (to LCT's reasonable satisfaction), training courses that LCT conducts in the U.S. and/or at a location outside of the U.S. as determined by LCT in its sole discretion, which courses will instruct such Master Trainer on the operation of the System and the training of other individuals under the System.  LCT shall at all times reserve the right to approve or disapprove any individual appointed by Franchisee to act in the capacity of a Master Trainer, or in such other capacity where such individual will be in charge of Franchisee's training operations.

5.5.1    If at any time LCT determines that a Master Trainer previously approved by LCT is unable to properly conduct training in the Territory with respect to System, or if there is no Master Trainer that has been previously trained by LCT (for whatever reason, including, but not limited to, the dismissal, resignation, or reassignment of a person who had previously served as a Master Trainer), then LCT reserves the right (without undertaking the obligation) either to send one (1) of its own representatives to the Territory to conduct an on-site training to train the employees of the applicable Restaurant(s) in the Territory or to require the Master Trainer to attend additional training, at Franchisee's expense, in the U.S. or a location outside of the U.S. as determined by LCT in its sole discretion.

5.5.2    Each Master Trainer may also be required to attend such refresher courses, seminars, and other training programs, in the U.S. or at a location outside of the U.S. as determined by LCT in its sole discretion, and as LCT may reasonably require from time to time.  Without limiting the foregoing, the parties anticipate and agree that the Master Trainers will attend such refresher courses, seminars, and other training programs in the U.S. once every twelve (12) to eighteen (18) months.

5.5.3    Under Franchisee's direction, the Master Trainer shall conduct a basic management training program previously approved by LCT for the training of specially trained management employees ("**Specially Trained Management Employees**").  The exact number of such Specially Trained Management Employees shall be determined by Franchisee in its sole discretion; provided, however, that Franchisee agrees to maintain at all times at least one (1) Specially Trained Management Employee for each Restaurant established and operated hereunder.  Franchisee shall maintain that number of Specially Trained Management Employees in the employ of Franchisee for each Restaurant throughout the term of this Agreement.

5.5.4    If any Master Trainer ceases to be engaged in active employment with Franchisee, Franchisee shall enroll a qualified replacement (who must be reasonably acceptable to LCT) in LCT's training program within ninety (90) days of cessation of the former Master Trainer's employment.

The replacement Master Trainer shall attend and successfully complete the appropriate training program as described in this Section 5.5 as soon as practicable.

5.5.5   If any Specially Trained Management Employee ceases to be engaged in active employment with Franchisee or is reassigned to other responsibilities within Franchisee's organization, Franchisee shall enroll a qualified replacement (who must be reasonably acceptable to LCT) in Franchisee's training program conducted by the appropriate Master Trainer within thirty (30) days of cessation of the former Specially Trained Management Employee's employment or his/her reassignment within Franchisee's organization. The replacement Specially Trained Management Employee shall attend and successfully complete the appropriate training program as described in this Section 5.5 as soon as practicable.  If, as contemplated under Section 5.5.4 above, no Master Trainer is available to conduct the necessary training program for the replacement Specially Trained Management Employee, Franchisee shall take all steps necessary to have an adequate replacement for both the Specially Trained Management Employee and the Master Trainer trained and engaged as soon as commercially reasonable, but not more than one hundred and twenty (120) days after the date when the former Specially Trained Management Employee ceased to be employed or assigned to this function within Franchisee's organization.

5.5.6   Franchisee shall maintain a competent, conscientious, trained staff in numbers sufficient to promptly service customers, including at least one (1) manager on duty at all times in each Restaurant.  Franchisee also shall take such steps as are needed to ensure that its employees preserve good customer relations and comply with such dress code as LCT may prescribe (subject to local law and custom).  Franchisee shall employ at least one (1) full-time supervisor, who shall meet such standards as may be reasonably imposed by LCT in the applicable Manual or otherwise in writing, to supervise and coordinate the operation of the Restaurants and the activities of their managers.  Franchisee shall take such steps as are necessary to ensure that its employees do not violate LCT's policies relating to the use of Networking Media Websites (as defined in Section 12.10.8 below), including, but not limited to, prohibiting employees from posting any information relating to LCT, the System, the Proprietary Marks, or the Restaurants on any Networking Media Website without LCT's prior written approval.

5.5.7   LCT shall have the right to conduct training at such times and places as are, in LCT's judgment, acting reasonably, appropriate given the development activities that are contemplated in the Territory.

5.5.8   All "Little Caesar" training courses, seminars, and programs conducted by LCT shall be held at locations designated by LCT, which may be in the United States or elsewhere, and in the English language.  For all such training courses, seminars, and programs, LCT shall provide instructors and training materials without cost to Franchisee, and Franchisee shall be responsible for any and all other expenses incurred by its principal and its employees (including Specially Trained Management Employees and Master Trainers) in connection with any such courses, seminars, and programs, including, without limitation, the costs of transportation, lodging, meals, wages, and the use of an interpreter, if necessary.

5.5.9   All employees, agents, staff, officers and other personnel employed by Franchisee for the purposes of and in connection with the operation of the Restaurant(s) shall at all times be regarded as employees of Franchisee.  LCT shall not, in any manner whatsoever, be responsible for the obligations of an employer under any law, rules, regulations or any service contract or otherwise.

5.5.10  Without limiting any other obligation in this Agreement, the Franchisee must:

5.5.10.1       pay all wages, penalty rates, allowances, and other benefits and entitlements to its employees in full as required by law;

5.5.10.2    pay workers compensation, superannuation contributions, taxes including income tax and any other charges levied on employers in respect of its employees;

5.5.10.3    comply with all applicable employment laws and instruments, including but not limited to, the Fair Work Act 2009, Fair Work Regulations 2009, modern awards, enterprise agreements, workplace determinations and orders of the Fair Work Commission;

5.5.10.4    keep employee records and pay slips in accordance with law, and provide copies to LCT immediately upon request;

5.5.10.5    deduct and remit all relevant employment related taxes, including but not limited to PAYG (or other income tax instalment deductions), and payroll tax (if applicable);

5.5.10.6    maintain certificates and registrations under the relevant occupational health and safety and worker's compensation laws in respect of all employees; and

5.5.10.7    immediately notify LCT in writing of any demand, correspondence or contact from the Fair Work Ombudsman in relation to its employees, and comply with any direction or instruction from LCT in relation to dealings with the Fair Work Ombudsman.

5.5.11  From and after the Effective Date of this Agreement, Franchisee shall not solicit, entice or induce, directly or indirectly, any employee of LCT or its parent company to leave their employment to work for Franchisee or any person or entity with whom Franchisee is or becomes affiliated, except with LCT's prior written consent.

5.6    Use of the Premises.  Subject to the local laws, customs, and official holidays observed where the Restaurants are operated, Franchisee agrees to keep each Restaurant open and in normal operation for such hours and days as LCT may from time to time specify in the Manual or as LCT may otherwise approve in writing and in consideration of local market conditions.  Franchisee agrees not to use or permit the use of the premises for any other purpose or activity at any time, without LCT's prior written consent.

5.7    Highest Health Standards.  Franchisee shall meet and maintain the highest health standards and ratings applicable to the operation of each Restaurant.  Franchisee shall provide to LCT, within five (5) days after receipt thereof, a copy of all inspection reports, warnings, citations, certificates, and/or ratings resulting from inspections conducted by any national, municipal, or other governmental agency with jurisdiction over any Restaurant.

5.8    Maintenance of the Premises.  Franchisee shall at all times maintain each Restaurant in a high degree of sanitation, repair, and condition, and in connection therewith shall make such additions, alterations, repairs, and replacements thereto (but no others without LCT's prior written consent) as may be required for that purpose, including, without limitation, such periodic repainting or replacement of obsolete signs, furnishings, equipment, and decor as LCT may reasonably direct.

5.9    Refurbishing.  At LCT's request, which shall not be more often than once every five (5) years from the date each Restaurant opens, Franchisee shall refurbish each Restaurant at its expense to conform to the building design, trade dress, color schemes, and presentation of the Proprietary Marks in a manner consistent with the image then in effect for new Little Caesar's restaurants under the System, including, without limitation, redecoration, and modifications to existing improvements.  Except for any remodel required under Section 7.2.2, Franchisee's refurbishing obligations shall not exceed Seventy-Five Thousand U.S. Dollars (US$75,000.00) for each Restaurant.

5.9A  Capital Expenditure.  LCT is entitled during the term of this Agreement to require the Franchisee to incur significant capital expenditure in circumstances where the expenditure: (i) is disclosed to the Franchisee in LCT's disclosure document; (ii) is required to be incurred by the Franchisee to comply with legislative obligations; (iii) has been agreed between LCT and the Franchisee (including any obligation under this Agreement, the purchase of any equipment, fitout costs, refurbishment costs, relocation costs or changes associated with any operational or system changes); (iv) is in LCT's opinion necessary and justified by a written statement given to the Franchisee with the rationale, amounts involved, anticipated outcomes and expected risks associated with the investment; or (v) is otherwise an expenditure of the kind or nature specified in the Code (from time to time) that LCT is entitled to require the Franchisee to incur in connection with the franchise.

5.10  Strict Conformity with Standards.  To ensure that the highest degree of quality and service is maintained, and also to ensure the uniformity of quality, high standards of presentation, safety, consumer acceptance and satisfaction, Franchisee shall operate each Restaurant in strict conformity with such methods, standards, and specifications as LCT may from time to time prescribe in the Manual, or otherwise in writing, with respect to the operation of Restaurants in the United States, subject to local law and custom as provided below in Section 5.17.  Additionally, with respect to each Restaurant, Franchisee agrees:

5.10.1  To maintain in sufficient supply, and to use and/or sell at all times when such Restaurant is open for business, only such menu items, ingredients, products, materials, supplies, and paper goods that conform to LCT's written standards and specifications, and to refrain from deviating therefrom by the use or offer of any non-conforming items, without LCT's prior written consent. Franchisee further agrees to discontinue selling and offering for sale any menu items, products, or services which LCT may, in its reasonable discretion, disapprove in writing at any time.

5.10.2  With respect to the offer and sale of all menu items and products from the Restaurant, Franchisee shall have sole discretion as to the prices to be charged to customers (however, to the extent permissible under applicable law in the Territory, Franchisee agrees that it shall not charge less than the minimum or more than the maximum prices that LCT may establish for a particular product or products).  Notwithstanding the generality of the foregoing, to the extent permissible under applicable law in the Territory, LCT and Franchisee may, at any time, agree to a list of special pre-approved menu items that are intended for a Restaurant's local area.  The decision of whether to add one or more menu items, or to change the composition of menu items, shall be made after LCT's consultation with Franchisee, but shall remain subject, in all cases and at all times, to LCT's sole judgment; provided, however, LCT acknowledges and agrees that any such decision by LCT to change the composition of menu items will be consistent with the local laws and customs of the Territory and in consideration of prices competitive in the Territory.

5.10.3  To permit LCT or its agents, at any reasonable time, to remove samples of food or non-food items from Franchisee's inventory, or from any Restaurant, without payment therefor, in amounts reasonably necessary for testing by LCT or an independent laboratory to determine whether said samples meet LCT's then-current standards and specifications.  In addition to any other remedies it may have under this Agreement, LCT may require Franchisee (or the proposed supplier) to bear the reasonable cost of such testing.

5.10.4  To purchase and install, at Franchisee's expense, all fixtures, furnishings, equipment, decor, and signs as LCT shall specify; and to refrain from installing or permitting to be installed on or about the premises of any Restaurant, without conforming to LCT's approved design and image.

5.10.5  To refrain from installing or permitting to be installed any vending machine, game, token (electronic, coin, or otherwise) operated device ("**Vending Machines**"), unless: (i) such devices are specifically approved in writing in advance by LCT; and (ii) the proceeds from said Vending

Machines shall be deemed Gross Sales and Franchisee shall make payments to LCT on the basis of such proceeds pursuant to the provisions of Section 4 above.

5.11 Approved Suppliers and Specifications. To ensure uniformity of quality, high standards of presentation, safety, consumer acceptance and satisfaction, Franchisee shall purchase all food items, ingredients, supplies, materials, and other products used or offered for sale at the Restaurants solely from suppliers (including manufacturers, distributors, and other sources, including LCT or its affiliates) who demonstrate, to the continuing satisfaction of LCT, the ability to meet LCT's then-current standards and specifications for such items used in Restaurants in the United States, subject to the laws of the Territory; who possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably; and who have been approved in writing by LCT prior to any purchases by Franchisee from any such supplier, and have not thereafter been disapproved. In this regard:

5.11.1 Without limiting the foregoing, Franchisee shall purchase Proprietary Food Products only from supplier(s) designated in accordance with Section 5.12 below.

5.11.2 To the extent permitted by law, LCT may designate a single distributor or supplier for any product, service, equipment, supply or material and may approve a supplier (including manufacturers, distributors, and other sources) only as to certain products, services, equipment, supplies or materials. The designated supplier (including manufacturers, distributors, and other sources) may be LCT or an affiliate of LCT.

5.11.3 LCT and its affiliates may receive payments in the form of rebates or fees (including, but not limited to, fees for the right to manufacture products for use in the Restaurants) and/or volume discounts from suppliers and distributors who sell directly or indirectly to Franchisee. LCT is not obliged to share such payments with franchisees directly or indirectly.

5.11.4 If Franchisee desires to purchase any products (other than Proprietary Food Products) from an unapproved supplier, Franchisee shall submit to LCT a written request for such approval, which will be processed by LCT as provided in this Section 5.11. LCT shall have the sole right to determine whether or not to approve such supplier. Franchisee shall not purchase from any supplier until, and unless, such supplier has been approved in writing by LCT. LCT shall have the right to require that its quality assurance representative or third party designee (the "**QA Representative**") be permitted to inspect the supplier's facilities, and that samples from the supplier be made available to the QA Representative for testing. A charge not to exceed the reasonable cost of the inspection and the actual cost of the test may be paid by Franchisee or the supplier. LCT may also require that the supplier comply with such other requirements as LCT may deem appropriate, including payment of reasonable continuing inspection fees and administrative costs. LCT reserves the right, at its option, to have its QA Representative re-inspect from time to time the facilities and products of any such approved supplier and to revoke its approval upon the supplier's failure to continue to meet any of LCT's then-current criteria. Nothing in the foregoing shall be construed to require LCT to approve any particular supplier, nor to require LCT to make available to prospective suppliers, standards and specifications for formulas that LCT, in its sole discretion, deems confidential.

5.12 Purchase of Proprietary Food Products. Franchisee acknowledges and agrees that preparation mixtures and ingredients used in preparing and cooking the Proprietary Food Products offered in Restaurants are manufactured in accordance with secret recipes and are proprietary products of LCT. In order to maintain and protect the rights of LCT in and to its proprietary products, Franchisee shall purchase Proprietary Food Products only from LCT (including Blue Line Foodservice Distribution Inc. or other divisions or affiliates of LCT) or its affiliates and/or supplier(s) or distributors of Proprietary Food Products that LCT designates, periodically, to sell Proprietary Food Products to Restaurants ("**Designated Supplier**" and/or "**Designated Distributor**"). In order to maintain the high standards of quality and uniformity associated with Proprietary Food Products sold at Little Caesar's restaurants under the System, Franchisee shall not offer or sell any Proprietary Food Products in the operation of the Restaurants that were not purchased from LCT and/or Designated Suppliers or Designated Distributors.

Furthermore, Franchisee shall not sell Proprietary Food Products unless such products have been prepared with spice mixtures and/or ingredients purchased from LCT and/or Designated Suppliers or Designated Distributors.

5.12.1  If Franchisee desires to purchase Proprietary Food Products from an unapproved supplier, Franchisee shall submit to LCT a written request for such approval.  Franchisee shall not purchase Proprietary Food Products from any such supplier unless, and until, LCT has approved such supplier in writing and such supplier has entered into an agreement with LCT in a form satisfactory to LCT.

5.12.2  Before approving any proposed supplier of Proprietary Food Products, among other things, LCT shall have the right to require that its QA Representative be permitted to inspect the supplier's facilities, and that samples from the supplier be made available to its QA representative.  A charge not to exceed the reasonable cost of the inspection and the actual cost of the test shall be paid by Franchisee or the supplier.  LCT may also require that the supplier comply with such other requirements as LCT may deem appropriate, including payment of royalties, reasonable continuing inspection fees, and administrative costs.

5.12.3  LCT reserves the right, at its option, to re-inspect from time to time the facilities and products of any approved supplier of any product and to revoke its approval upon the supplier's failure to continue to meet any of LCT's then-current criteria.

5.12.4  Nothing in this Section 5.12 shall be construed to require LCT to approve a particular supplier (or any alternative supplier), nor to require LCT to make available to prospective suppliers, standards and specifications for formulas that LCT, in its sole discretion, deems confidential.

5.12.5  Where LCT deems it necessary to do so, Franchisee and/or the proposed supplier shall enter into and deliver to LCT a confidentiality agreement or a non-disclosure agreement in the form provided by LCT for that purpose.

5.13    Promotional Material.  Franchisee shall require all advertising and promotional materials, signs, decorations, paper goods (including disposable food containers, napkins, menus, and all forms and stationery used in the Restaurants), and other items which may be designated by LCT, to bear the Proprietary Marks in the form, color, location, and manner prescribed by LCT.

5.14    Inspection.  Franchisee grants LCT and its agents the right at any reasonable time to enter upon the premises of the Restaurants for the purpose of conducting inspections.  Franchisee shall cooperate with LCT's representatives in such inspections by rendering such assistance as they may reasonably request; and, upon notice from LCT or its agents and without limiting LCT's other rights under this Agreement, Franchisee shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection.  LCT may request, and Franchisee must provide, photograph and/or video documentation (including, but not limited to, video that LCT can view on a secure Website) in connection with such inspections of the Restaurants.

5.15    Corporate Documents.   Copies of Franchisee's governing documents and any amendments thereto, including the resolution of the Board of Directors (or other governing body of individuals, as applicable) authorizing entry into this Agreement, shall be promptly provided to LCT in English.  Franchisee shall maintain a current list of all owners of record and all beneficial owners of any class of voting securities of Franchisee and shall furnish the list to LCT upon request.

5.16    Point-of-Sale System.  Franchisee shall record all sales at or from the Restaurants only on point-of-sale systems or devices dedicated solely to the recordation of sales at or from each such Restaurant ("POS System").  The following reporting requirements shall be in addition to and not in lieu of the reporting requirements under Section 10 below:

5.16.1  Franchisee shall report in writing to LCT, and obtain LCT's written approval of, the make and model of each POS System or device prior to the use of such POS System or device by Franchisee.  Such POS System or device (including cash registers, if used) shall, at a minimum, include a device to record accumulated sales and which cannot be turned back or reset, and shall also include, at a minimum, a back-up power system for memory storage in the event of a power loss.

5.16.2  Franchisee shall install, maintain, and at all times operate such computer hardware and software and maintain such Internet access as LCT may specify, including, without limitation, such peripheral devices and equipment as LCT may specify in the Manual or otherwise in writing as reasonably necessary for the efficient management and operation of the Restaurants and the transmission of data to and from LCT.  LCT may, from time-to-time, specify in the Manual or otherwise in writing the information that Franchisee shall collect and maintain on the computer system installed at the Restaurants, and Franchisee shall provide to LCT such reports as LCT may reasonably request from the data so collected and maintained.

5.16.3  Franchisee shall afford LCT unimpeded access to Franchisee's POS System or device and computer system as LCT may request, in the manner, form, and at the times requested by LCT.  All data provided by Franchisee, uploaded to LCT's system from Franchisee's system, and/or downloaded from Franchisee's system to LCT's system is and will be owned exclusively by LCT, and LCT will have the right to use such data in any manner that LCT deems appropriate without compensation to Franchisee.

5.17   Compliance with Applicable Laws.  Franchisee shall comply with all requirements of all national and local laws, rules, and regulations in the Territory, including all relevant employment, building, construction, safety, data privacy, environmental, tax, and other laws, rules and regulations of the Territory (including the timely filing of all tax returns and the payment of all taxes).  If Franchisee believes that the requirements of this Agreement are in conflict with any such laws, rules, or regulations, then: (a) Franchisee shall immediately provide written notice thereof to LCT; (b) Franchisee shall comply with said law, rule, or regulation to the extent it is inconsistent with this Agreement; and (c) the parties shall make a good faith effort to amend this Agreement to be in compliance with said laws, rules, or regulations. Notwithstanding the foregoing, Franchisee represents and warrants that as of the Effective Date, to the best of Franchisee's knowledge, this Agreement does not contravene any law, rule, or regulation applicable in the Territory.  Franchisee represents and warrants that it has and will maintain in full force and effect during the term of this Agreement all appropriate franchises and permits to enable it to undertake the obligations contemplated by this Agreement.

5.18   Laws Pertaining to Licensing of Trademarks.  Franchisee shall comply with any and all applicable laws and regulations in the Territory relating to the licensing of trademarks, and shall timely obtain any and all government approvals and/or registrations necessary for the full and proper conduct of the business contemplated hereunder.  (To the extent that these documents are for the registration of the Proprietary Marks and/or the right to use the Proprietary Marks within the overall Territory, LCT shall bear the costs and all registrations shall be in the name of LCT as registered proprietor; to the extent that these documents are for the right to use the Proprietary Marks in connection with the operation of a particular Restaurant, Franchisee shall bear the costs.)  Any documents necessary to be prepared to comply with such laws (whether or not filed with government authorities) shall be submitted to LCT for LCT's written approval before Franchisee may use such documents and/or submit them to a government authority for approval.  Franchisee shall forward to LCT copies of all such government approvals and/or registrations obtained pursuant to this Section 5.18 within ten (10) days of receipt thereof.

5.19   Australia residency.  At all times during the term of this Agreement, at least one of Franchisee's principals shall maintain primary, full-time residency in the Commonwealth of Australia. Upon LCT's request, Franchisee shall provide all information relevant to document such principal's legal residency status in the Commonwealth of Australia.

5.20   Franchisee Developments.  If Franchisee or its principals, agents or employees develops any new concept (including, without limitation, any advertising concept or idea), product, process, improvement, slogan, or technology (including, without limitation, hardware, software, texting system, accounting system, inventory tracking system, or electronic menu board) (collectively, "**New Developments**") for use in the operation or promotion of the Restaurant, Franchisee must promptly notify LCT and provide LCT with all necessary related information, without compensation.  Franchisee and its principals, agents and employees acknowledge and agree that any such New Developments are the property of LCT, and Franchisee and its principals, agents or employees must sign all documents, including a waiver of any moral rights relating thereto, necessary to evidence the assignment of any New Developments to LCT.  Franchisee acknowledges and agrees that LCT may use this information and disclose and/or license the information for use by others.  Franchisee must not introduce any New Developments or any additions or modifications of or to the System into the Restaurant without the prior written consent of LCT.  "New Developments" shall not include any proprietary business concept, proprietary process, proprietary material or other protectable intellectual property created by Eureka Media Group, LLC, Eureka Signs, LLC, or their affiliates (excluding Evo Pizza Pty Ltd.) whose development 1) originated wholly outside the System and 2) is neither based upon nor incorporates LCT Confidential Information (as defined in Section 9.1 below).

5.21   Immigration Laws.  Each party shall provide such assistance as may be reasonably requested by the other party in connection with applicable immigration laws and regulations in order to facilitate the free and unhindered travel of each party's representatives to, from, and within the Territory and the United States.

5.22   Cooperation.  Franchisee agrees that it shall cooperate, and cause its employees to cooperate, with LCT in connection with all activities conducted pursuant to this Agreement in order to implement the terms and conditions of this Agreement.

5.23   Guarantee and Ownership.  Franchisee represents and warrants that the statement of ownership provided in Attachment C hereto is a true and correct representation of all parties that possess a direct or indirect beneficial ownership interest in Franchisee as of the date hereof.  All owners of Franchisee and their spouses whose beneficial ownership interest is equal to or greater than five percent (5%), together with certain principals, shall be required, upon execution of this Agreement, to execute the Guarantee, Indemnification, and Acknowledgement attached as Attachment D hereto.

5.24   Standby Letter of Credit.  At any time during the term of this Agreement, at LCT's option, Franchisee shall, at Franchisee's expense, establish upon execution of this Agreement and maintain at all times during the term of this Agreement, an irrevocable standby letter of credit or bank guaranty in an amount reasonably determined by LCT and in a form reasonably acceptable to LCT, issued by or confirmed by a mutually agreeable banking institution based in the United States (the "**Standby L/C**").  LCT may draw upon the Standby L/C at any time in its sole discretion, to remedy a default of this Agreement by Franchisee, provided that LCT will not draw upon the Standby L/C until such time as LCT has notified Franchisee in writing of its intent to draw upon the Standby L/C and Franchisee has been accorded thirty (30) days after the date of such notice to cure the default and, if applicable, reimburse LCT its costs to remedy the default.  A true and correct copy of the notice to Franchisee shall be presented to the banking institution prior to the release of any funds.  If LCT draws upon the Standby L/C, Franchisee shall replenish the Standby L/C to the full amount described in this Section 5.24 in the manner and at the times specified by LCT.  The Standby L/C shall remain in place and, if necessary, periodically renew for so long as Franchisee retains any license rights in the Territory.  If the Standby L/C must be renewed, Franchisee shall complete the renewal process and receive approval from the banking institution for timely renewal of the Standby L/C at least ninety (90) days in advance of the expiration of the Standby L/C.

5.25   The Franchisee must keep, for a period of six (6) years from the date the relevant notice or document is created, original or copies, of all written notices the Franchisee is required under this

Agreement to give LCT and must keep all documents LCT relies on to support a statement or claim in LCT's disclosure document.

6.   **PROPRIETARY MARKS**

6.1   Franchisee's Representations and Warranties.  By virtue of the signature of one or more duly authorized officers of Franchisee to this Agreement, Franchisee and each of Franchisee's officers, directors, members, owners, and managers (in their personal capacities), represent and warrant to LCT (to the best of their respective knowledge) that:

6.1.1   Each is aware of no application made to, and/or registration issued by, any governmental body in the Territory for the Proprietary Marks, or any variation or marks similar thereto (other than applications made by and registrations issued to LCT).

6.1.2   Each is aware of no franchise, assignment, or other grant of a right from Franchisee to any other person or entity to use the Proprietary Marks.

6.1.3   Each is aware of no actual use in the Territory of the Proprietary Marks, the marks covered by the Proprietary Marks, or any marks similar thereto.

6.1.4   Each is aware of no claim by any person or entity (other than LCT or LCT's affiliates) of any right in or to the Proprietary Marks or any marks similar thereto.

6.1.5   Each shall not take any action, directly or indirectly, to register any of the Proprietary Marks or any transliteration thereof in the Territory, in any country or any other jurisdiction.

6.2   Franchisee's Use of the Proprietary Marks.  With respect to Franchisee's use of the Proprietary Marks, Franchisee agrees that:

6.2.1   Franchisee shall use only the Proprietary Marks set forth in Attachment E hereto and those which may hereafter be designated by LCT in writing for use in the Territory, and shall use them only in the manner authorized and permitted by LCT.  Franchisee shall not use any other trademark or service mark in combination with the Proprietary Marks without LCT's express prior written consent.

6.2.2   Franchisee shall use the Proprietary Marks only to exercise its rights and perform its obligations hereunder.

6.2.3   Franchisee shall maintain the good image of the Proprietary Marks and not use the Proprietary Marks in any manner that directly or indirectly dilutes, demeans, ridicules or otherwise tarnishes the image of the Proprietary Marks.

6.2.4   Unless otherwise authorized or required by LCT, Franchisee shall use the Proprietary Marks without prefix or suffix, and under no other name, translation, or phonetic version of the Proprietary Marks, or any other design or logo.

6.2.5   During the term of this Agreement, Franchisee shall identify itself as the owner of the Restaurants in conjunction with any use of the Proprietary Marks, including, without limitation, uses on invoices, order forms, receipts, and contracts, as well as conspicuously display of a notice in noticeable and conspicuous locations on the premises of the Restaurants.  Franchisee agrees that it shall comply with LCT's instructions with respect to the size, location, and wording of such statements.

6.2.6   Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on behalf of LCT.

6.2.7    Franchisee shall not use the Proprietary Marks, or any derivation thereof, or any phonetically similar name, or any other prefix, suffix, symbol, or other modified form (including any local or special adaptations or artistic variations) of the Proprietary Marks as part of its corporate, partnership, trade, as part of its corporate or other legal name, nor as part of any identification of Franchisee or its Website on the Internet or any other electronic medium (including a domain name, Internet home page, e-mail address, bulletin board, chat group, social feed, URL or electronic address of a Website).

6.2.8    Any unauthorized use by Franchisee of the Proprietary Marks shall constitute an infringement of LCT's rights, notwithstanding the license set forth herein.

6.2.9    Franchisee shall promptly execute and deliver to LCT any documents deemed necessary by LCT, at Franchisee's expense, to obtain protection for the Proprietary Marks or to maintain the continued validity and enforceability of the Proprietary Marks and the license contained in this Agreement.  Without limiting the generality of the foregoing, Franchisee must (at its cost) prepare, submit for LCT's approval, execute, and file a trademark license agreement or registered user agreement (the "**Trademark User Agreement**"), if and only if LCT deems it necessary to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.  The Trademark User Agreement shall be subject to the terms of this Agreement, and shall be in both English and, if required, local language.  At LCT's option, LCT may prepare and file such Trademark User Agreement, in which case Franchisee shall reimburse LCT for its reasonable out-of-pocket expense in the preparation and filing of such agreement.  Upon the termination or expiration of this Agreement, Franchisee shall do everything necessary to ensure that Franchisee ceases to be a licensee or registered user of the Proprietary Marks, including by terminating and de-registering the Trademark User Agreement.

6.2.10   Franchisee shall file and maintain requisite fictitious or assumed or business name registrations as required by applicable laws.  Franchisee agrees that it shall not, directly or indirectly, file an application or otherwise attempt to register the Proprietary Marks or any other of LCT's marks in the U.S., the Territory, or elsewhere with any governmental, quasi-governmental, public or private registry (including, but not limited to, Internet domain name registries).

6.3    <u>Franchisee's Acknowledgments</u>.  Franchisee acknowledges and agrees that:

6.3.1    LCT (either itself or through its affiliate LCT is the owner of all right, title, and interest in and to the Proprietary Marks, regardless of whether the Proprietary Marks are registered or unregistered, and the goodwill associated with and symbolized by them.

6.3.2    The Proprietary Marks are valid and serve to identify the System and those who are authorized to operate under the System.

6.3.3    Subject to Sections 12.10.8, 12.10.9 and 12.10.10, Franchisee shall not use any of the Proprietary Marks as part of its corporate or other legal name, or as part of any e-mail address, Internet domain name, or other identification of Franchisee in any electronic medium.  Franchisee agrees that if it has registered or does register, or permit any of its employees, agents, or others to register any of the Proprietary Marks, then upon LCT's written request, Franchisee shall assign said registrations to LCT or LCT's designee and/or, in the case of Internet domains, deactivate such domains and all Websites associated therewith.

6.3.4    Franchisee shall not directly or indirectly contest the validity of LCT's ownership of the Proprietary Marks, nor shall Franchisee, directly or indirectly, seek to or assist any person in registering the Proprietary Marks with any government agency except with LCT's express prior written consent.

6.3.5    Franchisee's use of the Proprietary Marks pursuant to this Agreement does not give Franchisee any ownership interest or other interest in the Proprietary Marks (except the non-exclusive license to use the Proprietary Marks set forth in this Agreement).

6.3.6     Any and all goodwill arising from Franchisee's use of the Proprietary Marks shall inure solely to LCT's benefit, and upon expiration or termination of this Agreement no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the Proprietary Marks.

6.3.7     Without limiting the rights set out under Section 1.6 above, Franchisee's license under this Agreement to use the Proprietary Marks is non-exclusive, and LCT thus has and retains the rights, at any location, and among others:

6.3.7.1  To use the Proprietary Marks in connection with selling products and services;

6.3.7.2  To grant other franchises for the Proprietary Marks, in addition to those franchises already granted to existing franchisees;

6.3.7.3  To develop and establish other systems using the same or similar Proprietary Marks, or any other marks, and to grant franchises or franchises thereto without providing any rights therein to Franchisee.

6.3.8     LCT reserves the right to substitute different Proprietary Marks for use in identifying the System and the businesses operating thereunder if any of the Proprietary Marks no longer can be used, or if LCT, in its sole discretion, determines that substitution of different Proprietary Marks will be beneficial to the System.  Franchisee agrees that it shall follow at its expense such direction from LCT upon notice thereof from LCT.

6.3.9     As of the Effective Date of the Prior Agreement, LCT has neither a) previously owned or operated Restaurants in the Commonwealth of Australia using the Proprietary Marks or previously granted any third parties the right to operate Restaurants in the Commonwealth of Australia using the Proprietary Marks, nor b) previously initiated any action at law or equity in the Commonwealth of Australia alleging the infringement of its Proprietary Marks therein.

6.3.10   The "Little Caesar" name is currently being used in certain geographic regions in the Commonwealth of Australia in the restaurant and food service industry in general and in connection with the sale of pizza and pizza-related products in particular, and also is being used in connection with Websites (as defined in Section 12.10.8) and domain names registered in Australia by third parties.

6.3.11   As a result of the foregoing Section 6.3.10, under the applicable law of the Commonwealth of Australia, and both as of the Effective Date of this Agreement and during the term of this Agreement, some or all of the Proprietary Marks may be subject to cancellation and/or removal in the Territory.  Further, LCT may not have the right to use, or to license the use of, the "Little Caesar" name (as reflected in the Proprietary Marks or otherwise) throughout all of the Commonwealth of Australia and/or in connection with a Website (as defined in Section 12.10.8) registered in Australia.  Moreover, and a result of the foregoing, 1) Franchisee's right to use the "Little Caesar" name (as reflected in the Proprietary Marks or otherwise) may, during the term of this Agreement, be terminated by operation of law in the Commonwealth of Australia and/or 2) Franchisee's right to use the "Little Caesar" name (as reflected in the Proprietary Marks or otherwise) may be limited (geographically or otherwise) by operation of law in the Commonwealth of Australia.  No fault, wrongdoing, or negligence may be attributed to LCT in the event of such termination or limitation, and Franchisee agrees not to take any action against LCT in connection with such termination or limitation or future "Little Caesar" restaurants that may be opened in the Commonwealth of Australia by third parties not licensed by LCT.

6.4      **Infringements and Legal Proceedings.**  Franchisee shall promptly notify LCT of any suspected infringement of the Proprietary Marks, any challenge to the validity of the Proprietary Marks, or any challenge to LCT's ownership of, or the right of Franchisee to use, the Proprietary Marks licensed hereunder.  Franchisee acknowledges that LCT has the sole right to direct and control any administrative

proceeding or litigation involving the infringement of the Proprietary Marks, including any settlement thereof. LCT shall also have the sole right, but not the obligation, to take action against uses by others that may constitute infringement of the Proprietary Marks.

6.5     Defense of Actions Involving Proprietary Marks. Provided that Franchisee has used the Proprietary Marks in accordance with this Agreement, LCT will defend Franchisee at LCT's expense against any third-party claim, suit, or demand involving the Proprietary Marks arising out of Franchisee's use thereof, including any third-party claim, suit, or demand arising from such third party's prior use of the Proprietary Marks in the Territory. If Franchisee has not used the Proprietary Marks in accordance with LCT's instructions and in accordance with this Agreement (and to the extent that such improper use was a cause of the third-party claim, suit, or demand involving the Proprietary Marks), LCT may defend Franchisee, but at Franchisee's expense, against such third-party claims, suits, or demands; and in such case, Franchisee agrees to promptly and fully reimburse LCT for any expenses paid by LCT. If LCT undertakes the defense or prosecution of any litigation relating to the Proprietary Marks, Franchisee shall execute any and all documents and do such acts and things as may, in the opinion of counsel for LCT, be necessary to carry out such defense or prosecution, including, but not limited to, becoming a party to any legal action.

6.6     LCT's Additional Representations and Warranties. LCT represents with respect to the Proprietary Marks that:

6.6.1     LCT (itself or through its affiliate LCT) is the owner of all right, title, and interest in and to the Proprietary Marks in the Territory described in Attachment E to this Agreement.

6.6.2     LCT (itself or through its affiliate LCT) has taken and will take all steps reasonably necessary to preserve and protect its ownership in, and the validity of, the Proprietary Marks.

6.6.3     LCT has registered or applied to register the Proprietary Marks as indicated in Attachment E to this Agreement. Except as otherwise stated in this Agreement, LCT disclaims all warranties of any nature regarding the Proprietary Marks including any express or implied warranty that the Proprietary Marks may be used, or that the Proprietary Marks do not infringe the rights of any third party, in the Territory. Moreover, LCT makes no representation that any Proprietary Marks for which applications are currently pending, or for which applications may be filed in the future, will be registered in the Territory or will continue to be registered in the Territory.

7.     **OPERATING RIGHTS AND OBLIGATIONS**

7.1     Establishing Restaurants. Each time that Franchisee wishes to open a Restaurant, Franchisee and LCT shall complete and sign a Restaurant Addendum in the form appended to this Agreement as Attachment A within thirty (30) days of LCT's written site approval for each Restaurant as described in Section 5.2.1.3.

7.1.1     With respect to each and every Restaurant governed by this Agreement, the parties agree that this Agreement and a Restaurant Addendum (as defined below) for each such Restaurant shall together serve as the franchise agreement between LCT and Franchisee with respect to each Restaurant.

7.1.2     If LCT deems it necessary or desirable to do so, the parties may substitute a separate franchise agreement for each Restaurant, incorporating all of the business and legal terms set forth in this Agreement without substantive modification.

7.2     Term and Renewal of Restaurant Addenda. The initial term ("**Initial Term**") for each Restaurant Addendum shall be ten (10) years from the date that such Restaurant first opens for business. At the end of the Initial Term, Franchisee may renew each Restaurant Addendum for one (1) additional

renewal term ("**Renewal Term**") of ten (10) years for each Restaurant, if Franchisee satisfies each of the following conditions:

7.2.1   Franchisee shall give LCT written notice of Franchisee's election to renew no fewer than seven (7) months and no more than twelve (12) months before the end of the Initial Term of the Restaurant Addendum;

7.2.2   Franchisee shall have fully remodeled the Restaurant to comply with LCT's then-current standards;

7.2.3   Franchisee shall not be in default of any provision of this Agreement, any amendment to this Agreement, any successor to this Agreement, any Restaurant Addendum, and/or any other agreement between Franchisee and LCT or its subsidiaries and affiliates; and, in LCT's reasonable judgment, Franchisee must have substantially complied with all the terms and conditions of this Agreement, all such other agreements, as well as the operating standards that LCT has prescribed during the Initial Term;

7.2.4   Franchisee shall pay LCT a renewal fee for each Restaurant in an amount equal to Five Thousand U.S. Dollars (US$5,000.00) before the start of a Renewal Term, and such fee shall apply only to Renewal Terms commencing after the Effective Date;

7.2.5   Franchisee must have satisfied all monetary obligations owed by Franchisee to LCT and LCT's subsidiaries and affiliates, and must have timely met those obligations throughout the Initial Term;

7.2.6   If requested by LCT, Franchisee shall sign LCT's then-current form of franchise agreement (the terms of which, subject to the UCT Qualification, may differ from the terms hereof and be less advantageous to Franchisee) for such Restaurant or for all of Franchisee's Restaurants (at LCT's election), which shall include the then-current applicable royalty fee (which will be determined by LCT acting reasonably), as may be amended by mutual agreement of LCT and franchisee;

7.2.7   Franchisee and its personnel shall comply with LCT's then-current qualification and training requirements; and

7.2.8   Franchisee shall be current with respect to its obligations to its lessor, suppliers, and any other parties with whom it does business.

7.2.9   Franchisee shall have executed a deed of surrender of the existing Restaurant Addendum, in a form satisfactory to LCT.

Every Detail Important.   Franchisee understands and acknowledges that every detail of the System is important to Franchisee, LCT, and other franchisees in order to develop and maintain high operating standards, to increase the demand for the services and products sold by all franchisees, and to protect LCT's reputation and goodwill.

7.4   Notice of Term Expiry.   If the Franchisee fails to satisfy any of the conditions set out in Section 7.2 with respect to a particular Restaurant Addendum and LCT intends not to otherwise renew the relevant Restaurant Addendum, LCT will provide Franchisee with at least 6 months' notice of such intention.

8.   **OPERATING MANUAL**

8.1   LCT to Loan Manual.   Franchisee acknowledges LCT has provided to Franchisee, on loan, one (1) copy of the Manual, and any subsequent modifications thereto, in the English language. Franchisee shall duplicate and provide to each Restaurant one (1) copy of the Manual modified by

Franchisee pursuant to Section 8.2 below.  The Manual (and all copies thereof) shall remain the sole property of LCT and copies distributed to the Restaurants shall at all times be kept in a secure place at those Restaurants.

8.2     Proposed Changes to the Manual.  Franchisee shall propose such revisions to the Manual as are necessary to take into account the differences between the market in the United States and the market in the Territory, such as adapting certain U.S. practices to appropriate local customs, health and preparation methods as well as U.S. measures (e.g., pounds, inches, feet); however, no such changes may be made to the Manual unless agreed to in writing by LCT.

8.3     Operation in Accordance with Manual.  In order to protect the reputation and goodwill of the System and to maintain high standards of operation under the Proprietary Marks, Franchisee shall operate the Restaurants in strict accordance with the Manual and as otherwise specified by LCT subject to the UCT Qualification, from time to time in writing.

8.4     Trade Secret.  Franchisee shall at all times treat the Manual, any other manuals created for or approved for use in the operation of the Restaurants, and the information contained therein as trade secrets of LCT, and shall use all reasonable efforts to keep such information secret and confidential. Franchisee shall not at any time copy, duplicate, record, or otherwise reproduce the foregoing materials, in whole or in part (except as required under Section 8.1), nor otherwise make them available to any unauthorized person.

8.5     Revisions to the Manual.  LCT may from time to time, subject to the UCT Qualification, revise the contents of the Manual, and Franchisee expressly agrees to make corresponding revisions to its copy of the Manual, and to the copies of the Manual provided to each Restaurant, and to comply with each new or changed standard. LCT may provide a portion or the entire Manual (including updates and amendments), and other instructional information and materials in, or via, electronic media including, without limitation, the Internet. Franchisee shall ensure that the Manual is kept current and up to date; and, if there is any dispute as to the contents of the Manual, the terms of the master copy of the Manual maintained by LCT at LCT's home office shall be controlling.

8.6     Translations and Conversion of Measures.  Franchisee may, at its own expense, translate the Manual and any updates, modifications, or revisions thereto into the local language (and any other language deemed reasonably necessary for the operation of the Restaurants), and, if necessary, shall convert measures from the U.S. system into the metric, according to the following standards:

8.6.1   In the event Franchisee translates the Manual into the local language, or converts measures contained in the Manual, Franchisee shall provide to LCT a true and correct copy of the translation (including any metric conversion and any modifications, updates, or revisions to the Manual), and LCT shall have the right to verify the accuracy of the translation by using a translator it selects at Franchisee's expense.  Any such translations, metric conversions, currency conversions, any copies thereof (whether or not made in violation of this Agreement) shall be the sole property of LCT and shall be governed by this Section 8.  Franchisee shall execute all documents and take all actions necessary to assign to LCT any copyrights or any rights it may have in or to any such translations or conversions.  If LCT determines that there is any difference in meaning between the copy of the Manual maintained by LCT and the Manual maintained by Franchisee, Franchisee shall modify its copy of the Manual as required by LCT.  If there is any dispute regarding the content or meaning of the Manual, the version of the Manual maintained by LCT shall always control.

8.6.2   Franchisee shall ensure that, before any employee or contractor begins work on translating the Manual or any update, revision, or modification thereto, each such employee and/or contractor shall execute documents in a form reasonably acceptable to LCT, indicating that such individual will keep confidential the content of the Manual (and/or any update, revision, or modification thereto), and that such individual irrevocably assigns to LCT, with no monetary consideration paid by LCT, any and all intellectual property rights such individual may have in the translated version of the

Manual (and/or any update, revision, or modification thereto). Franchisee shall immediately provide the original copy of each such document to LCT; and upon receipt, LCT shall immediately have been deemed to grant a non-exclusive license to Franchisee to use and copy the Manual solely for the purpose of training and as permitted under Section 5.5 above.

8.6.3    Franchisee shall, at its own expense, provide for use at each Restaurant one (1) copy of the Manual as finally revised, translated, converted into the metric system, submitted to, and approved by LCT, as well as one (1) copy of any translated revisions, updates, or modifications thereto (for which a true and accurate translation shall also promptly be submitted to LCT).

## 9.    CONFIDENTIAL INFORMATION

9.1    No Disclosure.  Franchisee shall not, during the term of this Agreement or at any time thereafter, communicate, divulge, or use for the benefit of any other person or entity any confidential information, trade secrets, knowledge, know-how or techniques concerning the System and the methods of operation of Little Caesar's restaurants which may be communicated to Franchisee or of which Franchisee may be apprised by virtue of Franchisee's operations hereunder, including, but not limited to: management and operating methods, procedures, systems, reports and plans (including, without limitation, the HOT-N-READY® system, program, and concept); recipes, ingredients, or product development information; training manuals, policy manuals, or operations manuals; "job helpers;" leasing and other real estate information; engineering and architectural drawings and information; sales promotion aids; business forms; accounting procedures; supplier information; purchasing or distribution procedures; inventory systems; demographic information; past, present, and future projects and proposals; customer, prospective customer, and vendor information and relationships; marketing reports; marketing and advertising procedures, techniques and/or campaigns; research processes; financial and economic information, including, without limitation, profit and loss statements; accounting and sales information; the terms of this Agreement and of other matters concerning LCT and/or its franchisees (collectively, "**Confidential Information**"). Franchisee may divulge such Confidential Information only to such of its employees as must have access to it in order to operate the Restaurants; to Franchisee's accountants, attorneys, and bankers as may be appropriate and necessary; and to governmental regulatory agencies as may be required. Franchisee will use its best efforts to ensure such persons are aware of the confidential nature of any divulged information and shall have such persons execute a confidentiality agreement prior to their receipt of any Confidential Information. Any and all information, knowledge, know-how, and techniques that LCT designates as confidential shall be deemed to be Confidential Information for purposes of this Agreement. In addition to and not instead of the foregoing, except as ordered or required by any applicable law or competent judicial, governmental, or similar authority, Franchisee shall not provide information or documentation to any third party without obtaining LCT's prior written approval as to the contents and the manner of presentation of said information and/or document(s). Without limiting the foregoing, Franchisee shall cause its principal officer or authorized representative to enter into the Confidentiality and Non-Competition Agreement, in the form attached hereto as Attachment F.

9.2    Franchisee Ownership Information.  LCT shall not, during the term of this Agreement or at any time thereafter, communicate, divulge, or use for the benefit of any other person or entity any ownership information contained in Attachment C hereto, except for any disclosure which may be required by law. Such information shall be deemed to be confidential information of the Franchisee and its owners.

9.3    Databases.  LCT and Franchisee hereby agree that the rights pertaining to the ownership and title of any database containing customer data, regardless of whether such customer data is personal in nature or not, shall be jointly held by the parties during the term of this Agreement, and shall automatically transfer in its entirety to LCT in the event of termination, cancellation or expiration of the Operating Rights of any Restaurant and this Agreement for any reason subject to any Privacy Laws (as defined in Section 12.10.5.1).

## 10.    ACCOUNTING AND RECORDS

10.1    Recordkeeping.  Franchisee shall maintain during the term of this Agreement, and shall preserve for at least six (6) years from the dates of their preparation, full, complete, and accurate books, records, and accounts in accordance with international business standards and the laws of the Territory, and in the form and manner consistent with English language version of the then-current International Financial Reporting Standards as published by the International Accounting Standards Board (the "IASB").  Franchisee shall maintain during the term of this Agreement, and shall preserve for at least three (3) years from the date of their preparation, all cash register tapes from all Restaurants.

10.2    P&L/Balance Sheet.  Franchisee shall, at its expense, provide LCT, on forms and in the manner prescribed by LCT, with (i) weekly reports of Gross Sales for each Restaurant to be delivered by noon Wednesday of the following week (or such other time specified by LCT); and (ii) within thirty (30) days after the end of each calendar quarter period ended March 31st, June 30th, September 30th and December 31st of each year during the term of this Agreement, a year-to-date profit and loss statement for the Restaurants and a quarterly balance sheet (which may be unaudited) and sales report, in a form specified by LCT, for the Restaurants.

10.3    Annual Financial Statements; Tax Returns.  Franchisee shall, at its expense, provide to LCT, in a format specified by LCT, a complete annual financial statement audited in accordance with the English language version of the then-current International Financial Reporting Standards as published by the IASB within ninety (90) days after the end of each fiscal year of Franchisee during the term hereof, showing the results of operations of Franchisee during said fiscal year (including, but not limited to, the establishment and operation of the Restaurants).  Franchisee also shall submit, within five (5) business days of their filing, its national, federal, provincial, state and local, as applicable, tax returns for each year during the term of this Agreement.

10.4    Reports.  Franchisee shall also submit to LCT, for review or auditing, such other forms, reports, records, information, and data as LCT may reasonably designate, in the form and at the times and places reasonably required by LCT, upon request and as specified from time to time in the Manual or otherwise in writing (this includes, but is not limited to, sales reports submitted at the time when royalty payments are due).

10.5    Auditing.  LCT or its designated agents shall have the right at all reasonable times to examine and copy (or receive copies of), at LCT's expense, the books, records, and tax returns of Franchisee.  LCT shall also have the right, at any time, to have an independent audit made of the books and records of Franchisee.  If an inspection should reveal that any payments have been understated in any report to LCT, then Franchisee shall immediately pay LCT the amount understated upon demand, in addition to interest from the date such amount was due until paid, at the rate specified in Section 4.10 above.  If an inspection was caused by Franchisee's failure to make sales reports to LCT, and/or if an inspection discloses an understatement in any report of five percent (5%) or more or that the Franchisee has breached any law applicable in the Territory, Franchisee shall, in addition, reimburse LCT for any and all costs and expenses connected with the inspection (including, without limitation, travel, lodging and wages expenses, and reasonable accounting and legal costs).   The foregoing remedies shall be in addition to any other remedies LCT may have.

10.6    Reasonable Enquiries.   LCT is authorized to make reasonable enquiries of the Franchisee's bank, landlord, employees and trade creditors concerning financial and compliance matters relating to this Agreement and the operation of the Restaurants, the Franchisee's credit worthiness and the Franchisee's compliance with all laws relevant to this Agreement and the operation of the Restaurants.  The production of this Agreement duly executed by the Franchisee to any such persons will constitute sufficient authority and direction by the Franchisee to such persons to provide to LCT such access, information and copies of documents as LCT may request under this Section. If the production of this Agreement is insufficient authority, the Franchisee will provide whatever constitutes sufficient authority to such person.

10.7    <u>Solvency Statement:</u> The Franchisee must:

10.7.1    within forty-eight (48) hours of LCT requesting the same, provide LCT with a statement that there are reasonable grounds to suspect that the Franchisee is able to pay its debts as and when they fall due in the form LCT reasonably requests ("**Statement of Solvency**"); and

10.7.2    within ten (10) Business Days of LCT's request for a Statement of Solvency, provide LCT with a financial statement in the form LCT specifies to support the Statement of Solvency.

## 11.    INSURANCE

11.1    <u>Franchisee's Insurance Obligation</u>.  Franchisee shall procure, prior to the opening of each Restaurant, and shall maintain in full force and effect at all times during the term of this Agreement, at Franchisee's expense, an insurance policy or policies protecting Franchisee, LCT and its affiliates, and their respective shareholders, directors, employees, and agents against any demand or claim with respect to personal and bodily injury, death, or property damage, or any loss, liability, or expense whatsoever arising or occurring at or in connection with the Restaurant, including automobile liability and business interruption insurance.  Such policy or policies shall:  (i) be written by insurer(s) acceptable to LCT; (ii) name LCT, and its shareholders, directors, employees, and agents as additional insureds; (iii) comply with the requirements prescribed by LCT at the time such policies are obtained; (iv) provide at least the types and minimum amounts of coverage consistent with insurance practices in the Territory for multi-unit franchises of U.S. or multinational franchisors of similar size and scope; and (v) contain a waiver by Franchisee and its insurers of their subrogation rights against LCT and its affiliates, and their respective shareholders, directors, employees and agents.

11.2    <u>Franchisee's Insurance Obligation Not Affected by LCT's Insurance</u>.  Franchisee's obligation to obtain and maintain the foregoing policy or policies in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by LCT, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in Section 18.4 of this Agreement.

11.3    <u>Additional Required Endorsements</u>.  All public liability and property damage policies shall contain a provision that LCT, although named as an additional insured, shall nevertheless be entitled to recover under such policies on any loss occasioned to LCT or its shareholders, directors, employees, and agents by reason of their negligence.

11.4    <u>Certificates of Insurance</u>.  At least ten (10) days prior to the time any insurance is first required to be carried by Franchisee, and thereafter at least thirty (30) days prior to the expiration of any policy, Franchisee shall deliver to LCT certificates of insurance evidencing the proper types and minimum amounts of coverage.  All certificates shall expressly provide that no fewer than thirty (30) days' prior written notice shall be given LCT in the event of material alteration to or cancellation or non-renewal of the coverages evidenced by such certificates.  Certificates evidencing the insurance required by this Section shall name LCT, and each of its affiliates, shareholders, directors, employees, and agents as additional insureds, and shall expressly provide that any interest of each shall not be affected by any breach by Franchisee of any policy provisions for which such certificates evidence coverage.

11.5    <u>LCT's Right to Secure Insurance on Behalf of Franchisee</u>.  Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as such requirements may be revised from time to time by LCT in writing, LCT shall have the right and authority (but not the obligation) to immediately procure such insurance and to charge the premium on such insurance to Franchisee, which charges, together with reimbursement for LCT's reasonable expenses in so acting, shall be payable by Franchisee immediately upon notice.  The foregoing remedies shall be in addition to any other remedies LCT may have.

## 12.    ADVERTISING AND TECHNOLOGY

Recognizing the value of advertising and promotion, and the importance of the standardization of advertising and promotional programs to the furtherance of the goodwill and public image of the System, the parties agree as follows:

12.1    Initial Opening Promotion.  Immediately preceding and following the opening of each Restaurant, Franchisee shall conduct an initial local advertising and promotion program in the form and manner prepared by Franchisee and approved by LCT in writing.  For initial advertising and promotion for each Restaurant, Franchisee shall spend no less than the greater amount of (a) the recommended budget set forth in the Manual or (b) Five Thousand U.S. Dollars (US$5,000.00).  If requested by LCT, Franchisee shall furnish to LCT, within sixty (60) days after the opening of each Restaurant, such evidence as LCT may reasonably require to verify such approved expenditure.

12.2    Allocation of Advertising Expenditures and Contributions.  In addition to the advertising required under Section 12.1 above, Franchisee shall spend on advertising in the Territory the following amounts for a time-period specified by LCT in accordance with the following schedule:

| For Gross Sales Received by Franchisee | Minimum Advertising Expenditure |
|---|---|
| From January 2018 through December 2021 | 6% of Gross Sales |
| From January 2022 until ten years from Effective Date | 5% of Gross Sales |

Notwithstanding the above, upon 180 days' notice to Franchisee, LCT shall have the right at any time, in its sole discretion, to increase the minimum advertising expenditure under this Section 12.2 to a maximum of eight percent (8%) of Franchisee's Gross Sales for the applicable time-period.  The minimum advertising expenditures set forth in this Section 12.2 may be exceeded by Franchisee at any time if Franchisee determines that market conditions in the Territory so warrant.  The time-period specified may be weekly, every four (4) weeks, monthly, quarterly, annually or such other period as LCT may specify in writing.  LCT shall allocate such specified amount among the following: (a) Franchisee's expenditures on local advertising, as described in Section 12.3; and (b) contributions to the GAF, RAF and/or NAF, as described in Sections 4.4 and 12.4.  LCT may from time to time and at any time, in accordance with this Section 12.2, modify both the allocation and amount of Franchisee's expenditures among Franchisee's required local advertising expenditures, the GAF, RAF and/or NAF.

12.3    Local Advertising.  Franchisee shall expend on local advertising in the Territory the minimum amounts and at the times required by LCT from time to time as described in Section 12.2 above.  LCT may, from time to time, designate to Franchisee what types of payments qualify as local advertising expenditures for purposes of Section 12.2 and this Section 12.3.  Any payments by Franchisee that do not LCT's requirements as a qualifying local advertising expenditure will not be credited towards Franchisee's minimum expenditure obligations.  Franchisee must show proof of required local advertising expenditures in the manner and at the times specified by LCT.

12.4    Administration of the GAF, RAF and/or NAF.  If LCT establishes the GAF, RAF and/or NAF, then Franchisee shall contribute to the GAF, RAF and/or NAF the amount specified in Section 12.2 above.  The GAF, RAF and/or NAF shall be maintained and administered by LCT or its designee, as follows:

12.4.1  LCT or its designee shall direct all advertising programs, and shall have the right to determine the concepts, materials, and media used in such programs and the placement and allocation thereof.  Franchisee agrees and acknowledges that the GAF, RAF and/or NAF are intended to maximize general-public recognition, acceptance, and use of the System; and that LCT and its designee are not obligated, in administering the GAF, RAF and/or NAF, to make expenditures for Franchisee which are equivalent or proportionate to Franchisee's contribution, or to ensure that any particular franchisee benefits directly or pro rata from expenditures by the GAF, RAF and/or NAF.

12.4.2  The GAF, RAF and/or NAF, all contributions thereto, and any earnings thereon, shall be used exclusively to meet any and all costs of maintaining, administering, directing, conducting, and preparing advertising, marketing, public relations and/or promotional programs and materials, and any other activities which LCT believes will, directly or indirectly, enhance the image of the System, including, among other things, the costs of preparing and conducting media advertising campaigns; utilizing Networking Media Websites and other emerging media or promotional tactics; direct mail advertising; marketing surveys and other public relations activities; employing advertising and/or public relations agencies to assist therein; purchasing promotional items, conducting and administering visual merchandising, point of sale, and other merchandising programs; and providing promotional and other marketing materials and services to the Restaurants operated under the System.  The GAF, RAF and/or NAF may also be used to provide rebates or reimbursements to franchisees for local expenditures on products, services, or improvements, approved in advance by LCT, which products, services, or improvements LCT deems will promote general-public awareness and favorable support for the System. The Franchisee acknowledges that each of the expenses described in this Section 12.4.2 are legitimate marketing or advertising expenses for the purposes of clause 31(3) of the Code.

12.4.3  Franchisee shall contribute to the GAF, RAF and/or NAF at such times and in the manner determined by LCT as set forth in Section 12.2 above.  All sums paid by Franchisee to the GAF, RAF and/or NAF shall be maintained in an account separate from the other monies of LCT and shall not be used to defray any of LCT's expenses, except for such reasonable costs and overhead, if any, as LCT may incur in activities reasonably related to the direction and implementation of the GAF, RAF and/or NAF and advertising programs for franchisees and the System, including, among other things, costs of personnel for creating and implementing, advertising, merchandising, promotional and marketing programs.  The GAF, RAF and/or NAF and its earnings shall not otherwise inure to the benefit of LCT. LCT or its designee shall maintain separate bookkeeping accounts for the GAF, RAF and/or NAF.

12.4.4  The GAF, RAF and/or NAF are not and shall not be assets of LCT.  A financial statement detailing all of the GAF, RAF and/or NAF's receipts and expenses for the last financial year as shown on LCT's books shall be prepared annually and LCT will have the GAF, RAF and/or NAF audited by a registered company auditor (unless Franchisee agrees otherwise in accordance with the Code) within four (4) months of the end of each financial year.  LCT will give to Franchisee a copy the annual financial statement and a copy of the auditor's report (if required) within 30 days of them being prepared.

12.4.5  Although the GAF, RAF and/or NAF are intended to be of perpetual duration, LCT retains the right to terminate the GAF, RAF and/or NAF.  The GAF, RAF and/or NAF shall not be terminated, however, until all monies in the GAF, RAF and/or NAF have been expended for advertising and/or promotional purposes.

12.5   LCT's Approval of Advertising.  All advertising and promotion by Franchisee shall be in such media and of such type and format as LCT may approve, shall be conducted in a dignified manner, and shall conform to such standards and requirements as LCT may specify.  Franchisee shall submit samples of all proposed advertising and promotional plans and materials to LCT in English and the applicable local language for its approval, in the manner requested by LCT, at least thirty (30) days before their intended use, unless such plans and materials were prepared by LCT or have been approved by LCT within the last six (6) months.  No materials shall be used and/or plans implemented unless and until LCT shall have furnished written notice authorizing such use.  LCT also shall have the right at any time after use of such materials commences, to prohibit further use, effective upon receipt of written notice from it to Franchisee.  Franchisee shall pay for the translations into local language (or English as appropriate and if requested by LCT) of any and all such advertising.

12.6   LCT's Advertising.  LCT may make advertising materials available to Franchisee in electronic format and in accordance with Section 3.10 above.

12.7   Copyright in Advertising Materials.  Franchisee acknowledges and agrees that any and all copyright in and to advertising and promotional materials developed by or on behalf of Franchisee

shall be the sole property of LCT. Franchisee shall irrevocably assign to LCT, and does hereby irrevocably assign, all right, title and interest worldwide in and to such materials, and Franchisee agrees to execute such documents (and, if necessary, require its employees and independent contractors to execute such documents) as may be deemed reasonably necessary by LCT to give effect to this provision.

12.8    Government Review.   If so required, Franchisee shall, at its own cost, submit all advertising and promotional materials (whether or not prepared by LCT) to the appropriate agencies of the national or provincial government for review and approval.  If any such government agency requires Franchisee to revise such advertisement or promotional materials, Franchisee shall submit such revised advertisement or promotional materials to LCT for review and approval under the procedures set forth in Section 12.5 above.

12.9    Use of Proprietary Marks in Advertising.   In all advertising and promotion, Franchisee shall use the Proprietary Marks only in accordance with the terms and conditions of Section 6 of this Agreement.

12.10   Technology.

12.10.1 *Computer Systems and Required Software.*

12.10.1.1    LCT shall have the right to specify or require that certain brands, types, makes, and/or models of communications, computer systems, and hardware to be used by, between, or among the Restaurants, including, without limitation:  (a) back office and POS System, data, audio, video, and voice storage, retrieval, and transmission systems for use at the Restaurants, between or among Restaurants, and between and among the Restaurants, Franchisee, LCT and/or other Little Caesar's restaurants; (b) cash register systems; (c) physical, electronic, and other security systems; (d) printers, digital menu boards and other peripheral devices, together with content-management software; (e) archival back-up systems; and (f) internet access mode (e.g., form of telecommunications connection) and speed (collectively, the "**Computer System**").

12.10.1.2    LCT shall have the right, but not the obligation, to develop or have developed for it, or to designate: (a) computer software programs and accounting system software that Franchisee must use in connection with the Computer System ("**Required Software**"), which Franchisee shall install; (b) updates, supplements, modifications, or enhancements to the Required Software, which Franchisee shall install; (c) the tangible media upon which Franchisee shall record data; and (d) the database file structure of Franchisee's Computer System.

12.10.1.3    Notwithstanding the foregoing provisions of this Section 12.10.1, if Franchisee reasonably believes that any of the obligations contained in Section 12.10.1.2 are impractical or unduly burdensome, Franchisee shall have the right to submit to LCT a detailed written request for a variance from such obligation in order to achieve the maximum amount of conformity to the standards set out in this Agreement and in the Manual, and LCT shall neither unreasonably withhold nor unduly delay its approval of that request.

12.10.1.4    Franchisee shall take any and all acts to install and use the Computer System and Required Software, including, without limitation, the execution of associated licenses, agreements and documents, purchasing and installing components of the Computer System and Required Software.

12.10.2 *Computer Upgrades.*   Franchisee shall implement and periodically make upgrades and other changes to the Computer System and Required Software as LCT may reasonably request in writing (collectively, "**Computer Upgrades**").

12.10.3 *Access.*   Franchisee shall afford LCT unimpeded access to Franchisee's Computer System and Required Software as LCT may request, in the manner, form, and at the times requested by LCT.  LCT shall have the right at any time to retrieve and use such data and information from Franchisee's Computer System and Required Software that LCT deems necessary or desirable.  In view of the contemplated interconnection of computer systems and the necessity that such systems be compatible with each other to the greatest practical extent, Franchisee agrees to comply with LCT's standards and specifications for all items associated with Franchisee's Computer System and Required Software, and with respect to Computer Upgrades, and to otherwise operate its Computer System in accordance with LCT's standards and specifications.

12.10.4 *Data.*  Except as set forth in Section 9.3 above and subject to the Privacy Laws, all data provided by Franchisee, uploaded to LCT's system from Franchisee's Computer System, and/or downloaded from Franchisee's Computer System to LCT's system is and will be owned exclusively by LCT, and LCT will have the right to use such data in any manner that LCT deems appropriate without compensation to Franchisee.  In addition, all other data created or collected by Franchisee in connection with the System, or in connection with Franchisee's operation of the Restaurants (including, but not limited to, consumer and transaction data), is and will be owned exclusively by LCT during the term of, and following termination or expiration of, this Agreement.  Copies and/or originals of such data must be provided to LCT upon LCT's request.  LCT hereby licenses use of such data back to Franchisee, at no additional cost, solely for the term of this Agreement and solely for Franchisee's use in connection with the establishment and operation of the Restaurants pursuant to this Agreement.

12.10.5 *Privacy.*  Subject to commercial standards of reasonableness based upon local business practices in the Territory, LCT may, from time-to-time, specify in the Manual (or otherwise in writing) the information that Franchisee shall collect and maintain on the Computer System installed at the Restaurants, and Franchisee shall provide to LCT such reports as LCT may reasonably request from the data so collected and maintained.  All data pertaining to or derived from the Restaurants (including, without limitation, data pertaining to or otherwise about Restaurant customers) is and shall be the exclusive property of LCT, and LCT hereby grants a royalty-free nonexclusive license to Franchisee to use said data during the term of this Agreement.

12.10.5.1   Franchisee shall abide by all applicable laws pertaining to the privacy of consumer, personal data protection, employee, and transactional information ("**Privacy Laws**").

12.10.5.2   Franchisee shall comply with LCT's standards and policies pertaining to privacy.  If there is a conflict between LCT's standards and policies pertaining to privacy and any Privacy Laws, Franchisee shall: (a) comply with the requirements of the Privacy Laws; (b) immediately give LCT written notice of said conflict; and (c) promptly and fully cooperate with LCT and LCT's counsel in determining the most effective way, if any, to meet LCT's standards and policies pertaining to privacy within the bounds of the Privacy Laws.

12.10.5.3   Franchisee shall not publish, disseminate, implement, revise, or rescind a data privacy policy without LCT's prior written consent as to said policy.

12.10.6 *Telecommunications.*  Franchisee shall comply with LCT's requirements (as set forth in the Manual or otherwise in writing) with respect to establishing and maintaining telecommunications connections between Franchisee's Computer System and LCT's Extranet and/or such other computer systems as LCT may reasonably require.  The term "**Extranet**" means a private network based upon Internet protocols that will allow users inside and outside of LCT's headquarters to access certain parts of LCT's computer network via the Internet.

12.10.7 *Extranet.*  LCT may establish an Extranet (but is not required to do so or to maintain an Extranet).  If LCT does establish an Extranet, then Franchisee shall comply with LCT's requirements (as set forth in the Manual or otherwise in writing) with respect to connecting to the Extranet, and utilizing the Extranet in connection with the operation of the Restaurants.  The Extranet may

include, without limitation, the Manual, training and other assistance materials, and management reporting solutions (both upstream and downstream, as LCT may direct). Franchisee shall purchase and maintain such computer software and hardware (including, but not limited to, telecommunications capacity) as may be required to connect to and utilize the Extranet. LCT shall have the right to require Franchisee to install a video, voice and data system that is accessible by both LCT and Franchisee on a secure Website, in real-time, all in accordance with LCT's then-current written standards as set forth in the Manual or otherwise in writing (subject to Section 5.17 above).

      12.10.8 *Websites*. Unless otherwise approved in writing by LCT, Franchisee shall not establish a separate Website, but shall only have one or more references or webpage(s), as designated and approved in advance by LCT, within LCT's Website. The term "**Website**" means an interactive electronic document contained in a network of computers linked by communications software, commonly referred to as the Internet or World Wide Web, including, but not limited to, social and business networking media such as Facebook, Twitter, LinkedIn, and on-line blogs and forums ("**Networking Media Websites**"). LCT shall have the right to require that Franchisee not have any Website other than the webpage, if any, made available on LCT's Website. However, if LCT approves, in writing, a separate Website for Franchisee (which LCT is not obligated to approve; and, which approval, if granted, may later be revoked by LCT), then each of the following provisions shall apply:

          12.10.8.1     Franchisee specifically acknowledges and agrees that any Website owned or maintained by or for the benefit of Franchisee, including any posting on or contribution to a Networking Media Website, shall be subject to LCT's prior review and approval under Section 12.5 above but shall not be deemed advertising for purposes of fulfilling its obligations under Sections 12.1, 12.2, 12.3, 12.4, or 12.5;

          12.10.8.2     Franchisee shall not establish or use any Website without LCT's prior written approval;

          12.10.8.3     Before establishing any Website, Franchisee shall submit to LCT, for LCT's prior written approval, a sample of the proposed Website domain name, format, visible content (including, without limitation, proposed screen shots), and non-visible content (including, without limitation, meta tags) in the form and manner LCT may reasonably require;

          12.10.8.4     Franchisee shall not use or modify such Website without LCT's prior written approval as to such proposed use or modification;

          12.10.8.5     In addition to any other applicable requirements, Franchisee shall comply with the standards and specifications for Websites that LCT may periodically prescribe in the Manual or otherwise in writing;

          12.10.8.6     If required by LCT, Franchisee shall establish such hyperlinks to LCT's Website and others as LCT may request in writing; and

          12.10.8.7     Franchisee shall not post any information relating to LCT, the System, the Proprietary Marks, or any Little Caesar's restaurants on a Networking Media Website without LCT's prior written approval; and Franchisee shall not make any posting or other contribution to a Networking Media Website that (a) is derogatory, disparaging, or critical of LCT, (b) is offensive, inflammatory, or indecent, or (c) harms the goodwill and public image of the System, Little Caesar's restaurants and/or the Proprietary Marks.

      12.10.9 *Domain Names*. Franchisee acknowledges and agrees that if LCT grants its approval for Franchisee's use of a generic, national, and/or regionalized domain name, LCT shall have the right to own and control said domain name at all times, and may license it to Franchisee but only for the term of this Agreement, on such terms and conditions as LCT may reasonably require (including, but not limited to, the requirement that Franchisee reimburse LCT's cost for doing so). If Franchisee already

owns any domain names, or hereafter registers any domain names, then as provided in Section 6.3.3 above, Franchisee agrees that it shall notify LCT in writing and assign said domain names to LCT and/or a designee that LCT has specified in writing. Franchisee further acknowledges and agrees that, as of the Effective Date, certain top level domain names registered in Australia by third parties contain the words "Little Caesar," and may not be available for use by Franchisee or LCT during the term of this Agreement by operation of Australian law. Such top level domain names include but are not limited to "littlecaesarspizzeria.com.au", "littlecaesars.com.au", "littlecaesars.au", and "littlecaesars.asia".

        12.10.10      *Online Use of Proprietary Marks and E-mail Solicitations.* Franchisee shall not use the Proprietary Marks or any abbreviation or other name associated with LCT and/or any System as part of any e-mail address, domain name; and/or other identification of Franchisee in any electronic medium, except as provided in Sections 12.10.8 and 12.10.9. Franchisee agrees not to transmit or cause any other party to transmit advertisements or solicitations by e-mail, text message, Networking Media Website, or other electronic media without first obtaining LCT's written consent as to: (a) the content of such e-mail advertisements or solicitations; and (b) Franchisee's plan for transmitting such advertisements. In addition to any other provision of this Agreement, Franchisee shall be solely responsible for compliance with any laws pertaining to sending e-mails, including, but not limited to, the U.S. Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (known as the "CAN-SPAM Act of 2003").

        12.10.11      *Changes to Technology.* Franchisee and LCT acknowledge and agree that changes to technology are dynamic and not predictable. In order to provide for inevitable but unpredictable changes to technological needs and opportunities, Franchisee agrees that LCT shall have the right to establish, in writing, reasonable new standards for the implementation of technology in connection with Franchisee's performance under this Agreement; and Franchisee agrees that it shall abide by those reasonable new standards established by LCT as if this Section 12 were periodically revised by LCT for that purpose.

## 13.    TRANSFER OF INTEREST

       13.1      <u>Transfer by LCT</u>. LCT shall have the right to transfer or assign all or any part of its rights or obligations under this Agreement to any person or legal entity; provided, however, any such transferee or assignee shall be obligated to meet the requirements of this Agreement with respect to the portion of LCT's rights that are transferred or assigned to that party.

       13.2      <u>Transfer by Franchisee</u>. THIS AGREEMENT; FRANCHISEE'S RIGHTS, OBLIGATIONS, AND ASSETS; AND/OR ANY INTEREST (INDIRECT AND/OR DIRECT) IN FRANCHISEE SHALL NOT BE ASSIGNED BY FRANCHISEE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF THIS SECTION 13.

       13.2.1  Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee, and that LCT has granted this license in reliance on the business skill, financial capacity, and personal character of the owners of Franchisee. Accordingly, neither Franchisee nor any immediate or remote successor to any part of Franchisee's interest in this Agreement, nor any individual, partnership, corporation, or other legal entity which directly or indirectly owns any interest in Franchisee and/or this Agreement shall sell, assign, transfer, convey, give away, subcontract, pledge, mortgage, or otherwise encumber any direct, indirect, or partial interest in Franchisee, this Agreement, or in any other agreement or arrangement directly or indirectly related to this Agreement, or in all or substantially all of Franchisee's assets related to this Agreement, without LCT's prior written consent. Any purported assignment or transfer, by operation of law or otherwise, not having LCT's prior written consent as required by this Section 13.2.1 shall be null and void and shall constitute a fundamental breach of this Agreement. Any request by the Franchisee for the consent of LCT pursuant to this Section 13.2.1 must be in writing and be accompanied by all information that LCT reasonably requests to make an informed decision.

13.2.2   LCT shall not except in accordance with the Code unreasonably withhold its consent to a proposed transfer of any direct or indirect interest in Franchisee, this Agreement, Franchisee's rights and obligations hereunder, the business contemplated hereunder, or substantially all of Franchisee's assets; provided, that, if any transfer, alone or together with other previous, simultaneous, or proposed transfers, would have the effect of transferring a controlling interest in Franchisee, this Agreement, Franchisee's rights and obligations hereunder, the business contemplated hereunder, or substantially all of the assets of the business contemplated hereunder, LCT shall have the right to require that Franchisee satisfy any or all of the following as conditions to LCT's approval:

13.2.2.1   All of Franchisee's accrued monetary obligations and all other outstanding obligations to LCT and its affiliates shall have been satisfied;

13.2.2.2   Franchisee is not in default of any material provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between Franchisee and LCT or its affiliates;

13.2.2.3   The transferor shall have executed a deed of surrender of this Agreement, in a form satisfactory to LCT; The transferee shall enter into a written assumption agreement, in a form satisfactory to LCT, assuming and agreeing to perform all of Franchisee's obligations under this Agreement;

13.2.2.4   The transferee shall demonstrate to LCT's satisfaction that it can meet LCT's educational, managerial, and business standards; possesses a good moral character, business reputation, and credit rating; has the aptitude and ability to conduct the business franchised hereunder (as may be evidenced by prior related business experience or otherwise); and has adequate financial resources and capital to operate said business;

13.2.2.5   If the transferee is a corporation or other legal entity, then such owners of a beneficial interest in the transferee as LCT may request shall execute a guarantee of the performance of Franchisee's obligations under this Agreement in the form attached as Attachment D hereto.

13.2.2.6   At the transferee's expense, at least two (2) qualified employees of transferee, who are reasonably acceptable to LCT, shall enroll in, attend, and successfully complete (to LCT's reasonable satisfaction) any training programs then in effect for franchisees upon such terms and conditions as LCT may reasonably require;

13.2.2.7   Franchisee shall pay a transfer fee in an amount equal to the greater of:   (a) Ten Thousand U.S. Dollars (US$10,000.00); or (b) One Thousand U.S. Dollars (US$1,000.00) for each Restaurant then open and in operation; however, no such transfer fee will be required in the case of a transfer to a newly-formed corporation or other legal entity, formed solely for the convenience of ownership, where the principals of the transferor and transferee and the percentages of ownership are the same before and after the transaction.

13.2.2.8   The transferor shall have first offered to sell such interest to LCT, pursuant to the provisions and time limits set forth in Section 13.5 hereof.

13.2.2.9   The transferor shall abide by the terms of Section 14 hereof relating to covenants not to compete and shall execute such documents as LCT may reasonably require in order to give effect to this provision.

13.2.2.10   The transferee must provide LCT with a written statement that it has received, read and had a reasonable opportunity to understand the Code and LCT's disclosure document as provided to the transferee by LCT pursuant to the Code.

13.2.3  Franchisee shall grant no security interest in any of the assets of the business contemplated hereunder unless the secured party agrees in writing that in the event of any default by Franchisee under any documents related to the security interest, LCT shall have the right and option to be substituted as obligor to the secured party and to cure any default of Franchisee, except that any acceleration of indebtedness due to Franchisee's default shall be void.

13.2.4  Franchisee acknowledges and agrees that each condition which must be met by the transferee is necessary to assure such transferee's full performance of the obligations hereunder.

13.2.5  Notwithstanding any consent provided by LCT under this Section 13, provided there are reasonable grounds, LCT may revoke its consent within fourteen (14) days of providing that consent by advising the Franchisee in writing that the consent has been revoked and the reasons why the consent has been revoked.

13.3  Prohibited Transfers.  Notwithstanding any other provision of this Section 13, and so long as there is compliance with the Code, neither this Agreement, nor any ownership interest in Franchisee, nor material assets of Franchisee, nor all or substantially all of the assets of the Restaurants, shall be transferred to any Publicly-Traded Entity (as defined below), or to any entity whose direct or indirect parent is a Publicly-Traded Entity.

13.3.1  "Publicly-Traded Entity" means an entity whose securities trade on any national or regional securities exchange or are quoted in any publication or electronic reporting service maintained by any securities association or comparable organization.

13.3.2  Neither Franchisee nor any direct or indirect owner of Franchisee shall offer securities of Franchisee or other ownership interests in Franchisee in a public offering or, except as provided in Section 13.4, in a private offering.

13.3.3  If any direct or indirect owner of Franchisee offers its or other ownership interests in Franchisee securities in a public offering or, except as provided in Section 13.4, in a private offering, LCT shall have the right to terminate this Agreement in accordance with Section 15.

13.3.4  It shall be reasonable for LCT to disapprove any proposed transfer if, as a result of the transfer, the beneficial ownership of Franchisee would be, in LCT's reasonable business judgment, so widely held by different persons as to materially compromise the financial stake and dedication of those persons in whose individual or collective character, skill, attitude, and business ability LCT relies on in granting a franchise.

13.4  Private Sale of Securities.  The sale of securities of Franchisee or of any direct or indirect owner of Franchisee (including, without limitation, common or preferred stock, bonds, debentures, general or limited partnership interests, or membership units, whether certificated or uncertificated or other ownership interests), is subject to all of the conditions and prohibitions set out in Section 13.2 hereof.  For any proposed offering of securities or other ownership interests approved in principle by LCT, Franchisee shall submit to LCT for its review all materials required by applicable law for the offering, including any materials to be used in any exempt offering.  No such materials shall be submitted to a government agency or to prospective investors (even in draft form) unless and until LCT has furnished its written approval.  No offering materials shall imply, by use of the Proprietary Marks or otherwise, that LCT is participating as an underwriter, issuer, or offeror of securities of either Franchisee or LCT, or that LCT has approved the offering prospectus or any other aspect of the offering.  Any review by LCT of the offering materials or the information included therein shall be conducted solely for LCT's benefit to determine their conformance with LCT's internal policies, and not to benefit or protect any other person. No investor should interpret such review by LCT, nor shall Franchisee or anyone acting on Franchisee's behalf suggest, that LCT's review constitutes an approval, endorsement, acceptance, or adoption of any representation, warranty, covenant, or projection contained in the materials reviewed; and the offering documents shall include legends and statements, in the form and manner specified by LCT, disclaiming

LCT's liability for, or involvement in, the transaction described in the offering documents.  Should LCT object to any reference to it or its business in such offering literature or prospectus, such literature or prospectus shall not be used unless and until LCT's objections are withdrawn.  Franchisee and other participants in the offering, must fully indemnify, defend and hold harmless the Indemnified Parties from any and all losses and expenses that arise directly or indirectly from, as a result of, or in connection with the offering.  LCT holds the indemnity on trust for the benefit of the other Indemnified Parties.  Franchisee agrees that any such indemnification shall be subject to the terms and conditions of Section 18.4 of this Agreement.  For each proposed offering, Franchisee shall pay to LCT a non-refundable fee of Twenty-Five Thousand U.S. Dollars (US$25,000.00), at the time that Franchisee submits materials for review by LCT and shall pay additional sums to cover LCT's out-of-pocket costs to review the materials when incurred if greater than Twenty-Five Thousand U.S. Dollars (US$25,000.00).  Franchisee shall give LCT written notice at least forty-five (45) business days prior to the date of commencement of any offering or other transaction covered by this Section 13.4.  Any such offering shall be subject to LCT's right of first refusal as provided in Section 13.5 hereof.

13.5   Right of First Refusal.

13.5.1  Any party: (a) holding any interest in the assets of the business contemplated hereunder; or (b) proposing to transfer a material right or obligation arising hereunder; who desires to accept any bona fide offer from a third party to purchase such right, obligation, or interest, shall notify LCT in writing of each such offer, and shall provide such information and documentation relating to the offer as LCT may require.  LCT shall have the right and option, exercisable within forty-five (45) days after receipt of such written notification (and any additional pertinent information that LCT may request), to send written notice to the seller that LCT intends to purchase (either by itself or through its nominee) the seller's right, obligation, or interest on the same terms and conditions offered by the third party.  If LCT elects to purchase the seller's right, obligation, or interest, closing on such purchase must occur within forty-five (45) days from the date of notice to the seller of the election to purchase by LCT.  Any material change in the terms of any offer prior to closing shall constitute a new offer subject to the same rights of first refusal by LCT as in the case of an initial offer.  Failure of LCT to exercise the option afforded by this Section 13.5 shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section 13, with respect to a proposed transfer.

13.5.2  If the consideration, terms, and/or conditions offered by a third party are such that LCT may not reasonably be required to furnish the same consideration, terms, and/or conditions, then LCT may purchase the interest proposed to be sold for the reasonable equivalent in cash.  If the parties cannot agree within a reasonable time on the cash consideration, an independent appraiser shall be designated by LCT, and said appraiser's determination shall be binding.  The cost of such an appraisal shall be evenly divided between LCT and Franchisee, and Franchisee agrees to make payment therefor before closing, or LCT shall be entitled to deduct one-half ($\frac{1}{2}$) of the cost of such appraisal from the amount paid to seller.

13.6   Transfer Upon Death or Mental Incapacity.  Upon the death or mental incapacity of any person with an interest in the franchise, the executor, administrator, or personal representative of such person shall transfer within six (6) months after such death or mental incapacity, his interest to a third party approved by LCT.  Such transfers, including, without limitation, transfers by devise or inheritance, shall be subject to the same conditions as any inter vivos transfer.

13.7   Non-Waiver of Claims.  LCT's consent to a transfer of any interest in Franchisee granted herein shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of LCT's right to demand exact compliance with any of the terms of this Agreement by the transferee.

13.8   Constitution.  Franchisee shall adopt share transfer restrictions in its Governing Documents that reflect and fully implement the provisions of this Section 13, and shall present LCT with a copy of said Governing Documents including said transfer restrictions; and Franchisee shall not thereafter

revise, waive, or otherwise amend the share transfer restrictions in its Governing Documents without LCT's prior written consent.   "**Governing Documents**" means articles of incorporation, articles of association, articles of organization, statement of qualification, charter, by-laws, certificate of incorporation, certificate of partnership, certificate of formation, memorandum of incorporation, memorandum of association, registration certificate, shareholders' agreement, partnership agreement, joint venture agreement, and other similar organizational and governing documents of an entity.

      13.9    <u>Share Certificates</u>.  On all share certificates or similar forms of evidence that a party owns an interest in Franchisee, Franchisee shall cause the following words to be included prominently on the face of such certificate: "THE SHARES OF EVO PIZZA PTY LIMITED SHALL NOT BE ASSIGNED WITHOUT THE PRIOR WRITTEN CONSENT OF LITTLE CAESAR ENTERPRISES, INC."

## 14.    <u>COVENANTS</u>

      14.1    <u>No Diversion of Business</u>.  Franchisee will receive valuable Confidential Information, including, without limitation, information regarding the operational, sales, promotional and marketing methods and techniques of LCT and the System.  Franchisee covenants that, during the term of this Agreement, except as otherwise approved in writing by LCT, Franchisee shall not, either directly or indirectly, for itself or through, on behalf of, or in conjunction with any person or legal entity, divert or attempt to divert any business or customer of any Restaurant to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks and the System.

      14.2    <u>In-Term Covenant Not to Compete</u>.  Franchisee covenants that it shall not, during the term of this Agreement, either directly or indirectly, for itself or through, on behalf of, or in conjunction with any person or legal entity, own, maintain, operate, engage in, be employed by, consult with, or have any interest in the development or operation of a Competing Business (as defined below).  For the purpose of this Agreement, the term "**Competing Business**" is agreed to mean a restaurant not affiliated with the System engaged in the sale of pizza, pasta, sandwiches, chicken wings, bread and/or other products that are similar to the products sold in Little Caesar's restaurants.

      14.3    <u>Post-Term Covenant Not to Compete</u>.  Provided clause 23 of the Code does not apply, Franchisee covenants that it shall not at any time during the Restraint Period (as defined below), for any reason, either directly or indirectly, for itself or through, on behalf of, or in conjunction with any person or legal entity, own, maintain, operate, lease to, engage in, be employed by, consult with, or have any interest whatsoever in any Competing Business which business is, or is intended to be, located either:

           14.3.1  within the Territory;

           14.3.2  within ten (10) kilometers of the Approved Location of any Restaurant or other Little Caesar's restaurant then-operating within the Territory; or

           14.3.3  within five (5) kilometers of the Approved Location of any Restaurant or other Little Caesar's restaurant then-operating within the Territory.

For the purposes of this Section 14.3, the "**Restraint Period**" is agreed to mean a continuous uninterrupted period commencing from the latest to occur of: (a) a transfer permitted under Section 13 above, (b) the expiration or termination of this Agreement (regardless of the cause for termination), or (c) a final order of a duly authorized arbitrator, panel of arbitrators, or a court of competent jurisdiction (after all appeals have been taken) with respect to any of the foregoing or with respect to the enforcement of this Section 14.3, and ending on the date which is: (a) two (2) years from that date; (b) one (1) year from that date; (c) six (6) months from that date; or (d) three (3) months from that date.  Without limiting the terms and conditions set forth in Section 14.2 and this Section 14.3, Franchisee shall cause its principal officer or authorized representative to enter into the Confidentiality and Non-Competition Agreement, in the form attached hereto as Attachment F.

14.4    <u>Modification of Covenants</u>.  Franchisee acknowledges and agrees that the rights granted to Franchisee under this Agreement are adequate consideration for the non-compete covenants of Franchisee contained in this Agreement and that restrictions contained in this Section 14 are considered reasonable for the legitimate protection of the business and goodwill of LCT.  However, in the event that any such restriction shall be found to be void, but would be valid if some part thereof was deleted or the scope, duration or area of application were reduced, such restriction shall apply with the deletion of such words or such reduction of scope, duration or area of application as may be required to make the restriction valid and effective.  Each covenant contained in Sections 14.2 and 14.3 shall be construed as a separate covenant, and if any such covenant is held to be against the public interest, unlawful, or in any way an unreasonable restraint of trade, the other covenants shall continue in full force and effect.  Furthermore, Franchisee understands and acknowledges that LCT shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in Sections 14.2 and 14.3, or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof; and Franchisee agrees that it shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 22 hereof.  Notwithstanding the limitation of this provision by any applicable law, the parties hereto undertake to at all times observe and be bound by this Section; provided however, that on the revocation, removal or diminution of the law or provisions, as the case may be, by virtue of which the restrictions contained in this Section are limited as provided herein, the original restrictions would stand renewed and be effective to their original extent, as if they had not been limited by the law or provisions revoked.

14.5    <u>Violation of Covenants</u>.  Franchisee acknowledges and agrees that the covenants and obligations with respect to non-compete and non-solicitation as set forth in this Agreement relate to special, unique and extraordinary matters, and that a violation of any of the terms of such covenants and obligations will cause LCT, irreparable injury. Therefore, Franchisee agrees that LCT shall be entitled to an interim injunction, restraining order or such other equitable relief as a court of competent jurisdiction may deem necessary or appropriate to restrain Franchisee from committing any violation of the covenants and obligations contained in this Section.  These injunctive remedies are cumulative and are in addition to any other rights and remedies LCT may have at law or in equity.

14.6    <u>Personal Covenants</u>.  Franchisee shall require and obtain execution of covenants similar to those set forth in this Section 14 and in Sections 6, 9, 14, 16, and 23 of this Agreement (including covenants applicable upon the termination of an individual's relationship with Franchisee) from all officers, directors, partners, members, managers, and holders of any beneficial interest in Franchisee, and of any corporation, partnership, company or other entity directly or indirectly having an interest in Franchisee, who have not executed the Guarantee, Indemnification, and Acknowledgement attached as Attachment D hereto.  Every covenant required by this Section 14.6 shall be in the form attached to this Agreement as Attachment D hereto, and shall name LCT as a third-party beneficiary of all such covenants, with the independent right to enforce them.  Failure by Franchisee to obtain execution of a covenant required by this Section 14.6 shall constitute a default under Section 15.2below.

14.7    <u>Enforcement of Covenants</u>.  Franchisee agrees that the existence of any claims it may have against LCT, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by LCT of the covenants in this Section 14.  Franchisee agrees to pay all costs and expenses (including, but not limited to, reasonable legal fees) incurred by LCT in connection with the enforcement of this Section 14.

14.8    <u>Covenant as to U.S. Foreign Corrupt Practices Act</u>.  Franchisee acknowledges and agrees that it is familiar with the prohibitions of the United States Foreign Corrupt Practices Act (the "**FCPA**") and has not previously been accused of violating the FCPA or engaging in any practice that would be deemed to be the making of an improper payment under the FCPA.  In addition:

14.8.1   Franchisee has not made, and will not make, any payment or transfer of value, directly or indirectly, to any Governmental Official (as defined in the FCPA) or to any other person or

entity if that payment or transfer would violate the laws of the Territory, the United States, or the country in which Franchisee resides or in which the payment or transfer is made.

14.8.2  Franchisee has not made, and will not make, any payment or transfer of value, directly or indirectly, for the purpose or effect of public or commercial bribery, or acceptance of or acquiescence in extortion, kickbacks, money laundering or other unlawful or improper means of obtaining or retaining business.

14.8.3  Franchisee will comply with the U.S. Foreign Corrupt Practices Act (a copy of which can be found at   http://www.justice.gov/criminal/fraud/fcpa/docs/fcpa-english.pdf, with certain foreign               language            translations               available               at http://www.justice.gov/criminal/fraud/fcpa/statutes/regulations.html),  and  any  comparable  law  or regulation in the Territory, as well as any international conventions that outlaw bribery and corrupt practices.

14.9    Covenant as to Anti-Terrorism Laws.  Franchisee and its Owners (as defined below) agree to comply with and/or to assist LCT to the fullest extent possible in LCT's efforts to comply with Anti-Terrorism Laws (as defined below).  In connection with such compliance, Franchisee and its Owners certify, represent, and warrant that (a) none of their respective property or interests are subject to being "blocked" under any of the Anti-Terrorism Laws; (b) each of them are familiar with and understand the content and requirements of the Anti-Terrorism Laws; and (c) neither Franchisee nor any of its Owners are otherwise in violation of any of the Anti-Terrorism Laws.

14.9.1  For the purposes of this Section 14.9, the following terms have the following meanings:

14.9.1.1    "**Anti-Terrorism Laws**" means Executive Order 13224 issued by the President of the United States ("**Executive Order 13224**"), the Terrorism Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies, lists and any other requirements of any other requirements of any governmental authority (including, without limitation, the United States Department of Treasury Office of Foreign Assets Control, and any government agency with jurisdiction over the parties to this Agreement and/or their actions) addressing or in any way relating to terrorist acts and/or acts of war.

14.9.1.2    "**Owner**" means any person, entity, partner, member, or shareholder who owns any direct or indirect interest in Franchisee, and/or in any of the assets of a Restaurant.

14.9.2  Franchisee and its Owners certify that none of them, their respective employees, or anyone associated with any of them is listed in the U.S. Department of Treasury Office of Foreign Assets Control Specially Designated Nationals List or similar successor list(s) (the "**SDN List**"), which is updated  from  time  to  time  and  currently  available  at:      https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx.  Franchisee agrees not to knowingly hire any individual who is listed in the SDN List (or, if he or she is already employed, not to retain the employment of that individual).  Franchisee also agrees not to knowingly: (a) establish a new relationship with a person as an employee, Owner, banker, or otherwise who is listed in the SDN List (whether or not LCT has consented to a transfer involving such new Owner); and (b) maintain a business relationship (whether with an employee, an Owner, banker, or otherwise) with a person who is added to the SDN List.

14.9.3  Franchisee certifies that it has no knowledge or information that, if generally known, would result in Franchisee and/or its Owners, its employees, or anyone else associated with Franchisee to be listed in the SDN List.

14.9.4   Franchisee understands that it is solely responsible for ascertaining what actions it must take to comply with the Anti-Terrorism Laws, and Franchisee further acknowledges and agrees that its indemnification responsibilities set forth in Section 18.4 of this Agreement also apply to Franchisee's obligations under this Section 14.9.

14.9.5   Any misrepresentation by Franchisee under this Section 14.9, or any violation of the Anti-Terrorism Laws by Franchisee, its Owners, its employees, and/or their respective affiliates shall constitute a breach of this Agreement which pursuant to Section 15.2 of this Agreement, may give LCT the right to terminate this Agreement provided, however, that:

14.9.5.1   if Franchisee's violation of the Anti-Terrorism Laws is the result of a single act (or a series of related acts) of impropriety conducted by a Franchisee employee, then Franchisee may avoid having this Agreement terminated in accordance with Section 15.2 by complying with the notice issued by LCT pursuant to Section 15.2.   Such notice may include the requirement to immediately terminate such employee and delivering written confirmation of such termination to LCT within ten (10) business days following such termination; and

14.9.5.2   provided, further, that the provisions of Section 14.9.5.1 above shall not apply if the employee's acts were directed by Franchisee, were undertaken with Franchisee's knowledge, or should have been known by Franchisee, or were part of a consistent pattern of general willful misconduct or inattention by Franchisee, or if such act or violation negatively impacts the goodwill associated with any Proprietary Mark.

## 15.   DEFAULT AND TERMINATION

### 15.1   Upon Notice With No Opportunity to Cure.

15.1.1   Franchisee shall be deemed to be in default under this Agreement, and LCT may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon receipt of notice by Franchisee, upon the occurrence of any of the following events:

15.1.1.1   If Franchisee no longer holds a license that the Franchisee must hold to carry on the franchised business;

15.1.1.2   If Franchisee becomes bankrupt, insolvent, under administration or chapter 5 body corporate (as defined in the *Corporations Act 2001* (Cth));

15.1.1.3   If Franchisee is deregistered by the Australian Securities and Investments Commission;

15.1.1.4   if Franchisee voluntarily abandons the business or the franchise relationship;

15.1.1.5   If Franchisee is convicted of a serious offence (as that term is defined by the Competition and Consumer (Industry Codes – Franchising) Regulations 2014) (as amended or replaced from time to time or any other replacement rule, regulation or law ("Code"));

15.1.1.6   If Franchisee operates the business in a way that endangers public health or safety;

15.1.1.7   If Franchisee is fraudulent in connection with operation of the business; or

15.1.1.8        If Franchisee and LCT mutually agree, at the time of termination, to terminate this Agreement.

15.1.2  The Franchisee and LCT agree that LCT may terminate this Agreement (provided it complies with clause 28 of the Code) forty-five (45) days after LCT notifies Franchisee in writing of a final adjudication in the Commonwealth of Australia that, as a result of valid legal process, one or more of the Proprietary Marks shall be cancelled and/or otherwise removed from registration in the Territory and in LCT's reasonable opinion, the cancellation or removal of such Proprietary Marks would cause the continued operation of this Agreement to be substantially unfeasible or unlawful.

15.1.3  Franchisee shall be deemed to be in default under a Restaurant Addendum, and LCT shall have the right, at its option, to terminate such Restaurant Addendum and/or this entire Agreement, and all rights granted thereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon receipt of notice by Franchisee, upon the occurrence of any of the events described in Section 15.1.1.

15.2    <u>Upon Notice With Opportunity to Cure</u>.  If Franchisee is in default of this Agreement, except as otherwise provided in Section 15.1 above, LCT may terminate this Agreement by giving the Franchisee written notice stating the nature of such default and giving the Franchisee a reasonable period to remedy the default (which does not have to exceed 30 days). Franchisee may avoid termination by curing such default to LCT's satisfaction as described in the notice within the period specified in the notice and promptly providing proof thereof to LCT.  If any such default is not cured within the specified time, this Agreement shall terminate without further notice to Franchisee, effective immediately upon the expiration of the specified time-period.  Franchisee shall be in default hereunder for any failure to comply with any of the requirements imposed by this Agreement, as it may from time to time be amended or reasonably be supplemented by the Manual, or any failure to carry out the terms of this Agreement in good faith.  Such defaults shall include, without limitation, the occurrence of any of the following events:

15.2.2  If Franchisee or any principal, officer, managing director, managing partner, or other executive of Franchisee commits any criminal offense punishable by imprisonment of six (6) months or more and/or a fine equal to Ten Thousand U.S. Dollars (US$10,000.00) or more.  (The term "principal" as used in this Agreement means an individual that, directly or indirectly, owns five percent (5%) or more of Franchisee.);

15.2.3  If any transfer is made without LCT's prior written consent, contrary to the terms of Section 13 above;

15.2.4  If, contrary to the terms of Sections 8 or 9 above, Franchisee discloses or divulges the contents of the Manual or any other trade secrets or Confidential Information of LCT;

15.2.5  If the Franchisee breaches any of its representations or warranties under this Agreement;

15.2.6  If Franchisee opens a Restaurant for business without fully and timely complying with all of the conditions under Section 5.4.2 hereof;

15.2.7  If Franchisee breaches Section 14.8 or Section 14.9 of this Agreement;

15.2.8  If Franchisee is unlikely to be able to pay its debts as they fall due, becomes insolvent, fails to comply with a statutory demand under section 459(F) of the Corporations Act 2001 (Cth), files to obtain the benefit or protection of bankruptcy laws or is served with a petition in bankruptcy or a bankruptcy notice, enters into liquidation (whether compulsory or voluntarily), makes any arrangement or composition with its creditors, has a receiver, controller, manager or trustee appointed in respect of all or any part of its assets or takes any similar action in consequence of debt;

15.2.9  If Franchisee or any principal, officer, managing director, managing partner, or other executive of Franchisee commits any criminal offense punishable by imprisonment of six (6) months or more and/or a fine equal to Ten Thousand U.S. Dollars (US$10,000.00) or more.  (The term "principal" as used in this Agreement means an individual that, directly or indirectly, owns five percent (5%) or more of Franchisee.);

15.2.10 If Franchisee fails, refuses, or neglects promptly to pay when due any monies owing from Franchisee to LCT or LCT's affiliates, or to submit the financial or other information required by LCT under this Agreement, and fails to cure such nonpayment within ten (10) days after LCT delivers notice thereof to Franchisee;

15.2.11 If Franchisee fails to maintain or observe any of the standards or procedures prescribed by LCT in this Agreement, the Manual, or otherwise in writing;

15.2.12 If Franchisee fails, refuses, or neglects to obtain LCT's prior written approval or consent as required by this Agreement and any other agreement between the parties hereto;

15.2.13 In accordance with Section 1.8 above, if Franchisee fails to fulfill its obligations under the Development Schedule, and such failure continues for thirty (30) or more days after LCT delivers notice thereof to Franchisee;

15.2.14 If Franchisee engages in any business or markets any service or product under a name or mark which, in LCT's opinion, is confusingly similar to the Proprietary Marks;

15.2.15 If Franchisee fails, refuses, or neglects to comply with the standards and specifications prescribed by LCT for the establishment and operation of the Restaurants;

15.2.16 If a threat or danger to health or safety results from the construction, maintenance, or operation of any Restaurant and such threat or danger is not cured within twenty-four (24) hours after LCT delivers notice thereof to Franchisee.

15.2.17 If Franchisee at any time ceases to operate or otherwise abandons the business contemplated under this Agreement;

15.2.18 If Franchisee knowingly maintains false books or records, or knowingly submits any false reports to LCT;

15.2.19 If the Franchisee is in default under a Restaurant Addendum;

15.2.20 If LCT terminates for default Franchisee's right to operate any Restaurant, any Restaurant Addendum, or any other agreement between LCT and Franchisee, or any of Franchisee's affiliates or any of Franchisee's owners;

15.2.21 If Franchisee misuses or makes any unauthorized use of the Proprietary Marks or otherwise materially impairs the goodwill associated therewith or LCT's rights therein; and/or

15.2.22 If one of Franchisee's principals fails to maintain permanent, full-time residency in the Commonwealth of Australia as required by Section 5.19.

15.3      No Rights or Remedies Are Exclusive.  No right or remedy herein conferred upon or reserved to LCT is exclusive of any other right or remedy provided or permitted by law.

15.4      Lesser-Included Rights.  If LCT is entitled to exercise any rights under this Agreement (for example, the right to terminate this Agreement in accordance with Sections 15.1 or 15.2 above), then LCT shall have the right, subject to the UCT Qualification, to exercise all – or only a portion

of – its rights under this Section 15.  In particular, and without limiting the foregoing, in the event of a default under Sections 15.1 or 15.2 above, LCT shall have the right, subject to the UCT Qualification, to undertake any one or more of the following actions in lieu of terminating this Agreement:

15.4.1       to terminate some or all of the Restaurant Addenda, or just the Restaurant Addendum(a) for the Restaurant(s) to which such default(s) apply(ies), in which case Franchisee's right to operate the corresponding Restaurant(s) shall terminate;

15.4.2       to terminate or modify any rights that Franchisee may have with respect to "exclusivity," or protected, exclusive, or quasi-exclusive rights, in the Territory, as granted under Section 1.1 above, effective ten (10) days after delivery of written notice thereof to Franchisee;

15.4.3       to modify, or eliminate completely, the Territory, and the territorial protections, described in Attachment B to this Agreement;

15.4.4       to reduce or otherwise modify the number of Restaurants Franchisee may develop and operate in the Territory;

15.4.5       to reduce or otherwise modify the Development Schedule or the Development Rights;

15.4.6       to deny Franchisee the right to participate in any purchasing arrangements LCT negotiates or otherwise establishes with suppliers;

15.4.7       to remove the listing of the Restaurant(s) to which such default(s) apply(ies) from any directories or advertising LCT purchases, publishes, or arranges and/or from any LCT Website or Networking Media Website; and/or

15.4.8       to deny Franchisee the right to attend any System conferences or conventions.

Franchisee agrees that LCT's exercise of the remedies in this Section 15.4 shall not be deemed actual or constructive termination or abandonment of this Agreement.  Franchisee shall not be entitled to any compensation, including repayment, reimbursement, refund or offsets, for any fees, charges, expenses, or losses Franchisee directly or indirectly incurs by reason of LCT's exercise and/or withdrawal of any interim remedy, to the extent permitted by law.

15.5       If any of such rights, options, arrangements, or areas are terminated or modified in accordance with Section 15.4 above, such action shall be without prejudice to LCT's right to terminate this Agreement in accordance with Sections 15.1 or 15.2 above, and/or to terminate any other rights, options or arrangements under this Agreement at any time thereafter for the same default or as a result of any additional defaults of the terms of this Agreement.

16.    **OBLIGATIONS UPON TERMINATION OR EXPIRATION**

Upon termination or expiration of this Agreement, all of the rights granted to Franchisee under this Agreement shall immediately terminate and:

16.1       Cessation of Operations.  Franchisee shall immediately cease to operate the Restaurants and shall not at any time thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee, affiliate, or distributor of LCT.

16.2       Cease Use of Intellectual Property.  Franchisee shall immediately and permanently cease to use, directly or indirectly in any manner whatsoever:

16.2.1        Any trade secrets, confidential methods, procedures, and techniques associated with the System or Little Caesar's restaurants in the Territory, the United States, or elsewhere;

16.2.2        The Proprietary Marks and all other trademarks and distinctive forms, slogans, signs, symbols, and devices associated with the System or Little Caesar's restaurants in the Territory, the United States, or elsewhere, including, without limitation:

16.2.2.1        All signs, advertising materials, displays, stationery, forms, and any other articles which display or make any reference to the Proprietary Marks; and

16.2.2.2        Any and all references whatsoever to LCT, the Proprietary Marks, any other mark owned by LCT, the System, and/or Franchisee's status as a former franchisee.

16.2.3        Franchisee further agrees that in the event of a termination of this Agreement for whatever cause, Franchisee shall execute and deliver such documents as may be required by LCT, and Franchisee shall in good faith cooperate with LCT to give effect to this Section 16, including, without limitation, signing any documents needed to cancel any trademark license and/or registered user agreement that has been filed with any government agency.

16.3        <u>Premises</u>.  Franchisee shall make such modifications or alterations to the premises of each Restaurant immediately upon the termination or expiration of this Agreement as may be necessary to distinguish the appearance of the premises from that of restaurants under the System or any other restaurant operated by LCT and shall make such specific additional changes thereto as LCT may reasonably request for that purpose.

16.4        <u>No Use of Marks in Other Businesses</u>.  Franchisee agrees, if it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks (nor any reference to the System, the Proprietary Marks, any other of LCT's marks, LCT, or Franchisee's status as a former franchisee) in connection with either such other business or the promotion thereof.  Franchisee further agrees that it shall not at any time in the future use (or allow any other party directly or indirectly acting on its behalf to use) any designation of origin, description, or representation that suggests, implies, or represents a past or present association or connection with LCT and/or any of the Restaurants, System, and/or Proprietary Marks.

16.5        <u>Pay Amounts Due</u>.  Franchisee shall promptly pay all sums owing to LCT and its affiliates.

16.6        <u>Damages</u>.  Franchisee shall pay LCT all damages, costs, and expenses, including reasonable legal fees that LCT incurs either as a result of Franchisee's defaults and/or in obtaining injunctive or other relief for the enforcement of any provisions of this Section 16.  Notwithstanding the above, this Section 16.6 shall not apply to any costs incurred by LCT in relation to settling a dispute under this Agreement, but shall include all costs incurred by LCT in relation to any arbitration or court proceedings arising under Sections 23.2, 23.3 or 23.6.

16.7        <u>Return Manual and Other Data</u>.  Franchisee shall immediately deliver to LCT all manuals, including the Manual (and any translated copies of the Manual and other copies, even if made in violation of this Agreement), in all media where recorded whatsoever, and all other records and reports, correspondence, and instructions containing trade secrets or Confidential Information of LCT.

16.8        <u>Option With Respect to Restaurant Leasehold and Assets</u>.  LCT shall have the right, but not the obligation, to be exercised within thirty (30) days after termination, to:

16.8.1        Require that Franchisee assign to LCT any interest which Franchisee has in any lease or sublease for the premises of one or more of the Restaurants (in which case LCT shall

take over the obligation to pay rent and related charges (such as C.A.M. charges), but no other payments, for the remainder of the lease term); and/or

        16.8.2        Purchase from Franchisee any or all of the furnishings, equipment, signs, fixtures, supplies, or inventory of Franchisee related to the operation of the Restaurants, at an amount equal to Franchisee's cost or fair market value, whichever is less. If the parties cannot agree on a fair market value within a reasonable time, an independent appraiser shall be designated by LCT, and his/her determination shall be binding. If LCT elects to exercise any option to purchase herein provided, it shall have the right to set off all amounts due from Franchisee, and one half (½) of the cost of the appraisal, if any, against any payment therefor.

        16.9        <u>Cooperation</u>.  Franchisee agrees to cooperate and promptly comply with any request made by LCT under this Section.

        16.10        <u>Expiration or Termination of the Restaurants</u>.  When a Restaurant Addendum expires or is terminated, then all of the rights granted to Franchisee with respect to the corresponding Restaurant shall immediately terminate and the provisions of Sections 16.1 through 16.9 shall apply with respect to that Restaurant.

## 17.      TAXES, PERMITS, AND INDEBTEDNESS

        17.1        <u>Taxes Imposed on Franchisee</u>.  Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, sales taxes and payroll taxes, and all accounts and other indebtedness of every kind incurred by Franchisee in the operation of the Restaurants (including, for example, and without limitation, sales and value-added taxes that may be imposed if and when Franchisee buys goods or services from LCT or LCT's affiliates).

        17.2        <u>Tax Disputes</u>.  In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law, but in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of any Restaurant, or any improvements thereon.

        17.3        <u>Permits</u>.  Franchisee shall timely obtain any and all permits, certificates, or franchises necessary for the full and proper operation of each Restaurant, including, without limitation, licenses to do business, tax permits, and fire clearances.

        17.4        <u>Government Fees</u>.  Any and all governmental charges relating to or arising out of this Agreement, or any amendment hereto, in the form of registration fees, surtax, stamp duties, or any other similar governmental rates, taxes, or charges of any nature whatsoever shall be paid:  (a) by Franchisee when such charges are assessed against, or payable by, Franchisee under any applicable law in the Territory; and (b) by LCT when such charges are assessed against, or payable by, LCT under any federal, state, or local law of the United States of America.

        17.5        <u>Legal Actions with Possible Adverse Consequences</u>.  Franchisee shall notify LCT in writing within five (5) days of the commencement of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which may adversely affect the operation or financial condition of any Restaurant.

## 18.      INDEPENDENT CONTRACTOR AND INDEMNIFICATION

        18.1        <u>No Fiduciary Relationship</u>.  It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between them; that Franchisee is an independent contractor, and that nothing in this Agreement is intended to constitute either party an agent, legal

representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose whatsoever.

18.2     Independent Contractor.  During the term of this Agreement, Franchisee shall hold itself out to the public as an independent contractor operating pursuant to this Agreement.  Franchisee agrees to take such actions as shall be necessary to that end including, without limitation, posting a conspicuous notice (in such form as may be reasonably acceptable to LCT) that Franchisee operates under a license from LCT, on the premises of each Restaurant as well as in all contracts, checks, invoices, business stationery, etc., in which reference to the Proprietary Marks are used in any manner.

18.3     No Right to Bind Each Other.  Nothing in this Agreement authorizes any party to make any contract, agreement, warranty, or representation on the other party's behalf, or to incur any debt or other obligation in the other party's name; and in no event shall one of the parties to this Agreement assume liability for, or be deemed liable as a result of, any such action, or by reason of any act or omission of the other party, or any claim or judgment arising therefrom.

18.4     Indemnity.  Subject to Section 18.5, Franchisee hereby indemnifies and agrees to indemnify, defend, and hold LCT and LCT's affiliates (including, but not limited to, Blue Line Foodservice Distribution Inc. and other LCT affiliates and divisions), and their respective officers, directors, shareholders, agents, and employees ("**Indemnified Parties**") harmless against any and all such claims arising directly or indirectly from, as a result of, or in connection with (i) the establishment and operation of Restaurants, (ii) breaches of this Agreement, violations of applicable law and/or misrepresentations by Franchisee, and/or (iii) transfers restricted under Section 13, as well as the costs, including attorneys' fees, of defending against them. LCT holds the benefit of all indemnities given by the Franchisee under this Agreement on trust for the other Indemnified Parties. Without limiting the generality of the foregoing, Franchisee and LCT agree that to the extent permitted by law, LCT shall have no direct or indirect liability for any and all liability claims brought by any consumer of a Restaurant (and related to the products, services and/or operation of one or more Restaurants) and that such claims shall be the exclusive obligation of Franchisee, except to the extent that such claims are caused by defects in Proprietary Food Products that existed at the time such products were purchased from LCT or LCT's affiliates.  The existence of any insurance policies maintained by LCT and/or Franchisee shall not diminish Franchisee's obligations under this Section 18.4; and Franchisee's obligations under this Section 18.4 shall not diminish Franchisee's obligations with respect to maintaining insurance. In addition, and notwithstanding the foregoing, in connection with any failure by Franchisee to comply with this Agreement, regardless of whether there is any legal proceeding to enforce the terms of this Agreement, Franchisee shall reimburse LCT, upon demand, for the actual (or reasonably approximate) costs and expenses incurred by LCT, as applicable, as a result of such failure and for its enforcement of the terms of this Agreement, including, without limitation, accountants', attorneys', attorneys' assistants and expert witness fees, cost of investigation and proof of facts, court costs, other litigation expenses and travel expenses however excluding costs incurred by LCT in relation to settling a dispute under this Agreement.

18.5     Qualifications On Indemnities.  Any indemnity given by the Franchisee under this Agreement is reduced only to the extent that LCT has directly caused or contributed to such loss or claim, including by any negligent act or omission of LCT.

# 19.     APPROVALS AND WAIVERS

19.1     Request for Approval.  Whenever this Agreement requires LCT's prior approval or consent, Franchisee shall make a timely written request to LCT therefor and such approval or consent shall be obtained in writing.  If LCT does not provide its written approval, LCT shall be deemed to have withheld its consent.

19.2     No Waivers.  No delay, waiver, omission, or forbearance on the part of LCT to exercise any right, option, duty, or power arising out of any breach or default by Franchisee under any of the terms, provisions, covenants, or conditions hereof shall constitute a waiver by LCT to exercise any

such right, option, duty, or power as against Franchisee, or as to subsequent breach or default by Franchisee.  Subsequent acceptance by LCT of any payments due to it hereunder shall not be deemed to be a waiver by LCT of any preceding breach by Franchisee of any terms, provisions, covenants, or conditions of this Agreement.

20.    **NOTICES**

20.1      *Sending Notices*.  Any and all notices required or permitted under this Agreement shall be in writing and shall be delivered by any means that affords the sender evidence of delivery or of attempted delivery, to the respective parties at the addresses designated below, unless and until a different address has been designated by written notice to the other party.  Any notice by a means which affords the sender evidence of delivery, or rejected delivery, shall be deemed to have been given at the date and time of receipt or rejected delivery.  Notwithstanding anything to the contrary, the parties agree that they shall not use e-mail as a means for providing notice under this Agreement unless they have first agreed to the terms for doing so in a pen-and-ink writing signed and exchanged by authorized officers of each party, and such writing must designate (at a minimum) the individuals (or office-holders) for each party who are authorized to send and who are authorized to receive such messages.

|  |  |
|---|---|
| To LCT: | Little Caesar Enterprises, Inc. |
|  | 2211 Woodward Avenue |
|  | Detroit, MI 48201 U.S.A. |
|  | Attn:  Sr. Vice President, International |
|  | With a Copy to:  General Counsel |
|  |  |
| To Franchisee: | Evo Pizza Pty Limited |
|  | 4C Wolseley Grove |
|  | Zetland, New South Wales 2017 |
|  | Australia |
|  | Attn:  Ernest Koury |
|  |  |
|  | with a copy to: |
|  |  |
|  | Husch Blackwell |
|  | 111 Congress Avenue, Suite 1400 |
|  | Austin, Texas 78701-4093 |
|  | Attn: Hal Katz, Partner |

20.2      *Waiver of Notarization*.  LCT and Franchisee hereby waive any requirement under applicable law that a notice from the other party that is required or permitted under this Agreement (including, without limitation, notices of termination) be notarized before a notary public.

20.3      *Governing Language*.  This Agreement, all related agreements and the Manual originally will be written in the English language, and all questions of interpretation of this Agreement or the Manual shall be resolved by reference to the same as written in English.  All financial statements, reports, notices, applications for approval and other communications between the parties arising out of or in connection with this Agreement shall be in English.  Franchisee represents and warrants to LCT that members of its senior management fully understand this Agreement, and do not require any translation.

21.    **SEVERABILITY AND CONSTRUCTION**

21.1      *Each Clause Severable*.  Except as expressly provided to the contrary herein, each portion, section, part, term, and/or provision of this Agreement shall be considered severable; and if, for any reason, any portion, section, part, term, and/or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid

jurisdiction, such determination shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms, and/or provisions of this Agreement as may remain otherwise intelligible (and the parties shall negotiate in good faith with one another to replace such provision with a valid and enforceable provision having substantially the same economic and legal effect upon the parties).

21.2   <u>No Rights Conferred on Others</u>.   Except as expressly provided to the contrary herein, nothing in this Agreement is intended or shall be deemed to confer upon any person or legal entity other than Franchisee, LCT, LCT's affiliates, and their respective officers, directors, and employees, and such of Franchisee's and LCT's respective successors and assigns as may be contemplated (and, as to Franchisee, permitted) by Section 13 hereof, any rights or remedies under or by reason of this Agreement.

21.3   <u>Provisions Meant to Survive Agreement</u>.   All covenants, obligations, and agreements hereunder that by their terms or by reasonable implication are to be performed, in whole or in part, after the termination or expiration of this Agreement, shall survive such termination or expiration.

21.4   <u>Represented by Counsel</u>.   The parties further acknowledge that each was represented by legal counsel of its own choosing, and that each party had an adequate amount of time to review and negotiate this Agreement and each other agreement executed in connection herewith.

21.5   <u>Time Measurements</u>.   The parties agree that all references to periods of time in this Agreement shall refer to the start and end of such periods in Detroit, Michigan, U.S.A.

21.6   <u>Captions and Headings; Recitals</u>.   The captions and headings in this Agreement are merely for the sake of convenient reference and shall not amend, modify, or have any effect whatsoever on the terms of this Agreement.   The parties agree that the Recitals are an integral part of this Agreement.

21.7   <u>Force Majeure</u>.   Whenever a period of time is provided in this Agreement for either party to do or perform any act or thing, except the payment of monies, neither party shall be liable or responsible for any delays due to acts of God, war, terrorist act, governmental regulation or control or other causes beyond the reasonable control of the parties, and in any event said time period for the performance of an obligation hereunder shall be extended for the amount of time of the delay for up to one (1) year, unless such time period is extended in writing by mutual consent of the parties; provided, however, that if such delay continues for more than a year, the party whose performance is not being excused under this Section 21.7 may terminate this Agreement on notice to the other party; and further provided, however, that if the payment of fees or monies to LCT or its affiliates is thereby delayed, interest on the unpaid amount shall accrue in accordance with Section 4.10 hereof.   This Section shall not apply or not result in an extension of the term of this Agreement.

21.8   <u>Further Assurances</u>.   The parties shall do and cause to be done all such acts, matters and things and shall execute and deliver all such documents and instruments as shall be required to enable the parties to perform their respective obligations under, and to give effect to the transactions contemplated by, this Agreement.

## 22.   <u>ENTIRE AGREEMENT AND AMENDMENTS</u>

21.1   <u>Complete Agreement</u>.   This Agreement and the documents referred to herein constitute the entire agreement between LCT and Franchisee concerning the subject matter hereof and to the extent permitted by law, supersede any and all prior agreements concerning the same subject matter. The parties agree that in deciding whether to enter into this Agreement, they did not rely on anything other than the words of this Agreement.

22.2     Amendment.  Except for those permitted to be made unilaterally by LCT hereunder, no amendment, change, or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

## 23.     APPLICABLE LAW

23.1     Governing Law.  This Agreement and all claims arising from the relationship between LCT (and/or any of its affiliates) and Franchisee (and/or any of its affiliates) under this Agreement will be governed by the laws of the Territory.

23.2     Dispute Resolution Clause.  A party to this Agreement who has a dispute with another party to this Agreement must follow the dispute resolution procedures specified in Part 4 of the Code.  The parties agree to comply in good faith with those dispute resolution procedures.  A party must not commence arbitration or court proceedings in respect of a dispute unless it has complied with this Section 23.2 and until the dispute resolution procedure in the Code has been followed in full.

23.3     Arbitration Clause.  Provided that the parties have complied with Section 23.2, any claim or controversy arising out of or related to this Agreement the making, performance, breach, or interpretation of this Agreement, or the relationship of the parties, shall be finally settled by arbitration conducted in the Territory before the International Chamber of Commerce ("**ICC**") in accordance with the then-prevailing Rules of Arbitration of the ICC, by one (1) arbitrator appointed in accordance with such Rules.  There shall be no consolidated, common, or class action arbitration and Franchisee and its owners waive any and all rights to proceed on a consolidated, common, or class action basis.  The following shall supplement the rules of the ICC and, in the event of a conflict, shall govern any arbitration: All arbitration proceedings shall be conducted in the English language. Each party shall bear its own costs of arbitration; provided, however, that the arbitrator's fee shall be shared equally by the parties. The arbitrator shall have no authority to determine class action claims and shall have no authority to amend or modify the terms of this Agreement.  No issue of fact or law determined in the arbitration shall be given preclusive or collateral estoppel effect in any other arbitration, except to the extent such issue arises in another proceeding between the parties. The parties agree to be bound by the award of the arbitrator and the award will be the exclusive remedy between the parties regarding any claims, counterclaims, issues, or accountings presented or pled to the arbitrator; will be promptly paid free of any tax, deduction, or offset; and any costs, fees, or taxes incident to enforcing the award will, to the maximum extent permitted by law, be charged against the party resisting such enforcement.  Judgment upon the award of the arbitration may be entered in the court having jurisdiction thereof, or application may be made to such court for a judicial acceptance of the award or an order of enforcement. Each party hereby waives all objection which it may have at any time to the laying of venue of any proceedings brought in such courts, waives any claim that such proceedings have been brought in an inconvenient forum and further waives the right to object with respect to such proceedings that any such court does not have jurisdiction over such party. This agreement to arbitrate shall survive any termination or expiration of this Agreement.

23.4     Waiver of Punitive Damages.  Except with respect to obligations regarding use of the Proprietary Marks and Confidential Information, or as may be awarded in a third-party action, LCT and Franchisee both expressly waive, to the fullest extent permitted by law, any right to or claim for punitive, multiple, and/or exemplary damages.

23.5     Limitation on Claims.  To the extent permitted by law, any and all claims that Franchisee may have relating to this Agreement, the rights and obligations of the parties hereto, or any other claims or causes of action relating to the making, interpretation, or performance of LCT under this Agreement, against LCT, its affiliates, officers, directors, and employees shall be made by filing a claim hereunder within one (1) year following the conduct, act or other event or occurrence first giving rise to the claim.  To the extent permitted by law, failure by Franchisee to file a claim within one (1) year will result in the loss and waiver forever of such claim.

23.6     Injunctive Relief.  Nothing in this Agreement bars the right of LCT to obtain preliminary or permanent injunctive relief against threatened conduct that will cause it loss or damage, in accordance with the rules for obtaining injunctive relief in any jurisdiction.  Without limiting the foregoing, Franchisee specifically acknowledges that LCT intends to seek such relief if Franchisee has violated, threatens to violate, or poses an imminent risk of violating Sections 6, 7, 8, 9, 12.10, 13 or 14 hereof. Franchisee agrees to pay all court costs and reasonable attorneys' fees incurred by LCT in obtaining such relief other than the costs incurred by LCT in relation to settling a dispute under this Agreement. Nothing herein contained shall bar LCT's right to seek injunctive relief against threatened conduct that will cause it loss or damages.  Notwithstanding the foregoing, if a court or tribunal in the Territory (or elsewhere) is unable to grant such relief, the parties agree that it will be impossible for the parties to settle upon a specific amount of damages and, therefore, Franchisee and LCT agree that a proper amount of liquidated damages for such a breach would be Five Thousand U.S. Dollars (US$5,000.00) for each day that the violation occurs and for each day that it continues.  LCT shall be entitled to such additional damages as LCT may prove to a court or to an arbitrator.

23.7     Representations and Warranties.  Each party to this Agreement hereby represents and warrants to the other that:

23.7.1     The person signing this Agreement on such party's behalf has been duly authorized to do so.

23.7.2     Any and all corporate or company actions necessary to be taken in order to authorize entry into this Agreement have been duly taken.

23.7.3     There are no other agreements, court orders, or other legal obligations that limit or prevent such party from negotiating, entering into, exercising its rights, and/or carrying out its responsibilities under this Agreement.

23.8     Acknowledgements by Franchisee:     Franchisee acknowledges, warrants and represents to LCT that:

23.8.1     at least fourteen (14) days prior to executing this Agreement or paying any money under this Agreement, it has received and carefully read and had a reasonable opportunity to understand the provisions of the Code and the disclosure document which is required to be provided to Franchisee under the Code; and

23.8.2     prior to executing this Agreement, it has been advised by LCT to obtain and has been given advice about this Agreement by either or all of an independent legal advisor, an independent business advisor and an independent accountant.

24.     **GOVERNMENTAL APPROVALS**

24.1     Application for Approvals.  Franchisee shall apply, at its sole expense, to the appropriate authorities in the Territory for any approvals that LCT or its counsel deem necessary concerning this Agreement under the applicable laws in the Territory.

24.2     Changes Mandated by Government Agencies.  If any government agency should require, as a condition for its approval of the initial effectiveness of this Agreement, any alteration or modification of any term or condition of this Agreement, or of the performance of the parties thereunder, Franchisee shall notify LCT of such requirement within ten (10) days.  LCT, at its option, may make all required alterations or modifications at Franchisee's expense.  If LCT reasonably considers the requested alteration or modification to be material and adverse to it, then LCT shall have the right to terminate this Agreement by giving written notice of termination to Franchisee within twenty (20) days of receiving notice of such governmental requirement.

24.3      Provision of Information to Government Agencies.   If any government agency requires information, documents, or evidence in connection with the application for approval referred to in this Section 24, or in connection with LCT's proof of ongoing compliance with government requirements, Franchisee agrees to provide such information, documents, or evidence.

## 25.    POWER OF ATTORNEY

25.1      Appointment.  The Franchisee hereby irrevocably appoints LCT as its attorney for it and in its name to execute documents and do all acts, deeds and things as may be necessary or desirable to ensure that the Franchisee complies with its obligations under this Agreement after this Agreement.

25.2      Must Be In Breach.  LCT shall not be entitled to act as the Franchisee's attorney pursuant to the preceding Section 25.1 unless, at that time, the Franchisee is in breach of this Agreement.

25.3      No Termination of Appointment:  LCT's appointment as the Franchisee's attorney may not be terminated and the Franchisee agrees to ratify anything LCT does in the exercise of such power of attorney.

## 26.    NO COMMERCIAL AGENCY, REPRESENTATION, OR DISTRIBUTION RELATIONSHIP

THIS AGREEMENT, AMONG OTHER THINGS, INCLUDES A GRANT OF DEVELOPMENT RIGHTS, AND OPERATING RIGHTS.  LCT AND FRANCHISEE ACKNOWLEDGE AND AGREE THAT THIS AGREEMENT IS A CONTRACT CALLING FOR THE USE BY FRANCHISEE OF THE "LITTLE CAESAR" SYSTEMS, THE LICENSING OF THE PROPRIETARY MARKS, AND THE PROVISION OF THE TECHNICAL ASSISTANCE AND OTHER MATTERS BY LCT, BUT THAT THE AGREEMENT DOES NOT COVER AN AGENCY, REPRESENTATION, OR DISTRIBUTION OF ANY PRODUCT OR SERVICE, AND, THEREFORE, THIS AGREEMENT DOES NOT CONSTITUTE OR CREATE ANY COMMERCIAL AGENCY, REPRESENTATION, OR DISTRIBUTION RELATIONSHIP AS PROVIDED UNDER THE LAWS OF THE TERRITORY.  LCT AND FRANCHISEE ACKNOWLEDGE AND AGREE THAT THIS AGREEMENT SHOULD NOT BE INTERPRETED OR CONSTRUED AS A COMMERCIAL AGENCY, REPRESENTATION, OR DISTRIBUTION AGREEMENT, AND LCT AND FRANCHISEE FURTHER ACKNOWLEDGE AND AGREE THAT NEITHER THEY NOR ANY PARTY ACTING DIRECTLY OR INDIRECTLY, WITH OR WITHOUT THEIR PERMISSION, CONSENT, OR OTHERWISE ON THEIR BEHALF, MAY ATTEMPT TO REGISTER THIS AGREEMENT WITH ANY AUTHORITY IN THE TERRITORY.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement in duplicate, by their duly authorized representatives, on the day and year first above written.

| LC Trademarks, Inc. (LCT) | Evo Pizza Pty Limited (Franchisee) |
|---|---|
| By: _Erin Martin_ (signature) | By: _Ernest Koury_ (DocuSigned by) FCEFE8804435457 |
| Printed Name: _Erin Martin_ | Printed Name: Ernest Koury |
| Title: _Authorized Agent_ | Title: Director |

**ATTACHMENT A**

**Restaurant Addendum**

**1. Restaurant Address:**                    **2. Opening Date:**

_____            _____

_____

_____            **3. Store Franchise Fee:**

Telephone: _____            US$ _____

Facsimile: _____

        By their signatures below, the parties agree that they will abide by the terms and conditions of the International Multiple Unit Franchise Agreement dated _____, 2018 (the "**Franchise Agreement**") by and between LC Trademarks, Inc. ("**LCT**") and Evo Pizza Pty Limited ("**Franchisee**") with respect to the Restaurant to be operated at the above-referenced location, and pay the Store Franchise Fee set forth above. By its authorized signature below, LCT hereby grants approval for Franchisee to establish a Restaurant at the location referenced above, and Franchisee agrees to operate a Restaurant at that location, all in accordance with the terms of the Franchise Agreement.

IN WITNESS WHEREOF, the parties hereto have duly signed and delivered this Restaurant Addendum on the dates written below.

WITNESS/ATTEST:                    **LC TRADEMARKS, INC.**


_____            By: _____

                                       Printed Name: _____

                                       Title: _____

                                       Date: _____


WITNESS/ATTEST:                    **EVO PIZZA PTY LIMITED**


_____            By: _____

                                       Printed Name: _____

                                       Title: _____

                                       Date: _____

**ATTACHMENT B**

**Territory and Development Schedule**

1.      The Territory under the Agreement shall consist of the political boundaries, as of the Effective Date of the Agreement, described as:

The State of New South Wales

2.      The Development Schedule under this Agreement shall be:

| On or before this date: | Franchisee shall have opened at least this number of Restaurants in the Territory during the applicable period: | Franchisee shall have open and in operation at least this number of Restaurants in the Territory: |
|---|---|---|
| July 31, 2018 | 3 | 9 |
| December 31, 2018 | 5 | 14 |
| June 30, 2019 | 5 | 19 |
| December 31, 2019 | 6 | 25 |

Initialed:

_____        _____
       LCT                        Franchisee

**ATTACHMENT C**

**Statement of Ownership**

Franchisee represents, warrants, and covenants that the following information is true, correct, and complete as of the date of the International Multiple Unit Franchise Agreement.

1.     As of the date of this Agreement, Franchisee is:

___ an individual        _X_ a corporation        ___ a limited liability company

2.     Evo Pizza Pty Limited.
       (Name of Franchisee, Corporation or Limited Liability Company)

       76 Watkins Road, Baulkham Hills, New South Wales 2153, Australia
          (Address)

       +61 413 647 628
          (Phone)                                    (Fax)

3.     <u>Direct Owners</u>.  If Franchisee is a corporation or limited liability company, the name and percentage of ownership of each shareholder or member having an ownership interest in Franchisee is as follows:

| Name | Percentage of Shares/Ownership Interests in Franchisee |
|------|---------------------------------------------------------|
| Victorious Foods, LLC | 100% |

4.     <u>Indirect Owners</u>.  If any direct owner listed in paragraph 3 above is a corporation or limited liability company, the name and percentage of ownership of each shareholder or member having an ownership interest in such direct owner is as follows:

| Name | Percentage of Shares/Ownership Interests in Victorious Foods, LLC |
|------|---------------------------------------------------------------------|
| Ernest Koury | 25.9% |
| VM3G Family Trust (trustors and trustees are Omar Koury and Gina Koury) | 24.7% |
| BitWealth Holdings LLC | 45% |
| Afifi Koury | 3.3% |
| Dr. Thomas B. Roshek III | 1.1% |

Ownership of Bitwealth Holdings LLC

| Name | Percentage of Shares/Ownership Interests in BitWealth Holdings LLC |
|------|---------------------------------------------------------------------|
| Matthew Goettsche | 50% |
| Gavin Dickson | 50% |

Initialed:

_____                    _____
        LCT                                        Franchisee

LC Trademarks, Inc.
International Multiple Unit Franchise Agreement – August        2018                    57
Doc ID 577428443/v1

ATTACHMENT D

**Deed of Guarantee, Indemnification, and Acknowledgment ("Guarantee")**

As an inducement to LC Trademarks, Inc. ("**LCT**"), to execute the International Multiple Unit Franchise Agreement between LCT and Evo Pizza Pty Limited ("**Franchisee**"), dated ___August 13, 2018___ (the "**Agreement**"), the undersigned, jointly and severally, hereby unconditionally guarantee that all of Franchisee's obligations to LCT and its affiliates, including under the Agreement and obligations to LCT's affiliate Blue Line Foodservice Distribution Inc., will be punctually paid and performed (the "**Obligations**").

Upon demand by LCT, the undersigned will immediately make each payment required of Franchisee under the Obligations.  The undersigned hereby waive any right to require LCT to:  (a) proceed against Franchisee for any payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee; or (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee.  Without affecting the obligations of the undersigned under this Guarantee, LCT may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee.  The undersigned waive notice of amendment of the Agreement and notice of demand for payment by Franchisee, and agree to be bound by any and all such amendments and changes to the Agreement.

The undersigned hereby agree to defend, indemnify and hold LCT harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorneys' fees, reasonable costs of investigation, court costs, and arbitration fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement, any amendment thereto, any other agreement executed by Franchisee referred to therein, or any other Obligations.

The undersigned hereby acknowledge and agree to be individually bound by all of the covenants and terms contained in the Agreement, including, without limitation, those contained in Sections 6, 9, 13, 14, 16, and 23 of the Agreement; however, nothing in this Guarantee shall afford the undersigned the right to exercise any of Franchisee's rights under the Agreement.  The undersigned specifically acknowledge and agree that they shall be individually bound by such covenants and terms that apply to "Franchisee" in such sections of the Agreement as if the undersigned were named personally in such provisions.  In addition to the foregoing, with regard to the Confidential Information defined in Section 9.1, if any of the undersigned is a corporate entity, such entity specifically acknowledges and agrees that it shall not disclose any Confidential Information to its shareholders, either individually or collectively, and either directly or indirectly, including, but not limited to, by disclosing such Confidential Information in its annual report to shareholders.

This Guarantee shall terminate upon the termination or expiration of the Agreement, except that all obligations and liabilities of the undersigned which arose from events which occurred on or before the effective date of such termination shall remain in full force and effect until satisfied or discharged by the undersigned, and all covenants which by their terms continue in force after the expiration or termination of the Agreement shall remain in force according to their terms.  Upon the death of an individual guarantor, the estate of such guarantor shall be bound by this Guarantee, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

Unless specifically stated otherwise, the terms used in this Guarantee shall have the same meaning as in the Agreement, and shall be interpreted and construed in accordance with Section 23 of the Agreement.  However, In recognition that most of the undersigned are domiciled in and executing this Guarantee in the United States of America, if LCT elects to commence any action, litigation or proceeding of any kind whatsoever against the undersigned in any way arising from or relating to this Guarantee and

all contemplated transactions, the undersigned agrees to submit to the federal courts sitting in Detroit, Michigan or, if such court does not have subject matter jurisdiction, the courts of the State of Michigan sitting in Wayne County, and the courts competent to determine appeals from those courts, and in such instances, this Guarantee shall be interpreted and construed under the laws of the State of Michigan, U.S.A. (excluding any applicable choice of law rules, which shall not be applied).

**The undersigned represent and warrant that they have full power and** authority to execute, deliver and perform this Guarantee, and that neither the execution, delivery nor performance of this Guarantee will violate any law or regulation, or any order or decree of any court or governmental authority, or will conflict with, or result in the breach of, or constitute a default under, any agreement or other instrument to which they are a party or by which the undersigned may be bound, or will result in the creation or imposition of any lien, claim or encumbrance upon any property of the undersigned.

IN WITNESS WHEREOF, the undersigned have signed this Guarantee as a deed as of the date of the Agreement.

### GUARANTORS:

Signed, sealed and delivered by **Ernest Koury**, Individually

Signed: _____

Printed Name: ERNEST KOURY

Address: 4C Wolseley Grove, Zetland, NSW 2017

Witness: _____

Witness Address: 4D WOLSELEY GROVE ZETLAND 2017

Signed, sealed and delivered by **Sandra Koury**, Individually

Signed: _____

Printed Name: Sandra Koury

Address: 4C Wolseley Grove, Zetland, NSW 2017

Witness: _____

Witness Address: 4D WOLSEBEY GROVE ZETLAND 2017

Signed, sealed and delivered by **G. Omar Koury**, Individually

Signed: _____

Printed Name: _____

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness: _____

Witness Address: _____

Signed, sealed and delivered by **Gina Koury**, Individually

Signed: _____

Printed Name: _____

11 Paradise Valley Ct., Henderson, NV 89052

Witness: _____

Witness Address: _____

*[Additional Signature Pages Follow]*

all contemplated transactions, the undersigned agrees to submit to the federal courts sitting in Detroit, Michigan or, if such court does not have subject matter jurisdiction, the courts of the State of Michigan sitting in Wayne County, and the courts competent to determine appeals from those courts, and in such instances, this Guarantee shall be interpreted and construed under the laws of the State of Michigan, U.S.A. (excluding any applicable choice of law rules, which shall not be applied).

**The undersigned represent and warrant that they have full power and** authority to execute, deliver and perform this Guarantee, and that neither the execution, delivery nor performance of this Guarantee will violate any law or regulation, or any order or decree of any court or governmental authority, or will conflict with, or result in the breach of, or constitute a default under, any agreement or other instrument to which they are a party or by which the undersigned may be bound, or will result in the creation or imposition of any lien, claim or encumbrance upon any property of the undersigned.

IN WITNESS WHEREOF, the undersigned have signed this Guarantee as a deed as of the date of the Agreement.

### GUARANTORS:

Signed, sealed and delivered by **Ernest Koury**, Individually

Signed: _____

Printed Name: _____

Address: 4C Wolseley Grove, Zetland, NSW 2017

Witness:_____

Witness Address:_____

Signed, sealed and delivered by **Sandra Koury**, Individually

Signed: _____

Printed Name: _____

Address: 4C Wolseley Grove, Zetland, NSW 2017

Witness:_____

Witness Address:_____

Signed, sealed and delivered by **G. Omar Koury**, Individually

Signed: _____

Printed Name: GEORGE OMAR KOURY

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness: Jessica Story

Witness Address: 9691 Pictou Ct. Las Vegas NV 89148

Signed, sealed and delivered by **Gina Koury**, Individually

Signed: Gina Renee Koury

Printed Name: GINA RENEE KOURY

: 11 Paradise Valley Ct., Henderson, NV 89052

Witness: Katty J. S.

Witness Address: 2144 Fort Holly Cax St Henderson NV 89052

*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Afifi Koury**, Individually

Signed: _Afifi Koury_

Printed Name: _AFIFI KOURY_

Address: 348 Roland Falls Ln., Las Vegas, NV 89183

Witness: _____

Witness Address: _737 EVEREST PEAK AVE, HENDERSON NV 89012_


Signed, sealed and delivered by **Dr. Thomas B. Roshek III**, Individually

Signed: _____

Printed Name: _____

Address: 7011 Spanky Branch Ct., Dallas, TX 75248

Witness:_____

Witness Address:_____

Signed, sealed and delivered by **Dr. Tara Michelle Du Val**, Individually

Signed: _____

Printed Name: _____

Address: 7011 Spanky Branch Ct., Dallas, TX 75248

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **Matthew Goettsche**, Individually

Signed: _____

Printed Name: _____

Address: 80 Rivera Court, Erie, Colorado 80516

Witness:_____

Witness Address:_____

Signed, sealed and delivered by **Danielle Goettsche**, Individually

Signed: _____

Printed Name: _____

Address: 80 Rivera Court, Erie, Colorado 80516

Witness:_____

Witness Address:_____


*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Afifi Koury**, Individually

Signed: _____

Printed Name: _____

Address: 348 Roland Falls Ln., Las Vegas, NV 89183

Witness:_____

Witness Address:_____

Signed, sealed and delivered by **Dr. Thomas B. Roshek III**, Individually

Signed: _____ T. Roshek _____

Printed Name: ___ T. ROSHEK ___

Address: 7011 Spanky Branch Ct., Dallas, TX 75248

Witness: _Jana Haby_

Witness Address: _589 Southfork blvd_
Wylie Tx 75098

Signed, sealed and delivered by **Dr. Tara Michelle Du Val**, Individually

Signed: _____

Printed Name: _Tara Duval_

Address: 7011 Spanky Branch Ct., Dallas, TX 75248

Witness: _Jana Haby_

Witness Address: _589 Southfork blvd_
Wylie Tx 75098

Signed, sealed and delivered by **Matthew Goettsche**, Individually

Signed: _____

Printed Name: _____

Address: 80 Rivera Court, Erie, Colorado 80516

Witness:_____

Witness Address:_____

Signed, sealed and delivered by **Danielle Goettsche**, Individually

Signed: _____

Printed Name: _____

Address: 80 Rivera Court, Erie, Colorado 80516

Witness:_____

Witness Address:_____

*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Afifi Koury**, Individually

Signed: _____

Printed Name: _____

Address: 348 Roland Falls Ln., Las Vegas, NV 89183

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **Dr. Thomas B. Roshek III**, Individually

Signed: _____

Printed Name: _____

Address: 7011 Spanky Branch Ct., Dallas, TX 75248

Witness:_____

Witness Address:_____

Signed, sealed and delivered by **Dr. Tara Michelle Du Val**, Individually

Signed: _____

Printed Name: _____

Address: 7011 Spanky Branch Ct., Dallas, TX 75248

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **Matthew Goettsche**, Individually

Signed: _~signature~_____

Printed Name: _Matthew Goettsche_____

Address: 80 Rivera Court, Erie, Colorado 80516

Witness: Allison Kloek_____

Witness Address:__~signature~_____
2735 W 27th Ave
Denver, CO 80211

Signed, sealed and delivered by **Danielle Goettsche**, Individually

Signed: _Danielle Goettsche~signature~_____

Printed Name: _Danielle Goettsche_____

Address: 80 Rivera Court, Erie, Colorado 80516

Witness: Allison Kloek ~signature~_____

Witness Address: 2735 W 27th Ave, Denver, CO 8021_

*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Gavin Dickson**, Individually

Signed: _____

Printed Name: _Gavin Dickson_

Address:   4604  Summerview  Road,  Bountiful,  UT 84010

Witness: _____

Witness Address: _8483 Robidoux Road Sandy, UT 84093_

| Signed, sealed and delivered by **VM3G Family Trust** | Signed, sealed and delivered by **VM3G Family Trust** |
|---|---|
| _____ | _____ |
| By:  Omar Koury | By:  Gina Koury |
| Its:  Trustee | Its:  Trustee |
| Address: 11 Paradise Valley Ct., Henderson, NV 89052 | 11 Paradise Valley Ct., Henderson, NV 89052 |
| Witness:_____ | Witness:_____ |
| Witness Address:_____ | Witness Address:_____ |

| Signed, sealed and delivered by **Victorious Foods, LLC** | Signed, sealed and delivered by **Victorious Foods, LLC** |
|---|---|
| _____ | _____ |
| By:  Omar Koury | By:  Ernest Koury |
| Its:  Manager | Its:  Manager |
| Address: 11 Paradise Valley Ct., Henderson, NV 89052 | 11 Paradise Valley Ct., Henderson, NV 89052 |
| Witness:_____ | Witness:_____ |
| Witness Address:_____ | Witness Address:_____ |

*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Gavin Dickson**, Individually

Signed: _____

Printed Name: _____

Address:    4604 Summerview Road, Bountiful, UT 84010

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **VM3G Family Trust**

By:  Omar Koury

Its:  Trustee

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness: _____

Witness Address: 9691 Pictou Ct, Las Vegas, NV 89148


Signed, sealed and delivered by **VM3G Family Trust**

By:  Gina Koury

Its:  Trustee

11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address: 2144 Fort Haci FAbo St Henderson, NV 89052


Signed, sealed and delivered by **Victorious Foods, LLC**

By:  Omar Koury

Its:  Manager

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness_____

Witness Address: 9691 Pictou Ct, Las Vegas, NV 89148


Signed, sealed and delivered by **Victorious Foods, LLC**

_____

By:  Ernest Koury

Its:  Manager

11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address:_____


*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Gavin Dickson**, Individually

Signed: _____

Printed Name: _____

Address:    4604 Summerview Road, Bountiful, UT 84010

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **VM3G Family Trust**

_____

By:  Omar Koury

Its:  Trustee

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **VM3G Family Trust**

_____

By:  Gina Koury

Its:  Trustee

11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **Victorious Foods, LLC**

_____

By:  Omar Koury

Its:  Manager

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **Victorious Foods, LLC**

_____

By:  Ernest Koury

Its:  Manager

11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address: _40_ _HOLSLEY_ _GROVE_ _ZETLAM)_ _2017_


*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **BitWealth Holdings LLC**

By:  Matt Goettsche

Its: Managing Member

Address:  321 Greenleaf Glen St., Henderson, NV
          89014; 360 W. Broadway, Ste. 100, Salt Lake
          City, UT 84101

Witness: Allison Kloek

Witness Address: 2735 W 22th Ave, Denver, co 80211

Signed, sealed and delivered by **BitWealth Holdings LLC**

By: ~~Matt Goettsche~~ Gavin Dickson

Its: ~~Managing Member~~ Co - President

Address:   321  Greenleaf  Glen  St.,  Henderson,  NV
               89014; 360 W. Broadway, Ste. 100, Salt Lake
               City, UT 84101

Witness: _____

Witness Address: __8483 Robidoux Road__
                        Sandy, UT 84093

ATTACHMENT E

**Proprietary Marks in the Territory**

| Trade mark | Classes | Registration Date (note that the last two Trade Marks are pending registration) | Trade Mark number | Country |
|---|---|---|---|---|
| WORD: LITTLE CAESARS | 32 | 25 August 1987 | 471478 | Australia |
| WORD: LITTLE CAESARS | 30 | 25 August 1987 | 471479 | Australia |
| WORD: LITTLE CAESARS | 29 | 25 August 1987 | 471480 | Australia |
| WORD: LITTLE CAESARS | 42 | 18 November 1993 | 616524 | Australia |
| WORD: LITTLE CAESARS | 30, 43 | 2 May 2013 | 1555345 | Australia |
| WORD: LITTLE CAESARS | 29 | 14 October 2014 | 1652315 | Australia |
| WORD: HOT-N-READY | 30, 43 | 2 May 2013 | 1555346 | Australia |
| DEVICE: PERSON, ROMAN CARTOON EATING PIZZA, HOLDING SPEAR  | 30, 43 | 2 May 2013 | 1555347 | Australia |
| COMPOSITE SERIES: WORD: LITTLE CAESARS IMAGE: | 30, 43 | 2 May 2013 | 1555348 | Australia |

| Trade mark | Classes | Registration Date (note that the last two Trade Marks are pending registration) | Trade Mark number | Country |
|---|---|---|---|---|
| PERSON, ROMAN CARTOON EATING PIZZA, HOLDING SPEAR | | | | |
| COMPOSITE:<br><br>WORD:<br>LITTLE CAESARS PIZZA! PIZZA!<br><br>IMAGE:<br>PERSON, ROMAN CARTOON EATING PIZZA, HOLDING SPEAR | 30, 43 | 2 May 2013 | 1555349 | Australia |
| COMPOSITE:<br><br>WORD:<br>HOT-N-READY PIZZA<br><br>IMAGE:<br>WORD IN OVAL | 30, 43 | 2 May 2013 | 1555350 | Australia |
| WORD:<br>CRAZY BREAD | 30, 43 | 2 May 2013 | 1555351 | Australia |
| WORD:<br>HOT-N-READY | 43 | 9 December 2004 | 1033758 | Australia |
| COMPOSITE: | 30, 42 | 16 December | 751221 | Australia |

| Trade mark | Classes | Registration Date (note that the last two Trade Marks are pending registration) | Trade Mark number | Country |
|---|---|---|---|---|
| WORD:<br>LITTLE CAESARS<br><br>IMAGE:<br>PERSON, ROMAN CARTOON EATING PIZZA, HOLDING SPEAR<br><br>LITTLE CAESARS | | 1997 | | |
| DEVICE:<br>MAN, ROMAN CARTOON EATING & HOLDING SPEAR IN CIRCLE<br> | 29 | 27 August 1987 | 471674 | Australia |
| DEVICE:<br>MAN, ROMAN CARTOON EATING & HOLDING SPEAR IN CIRCLE<br> | 30 | 27 August 1987 | 471673 | Australia |
| DEVICE:<br>MAN, ROMAN CARTOON EATING & HOLDING SPEAR IN CIRCLE | 32 | 27 August 1987 | 471672 | Australia |

| Trade mark | Classes | Registration Date (note that the last two Trade Marks are pending registration) | Trade Mark number | Country |
|---|---|---|---|---|
|  | | | | |
| DEVICE: MAN, ROMAN CARTOON EATING & HOLDING SPEAR IN CIRCLE  | 42 | 27 August 1987 | 471671 | Australia |
| WORD: LITTLE CAESARS PIZZA! PIZZA! | 30, 42 | 12 August 1996 | 714824 | Australia |
| DEVICE SERIES:  | 30, 43 | Not applicable  Status: Pending (awaiting examination) | 1930424 | Australia |
| DEVICE SERIES: Little Caesars Little Caesars | 30, 43 | Not applicable  Status: Pending (awaiting examination) | 1930425 | Australia |

**ATTACHMENT F**

**Confidentiality and Non-Competition Agreement**

In consideration of my position as ___Director___ of Evo Pizza Pty Limited ("**Franchisee**"), and One U.S. Dollar (US$1.00), receipt of which is acknowledged, I hereby acknowledge and agree that:

1.       **LC Trademarks, Inc.** ("**LCT**"), has developed and owns a distinctive format and system relating to the establishment and operation of Little Caesar's restaurants that feature, among other things, a variety of pizza, pasta, and other items prepared in accordance with LCT's proprietary formula, recipes and accompaniments (the "**System**").  The System is identified by means of certain trademarks, trade names, logos, emblems, and indicia of origin as may be designated by LCT in writing for use in connection with the System (the "**Proprietary Marks**").

2.       As an officer, director, partner, member, manager, or holder of any beneficial interest in Franchisee, I will receive valuable confidential information, trade secrets, knowledge, know-how and techniques concerning the System and the methods of operation of Franchisee's Little Caesar's restaurants (the "**Restaurants**"), including, without limitation, information regarding the operational, sales, promotional and marketing methods and techniques of LCT and the System, which are beyond the present skills and experience possessed by me ("**Confidential Information**"), disclosure of which would be detrimental to LCT and Franchisee.

3.       I will hold in strict confidence all Confidential Information, which shall include, but not be limited to, any information designated by LCT as confidential.  Unless LCT otherwise agrees in writing, I will disclose and/or use the Confidential Information only in connection with my duties or role with Franchisee.  My undertaking not to disclose Confidential Information is a condition of my position with Franchisee, and continues even after I cease to be in that position.

4.       While in my position with Franchisee, I will not, either directly or indirectly, for myself or through, on behalf of, or in conjunction with any person or legal entity:  (a) divert or attempt to divert any business or customer of any Little Caesar's restaurant to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks and the System; or (b) own, maintain, operate, engage in, be employed by, consult with, or have any interest in the development or operation of a Competing Business (as defined in Paragraph 6 below).

5.       For a continuous uninterrupted period of two (2) years from the last date of my association with Franchisee, I will not, either directly or indirectly, for myself or through, on behalf of, or in conjunction with any person or legal entity, own, maintain, operate, lease to, engage in, be employed by, consult with, or have any interest whatsoever in any Competing Business (as defined in Paragraph 6 below) which business is, or is intended to be, located either: (a) within the Territory; (b) within ten (10) kilometres of the Territory; or (c) within ten (10) kilometres of the Approved Location of any Restaurant or other Little Caesar's restaurant then-operating either within the Territory or within the country in which the Territory is located.

6.       For the purpose of this Agreement, the term "**Competing Business**" is agreed to mean a business that offers a quick or fast service restaurant not affiliated with the System engaged in the sale of pizza, pasta, sandwiches, chicken wings, bread and/or other products that are similar to the products sold in Little Caesar's restaurants.

7.       LCT is a third party beneficiary of this Agreement and may enforce it, solely and/or jointly with Franchisee.  I am aware that my violation of this Agreement will cause LCT and Franchisee irreparable harm; therefore, I acknowledge and agree that LCT and/or Franchisee may apply for the issuance of an injunction preventing me from violating this Agreement in addition to any other remedies it may have hereunder, at law or in equity; and I agree to pay LCT and Franchisee all the costs it/they incur/s, including without limitation attorneys' fees, if this Agreement is enforced against me.  Due to the

importance of this Agreement to LCT and Franchisee, any claim I have against LCT or Franchisee is a separate matter and does not entitle me to violate, or justify any violation of, this Agreement. If any part of this Agreement is held invalid by a court or agency having valid jurisdiction, the rest of the Agreement is still enforceable and the part held invalid is enforceable to the extent found reasonable by the court or agency. I agree that all the words and phrases used in this Agreement will have the same meaning as used in the International Multiple Unit Franchise Agreement entered into between LCT and Franchisee, and that such meaning has been explained to me.

8.    LCT may, in its sole discretion, reduce the scope of any covenant set forth in this Agreement, without my consent, effective immediately upon my receipt of written notice thereof; and I agree to comply with any covenant as so modified.

9.    This Agreement shall be construed under the laws of the Territory. The only way this Agreement can be changed is in a writing signed by both Franchisee and me.

IN WITNESS WHEREOF, the undersigned has signed this Confidentiality and Non-Competition Agreement, effective as of this 13th day of August, 2018.

INDIVIDUAL:

Signature: _Ernest koury_

Printed Name: Ernest Koury

Title: Director

Address: 4C Wolseley Grove Zetland, NSW 2017

Date: 8/9/2018

LC TRADEMARKS, INC.

By: _____

Printed Name: Erin Martin

Title: Authorized Agent

**ATTACHMENT G**

**Index to Defined Terms**

The following index to the defined terms used in the Agreement is provided solely for the convenience of reference.  This index is not meant to (and shall not) amend or modify the Agreement.

| Term | Section in Agreement |
|---|---|
| Accounting Period | 4.5 |
| Agreement | 1st para. of the Agreement |
| Annual Minimum | 4.6 |
| Anti-Terrorism Laws | 14.9.1.1 |
| Approved Location | 1.3 |
| Code | 15.1.1.5 |
| Competing Business | 14.2 |
| Computer System | 12.10.1.1 |
| Computer Upgrades | 12.10.2 |
| Confidential Information | 9.1 |
| Designated Supplier | 5.12 |
| Designated Distributor | 5.12 |
| Development Schedule | 1.8.1 |
| Development Rights | 1.1.1 |
| Development Rights Fee | 4.2 |
| Effective Date | 1st para. of the Agreement |
| Executive Order 13224 | 14.9.1.1 |
| Existing Restaurants | Recitals |
| Extranet | 12.10.6 |
| FCPA | 14.8 |
| Food Products | Recitals |
| Franchisee | 1st para. of the Agreement |
| GAF | 4.4 |
| Governing Documents | 13.8 |
| Gross Sales | 4.7 |
| Guarantors | Recitals |
| ICC | 23.3 |
| Indemnified Parties | 18.4 |
| Initial Term | 7.2 |
| LCT | 1st para. of the Agreement |
| LCE | Recitals |
| LCT | Recitals |
| Manual | 3.6 |
| Master Trainer | 5.5 |
| NAF | 4.4 |
| New Developments | 5.20 |
| New Restaurants | Recitals |
| Networking Media Websites | 12.10.8 |
| Operating Rights | 1.1.2 |
| Owner | 14.9.1.2 |
| POS System | 5.16 |
| Prior Agreement | Recitals |
| Privacy Laws | 12.10.5.1 |
| Proprietary Food Products | Recitals |
| Proprietary Marks | Recitals |
| Prototype Plans | 3.2 |
| Publicly-Traded Entity | 13.3.1 |

QA Representative...........................................................................................................5.11.4
RAF ...............................................................................................................................4.4
Required Software ......................................................................................................12.10.1.2
Renewal Term..................................................................................................................7.2
Restaurant Addendum ...................................................................................................1.1.2
Restaurant Radius Restriction .........................................................................................1.5
Restaurants.................................................................................................................Recitals
Restraint Period ............................................................................................................14.3.3
ROFO Period ................................................................................................................1.1.4
ROFO Right .................................................................................................................1.1.4
Site Approval Package...................................................................................................5.2.1.1
SDN List .......................................................................................................................14.9.2
Special Limited Access Facilities .....................................................................................1.6.4
Specially Trained Management Employees .......................................................................5.5.3
Standby L/C ...................................................................................................................5.24
Statement of Solvency.....................................................................................................10.7.1
Store Franchise Fee........................................................................................................4.1
System .......................................................................................................................Recitals
Territory .....................................................................................................................Recitals
Trademark User Agreement ............................................................................................6.2.9
UCT Qualification .............................................................................................................1.14
Vending Machines..........................................................................................................5.10.5
Website .......................................................................................................................12.10.8

LC Trademarks, Inc.
International Multiple Unit Franchise Agreement – August 2018   70
Doc ID 577428443/v1

Attachment H

List of Existing Restaurants

| Store Number | Address | Opening Date | Initial Term Expiration Date |
|---|---|---|---|
| 4136-0001 | Casula, 3 Graham Avenue, Casula, NSW 2170 | October 02, 2014 | October 1, 2024 |
| 4136-0002 | Shop 9 Parkside Plaza 4-6 Wandella Road, Miranda, NSW 2228 | December 27, 2016 | December 26, 2026 |
| 4136-0003 | 111 George Street, Parramatta, NSW, 2228 | September 19, 2016 | September 18, 2026 |
| 4136-0004 | 137 Marion Street, Leichhardt, NSW, 2040 | January 23, 2017 | January 22, 2027 |
| 4136-0005 | Shop 10, 2 Birmingham Road, South Penrith, NSW, 2750 | November 13, 2017 | November 12, 2027 |
| 4136-0007 | 20 Sale Str4eet, Orange, NSW, 2800 | July 30, 2018 | July 29, 2028 |
| 4136-0008 | Shop 3 A Bradbury Shopping Villa, Bradbury, NSW, 2560 | January 29, 2018 | January 28, 2028 |
| 4136-0010 | ½ Blamey Street, Revesby, NSW, 2212 | June 25, 2018 | June 24, 2028 |
| 4136-0012 | 684 Hunter Street, Newcastle, NSW, 2302 | July 16, 2018 | July 15, 2028 |

**Attachment I**

**List of Guarantors**

1. Ernest Koury
2. Sandra Koury
3. G. Omar Koury
4. Gina Koury
5. Afifi Koury
6. Dr. Thomas B. Roshek III
7. Dr. Tara Michelle Du Val
8. Matthew Goettsche
9. Danielle Goettsche
10. Gavin Dickson
11. Bitwealth Holdings LLC
12. VM3G Family Trust
13. Victorious Foods, LLC

**Attachment J**

**Form of General Release**

This **RELEASE** (the "**Release**") is effective as of the 13th day of Aug, 2018 by

(i)     Evo Pizza Pty Limited, an Australian Proprietary Company organized under the laws of the Commonwealth of Australia (the "**Franchisee**");

(ii)    Victorious Foods, LLC, a Nevada limited liability company; and

(iii)   Ernest Koury, an individual, G. Omar Koury, an individual, and Afifi Koury, an individual,

each of whom is or was a party to, and/or a guarantor of, that certain International Multiple Unit Franchise Agreement, dated February 1, 2014, between the Franchisee and LC Trademarks, Inc. ("LCT") (as amended, modified and supplemented from time to time, the "**Prior Agreement**"), under which LCT granted the undersigned certain rights to develop and operate Little Caesars® restaurants ("**Restaurants**") in the State of New South Wales in the Commonwealth of Australia.

    **WHEREAS**, each of the undersigned and LCT desires to replace the Prior Agreement and enter into a new Multiple Unit Franchise Agreement, dated the date hereof, between the Franchisee and LCT (the "**New Agreement**"), along with each Guarantor (as defined in the New Agreement) entering into the Guarantee, Indemnification, and Acknowledgement (attached to the New Agreement);

    **NOW THEREFORE**, each of the undersigned, jointly and severally, for itself and on behalf of its successors, assigns, heirs, personal representatives, and all other persons acting on its behalf or claiming under it, hereby releases and forever discharges LCT, its affiliates, and their respective past, present and future officers, directors, shareholders, employees, parents, subsidiaries, affiliates, successors, assigns, agents, legal representatives, attorneys, accountants, and insurers from any and all claims, debts, liabilities, demands, obligations, promises, agreements, controversies, judgments, costs, expenses, suits, actions, and causes of action, of whatever nature, known or unknown, suspected or unsuspected, vested or contingent, that the undersigned ever had, now have, or may in the future have, arising out of or relating to the Prior Agreement, or the development or operation of the Restaurants (as defined in the Prior Agreement) before the date of this Release.

[signature page follows]

**IN WITNESS WHEREOF**, the undersigned have executed this Release as of the day, month and year first above written.

**EVO PIZZA PTY LIMITED**

By: _Ernest Koury_
        FCEFE8B84435457

Printed Name: _Ernest Koury_

Title: _Director_


**VICTORIOUS FOODS, LLC**

By: _Omar Koury_
        529AC3C79DD247A

Printed Name: _G. Omar Koury_

Title: _Manager_


**Individuals:**

Signed: _Ernest Koury_
              FCEFE8B84435457

Printed Name: _Ernest Koury_

Home Address: _4C Wolseley Grove_

_Zetland, NSW 2017_

Signed: _Omar Koury_
              529AC3C79DD247A.

Printed Name: _G. Omar Koury_

Home Address: _11 Paradise Valley Ct_

_Henderson, NV 89052_

Signed: _Afifi Koury_
              357AF549E1B34B7

Printed Name: _Afifi Koury_

Home Address: _348 roland falls lane_

_las vegas nv 89183_

**Attachment K**
**Existing Restaurant Addenda**

**[See attached]**

Restaurant Addendum
4136-0001

**1. Restaurant Address:**

Casula, 3 Graham Avenue

Casula, NSW 2170

Telephone:

Facsimile:

**2. Opening Date:**

October 2, 2014

**3. Store Franchise Fee:**

US$

By their signatures below, the parties agree that they will abide by the terms and conditions of the International Multiple Unit Franchise Agreement dated _Aug. 13_, 2018 (the "**Franchise Agreement**") by and between LC Trademarks, Inc. ("**LCT**") and Evo Pizza Pty Limited ("**Franchisee**") with respect to the Restaurant to be operated at the above-referenced location, and pay the Store Franchise Fee set forth above. By its authorized signature below, LCT hereby grants approval for Franchisee to establish a Restaurant at the location referenced above, and Franchisee agrees to operate a Restaurant at that location, all in accordance with the terms of the Franchise Agreement.

IN WITNESS WHEREOF, the parties hereto have duly signed and delivered this Restaurant Addendum on the dates written below.

WITNESS/ATTEST:

_Terri Bunch_

WITNESS/ATTEST:

DocuSigned by:
_Hal Katz_
AF3E3E7202B34F0...

**LC TRADEMARKS, INC.**

By: _[signature]_

Printed Name: _Erin Martin_

Title: _Authorized Agent_

Date: _August 13, 2018_

**EVO PIZZA PTY LIMITED**

DocuSigned by:
_Ernest Koury_
FCEFE88B4435457...

By: 

Printed Name: Ernest Koury

Title: Director

Date: 8/9/2018

**Restaurant Addendum**
**4136-0002**

**1. Restaurant Address:**

Shop 9 Parkside Plaza 4-6

Miranda, NSW 2228

Telephone:

Facsimile:

**2. Opening Date:**

December 27, 2016

**3. Store Franchise Fee:**

US$

By their signatures below, the parties agree that they will abide by the terms and conditions of the International Multiple Unit Franchise Agreement dated _Aug. 13_, 2018 (the "**Franchise Agreement**") by and between LC Trademarks, Inc. ("**LCT**") and Evo Pizza Pty Limited ("**Franchisee**") with respect to the Restaurant to be operated at the above-referenced location, and pay the Store Franchise Fee set forth above. By its authorized signature below, LCT hereby grants approval for Franchisee to establish a Restaurant at the location referenced above, and Franchisee agrees to operate a Restaurant at that location, all in accordance with the terms of the Franchise Agreement.

IN WITNESS WHEREOF, the parties hereto have duly signed and delivered this Restaurant Addendum on the dates written below.

WITNESS/ATTEST:

Terri Bunch

WITNESS/ATTEST:

Hal Katz
AF3E3E7202B34F0...

**LC TRADEMARKS, INC.**

By: _____
Printed Name: _Erin Martin_
Title: _Authorized Agent_
Date: _August 13, 2018._

**EVO PIZZA PTY LIMITED**

By: Ernest Koury
FCEFE8B6443517...
Printed Name: Ernest Koury
Title: Director
Date: 8/9/2018

**Restaurant Addendum**
**4136-0003**

**1. Restaurant Address:**

111 George Street

Parramatta, NSW 2228

Telephone:

Facsimile:

**2. Opening Date:**

September 19, 2016

**3. Store Franchise Fee:**

US$

By their signatures below, the parties agree that they will abide by the terms and conditions of the International Multiple Unit Franchise Agreement dated *Aug. 13*, 2018 (the "**Franchise Agreement**") by and between LC Trademarks, Inc. ("**LCT**") and Evo Pizza Pty Limited ("**Franchisee**") with respect to the Restaurant to be operated at the above-referenced location, and pay the Store Franchise Fee set forth above. By its authorized signature below, LCT hereby grants approval for Franchisee to establish a Restaurant at the location referenced above, and Franchisee agrees to operate a Restaurant at that location, all in accordance with the terms of the Franchise Agreement.

IN WITNESS WHEREOF, the parties hereto have duly signed and delivered this Restaurant Addendum on the dates written below.

WITNESS/ATTEST:

*Terri Bunch.*

WITNESS/ATTEST:

*Hal Katz*
AF3E3E7202B34F0...

**LC TRADEMARKS, INC.**

By:

Printed Name: *Erin Martin*

Title: *Authorized Agent*

Date: *August 13, 2018*

**EVO PIZZA PTY LIMITED**

By: *Ernest Koury*
FCEFE8B0449949F...

Printed Name: Ernest Koury

Title: Director

Date: 8/9/2018

**Restaurant Addendum**
**4136-0004**

**1. Restaurant Address:**

137 Marion Street

Leichhardt, NSW 2040

Telephone:

Facsimile:

**2. Opening Date:**

January 23, 2017

**3. Store Franchise Fee:**

US$

By their signatures below, the parties agree that they will abide by the terms and conditions of the International Multiple Unit Franchise Agreement dated _Aug. 13_, 2018 (the "**Franchise Agreement**") by and between LC Trademarks, Inc. ("**LCT**") and Evo Pizza Pty Limited ("**Franchisee**") with respect to the Restaurant to be operated at the above-referenced location, and pay the Store Franchise Fee set forth above. By its authorized signature below, LCT hereby grants approval for Franchisee to establish a Restaurant at the location referenced above, and Franchisee agrees to operate a Restaurant at that location, all in accordance with the terms of the Franchise Agreement.

IN WITNESS WHEREOF, the parties hereto have duly signed and delivered this Restaurant Addendum on the dates written below.

WITNESS/ATTEST:

_Jessi Bunch._

WITNESS/ATTEST:

Hal Katz
AF3E3EF202B34F6...

**LC TRADEMARKS, INC.**

By: _____

Printed Name: _Erin Martin_

Title: _Authorized Agent_

Date: _August 13, 2018._

**EVO PIZZA PTY LIMITED**

By: Ernest Koury
FCEFE88D6435B97...

Printed Name: Ernest Koury

Title: Director

Date: 8/9/2018

**Restaurant Addendum**
**4136-0005**

**1. Restaurant Address:**

_____ Shop 10, 2 Birmingham Road _____

_____ South Penrith, NSW 2750 _____

_____

Telephone: _____

Facsimile: _____

**2. Opening Date:**

_____ November 13, 2017 _____

**3. Store Franchise Fee:**

US$ _____

By their signatures below, the parties agree that they will abide by the terms and conditions of the International Multiple Unit Franchise Agreement dated _Aug. 13_ , 2018 (the "**Franchise Agreement**") by and between LC Trademarks, Inc. ("**LCT**") and Evo Pizza Pty Limited ("**Franchisee**") with respect to the Restaurant to be operated at the above-referenced location, and pay the Store Franchise Fee set forth above. By its authorized signature below, LCT hereby grants approval for Franchisee to establish a Restaurant at the location referenced above, and Franchisee agrees to operate a Restaurant at that location, all in accordance with the terms of the Franchise Agreement.

IN WITNESS WHEREOF, the parties hereto have duly signed and delivered this Restaurant Addendum on the dates written below.

WITNESS/ATTEST:

_Jerri Bunch_

LC TRADEMARKS, INC.

By: _____

Printed Name: _Erin Martin_

Title: _Authorized Agent_

Date: _August 13, 2018_

WITNESS/ATTEST:

DocuSigned by:
_Hal Katz_
AF2E3E7202B34F6...

EVO PIZZA PTY LIMITED

DocuSigned by:
_Ernest Koury_
FCEFE8804...

By: _____

Printed Name: Ernest Koury

Title: Director

Date: 8/9/2018

Restaurant Addendum
4136-0007

**1.  Restaurant Address:**

20 Sale Street

Orange, NSW 2800

Telephone: _____

Facsimile: _____

**2.  Opening Date:**

July 30, 2018

**3.  Store Franchise Fee:**

US$ _____

By their signatures below, the parties agree that they will abide by the terms and conditions of the International Multiple Unit Franchise Agreement dated _Aug 13_ , 2018 (the "**Franchise Agreement**") by and between LC Trademarks, Inc. ("**LCT**") and Evo Pizza Pty Limited ("**Franchisee**") with respect to the Restaurant to be operated at the above-referenced location, and pay the Store Franchise Fee set forth above.  By its authorized signature below, LCT hereby grants approval for Franchisee to establish a Restaurant at the location referenced above, and Franchisee agrees to operate a Restaurant at that location, all in accordance with the terms of the Franchise Agreement.

IN WITNESS WHEREOF, the parties hereto have duly signed and delivered this Restaurant Addendum on the dates written below.

WITNESS/ATTEST:

_Terri Bunch_

**LC TRADEMARKS, INC.**

By: _____

Printed Name: _Erin Martin_

Title: _Authorized Agent_

Date: _August 13, 2018_

WITNESS/ATTEST:

DocuSigned by:
_Hal Beaty_
AF9E9E7202694F6...

**EVO PIZZA PTY LIMITED**

DocuSigned by:
_Ernest Koury_
FCEFE8904334437...

By: _____

Printed Name: Ernest Koury

Title: Director

Date: 8/15/2018

**Restaurant Addendum**
**4136-0008**

**1. Restaurant Address:**

    Shop 3, Bradbury Shopping Villa

    Bradbury, NSW 2560

Telephone: _____

Facsimile: _____

**2. Opening Date:**

    January 29, 2018

**3. Store Franchise Fee:**

US$ _____

    By their signatures below, the parties agree that they will abide by the terms and conditions of the International Multiple Unit Franchise Agreement dated _Aug 13_, 2018 (the "**Franchise Agreement**") by and between LC Trademarks, Inc. ("**LCT**") and Evo Pizza Pty Limited ("**Franchisee**") with respect to the Restaurant to be operated at the above-referenced location, and pay the Store Franchise Fee set forth above.  By its authorized signature below, LCT hereby grants approval for Franchisee to establish a Restaurant at the location referenced above, and Franchisee agrees to operate a Restaurant at that location, all in accordance with the terms of the Franchise Agreement.

IN WITNESS WHEREOF, the parties hereto have duly signed and delivered this Restaurant Addendum on the dates written below.

WITNESS/ATTEST:

_Jessi Bunch_

WITNESS/ATTEST:

DocuSigned by:
_Hal Katz_
AF3E5EF202E84F0...

**LC TRADEMARKS, INC.**

By: _____

Printed Name: _Erin Martin_

Title: _Authorized Agent_

Date: _August 13, 2018_

**EVO PIZZA PTY LIMITED**

DocuSigned by:
_Ernest Koury_

By: _____
FCEFEBBG443507...

Printed Name: _Ernest Koury_

Title: Director

Date: 8/15/2018

**Restaurant Addendum**
**4136-0010**

**1.  Restaurant Address:**

_____ ½ Blamey Street _____

_____ Revesby, NSW 2212 _____

_____

Telephone: _____

Facsimile: _____

**2.  Opening Date:**

_____ June 25, 2018 _____

**3.  Store Franchise Fee:**

US$ _____

By their signatures below, the parties agree that they will abide by the terms and conditions of the International Multiple Unit Franchise Agreement dated _Aug. 13_____, 2018 (the "**Franchise Agreement**") by and between LC Trademarks, Inc. ("**LCT**") and Evo Pizza Pty Limited ("**Franchisee**") with respect to the Restaurant to be operated at the above-referenced location, and pay the Store Franchise Fee set forth above.   By its authorized signature below, LCT hereby grants approval for Franchisee to establish a Restaurant at the location referenced above, and Franchisee agrees to operate a Restaurant at that location, all in accordance with the terms of the Franchise Agreement.

IN WITNESS WHEREOF, the parties hereto have duly signed and delivered this Restaurant Addendum on the dates written below.

WITNESS/ATTEST:

_Jessi Bunch._

**LC TRADEMARKS, INC.**

By: _____

Printed Name: _Erin Martin_____

Title: _Authorized Agent._____

Date: _August 13, 2018._____

WITNESS/ATTEST:

DocuSigned by:
_Hal Katz_
AF3E3E7203034F0...

**EVO PIZZA PTY LIMITED**

DocuSigned by:
_Ernest Koury_
FCEFC8D64435457...

By: _____
      Ernest Koury

Printed Name: _____

Title:   Director _____

Date: 8/15/2018 _____

**Restaurant Addendum**
**4136-0012**

**1.  Restaurant Address:**

_____684 Hunter Street_____

_____Newcastle, NSW 2302_____

_____

Telephone: _____

Facsimile: _____

**2. Opening Date:**

_____July 16, 2018_____

**3. Store Franchise Fee:**

US$ _____

By their signatures below, the parties agree that they will abide by the terms and conditions of the International Multiple Unit Franchise Agreement dated Aug. 13 , 2018 (the "**Franchise Agreement**") by and between LC Trademarks, Inc. ("**LCT**") and Evo Pizza Pty Limited ("**Franchisee**") with respect to the Restaurant to be operated at the above-referenced location, and pay the Store Franchise Fee set forth above.   By its authorized signature below, LCT hereby grants approval for Franchisee to establish a Restaurant at the location referenced above, and Franchisee agrees to operate a Restaurant at that location, all in accordance with the terms of the Franchise Agreement.

IN WITNESS WHEREOF, the parties hereto have duly signed and delivered this Restaurant Addendum on the dates written below.

WITNESS/ATTEST:

_Jerri Bunch._

**LC TRADEMARKS, INC.**

By: _____

Printed Name: _Erin Martin_

Title: _Authorized Agent._

Date: _August 13, 2018._

WITNESS/ATTEST:

DocuSigned by:
_Hal Katz_
AF3E3E7202B34F0...

**EVO PIZZA PTY LIMITED**

DocuSigned by:
_Ernest Koury_
FC6FEEB0445940F...

By: _____

Printed Name: Ernest Koury

Title: Director

Date: 8/15/2018

# EXHIBIT D

## PERSONAL GUARANTY

ATTACHMENT D

### Deed of Guarantee, Indemnification, and Acknowledgment ("Guarantee")

As an inducement to LC Trademarks, Inc. ("**LCT**"), to execute the International Multiple Unit Franchise Agreement between LCT and Evo Pizza Pty Limited ("**Franchisee**"), dated ___August 13, 2018___ (the "**Agreement**"), the undersigned, jointly and severally, hereby unconditionally guarantee that all of Franchisee's obligations to LCT and its affiliates, including under the Agreement and obligations to LCT's affiliate Blue Line Foodservice Distribution Inc., will be punctually paid and performed (the "**Obligations**").

Upon demand by LCT, the undersigned will immediately make each payment required of Franchisee under the Obligations. The undersigned hereby waive any right to require LCT to: (a) proceed against Franchisee for any payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee; or (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee. Without affecting the obligations of the undersigned under this Guarantee, LCT may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee. The undersigned waive notice of amendment of the Agreement and notice of demand for payment by Franchisee, and agree to be bound by any and all such amendments and changes to the Agreement.

The undersigned hereby agree to defend, indemnify and hold LCT harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorneys' fees, reasonable costs of investigation, court costs, and arbitration fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement, any amendment thereto, any other agreement executed by Franchisee referred to therein, or any other Obligations.

The undersigned hereby acknowledge and agree to be individually bound by all of the covenants and terms contained in the Agreement, including, without limitation, those contained in Sections 6, 9, 13, 14, 16, and 23 of the Agreement; however, nothing in this Guarantee shall afford the undersigned the right to exercise any of Franchisee's rights under the Agreement. The undersigned specifically acknowledge and agree that they shall be individually bound by such covenants and terms that apply to "Franchisee" in such sections of the Agreement as if the undersigned were named personally in such provisions. In addition to the foregoing, with regard to the Confidential Information defined in Section 9.1, if any of the undersigned is a corporate entity, such entity specifically acknowledges and agrees that it shall not disclose any Confidential Information to its shareholders, either individually or collectively, and either directly or indirectly, including, but not limited to, by disclosing such Confidential Information in its annual report to shareholders.

This Guarantee shall terminate upon the termination or expiration of the Agreement, except that all obligations and liabilities of the undersigned which arose from events which occurred on or before the effective date of such termination shall remain in full force and effect until satisfied or discharged by the undersigned, and all covenants which by their terms continue in force after the expiration or termination of the Agreement shall remain in force according to their terms. Upon the death of an individual guarantor, the estate of such guarantor shall be bound by this Guarantee, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

Unless specifically stated otherwise, the terms used in this Guarantee shall have the same meaning as in the Agreement, and shall be interpreted and construed in accordance with Section 23 of the Agreement. However, in recognition that most of the undersigned are domiciled in and executing this Guarantee in the United States of America, if LCT elects to commence any action, litigation or proceeding of any kind whatsoever against the undersigned in any way arising from or relating to this Guarantee and

all contemplated transactions, the undersigned agrees to submit to the federal courts sitting in Detroit, Michigan or, if such court does not have subject matter jurisdiction, the courts of the State of Michigan sitting in Wayne County, and the courts competent to determine appeals from those courts, and in such instances, this Guarantee shall be interpreted and construed under the laws of the State of Michigan, U.S.A. (excluding any applicable choice of law rules, which shall not be applied).

**The undersigned represent and warrant that they have full power and** authority to execute, deliver and perform this Guarantee, and that neither the execution, delivery nor performance of this Guarantee will violate any law or regulation, or any order or decree of any court or governmental authority, or will conflict with, or result in the breach of, or constitute a default under, any agreement or other instrument to which they are a party or by which the undersigned may be bound, or will result in the creation or imposition of any lien, claim or encumbrance upon any property of the undersigned.

IN WITNESS WHEREOF, the undersigned have signed this Guarantee as a deed as of the date of the Agreement.

## GUARANTORS:

Signed, sealed and delivered by **Ernest Koury**, Individually

Signed: _____

Printed Name: ᴇʀɴᴇѕᴛ ᴋᴏᴜʀʏ

Address: 4C Wolseley Grove, Zetland, NSW 2017

Witness: _____

Witness Address: 40 WOLSELEY GROVE ZETLAND 2017

Signed, sealed and delivered by **Sandra Koury**, Individually

Signed: _____

Printed Name: Sandra Koury

Address: 4C Wolseley Grove, Zetland, NSW 2017

Witness: _____

Witness Address: 4A WOLSEBEY GROVE ZETLAND 2017

Signed, sealed and delivered by **G. Omar Koury**, Individually

Signed: _____

Printed Name: _____

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness: _____

Witness Address: _____

Signed, sealed and delivered by **Gina Koury**, Individually

Signed: _____

Printed Name: _____

: 11 Paradise Valley Ct., Henderson, NV 89052

Witness: _____

Witness Address: _____

*[Additional Signature Pages Follow]*

all contemplated transactions, the undersigned agrees to submit to the federal courts sitting in Detroit, Michigan or, if such court does not have subject matter jurisdiction, the courts of the State of Michigan sitting in Wayne County, and the courts competent to determine appeals from those courts, and in such instances, this Guarantee shall be interpreted and construed under the laws of the State of Michigan, U.S.A. (excluding any applicable choice of law rules, which shall not be applied).

**The undersigned represent and warrant that they have full power and** authority to execute, deliver and perform this Guarantee, and that neither the execution, delivery nor performance of this Guarantee will violate any law or regulation, or any order or decree of any court or governmental authority, or will conflict with, or result in the breach of, or constitute a default under, any agreement or other instrument to which they are a party or by which the undersigned may be bound, or will result in the creation or imposition of any lien, claim or encumbrance upon any property of the undersigned.

IN WITNESS WHEREOF, the undersigned have signed this Guarantee as a deed as of the date of the Agreement.

## GUARANTORS:

Signed, sealed and delivered by **Ernest Koury**, Individually

Signed: _____

Printed Name: _____

Address: 4C Wolseley Grove, Zetland, NSW 2017

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **Sandra Koury**, Individually

Signed: _____

Printed Name: _____

Address: 4C Wolseley Grove, Zetland, NSW 2017

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **G. Omar Koury**, Individually

Signed: _~~_CC_~~_____

Printed Name: GEORGE OMAR KOURY

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness: _Jessica Stay_

Witness Address: 9691 Pictou Ct. Las Vegas NV 89148


Signed, sealed and delivered by **Gina Koury**, Individually

Signed: Gina Renee Koury

Printed Name: GINA RENEE KOURY

: 11 Paradise Valley Ct., Henderson, NV 89052

Witness: Kathy U. S

Witness Address: 2144 Fort Holiday St Henderson NV 89052


*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Afifi Koury**, Individually

Signed: _Afif. Koury_

Printed Name: _AFIFI KOURY_

Address: 348 Roland Falls Ln., Las Vegas, NV 89183

Witness: _Alfs ny_

Witness Address: _737 EVEREST PEAK AVE, HENDERSON NV 89012_

---

Signed, sealed and delivered by **Dr. Thomas B. Roshek III**, Individually

Signed: _____

Printed Name: _____

Address: 7011 Spanky Branch Ct., Dallas, TX 75248

Witness: _____

Witness Address: _____

Signed, sealed and delivered by **Dr. Tara Michelle Du Val**, Individually

Signed: _____

Printed Name: _____

Address: 7011 Spanky Branch Ct., Dallas, TX 75248

Witness: _____

Witness Address: _____

---

Signed, sealed and delivered by **Matthew Goettsche**, Individually

Signed: _____

Printed Name: _____

Address: 80 Rivera Court, Erie, Colorado 80516

Witness: _____

Witness Address: _____

Signed, sealed and delivered by **Danielle Goettsche**, Individually

Signed: _____

Printed Name: _____

Address: 80 Rivera Court, Erie, Colorado 80516

Witness: _____

Witness Address: _____

*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Afifi Koury**, Individually

Signed: ______________________

Printed Name: ______________________

Address: 348 Roland Falls Ln., Las Vegas, NV 89183

Witness: ______________________

Witness Address: ______________________

Signed, sealed and delivered by **Dr. Thomas B. Roshek III**, Individually

Signed: T. Roshek

Printed Name: T. ROSHEK

Address: 7011 Spanky Branch Ct., Dallas, TX 75248

Witness: Jana Haby

Witness Address: 589 Southfork blvd Wylie TX 75098

Signed, sealed and delivered by **Dr. Tara Michelle Du Val**, Individually

Signed: [signature]

Printed Name: Tara DuVal

Address: 7011 Spanky Branch Ct., Dallas, TX 75248

Witness: Jana Haby

Witness Address: 589 Southfork blvd Wylie TX 75098

Signed, sealed and delivered by **Matthew Goettsche**, Individually

Signed: ______________________

Printed Name: ______________________

Address: 80 Rivera Court, Erie, Colorado 80516

Witness: ______________________

Witness Address: ______________________

Signed, sealed and delivered by **Danielle Goettsche**, Individually

Signed: ______________________

Printed Name: ______________________

Address: 80 Rivera Court, Erie, Colorado 80516

Witness: ______________________

Witness Address: ______________________

*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Afifi Koury**, Individually

Signed: _____

Printed Name: _____

Address: 348 Roland Falls Ln., Las Vegas, NV 89183

Witness:_____

Witness Address:_____


| | |
|---|---|
| Signed, sealed and delivered by **Dr. Thomas B. Roshek III**, Individually | Signed, sealed and delivered by **Dr. Tara Michelle Du Val**, Individually |
| Signed: _____ | Signed: _____ |
| Printed Name: _____ | Printed Name: _____ |
| Address: 7011 Spanky Branch Ct., Dallas, TX 75248 | Address: 7011 Spanky Branch Ct., Dallas, TX 75248 |
| Witness:_____ | Witness:_____ |
| Witness Address:_____ | Witness Address:_____ |


| | |
|---|---|
| Signed, sealed and delivered by **Matthew Goettsche**, Individually | Signed, sealed and delivered by **Danielle Goettsche**, Individually |
| Signed: _~~signature~~_ | Signed: _Danielle Goettsche_ |
| Printed Name: _Matthew Goettsche_ | Printed Name: _Danielle Goettsche_ |
| Address: 80 Rivera Court, Erie, Colorado 80516 | Address: 80 Rivera Court, Erie, Colorado 80516 |
| Witness: _Allison Kloek_ | Witness: _Allison Kloek_ |
| Witness Address: _AK_ 2735 W 37th Ave Denver CO 80211 | Witness Address: _2735 W 37th Ave, Denver, CO 80:_ |

*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Gavin Dickson**, Individually

Signed: _____

Printed Name: _Gavin Dickson_

Address:   4604 Summerview Road, Bountiful, UT 84010

Witness: _____

Witness Address: _8483 Robidoux Road Sandy, UT 84093_

| | |
|---|---|
| Signed, sealed and delivered by **VM3G Family Trust** | Signed, sealed and delivered by **VM3G Family Trust** |
| _____ | _____ |
| By:  Omar Koury | By:  Gina Koury |
| Its:  Trustee | Its:  Trustee |
| Address: _11 Paradise Valley Ct., Henderson, NV 89052_ | _11 Paradise Valley Ct., Henderson, NV 89052_ |
| Witness:_____ | Witness:_____ |
| Witness Address:_____ | Witness Address:_____ |
| | |
| Signed, sealed and delivered by **Victorious Foods, LLC** | Signed, sealed and delivered by **Victorious Foods, LLC** |
| _____ | _____ |
| By:  Omar Koury | By:  Ernest Koury |
| Its:  Manager | Its:  Manager |
| Address: _11 Paradise Valley Ct., Henderson, NV 89052_ | _11 Paradise Valley Ct., Henderson, NV 89052_ |
| Witness:_____ | Witness:_____ |
| Witness Address:_____ | Witness Address:_____ |

*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Gavin Dickson**, individually

Signed: _____

Printed Name: _____

Address:    4604 Summerview Road, Bountiful, UT 84010

Witness:_____

Witness Address:_____


Signed, sealed and delivered by **VM3G Family Trust**

By:  Omar Koury

Its:  Trustee

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address: 9691 Pictou Ct, Las Vegas, NV 89148


Signed, sealed and delivered by **VM3G Family Trust**

By:  Gina Koury

Its:  Trustee

11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address: 2144 Fort Ascifano St Henderson, NV 89052


Signed, sealed and delivered by **Victorious Foods, LLC**

By:  Omar Koury

Its:  Manager

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address: 9691 Pictou Ct, Las Vegas, NV 89148


Signed, sealed and delivered by **Victorious Foods, LLC**

_____

By:  Ernest Koury

Its:  Manager

11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address:_____


*[Additional Signature Pages Follow]*

Signed, sealed and delivered by **Gavin Dickson**, Individually

Signed: _____

Printed Name: _____

Address: 4604 Summerview Road, Bountiful, UT 84010

Witness:_____

Witness Address:_____

Signed, sealed and delivered by **VM3G Family Trust**

_____

By: Omar Koury

Its: Trustee

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address:_____

Signed, sealed and delivered by **VM3G Family Trust**

_____

By: Gina Koury

Its: Trustee

11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address:_____

Signed, sealed and delivered by **Victorious Foods, LLC**

_____

By: Omar Koury

Its: Manager

Address: 11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address:_____

Signed, sealed and delivered by **Victorious Foods, LLC**

_____

By: Ernest Koury

Its: Manager

11 Paradise Valley Ct., Henderson, NV 89052

Witness:_____

Witness Address: _4D HOLSLEY GROVE ZETLAND) 2017_

*[Additional Signature Pages Follow]*

LC Trademarks, Inc.
International Multiple Unit Franchise Agreement – 13 August 2018
Doc ID 57742B443/v1

61

Signed, sealed and delivered by **BitWealth Holdings LLC**

By:  Matt Goettsche

Its: Managing Member

Address:  321 Greenleaf Glen St., Henderson, NV
89014; 360 W. Broadway, Ste. 100, Salt Lake
City, UT 84101

Witness: Allison Kloek

Witness Address: 2735 W 27th Ave, Denver, CO 80211

Signed, sealed and delivered by BitWealth Holdings
LLC

By: ~~Matt Goettsche~~ GAVIN DICKSON

Its: ~~Managing Member~~ Co- PRESIDENT

Address: 321 Greenleaf Glen St., Henderson, NV
89014; 360 W. Broadway, Ste. 100, Salt Lake
City, UT 84101

Witness: _____

Witness Address: 8483 ROBIDOUX ROAD
SANDY, UT 84093